**MONIKA Y. LANGARICA** (SBN 308518)(mlangarica@aclusandiego.org)
**JONATHAN MARKOVITZ** (SBN 301767)(jmarkovitz@aclusandiego.org)
**KIMBERLY GRANO** (SBN 328298)(kgrano@aclusandiego.org)
**BARDIS VAKILI** (SBN 247783)(bvakili@aclusandiego.org)
**DAVID LOY** (SBN 229235)(davidloy@aclusandiego.org)
**ACLU FOUNDATION OF SAN DIEGO &
IMPERIAL COUNTIES**
P.O. Box 87131
San Diego, CA 92138-7131
Telephone: (619) 398-4493

Counsel for Plaintiff-Petitioners

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

Adrian RODRIGUEZ ALCANTARA;
Yasmani OSORIO REYNA; Maria Flor
CALDERON LOPEZ; Mary DOE; on behalf
of themselves and all others similarly
situated,

        Plaintiff-Petitioners,

        v.

Gregory J. ARCHAMBEAULT, San Diego
Field Office Director, Immigration and
Customs Enforcement; James DOBSON,
Otay Mesa Detention Center Officer in
Charge, Immigration and Customs
Enforcement; Jesus REYNA, Calexico
Assistant Field Office Director, Immigration
and Customs Enforcement; Christopher J.
LAROSE, Senior Warden, Otay Mesa
Detention Center; Sixto MARRERO,
Facility Administrator, Imperial Regional
Detention Facility; Matthew T. ALBENCE,
Deputy Director and Senior Official
Performing the Duties of the Director of
Immigration and Customs Enforcement;
Chad WOLF, Acting Secretary of Homeland
Security,

        Defendant-Respondents.

Case No.   '20 CV0756 GPC AHG

**COMPLAINT – CLASS
ACTION AND PETITION
FOR WRIT OF HABEAS
CORPUS**

## **INTRODUCTION**

1.     We are in the midst of a global pandemic on a scale not seen for a century. Hundreds of thousands of people have died in a matter of months. The Otay Mesa Detention Center is being ravaged by the largest confirmed outbreak of the Coronavirus Disease 2019 ("COVID-19") of any immigration detention center in the United States. Dozens have been infected and hundreds have been potentially exposed. Without this court's timely intervention, many more people will get sick, many will suffer severe symptoms, and some will die.

2.     This action challenges U.S. Immigration and Customs Enforcement ("ICE")'s continued detention of Plaintiff-Petitioners ("Plaintiffs") and similarly situated people in the midst of the Coronavirus Disease 2019 pandemic, under conditions and population levels that make social distancing impossible and place them at severe risk, in violation of their Fifth Amendment Due Process Rights.

3.     Plaintiffs are people confined in immigration custody at Otay Mesa Detention Center ("Otay Mesa") and Imperial Regional Detention Facility ("Imperial"). Due to the conditions of their confinement, the population levels of the facilities where they are detained, and Defendants' otherwise insufficient response to the pandemic, they are at extraordinary risk of contracting COVID-19. On behalf of themselves and two classes of detained persons – one class  at Otay Mesa and the other at Imperial – they seek immediate release from ICE custody due to the urgent threat to their lives and health posed by COVID-19.

4.     Otay Mesa is now home to the largest confirmed COVID-19 outbreak in any federal immigration detention facility in the entire country, with 27 detainees—18 immigration detainees and nine U.S. Marshals Service detainees—and eight ICE officers confirmed positive as of April 17, 2020, plus more cases among private prison employees.

5.     On March 11, 2020, the World Health Organization declared the global outbreak of COVID-19, the disease caused by a novel coronavirus, a pandemic. Since

CLASS COMPLAINT AND PETITION FOR
WRIT OF HABEAS CORPUS

then, in the span of just over a month, confirmed cases of the disease in the United States surged from a thousand to 746,625 as of April 20, 2020. At least 39,083 of those people have died.

6.      There is no specific treatment, vaccine, or cure for COVID-19, and no one is immune. The only way to prevent the chance of serious illness or death from COVID-19 is to practice scrupulous hygiene and social distancing.

7.      The United States now has the most confirmed COVID-19 cases and deaths in the world, though numbers may be undercounted because access to testing remains limited. California alone has reported almost 30,000 cases, a number that would be much higher if not for early and consistent adoption of social distancing measures.

8.      The COVID-19 pandemic has fundamentally changed most aspects of everyday life, with public and private institutions dramatically altering daily operations. Public health experts and public officials have reiterated that these unprecedented shifts in the way we live will likely last for months.

9.      In contrast, ICE has failed to meaningfully respond to protect the health and safety of people in its custody.

10.     Despite ICE's claims that it has taken appropriate protective measures, outbreaks of COVID-19 at its detention centers have rapidly escalated in the past several weeks. As noted, Otay Mesa, which holds both ICE detainees and criminal detainees for the U.S. Marshals Service, now has the most confirmed cases of COVID-19 among detainees and ICE staff of any ICE facility in the country, with 18 civil immigration detainees and eight ICE officers having tested positive, as well as nine U.S. Marshals Service inmates, ten private detention center employees of CoreCivic, and eight medical staffers as of April 17. This almost certainly undercounts the true number of infections, as ICE has not implemented widespread testing of all detainees and the Centers for Disease Control and Prevention ("CDC")

CLASS COMPLAINT AND PETITION FOR
WRIT OF HABEAS CORPUS

estimate that as many as 25% of those infected by the novel coronavirus may have no symptoms. ICE has tested less than 1% of its detainee population for COVID-19.

11.     Facility staff have failed to take appropriate measures to save lives, even as the number of cases among detainees and staff at Otay Mesa have surged. Plaintiffs and putative class members continue to sleep in barracks-style bunks less than six feet away from each other and are forced to use shared communal dining, bathing, and recreation areas. When a detainee has tested positive, ICE's response has been to keep the dozens of people who were in the same housing unit as that person locked up together for two weeks, though the two-week clock starts again when, inevitably, another detainee from the unit tests positive. This strategy virtually ensures that the virus will spread further within that unit, where detainees are unable to practice social distancing measures. Thus, even those who managed to avoid contracting COVID-19 from contact with an initial confirmed case may be closely confined with others who did but may not yet be symptomatic.

12.     Plaintiffs and other people detained at Otay Mesa and Imperial recount an atmosphere of desperation and fear within the detention centers, as many worry about contracting the virus in detention with no way to protect themselves.

13.     The CDC and other public health experts unanimously advise that the only effective means of limiting transmission of COVID-19 is practicing "social distancing,"' with a recommended minimum of six feet between people and reduced frequency of contact. Although scrupulously maintaining hygiene and frequently disinfecting surfaces is advisable, social distancing is the single most important measure to reduce the spread of disease because the virus appears to mainly be transmitted through the air between people in close contact.

14.     People in congregate environments—places where people live, eat, and sleep in close proximity—face increased risk of contracting COVID-19, as already evidenced by the rapid spread of the virus in cruise ships, nursing homes, and jails.

CLASS COMPLAINT AND PETITION FOR
WRIT OF HABEAS CORPUS

15. For people like Plaintiffs who are confined in Otay Mesa and Imperial under current conditions and population numbers, it is effectively impossible to engage in the social distancing necessary to mitigate the risk of transmission.

16. Public health and government officials worldwide have undertaken extraordinary measures to combat the spread of COVID-19, most commonly by ordering people not to congregate in groups. On March 19, 2020, the State of California issued a "shelter in place" order requiring people to stay at home except for essential activities and to maintain social distancing to the maximum extent possible. As of the filing of this complaint, over 300 million people in the United States are under some instruction to stay home to prevent community spread of the virus.

17. People in prisons, jails, and detention centers cannot engage in the preventative measures the rest of the country is taking. The higher risk of infection those in custody face is undeniable. For example, as of February 29, 2020, at the peak of the outbreak in Wuhan, China—the city where COVID-19 originated—over half of all new cases were among incarcerated people. On Rikers Island, the rate of infection among incarcerated people is almost six times the rate of infection in New York City generally and over 40 times higher than the rate in the United States as a whole. Seven federal prisoners have died of COVID-19 in FCI Oakdale in Louisiana. Six prisoners have died of the disease at FSL Elkton, a federal prison near Youngstown, Ohio. As of April 18, 2020, the number of infected inmates and staff of the Bureau of Prisons over the course of the past month increased by more than 39,000 percent.

18. Recognizing the urgency of present circumstances, judges, prosecutors and correctional authorities across the country have been ordering releases to protect individuals and the public health. Such releases not only protect the people with the greatest vulnerability to serious illness and death due to COVID-19 from

CLASS COMPLAINT AND PETITION FOR
WRIT OF HABEAS CORPUS

transmission, but also contribute to greater risk mitigation for all people in custody, carceral facility employees, and the surrounding community at large.

19.    Many of California's jails and prisons have released people detained in the criminal justice system to protect those people and the community from COVID-19. The Judicial Council of California announced emergency rules to lower jail populations. The California Department of Corrections and Rehabilitation announced a reduction in the prison population of nearly 7,000 inmates. The San Diego County Sheriff's Department released about 1000 people and announced plans to release about 400 more. Alameda County's Santa Rita Jail released approximately 500 people. Los Angeles County released about 1,700 people from its jails.

20.    Law enforcement and jail officials in New Jersey, New York City, Cleveland, Nashville, Houston, San Antonio, Charlotte, and numerous other jurisdictions have released civil detainees and, in many cases, people serving sentences for criminal convictions, in response to the threat COVID-19 poses inside jails. For example, on March 22 the New Jersey Supreme Court issued a consent order presumptively ordering the release of every person serving a county jail sentence by no later than Thursday morning, March 26.[1]

21.    Courts across the state and country are also ordering the release of people in civil immigration custody in recognition of the threat posed by COVID-19. *E.g.*, *Xochihua-Jaimes v. Barr*, No. 18-71460, 2020 WL 1429877 (9th Cir. Mar. 24, 2020); *Bahena Ortuño v. Jennings*, No. 20-cv-02064, 2020 WL 1701724 (N.D. Cal. Apr. 8, 2020); *Ixchop Perez v. Wolf*, No. 19-cv-05191, 2020 WL 1865303 (N.D. Cal. Apr. 14, 2020); *Castillo v. Barr*, No. CV2000605TJHAFMX, 2020 WL 1502864 (C.D. Cal. Mar. 27, 2020); *Fraihat v. Wolf*, No. ED-CV2000590-TJH, ECF No. 18 (C.D. Cal. Mar. 30, 2020); *Hernandez v. Wolf*, No. 20-cv-00617, ECF No. 17 (C.D.

---

[1] Consent Order, *In the Matter of the Request to Commute or Suspend County Jail Sentences*, No. 084230 (N.J. March 22, 2020), https://www.aclu-nj.org/files/5415/8496/4744/2020.03.22_-_Consent_Order_Filed_Stamped_Copy-1.pdf.

CLASS COMPLAINT AND PETITION FOR
WRIT OF HABEAS CORPUS

Cal. Apr. 1, 2020); *Basank v. Decker*, No. 20-cv-02518, 2020 WL 1481503 (S.D.N.Y. Mar. 26, 2020); *Coronel v. Decker*, No. 20-cv-2472, 2020 WL 1487274 (S.D.N.Y. Mar. 27, 2020); *Thakker v. Doll*, No. 20-cv-00480, 2020 WL 1671563 (M.D. Pa. Mar. 31, 2020); *Hope v. Doll*, No. 20-cv-00562, ECF No. 11 (M.D. Pa. Apr. 7, 2020); *Calderon Jimenez v. Wolf*, No. 18-cv-10225, ECF No. 507 (D. Mass. Mar. 26, 2020); *Arriaga Reyes v. Decker*, No. 20-cv-3600, ECF No. 27 (D. N.J. Apr. 14, 2020); *Malam v. Adducci*, No. 20-cv-10829, ECF No. 33 (E.D. Mich.  Apr. 17, 2020); *Vasquez-Barrera v. Wolf*, No. 20-cv-01241, ECF No. 41 (S.D. Tex. April 17, 2020). These orders recognize that "[t]he risk of contracting COVID-19 in tightly-confined spaces, especially jails, is now exceedingly obvious" and that "public health authorities predict [COVID-19] will especially impact immigration detention centers." *Basank*, 2020 WL 1481503, at *6; *Xochihua-Jaimes*, 2020 WL 1429877, at *1.

22.    On, March 18, 2020, two medical experts for the Department of Homeland Security's Office of Civil Rights and Civil Liberties ("DHS CRCL") sent a letter to Congress, writing "regarding the need to implement immediate social distancing to reduce the likelihood of exposure to detainees, facility personnel, and the general public, ***it is essential to consider releasing all detainees who do not pose an immediate risk to public safety.***"[2] On multiple occasions since at least February 25, 2020, these experts sounded the alarm with DHS regarding the imminent risks to the health of immigrant detainees and the public at large presented by COVID-19 unless swift mitigation measures, including decreasing the population of immigration detention facilities, are taken.

23.    Instead, ICE's response to the pandemic has been to engage in business as usual, conducting uninterrupted enforcement and detention operations. In a

---

[2] Letter from Scott A. Allen, MD and Josiah Rich, MD, MPH to Congressional Committee Chairpersons (Mar. 19, 2020), *available at* https://assets.documentcloud.org/documents/6816336/032020-Letter-From-Drs-Allen-Rich-to-Congress-Re.pdf.

CLASS COMPLAINT AND PETITION FOR
WRIT OF HABEAS CORPUS

statement demonstrative of the agency's chilling indifference to the lives of the people in its facilities, Defendant Albence asserted that ICE would not release additional detainees to slow the spread of COVID-19 because it would send the wrong message about ICE enforcement priorities.

24.     Inside ICE facilities, immigrants say that ICE is not consistently taking even the less aggressive precautionary measures the agency claims it is taking. To take one critical example, ICE is continuing to introduce detainees into the general population at Imperial without quarantining them separately for 14 days.

25.     This echoes a concern of the two experts for DHS CRCL, who say that "the track record of ICE facilities implementing [early screening, testing, isolation and quarantine] protocols historically has been inconsistent." Moreover, even if ICE was consistently taking these precautions, the experts have explained that such efforts "won't be enough" without rapidly 'releas[ing] those who do not pose an immediate danger to public safety."[3]

26.     The fact that COVID-19 is already raging through Otay Mesa, despite ICE's claimed adherence to its own protocols, demonstrates that ICE is incapable of complying with its constitutional duty to protect the health and safety of people in its custody by preventing the introduction and spread of the virus in its detention centers at their current population levels.

27.     The danger posed by Plaintiffs' and the putative classes' detention during the COVID-19 pandemic is "so grave that it violates contemporary standards of decency to expose anyone unwillingly to such a risk" and violates their constitutional right to safety in government custody even under an Eighth Amendment standard of deliberate indifference for persons serving criminal sentences, much less the more stringent standard protecting persons detained under civil immigration authority. *Helling v. McKinney*, 509 U.S. 25, 36 (1993).

---

[3] Allen and Rich, *supra* note 2.

CLASS COMPLAINT AND PETITION FOR
WRIT OF HABEAS CORPUS

28.     Defendants cannot justify continuing to subject Plaintiffs and other detainees to extraordinary risks of illness or death with any legitimate government objective, particularly in light of the alternatives available to them.

29.     Even where ICE invokes a "mandatory" detention statute to justify an individual's confinement, the agency cannot detain that person if doing so violates the Constitution.

30.     ICE's lackluster response to the pandemic has already caused detainees and staff in Otay Mesa to test positive for the virus and has put all detainees and staff at Otay Mesa and Imperial at risk of COVID-19 infection. But the vast majority of immigration detainees in Otay Mesa and Imperial lack the resources to file individual lawsuits to protect their safety by seeking their release. Over the past month, even represented detainees have had difficulty consulting with their lawyers because of visitation and telephone restrictions, and the closure of law libraries in both facilities makes it extraordinarily difficult for pro se detainees to prepare their cases. Otay Mesa detainees in "cohorted" housing units have not even been able to telephonically attend their immigration court hearings.[4] It is unclear whether pro se detainees in cohorted units at Otay Mesa will even be able to have bond hearings due to doubts regarding the continued functioning of the Otay Mesa immigration court and the inability of detainees to leave their unit. Defendants' responses to the COVID-19 outbreak are thus hampering access to the courts and the ability of detainees to seek release through other channels. Moreover, even if they could all sue, piecemeal individualized litigation is too slow to meet the rapidly evolving emergency at hand, too disorganized to ensure an orderly process of release, and too resource-intensive to be sustainable.

31.     Plaintiffs thus bring this suit as a class action to remedy grave violations of their and other detainees' constitutional rights that immediately threaten them with

---

[4] ICE uses the term "cohorting" to its practice of requiring all detainees in a housing unit that has been exposed to COVID-19 to remain in the unit and all times.

illness and death. This court has authority to order the orderly reduction in population of Otay Mesa and Imperial to levels that allow social distancing, as well as require other health and safety measures, to remedy to Plaintiffs' egregious violations of Plaintiffs' due process rights. This reduction in population must begin with a subclass of medically vulnerable people in Otay Mesa.

32.     Unless this Court intervenes to order the Defendants to dramatically reduce the population of the Otay Mesa and Imperial detention centers, Plaintiffs and many other detained individuals will face dramatically increased chances of contracting COVID-19, becoming seriously ill, and dying.

## PARTIES

33.     Plaintiff Adrian RODRIGUEZ ALCANTARA ("Mr. Rodriguez Alcantara") is a 31-year-old asylum seeker from Cuba who is currently detained at Otay Mesa along with his partner, Plaintiff Osorio Reyna. Mr. Rodriguez Alcantara passed his Credible Fear Interview in February 2020. He now awaits a merits hearing on his asylum claim, which has been delayed by a month due to the COVID-19 outbreak's impact on the Otay Mesa immigration court. Mr. Rodriguez Alacantara's housing unit at Otay Mesa contains over 100 detainees, making it impossible for him to keep a six-foot distance from others, and lacks adequate hygiene and protective equipment. Mr. Rodriguez Alcantara has HIV. His condition puts him at heightened risk for severe illness and death due to COVID-19. He seeks to represent a class of detainees at Otay Mesa and a subclass of all other similarly situated medically vulnerable civil immigration detainees at Otay Mesa who are at high risk of severe illness and death due to COVID-19. Mr. Rodriguez Alcantara plans to quarantine in San Diego for 14 days before going to Florida to stay with his partner's lawful permanent resident cousin, unless he is able to obtain a coronavirus test that would clear him to travel sooner. Once in Florida, he plans to further self-quarantine and practice social distancing.

CLASS COMPLAINT AND PETITION FOR
WRIT OF HABEAS CORPUS

34.    Plaintiff Yasmani OSORIO REYNA ("Mr. Osorio Reyna"), Mr. Rodriguez Alcantara's partner, is a 32-year-old asylum seeker from Cuba who is currently detained at Otay Mesa. Mr. Osorio Reyna is awaiting the results of his Credible Fear Interview. Mr. Osorio Reyna's housing unit at Otay Mesa contains over 100 detainees, making it impossible for him to keep a six-foot distance from others, and lacks adequate hygiene and protective equipment. He seeks to represent a class of all other similarly situated civil immigration detainees at Otay Mesa. Mr. Osorio Reyna plans to quarantine in San Diego for 14 days before going to Florida to stay with his lawful permanent resident cousin, unless he is able to obtain a coronavirus test that would clear him to travel sooner. Once in Florida, he plans to further self-quarantine and practice social distancing.

35.    Plaintiff Maria Flor CALDERON LOPEZ ("Ms. Calderon Lopez") is a 35-year-old asylum seeker from Honduras who passed her Credible Fear Interview earlier this year. Ms. Calderon Lopez has been detained at Imperial for almost four months, although her partner with whom she arrived to the United States was released from custody. Ms. Calderon Lopez's housing unit contains about 50 detainees, making it impossible for her to keep a six-foot distance from others, and lacks adequate hygiene and protective equipment. Ms. Calderon Lopez has moderate-severe intermittent asthma. Her condition puts her at heightened risk for severe illness and death due to COVID-19. She seeks to represent a class of detainees at Imperial and a subclass of all other similarly situated medically vulnerable civil immigration detainees at Imperial who are at high risk of severe illness and death due to COVID-19.  Ms. Calderon Lopez  plans to quarantine in San Diego for 14 days before going to Texas, where she will live with her partner and his sister, a lawful permanent resident, unless she is able to obtain a coronavirus test that would clear her to travel sooner. Once in Texas, she plans to further self-quarantine and practice social distancing.

CLASS COMPLAINT AND PETITION FOR
WRIT OF HABEAS CORPUS

36.     Plaintiff Mary DOE[5] ("Ms. Doe") is a 19 year-old asylum seeker and is currently detained at Imperial. Ms. Doe was previously placed in the Migrant Protection Protocols program, but an immigration judge terminated her removal proceedings in January 2020. She subsequently entered ICE custody at Imperial on January 16, 2020. She has no pending immigration court hearings and has not been in front of an immigration judge since she arrived at Imperial.  Ms. Doe's housing unit contains about 50 detainees, making it impossible for her to keep a six-foot distance from others, and lacks adequate hygiene and protective equipment. She seeks to represent a class of all other similarly situated civil immigration detainees at Imperial. If released, Ms. Doe's brother, a lawful permanent resident, would drive her directly from the detention center to his home in California, where she could self-quarantine for 14 days and practice social distancing.

37.     Defendant Gregory J. ARCHAMBEAULT is the San Diego Field Office Director for ICE Enforcement and Removal Operations ("ERO"), a federal law enforcement agency within the U.S. Department of Homeland Security ("DHS"). The San Diego Field Office is responsible for, among other things, carrying out ICE's immigration detention operations at Otay Mesa Detention Center and Imperial Regional Detention Facility. Defendant Archambeault is a legal custodian of Plaintiffs and all class members. He is sued in his official capacity.

38.     Defendant James DOBSON is the Otay Mesa Detention Center Officer in Charge for ICE ERO. He is responsible for immigration detention operations at Otay Mesa Detention Center. Defendant Dobson is a legal custodian of Plaintiffs and members of the class detained at Otay Mesa. He is sued in his official capacity.

---

[5] Plaintiff Mary Doe seeks to proceed under pseudonym because she would face severe retaliatory harm from her persecutors in her home country, where she may have to return. *See Does I thru XXIII v. Advanced Textile Corp.*, 214 F.3d 1058, 1068 (9th Cir. 2000). Counsel for Plaintiffs will file a motion to proceed under pseudonym and observe all related requirements.

39.     Defendant Jesus REYNA is the Assistant Field Office Director for ICE ERO in Calexico, California. Defendant Reyna is responsible for, among other things, overseeing ICE's immigration detention operations at Imperial Regional Detention Facility. Defendant Reyna is a legal custodian of Plaintiffs and members of the class detained at Imperial. He is sued in his official capacity.

40.     Defendant Christopher J. LAROSE is the Senior Warden of Otay Mesa Detention Center and is employed by the private corporation CoreCivic. Defendant LaRose is the immediate physical custodian of Plaintiffs and members of the class detained at Otay Mesa. He is sued in his official capacity.

41.     Defendant Sixto MARRERO is the Facility Administrator of Imperial Regional Detention Facility and is employed by the private corporation Management & Training Corporation. Defendant Marrero is the immediate physical custodian of Plaintiffs and members of the class detained at Imperial. He is sued in his official capacity.

42.     Defendant Matthew T. ALBENCE is the Deputy Director and Senior Official Performing the Duties of the Director of ICE. Defendant Albence is responsible for ICE's policies, practices, and procedures, including those related to the detention of immigrants. Defendant Albence is a legal custodian of Plaintiffs and all class members. He is sued in his official capacity.

43.     Defendant Chad WOLF is the Acting Secretary of DHS, an agency of the United States with several components responsible for enforcing United States immigration laws. Defendant Wolf is a legal custodian of Plaintiffs and all class members. He is sued in his official capacity.

## JURISDICTION AND VENUE

44.     This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 (federal questions), 1346 (original jurisdiction), 2241 (habeas corpus), and Article I, Section 9, clause 2 of the United States Constitution (the Suspension Clause).

Sovereign immunity against actions for relief other than money damages is waived pursuant to 5 U.S.C. § 702.

45.   This Court may grant relief under 28 U.S.C. §§ 2241, 2243 (habeas corpus), 2201–02 (declaratory relief), 1651 (All Writs Act), 5 U.S.C. § 702 (judgment against U.S. officers), Federal Rule of Civil Procedure 65 (injunctive relief), Federal Rule of Civil Procedure 23 (class action), as well as the Fifth Amendment to the U.S. Constitution.

46.   Venue is proper in the Southern District of California pursuant to 28 U.S.C. § 1391(e) and the habeas statute because Plaintiffs and the class are detained in this district, a defendant resides in this district, and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this district.

## FACTS

### I.   COVID-19 Poses Grave Risks of Serious Illness or Death.

47.   The outbreak of COVID-19, a disease caused by a novel coronavirus, has reached pandemic status. Because COVID-19 is easily transmitted and may not cause symptoms in all individuals, and because testing remains limited, the confirmed case count and death toll of COVID-19—already at over two million and 150,000 worldwide, respectively—likely underestimates the true prevalence of the disease.

48.   The need for care, including intensive care, and the likelihood of death, is much higher from COVID-19 infection than from influenza. Though earlier estimates suggested the virus was 10 times deadlier than the flu, the most recent data places the fatality rate of people infected with COVID-19 in the United States as high as 5 percent—50 times higher than that of seasonal influenza. For people in the highest risk populations, the fatality rate of COVID-19 infection is significantly higher.

49.   All human beings share a risk of contracting, and upon contraction, transmitting the virus that causes COVID-19. Any adult who contracts the virus may

CLASS COMPLAINT AND PETITION FOR
WRIT OF HABEAS CORPUS

experience life-threatening symptoms. According to the CDC, about 25% of patients who were hospitalized with COVID-19 were under the age of 49.

50.     People age 45 and over face a high risk of serious illness from COVID-19, while those over the age of 55 face a high risk of serious illness or death from COVID-19. Certain underlying medical conditions increase the risk of serious illness or death from COVID-19 for people of any age, including lung disease, heart disease, hypertension, asthma, chronic liver or kidney disease, diabetes, epilepsy, compromised immune systems (such as from cancer, HIV, or an autoimmune disease), blood disorders (including sickle cell disease), metabolic disorders, stroke, developmental delay. People who are pregnant or post-partum, with a body mass index greater than 40, or who have a history of smoking are also at increased risk of developing severe cases of COVID-19.

51.     New information regarding COVID-19 risk factors emerges daily. Other categories of individuals may have conditions that predispose them to complications from COVID-19, but are not yet identified by the medical literature. Some evidence suggests that exposure to larger viral loads—such as occurs with close, in-person interaction in enclosed spaces at short distances—may lead to more serious infection.

52.     COVID-19 can have devastating health effects, including severe damage to lung tissue, respiratory failure, heart failure, kidney failure, and death. People who do not die from COVID-19 but experience prolonged serious illness should expect prolonged recovery, loss of digits, neurologic damage, and the loss of respiratory capacity.

53.     Most people in high risk categories who contract the virus will need advanced support. Such supportive care requires highly specialized equipment that is in limited supply, such as ventilators, and an entire team of care providers, including 1:1 or 1:2 nurse to patient ratios, respiratory therapists, and intensive care physicians. This level of support can quickly exceed local health care resources.

CLASS COMPLAINT AND PETITION FOR
WRIT OF HABEAS CORPUS

54.     These complications can manifest at an alarming pace. Although the incubation period of the virus can be long, some patients' conditions can seriously deteriorate in five days or less. Individuals can be presymptomatic, yet still contagious, for a period of time before their symptoms rapidly escalate.

55.     People can also spread COVID-19 but be asymptomatic. The CDC estimates that as many as 25 percent of people infected with COVID-19 do not show symptoms.

56.     Even in cases of COVID-19 referred to as "mild to moderate," the symptoms of the disease can be serious. Individuals with persistent fever, body aches, and extreme fatigue have been advised not to go to the hospital until absolutely necessary because their cases are not considered severe enough. People with mild to moderate cases can still develop pneumonia and require supplemental oxygen.

57.     There is no vaccine against COVID-19, nor is there any known medication to prevent or treat infection. The only known effective measures to reduce the risk for vulnerable people from injury or death from COVID-19 are to prevent them from being infected in the first place, and to limit spread via social distancing measures.

58.     Social distancing, or remaining physically separated from known or potentially infected individuals, is the most important mitigation strategy to prevent transmission. Although the CDC has recommended people stay at least six feet apart, new data suggests that transmission may occur across distances as large as thirteen feet.

59.     Vigilant sanitation and hygiene, including repeatedly and thoroughly washing hands with soap and water, are also important measures for protecting vulnerable people from COVID-19. But because most documented transmission appears to occur through respiratory droplets carried through the air when a person coughs, sneezes, or even projects their voice, sanitation measures alone, without social distancing, are insufficient to prevent the spread of the virus.

CLASS COMPLAINT AND PETITION FOR
WRIT OF HABEAS CORPUS

60.     In recent weeks, the number of reported cases of infection in many parts of the country have shown a frightening increase, and more cases are confirmed daily. The death toll has similarly skyrocketed, up to over 39,000 at the time of this Complaint from just over one hundred last month.

## II.     People Confined in ICE Detention Centers Face Greater Risk of COVID-19 Transmission.

61.     The current outbreak underway at Otay Mesa is proof that detention centers are tinderboxes for rapid widespread infection within and beyond the facilities. At Otay Mesa, one employee was confirmed to have tested positive on March 31, 2020. As of April 17, just over two weeks later, the number of confirmed positive cases inside had exploded to at least 45 confirmed cases; 27 detainees across at least nine housing units, eight ICE officers, ten CoreCivic staff members, and eight medical staffers[6] have been confirmed to have contracted the virus.

62.     After COVID-19 was detected in the facility, immigration judges were evacuated from the Otay Mesa immigration court, located inside the detention center. The immigration court was then closed for all proceedings. It is not clear when the court will reopen.

63.     Across ICE facilities more generally, ICE has confirmed 124 cases of COVID-19 among its detainees and 30 cases among detention center ICE officers as of April 17, statistics which do not include cases among private detention center staff or presumed cases in individuals who have not been tested.[7] Defendant Albence confirmed that testing has only been done for less than once percent of detainees in ICE detention centers nationwide.[8] ICE is not disclosing how many facility workers

---

[6] It is not clear whether any of the medical staffers are included in the count of ICE employees who have contracted the virus.

[7] *ICE Guidance on COVID-19*, U.S. Immigration and Customs Enforcement, https://www.ice.gov/covid19 (last accessed Apr. 19, 2020).

[8] Press Release, House Committee on Oversight and Reform, DHS Officials Refuse to Release Asylum Seekers and Other Non-Violent Detainees Despite Spread of Coronavirus (Apr. 17, 2020), https://oversight.house.gov/news/press-releases/dhs-officials-refuse-to-release-asylum-seekers-and-other-non-violent-detainees

employed by private detention center operators, such as CoreCivic or Management & Training Corporation, or other contract staff have tested positive for the virus.

64.    In institutional settings such as immigration detention centers, people are at grave risk of contracting COVID-19, putting all detainees —and especially those with underlying health conditions and in high-risk age groups —at risk of serious illness or death.

65.    The coronavirus is significantly more likely to spread in detention facilities. In the community at large, researchers estimate that one person with COVID-19 will infect about two and a half people without social distancing, and about one person with strong social distancing and quarantining. By contrast, in confined settings like prisons and cruise ships, one person with COVID-19 will infect an estimated 11 people, who in turn will infect up to 11 other people each.

66.    Because of how detention centers necessarily operate, it is almost inevitable that even more facilities will experience an outbreak of COVID-19 beyond those that already have, and that those with existing outbreaks will be unable to effectively contain the spread.

67.    In order for detention centers to operate, numerous staff, contractors, and vendors also must circulate through the facilities daily. The movement of these individuals into and out of detention centers creates a potential chain of transmission between the community at large and the detained population. An outbreak in a facility can easily lead to reintroduction of the virus outside, as workers come and go for each shift. Continued operation of detention centers under conditions and population levels that incease the risk of spread thus amplifies, rather than reduces, the risk of transmission to the surrounding community.

68.    The social distancing measures recommended by public health authorities cannot be implemented in carceral settings, where detained people must share close quarters at almost all times. And given the number of people sharing the

same space, keeping surfaces in detention centers adequately sanitized to prevent transmission of COVID-19 is not realistic.

69.     Immigration detention facilities have a high risk of infectious spread because of crowding, the proportion of vulnerable people detained, and often scant medical care resources. Immigration detention facilities generally lack adequate medical infrastructure to address the spread of infectious disease and treatment of people most vulnerable to illness in detention.

70.     Because COVID-19 is easily spread between people in close proximity, any outbreak is nearly impossible for detention centers to control once the COVID-19 virus is introduced.

III.   **ICE's Protocols Are Insufficient on Their Face to Prevent Widespread Transmission of COVID-19 in Custody, and Defendants Fail to Adhere to Even Those Deficient Guidelines at Otay Mesa and Imperial**

71.     ICE detainees are at significant risk of contracting COVID-19 even if ICE were to fully abide by its own COVID-19 protocols, because they fall woefully short of what public health experts say is necessary to protect individuals in detention settings.

72.     For example, ICE guidance to date only requires compliance with many of its measures to the extent "practicable" or "whenever possible," rather than mandatory directives. This malleability in the guidance allows facilities to claim compliance with guidance without actually implementing crucial changes. In fact, as explained below, Otay Mesa and Imperial have failed to adopt many of the anemic measures listed in the guidance.

73.     Glaringly, the guidance does not mandate social distancing, but merely recommends it. It also does not address how social distancing can be achieved in dense housing units, where detainees must share sleeping quarters, communal spaces, and bathrooms and are surrounded by dozens of others day and night.

74.     The ICE guidance fails to account for presymptomatic or asymptomatic transmission, which especially impacts high-risk detainees. It does not

CLASS COMPLAINT AND PETITION FOR
WRIT OF HABEAS CORPUS

establish special protections for high-risk detainees until they are already symptomatic, by which point it is too late to meaningfully mitigate the risk of serious illness and death or the risk of transmission to others.

75.     The screening measures noted in the ICE guidance—temperature checks and verbal screening—are insufficient to detect cases of COVID-19 before they enter detention facilities. Many infected with COVID-19 are capable of spreading the disease even when they are presymptomatic or asymptomatic. Because COVID-19 appears to be so widespread, ICE would need to quarantine and monitor *every* person arriving at the detention center for 14 days or perform daily COVID-19 tests, which it has not demonstrated a willingness or ability to do. Even if ICE cohorts groups of incoming detainees before introducing them to the general population, this practice would facilitate transmission between new arrivals, which increases risk of spread throughout the facility, to other detainees, to staff, and, as a result, to the surrounding community.

76.     ICE's abject failure to protect those it confines from COVID-19 is best illustrated by what has already occurred at Otay Mesa. For weeks, detainees have sounded the alarm about the impossibility of practicing social distancing, facility staff's refusal to provide personal protective equipment, adequate cleaning supplies and hygiene products, and the presence of fellow detainees with symptoms.

77.     Detainees, including those in housing units where individuals had tested positive, were not provided protective facemasks masks until as late as April 10, 2020, weeks after multiple COVID-19 cases had already been confirmed in the detention center.

78.     When masks were finally offered, Defendants initially conditioned their distribution on detainees signing liability waivers.

79.     Dozens of detainees and staff are now infected.

80.     At the time of filing this Complaint, detainees at Otay Mesa still face enormous risk of contracting COVID-19 as a result of Defendants' continued failure

CLASS COMPLAINT AND PETITION FOR
WRIT OF HABEAS CORPUS

to adequately respond to the crisis, including by failing to reduce the facility's population to allow social distancing. Some housing units still contain about 90 to 100 people who must sleep in cells containing up to eight detainees each, in which bunk beds are no more than four or five feet away from one another, making adequate distancing impossible. With so many people housed in close quarters, it is impossible for detainees to maintain their distance in their cells or common areas. When a detainee has been removed to medical isolation because of COVID-19, their cellmates are required to continue sleeping in the same room, despite the likelihood of surface contamination.

81.   In Otay Mesa segregation cells, where people can be sent for their protection or for discipline, two people are usually confined per cell, and it is impossible to remain six feet apart.

82.   Conditions in Imperial also make it nearly impossible for detainees to practice social distancing. Detained individuals usually sleep in open dormitory style units containing 60 bunks, with partially walled-off cubicle-type cells each containing two bunk beds about three feet apart from each other. Even during this crisis, some pods contain about 50 people, and detainees continue to sleep four to a cell. Detainees house in different units come into frequent contact with one another as facility staff shuffle living spaces around, purportedly due to painting in some units. On information and belief, rather than work toward reducing the population, Imperial continues to receive new detainees.

83.   In both detention centers, food preparation and service is communal, with little opportunity for surface disinfection. Though food service now takes place within housing units at Otay Mesa in the wake of the COVID-19 outbreak, officers still require detainees to line up closely behind one another to receive their meals and permit them to eat at communal tables, where there is not space to maintain a six-foot distance. As recently as April 17, detainees from different units continued to work together in close quarters in the kitchen with no more protection than the

CLASS COMPLAINT AND PETITION FOR
WRIT OF HABEAS CORPUS

standard paper masks and gloves they have always been provided when preparing food. At Imperial, the entire housing unit lines up to receive their meals, and they must sit close together to eat their food at full tables.

84.    Outside of housing units, detainees are often clustered together in hallways, where they are made to wait in line as staff move them between different areas in the facility.

85.    Detainees who work for about $1 per day often must do so outside of their housing units and without proper protective gear, exposing them to other people directly or through surfaces they have touched.

86.    Staff arrive and leave on a shift basis, and there is limited ability to adequately screen staff, contractors, and visitors for new, asymptomatic infection.

87.    Announcements about COVID-19 are only given in English. Detainees must translate for each other into Spanish. Detainees who do not speak English or Spanish do not receive consistent translation of these announcements and must rely on other detainees who are bilingual in English and the second language to translate, which is not always possible. The announcements lack meaningful information and have included advice to observe social distancing without instruction on how to so in a facility where that is physically impossible at current population levels. To learn crucial information about the virus, detainees must gather in close proximity around televisions in the common area of their housing unit.

88.    People detained at the Otay Mesa and Imperial endure inadequate hygiene and sanitation which raises the risk of infection and an outbreak.

89.    Toilets, sinks, and showers are shared among dozens of detainees, without disinfection between each use. Detainees are not consistently given gloves, even when they are required to clean the unit with used rags. Some detainees report that they are not given soap or cleaning solution, only water, with which they are supposed to clean. Facility staff do not clean shared objects in common areas like toilets or telephones.

CLASS COMPLAINT AND PETITION FOR
WRIT OF HABEAS CORPUS

90.    Neither facility provides sufficient access to soap. At Otay Mesa, detainees have resorted to buying soap from the commissary because facility staff are inconsistent about refilling soap, sometimes not doing so for multiple days. Whether a detainee can easily receive a small bar of replacement soap once they run out is largely contingent on which guard is on duty. Detainees who do not have money in their commissary accounts, or who are forced to choose between necessities like food and hygiene items, go without soap when none is available in the bathrooms, putting themselves and others at risk.

91.    Detainees at Imperial have had access to liquid soap as of April 13, but it frequently runs out and is not refilled promptly, sometimes not for an entire day. Detainees must pay for bar soap with their commissary funds and do not have access to hand sanitizer.

92.    At Otay Mesa, although facility staff have purportedly stopped requiring detainees to sign forms before they could receive masks, detainees still do not have access to sufficient personal protective equipment. Detainees in one unit were given one disposable surgical-style mask each on April 10, and as of April 18, had not been provided replacement masks. Plaintiff Rodriguez Alcantara's mask is dirty from constant use and its ties have broken off.

93.    Imperial detainees received a single-use mask on April 9 or 10, but were told they would only receive new ones every five days. As of April 18, Plaintiff Calderon Lopez had not received a replacement mask. Detainees at Imperial have not generally been given other personal protective equipment, such as gloves or eye protection. Not all facility staff wear masks, even when coming into close contact with one another and detainees.

94.    Detainees at Imperial reported that as recently as April 13, new people were brought into the facility and placed in the general population unit after only 7 days of quarantine. Because symptoms can take as long as 14 days to manifest, this

CLASS COMPLAINT AND PETITION FOR
WRIT OF HABEAS CORPUS

practice will not prevent new arrivals from introducing COVID-19 to the existing population.

95.     Otay Mesa detainees must share the same space with one another during their video visitation with attorneys, and the handsets used to make video calls are not cleaned between each use. Telephones at both facilities are shared, often positioned close to one another, and not sanitized between each use.

96.     At Imperial, detainees are grouped together as they await their non-contact legal visits or asylum interviews. The rooms used for these interactions lack hand sanitizer.

97.     Currently, nine housing units at Otay Mesa are "cohorted," or locked down, due to confirmed cases of COVID-19 connected to the units. This means that detainees are not allowed to leave their units. But the hundred-plus detainees within the units—some of whom were likely exposed to the virus through the detainee who tested positive—are still in frequent close contact. They must congregate during mealtime, share bathrooms, and sleep within feet of one another. This practice facilitates transmission of the disease to many individuals in the unit, as non-infected detainees are forced to live alongside others who may have the virus but have not yet been confirmed, including asymptomatic carriers. Within "cohorted" units, COVID-19 appears to be spreading even between cellmates who try their best to social distance and clean their space. Defendants have trapped the detainees inside together without the ability to protect themselves.

98.     Complaints from both Otay Mesa and Imperial reflect widespread inadequacies in the provision of medical care to people in custody, even when there is no ongoing public health emergency. As recently as 2019, mumps spread throughout Otay Mesa, making it the epicenter of the disease's resurgence in San Diego county. Prior to the pandemic, people detained at Otay Mesa have submitted complaints alleging extreme neglect by medical staff, including one case where a detained person was given a potentially harmful, "antiquated" HIV treatment.

CLASS COMPLAINT AND PETITION FOR
WRIT OF HABEAS CORPUS

99.    People detained at Imperial have been deprived of necessary medication and refused treatment for serious health complaints.

100.   In both facilities, detainees with limited English ability or low literacy struggle with the process of placing requests for medical attention. Even when detainees are able to submit a request, they often experience significant delays in obtaining treatment.

101.   People exhibiting known symptoms of COVID-19, including fever, dry cough, headaches, or shortness of breath, have to wait for medical attention, and may have to submit multiple requests before they are seen. Until they are seen by the medical unit, those who report COVID-19 symptoms are not always isolated or given protective equipment that could help prevent inadvertent transmission to others. One detainee at Otay Mesa was returned to the cell he shares with seven others after finally seeing a nurse for his symptoms. He was not transferred to the medical unit until several more days of a worsening fever. At Imperial, a detainee had a fever for a week before she was removed from her housing unit. One detainee was told to take a packet of salt after reporting symptoms to facility staff.

102.   One COVID-19-positive detainee at Otay Mesa had difficulty getting appropriate care, even after being placed in isolation. Though he has a fever, shortness of breath, and can barely stand up, his requests for blankets and medicine have been either ignored or met with the instruction to fill out a request form, which he would have to obtain from a different officer. Last week, he and the other detainee in the isolation room were told they must clean the room every 30 minutes, but they are too sick to clean. Facility staff have not made arrangements to have someone else clean the room, and the detainee reports there is vomit and phlegm everywhere. Flagging down a nurse or other staff requires them to stand and go to the door of the isolation room. At one point, the detainee's symptoms became so serious that the other detainee in the isolation room banged on the door to request medical assistance,

but was unable to catch anyone's attention for several hours. The detainee was then taken to the hospital but returned to Otay Mesa the same day.

103.   The most recent ICE COVID-19 response protocols do not provide guidance for how facilities should plan their surging capacity needs as more detainees require care and fewer staff are available due to potential COVID-19 infection. They do not outline what qualifications or training medical staff must have to respond to COVID-19 cases. Several medical staff members at Otay Mesa have now been confirmed to have contracted COVID-19.

104.   Otay Mesa and Imperial lack the medical infrastructure needed to handle an outbreak of COVID-19. As recently as 2017, Otay Mesa had only two full-time staff physicians for the entire population of over a thousand ICE and U.S. Marshals Service detainees. The medical units, each of which only have a few rooms, will be incapable of handling the number of people who need to be isolated and treated. Especially as the number of infections rise, ICE will not be able to follow even its own insufficient protocols for isolating confirmed and suspected cases, let alone CDC guidance.

105.   The ICE guidance also does not specifically identify when testing is required. Though it references testing in accordance with CDC guidelines, the CDC guidelines prioritize testing high risk individuals. But testing is not widely available at Otay Mesa or Imperial, even for medically vulnerable individuals and those at the highest risk of exposure to COVID-19.

106.   At Otay Mesa, three out of six detainees in a single cell were transferred to the medical department for severe COVID-19 symptoms, but the remaining three detainees were not provided COVID-19 tests. Detainees have been removed from housing units for COVID-19 symptoms and returned days later. Fellow detainees do not know whether they have been tested. Neither Plaintiff Rodriguez Alcantara nor Plaintiff Calderon Lopez, both high risk according to CDC guidelines, have been tested.

CLASS COMPLAINT AND PETITION FOR
WRIT OF HABEAS CORPUS

**IV.    Release of Detainees, Prioritizing Those Most Vulnerable to Severe Harm as a Result of COVID-19, Will Reduce the Risk of Infection to Detainees and the Public.**

107.    Risk mitigation is the only known strategy that can protect detainees from COVID-19, and ICE has demonstrated that it is both unwilling and unable to implement meaningful risk mitigation measures. Accordingly, the requirements of public health as applied to immigration detention make it necessary that detention centers immediately reduce their populations, beginning with the release of detainees most vulnerable to severe cases of COVID-19.

108.    Social distancing and proper hygiene are infeasible in institutionalized settings such as immigration detention centers. Yet they are crucial measures for protecting vulnerable people from COVID-19.

109.    Reducing the overall number of people in detention centers is necessary in order for facilities to implement social distancing for those still detained and lessen the burden of protecting the health of detainees and staff.

110.    Prioritizing the release of individuals at high risk of severe disease is a crucial risk mitigation strategy. At minimum, high-risk people must be released from detention given the lack of a viable vaccine or effective treatment. Other detainees should also be considered for release to allow the detention centers to reduce their populations to a level that will allow for social distancing.

111.    An outbreak would lead to large numbers of ill detainees and detention center staff, putting further strain on the community's health system. Courts agree that release of high-risk detainees is "absolutely in the public's best interest." *Castillo*, 2020 WL 1502864, at *6.

112.    Releasing individuals at highest risk who can then self-isolate provides a significantly better likelihood of preventing infection, disease spread and death, both in the facility and in the community at large. For their personal health, the health of detention staff members, and their families and the surrounding community, it is

CLASS COMPLAINT AND PETITION FOR
WRIT OF HABEAS CORPUS

unequivocally beneficial to release detainees to the community where they can practice social distancing as the rest of the population is doing.

113.   Detention centers are integral components of the public health systems in the communities in which they are located. If many contract COVID-19 in such a facility they will require hospitalization in the community, threatening to overwhelm the community's resources. This problem is particularly acute in Calexico, California, where Imperial is located, and the area of South San Diego along the U.S.-Mexico border where Otay Mesa is located. Even in ordinary times, parts of both communities have been designated as medically underserved by the federal government. In the event of an outbreak of COVID-19 in either Otay Mesa or Imperial, the surrounding communities would likely be unable to provide adequate medical treatment to infected persons. Transmission of COVID-19 may skyrocket in the local community and among local healthcare workers if an outbreak occurred in a nearby detention center.

114.   Furthermore, a surge of hospitalizations from Otay Mesa or Imperial due to Defendants' failure to reduce their detention populations will divert local medical resources in San Diego and Imperial counties at a time when those communities are doing everything they can to "flatten the curve" to avoid such pressures on those systems. Overwhelming local public health systems will prevent the facilities from providing treatment to all who require it, including those in local communities whose infection did not originate inside the detention centers, increasing the likelihood that individuals with serious cases will die.

115.   Defendants have not provided the public with timely, transparent, or up-to-date information regarding the COVID-19 outbreak in Otay Mesa.

**V.   Defendants' Practices, Including their Failure to Reduce the Populations at Otay Mesa and Imperial, Place Plaintiffs and the Class Members they Seek to Represent at Unacceptably High Risk of Contracting COVID-19.**

116. Plaintiffs and all other civil immigration detainees at Otay Mesa and Imperial are at an unacceptably high risk of contracting the potentially lethal COVID-19 virus.

117. Plaintiff Rodriguez Alcantara and Plaintiff Calderon Lopez, as medically vulnerable individuals, are at particular risk of serious disease or death if they contract the virus.

118. Plaintiff Rodriguez Alcantara has HIV. The HIV medication he receives at Otay Mesa causes him to feel weak, nauseous, and tired. Mr. Rodriguez Alcantara does not know if his HIV has been appropriately controlled while in detention, because medical staff at Otay Mesa have failed to provide him with information about his CD4 (T-cell) count or viral load. He is currently in a locked down "cohorted" unit at Otay Mesa with over a hundred other individuals, placing him at high risk of coming into contact with someone infected. Physicians and public health experts consider patients with HIV to be at high risk of contracting COVID-19 and developing severe illness. Because of the inconsistencies in HIV healthcare at ICE detention facilities, Mr. Rodriguez Alcantara is at increased risk of infection and severe disease from COVID-19.

119. Plaintiff Calderon Lopez has bronchial asthma, a condition she developed during pregnancy when amniotic fluid leaked into her lungs. She required immunizations, treatments, and throat sprays for years after her pregnancy, and now controls her asthma with an inhaler. Ms. Calderon Lopez's asthma flares up when she is sick, causing her to feel as if she cannot breathe. She has struggled to obtain treatment while in detention. A woman who had a fever for seven days was recently removed from Ms. Calderon Lopez's housing unit, but the unit continues to operate without social distancing or sufficient hygiene measures. Based on Ms. Calderon Lopez's description of symptoms, her asthma appears to be moderate-severe. Ms. Calderon Lopez's asthma places her at risk for severe disease or death, were she to develop COVID-19.

CLASS COMPLAINT AND PETITION FOR
WRIT OF HABEAS CORPUS

120. On information and belief, dozens or more other detainees at both Otay Mesa and Imperial have risk factors that make them medically vulnerable to severe disease and death if they contract COVID-19. These include detainees age 45 and over and/or with high-risk medical conditions.

121. Plaintiff Osorio Reyna is confined at Otay Mesa in a housing unit known as J pod, alongside approximately 100 individuals, where they eat, sleep, and spend much of their time in close quarters. J pod is currently cohorted. Mr. Osorio Reyna lives in a cell with seven other detainees and he cannot keep six feet apart from them. Detainees in his unit went without soap for the majority of the day last Friday, April 17, and then were eventually given only five bars to share amongst 100 people. As of April 18, Mr. Osorio Reyna had been using the same disposable face mask for over a week.

122. Plaintiff Doe is confined at Imperial in pod F, a housing unit with about 46 detainees. She shares a cell with three other people and is in constant contact with others in her unit. Her conditions of confinement render it impossible for her to stay six feet apart from other people. She does not have consistent access to soap or hand sanitizer. Ms. Doe enters other parts of the detention center to work, cleaning rooms in the medical unit, exposing her to areas frequented by people from all over the detention center.

123. The conditions at Otay Mesa and Imperial place all detainees in danger of COVID-19 infection.

124. Otay Mesa and Imperial each currently confine hundreds of civil immigration detainees. All are subject to the same conditions at Otay Mesa and Imperial as their respective class representatives. Because it is impossible for detainees to socially distance and maintain adequate hygiene, all class members are at high risk of contracting COVID-19. Without reducing the number of detainees in Otay Mesa and Imperial to a level that allows for social distancing and strict

CLASS COMPLAINT AND PETITION FOR
WRIT OF HABEAS CORPUS

adherence to guidance from public health experts, even more detainees will become infected with COVID-19.

## VI.   ICE Has the Authority to Release Detained People in Its Custody.

125.   It is well within ICE's authority to protect the safety and well-being of individuals in its custody by releasing people to remedy the conditions of confinement in Otay Mesa and Imperial that put Plaintiffs and others detained there at an unreasonably high risk of contracting COVID-19.

126. ICE has routinely exercised its discretion to release particularly vulnerable detainees, including individuals with serious medical conditions from detention under its humanitarian parole authority.

127. ICE's discretion applies regardless of the statutory basis for an individual's detention.

128.  ICE has a range of highly effective tools at its disposal to ensure that people report for hearings and appointments, including the Intensive Supervision Appearance Program ("ISAP"). ISAP uses electronic ankle monitors, biometric voice recognition software, home visits, employer verification, and in-person reporting to supervise participants.

## LEGAL FRAMEWORK

## I.   Plaintiffs' Continued Detention Violates Their Constitutional Rights.

129.   Defendants' continued detention of Plaintiffs and members of the proposed classes under current conditions and population levels puts them at a high risk of exposure to a highly contagious disease resulting in serious illness, severe harm, or death, in violation of their due process rights under the Fifth Amendment.

130.   Immigration detainees, with or without prior criminal convictions, are civil detainees whose constitutional protections while in custody derive from the Fifth Amendment due process clause. *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001).

CLASS COMPLAINT AND PETITION FOR
WRIT OF HABEAS CORPUS

131.   Civil detainees, including immigration detainees in Otay Mesa and Imperial, are entitled to greater rights than people in pretrial criminal custody or people serving criminal sentences. *Jones v. Blanas*, 393 F.3d 918, 933–34 (9th Cir. 2004), *cert. denied*, 546 U.S. 820 (2005); *see also King v. Cty. of Los Angeles*, 885 F.3d 548, 557 (9th Cir. 2018) (finding presumption of punitive, and thus unconstitutional, treatment where conditions of confinement for civil detainees are similar to those faced by pre-trial criminal detainees). The constitutional protections to which civil immigration detainees are entitled are more comprehensive than those afforded to imprisoned people.

132.   "When the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." *DeShaney v. Winnebago Cty. Dept. of Soc. Servs.*, 489 U.S. 189, 199–200 (1989). As a result, the government must provide those in its custody with "food, clothing, shelter, medical care, and reasonable safety." *Id.* at 200.

133.   Conditions that pose an unreasonable risk of future harm violate the Eight Amendment's prohibition against cruel and unusual punishment, a standard less strict than the due process standard protecting civil immigration detainees, even if that harm has not yet come to pass and may not ultimately affect all detainees. *Parsons v. Ryan*, 754 F.3d 657, 678 (9th Cir. 2014) ("Although a presently existing risk may ultimately result in different future harm for different inmates—ranging from no harm at all to death—every inmate suffers exactly the same constitutional injury when he is exposed to a single statewide [corrections] policy or practice that creates a substantial risk of serious harm.").

134.   The Eighth Amendment requires that "inmates be furnished with the basic human needs, one of which is 'reasonable safety.'" *Helling v. McKinney*, 509 U.S. 25, 33 (1993) (quoting *DeShaney*, 489 U.S. at 200).

CLASS COMPLAINT AND PETITION FOR
WRIT OF HABEAS CORPUS

135.   The Supreme Court has explicitly recognized that the risk of contracting a communicable disease may constitute such an "unsafe, life-threatening condition" that threatens "reasonable safety." *Id.*

136.   While the Eighth Amendment prohibits punishment that is "cruel and unusual," the Due Process Clause of the Fifth Amendment prohibits *any punishment at all*. *Bell v. Wolfish*, 441 U.S. 520, 535 n.16 (1979); *see also Vazquez v. Cty. of Kern*, 949 F.3d 1153, 1163–64 (9th Cir. 2020). Conditions that would violate the Eighth Amendment rights of an individual serving a criminal sentence are more than enough to violate the Fifth Amendment due process rights of a civil detainee. Unlike an Eighth Amendment claim, there is no requirement for civil detainees to prove "deliberate indifference" of government officials in order to establish a due process violation.

137.   Conditions of confinement for civil detainees violate the Fifth Amendment when they do not "bear some reasonable relation to the purpose for which the individual is committed." *Jones*, 393 F.3d at 931. This standard is met when the conditions create an unreasonable risk to detainees' safety and health.

138.   The conditions of Plaintiffs' and class members' confinement under the current circumstances and as described in this Complaint violate their due process rights.

139.   Defendants cannot justify the continued confinement of Plaintiffs and members of the class under current conditions given the extraordinary risks to their health.

140.   In addition, Defendants have even less justification for the continued detention of anyone at Otay Mesa whose immigration court cases have been put on hold in light of the court closure. *Cf. Zadvydas*, 533 U.S. at 690 ("[W]here detention's goal is no longer practically attainable, detention no longer bears a reasonable relation to the purpose for which the individual was committed.") (internal quotation marks, alterations, and citation omitted).

CLASS COMPLAINT AND PETITION FOR
WRIT OF HABEAS CORPUS

141.   General deterrence is not a valid justification for civil immigration detention. *See R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 188-89 (D.D.C. 2015) (rejecting argument that "one particular individual may be civilly detained for the sake of sending a message of deterrence" to other individuals "who may be considering immigration"); *cf. Kansas v. Crane,* 534 U.S. 407, 412 (2002) (civil detention may not "become a 'mechanism for retribution or *general deterrence*'— functions properly those of criminal law, not civil commitment"). Just as ICE could not summarily execute immigrants to deter immigration, ICE cannot place them in detention centers where an incurable, potentially lethal virus is running rampant just to send a message about its enforcement priorities.

142.   As this public health crisis escalates, courts throughout the country have already recognized that continued confinement, particularly of vulnerable populations, in the face of COVID-19 violates due process. *See e.g., Castillo*, 2020 WL 1502864, at *5 ("Under the Due Process Clause, a civil detainee cannot be subject to the current conditions of confinement at Adelanto."); *Basank*, 2020 WL 1481503 at *5 ("Confining vulnerable individuals such as Petitioners without enforcement of appropriate social distancing and without specific measures to protect their delicate health 'pose[s] an unreasonable risk of serious damage to [their] future health,' and demonstrates deliberate indifference.") (quoting *Phelps v. Kapnolas*, 308 F.3d 180, 185 (2d Cir. 2002)); *Thakker*, 2020 WL 1671563 at *8 ("Physical detention itself will place a burden on community healthcare systems and will needlessly endanger Petitioners, prison employees, and the greater community. We cannot see the rational basis of such a risk."); *United States v. Martin*, No. CR PWG-19-140-13, 2020 WL 1274857, at *2 (D. Md. Mar. 17, 2020) ("[T]he Due Process Clauses of the Fifth or Fourteenth Amendments, for federal and state pretrial detainees, respectively, may well be implicated if defendants awaiting trial can demonstrate that they are being subjected to conditions of confinement that would subject them to exposure to serious (potentially fatal, if the detainee is elderly and with underlying

medical complications) illness."); *Malam*, No. 20-cv-10829, ECF No. 33, at 25 ("To order Petitioner's continued civil detention would be to play Russian roulette with her rights and with her life.").

**II.   This Court Has the Authority to Order Release of Medically Vulnerable Detainees, a Reduction in the Detainee Population, and Compliance with Prevailing Public Health Standards, and Such Relief is Appropriate Here.**

143.   The release of a sufficient number of Otay Mesa and Imperial detainees to permit social distancing and hygiene measures for those who remain in detention is the only means to ensure compliance with the Constitution's prohibition against punitive or unreasonable civil detention.

144.   The Court's authority to order Plaintiffs' release to ensure their constitutional rights are protected is well-established. "Federal courts possess whatever powers are necessary to remedy constitutional violations because they are charged with protecting these rights." *Stone v. City & Cty. of San Francisco*, 968 F.2d 850, 861 (9th Cir. 1992). As a result, "[w]hen necessary to ensure compliance with a constitutional mandate, courts may enter orders placing limits on a prison's population." *Brown v. Plata*, 563 U.S. 493, 511 (2011).

145.   Courts have regularly exercised this authority to remedy constitutional violations caused by overcrowding. *Duran v. Elrod*, 713 F.2d 292, 297–98 (7th Cir. 1983), *cert. denied*, 465 U.S. 1108 (1984) (concluding that court did not exceed its authority in directing release of low-bond pretrial detainees as necessary to reach a population cap); *Mobile Cty. Jail Inmates v. Purvis*, 581 F. Supp. 222, 224–25 (S.D. Ala. 1984) (finding district court properly exercised remedial powers to order a prison's population reduced to alleviate unconstitutional conditions, and noting other cases); *Inmates of the Allegheny Cty. Jail v. Wecht*, 565 F. Supp. 1278, 1297 (W.D. Pa. 1983) (order to reduce overcrowding "is within our power to correct the constitutional violations").

146.   When conditions of confinement in an immigration detention facility lead to uniformly unsafe conditions that rise to the level of a constitutional violation,

the only available remedy is to reduce levels of detention unless and until conditions can be brought in line with constitutional standards. For example, in a recent case challenging conditions of confinement in Border Patrol detention facilities along the Arizona border, a District Court ordered that the Constitution prohibited Border Patrol from continuing to detain any person to whom it did not provide a bed, shower, nutritious food, and a screening by a medical professional within 48 hours of book-in. *Unknown Parties v. Nielsen*, CV-15-00250-TUC-DCB, 2020 WL 813774, at *1 (D. Az. Feb. 19, 2020).

147.   The same principle applies here. As the constitutional principles and public health requirements mandate, releasing detainees from Otay Mesa and Imperial is the only viable remedy to ensure their safety from the threat to their health that COVID-19 poses.

148.   Additionally, social distancing and sanitation measures compliant with public health requirements must be fully implemented to protect any individuals that remain in detention. In the face of this great threat, these measures are Plaintiffs' and class members' only defense against COVID-19. Defendants' actions make such protective measures exceedingly difficult, if not impossible, in the environment of an immigration detention center, where detainees share toilets, sinks, and showers, eat in communal spaces, and are in close contact with the many other detainees and officers around them.

149.   Defendants are subjecting Plaintiffs to unreasonable harm from continued detention. Release is the only effective remedy.

## CLASS ALLEGATIONS

150.   Plaintiffs bring this action pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedures on behalf of themselves and a class of similarly situated individuals.

151.   Plaintiffs seek to represent two classes of civil immigration detainees, one for those incarcerated at Otay Mesa ("Otay Mesa Class") and another for those incarcerated at Imperial ("Imperial Class").

152.   The proposed Otay Mesa Class is defined as "All civil immigration detainees incarcerated at the Otay Mesa Detention Center." Plaintiff Rodriguez Alcantara and Plaintiff Osorio Reyna seek to represent this class.

153.   The proposed Imperial Class is defined as "All civil immigration detainees incarcerated at the Imperial Regional Detention Facility." Plaintiff Calderon Lopez and Plaintiff Doe seek to represent this class.

154.   Within each class, Plaintiffs also seek to represent a subclass of persons at each detention center who, by reason of age or medical condition, are particularly vulnerable to serious illness or death if they were to contract COVID-19 ("Otay Mesa Medically Vulnerable Subclass" and "Imperial Medically Vulnerable Subclass").

155.   The proposed Otay Mesa Medically Vulnerable Subclass is defined as "All civil immigration detainees incarcerated at the Otay Mesa Detention Center who are age 45 years or older or who have medical conditions that place them at heightened risk of severe illness or death from COVID-19"[9] Plaintiff Rodriguez Alcantara seeks to represent this subclass.

156.   The proposed Imperial Medically Vulnerable Subclass is defined as "All civil immigration detainees incarcerated at the Imperial Regional Detention Facility who are age 45 years or older or who have medical conditions that place them at heightened risk of severe illness or death from COVID-19"[10] Plaintiff Calderon Lopez seeks to represent this subclass.

---

[9] Qualifying medical conditions for class membership will fall within standards set by the CDC. *See, e.g., People Who Are at Higher Risk for Severe Illness,* Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/specific-groups/people-at-higher-risk.html
[10] *Id.*

CLASS COMPLAINT AND PETITION FOR
WRIT OF HABEAS CORPUS

157.   The proposed classes and subclasses satisfy the requirements of Federal Rule of Civil Procedure 23(a)(1) because they are so numerous that joinder of all members is impracticable. There are currently several hundred detainees at each Otay Mesa and Imperial. Based on the prevalence of CDC-identified risk factors in the U.S. adult population overall, well over 40 of the hundreds of detainees at each facility likely are medically vulnerable or over age 45.

158.   Joinder is also impracticable because class members are detained, largely unrepresented, and highly unlikely to find representation, particularly given reduced legal visitation at both Otay Mesa and Imperial, limiting their ability to bring individual litigation. Most do not speak English and many lack sufficient resources, financial or otherwise, to bring their own cases.

159.   The proposed classes meet the commonality requirements of Federal Rule of Civil Procedure 23(a)(2). Whether Defendants' practices and the conditions to which they subject class members at Otay Mesa and Imperial, including maintaining populations so high that social distancing is impossible, comply with the Fifth Amendment presents questions of fact and law common to the entire class at each facility. The proposed subclasses also present common questions of fact and law related to whether conditions at each detention center comply with the Fifth Amendment in light of the subclass members' heightened risk of developing severe cases of COVID-19.

160.   The proposed classes meet the typicality requirements of Federal Rule of Civil Procedure 23(a)(3) because Plaintiffs' claims are typical of the claims of the class at each detention center. Plaintiffs Rodriguez Alcantara and Osorio Reyna are currently detained at Otay Mesa and are exposed to the same conditions of detention and population numbers also experienced by all others detained there. Plaintiffs Calderon Lopez and Doe are currently detained at Imperial and are exposed to the same conditions of detention and population numbers also experienced by all others detained there. Plaintiff Rodriguez Alcantara is detained at Otay Mesa and, because

of his HIV, is medically vulnerable to severe illness or death due to COVID-19. He has a place to go upon release where he can self-quarantine and practice social distancing. His claim is thus typical of the Otay Mesa Medically Vulnerable Subclass. Plaintiff Calderon Lopez is detained at Imperial and, because of her moderate-severe intermittent asthma, is medically vulnerable to severe illness or death due to COVID-19. She has a place to go upon release where she can self-quarantine and practice social distancing. Her claim is thus typical of the Imperial Medically Vulnerable Subclass.

161.   The proposed classes meet the adequacy requirements of Federal Rule of Civil Procedure 23(a)(4). Named Plaintiffs have the requisite personal interest in the outcome of this action and have no interests adverse to the interests of the proposed classes or subclasses. Additionally, the proposed classes are represented by pro bono counsel from the ACLU Foundation of San Diego & Imperial Counties. Plaintiffs' counsel have extensive experience litigating class action lawsuits and other complex cases in federal court, including civil rights lawsuits on behalf of detained immigrants.

162.   Although ascertainability is not a requirement for class certification, the class members are readily ascertainable through Defendants' records. The members of each subclass are ascertainable through Defendants' records and their own documentation of underlying health conditions. Defendants conduct health screenings at intake whenever a detainee enters one of their facilities. These records will contain necessary medical information that can be compared against CDC standards to determine whether a detainee is medically vulnerable. Furthermore, their own internal guidance requires them to identify detainees in their custody who have medical conditions that place them at heightened risk from COVID-19. Therefore, Defendants' own files contain all the information necessary to ascertain class membership.

CLASS COMPLAINT AND PETITION FOR
WRIT OF HABEAS CORPUS

163.   Finally, the proposed classes satisfy Federal Rule of Civil Procedure 23(b)(2). Defendants have acted on grounds generally applicable to the class by detaining class members in conditions that place them at high risk of contracting COVID-19, including by maintaining population levels too high for social distancing to be possible. Defendants can only remedy the injury to the class by reducing the population of each detention centers as a whole. Thus, classwide injunctive, declaratory, and habeas relief is appropriate.

164.   In the alternative, the requirements of Rule 23(b)(1) are satisfied because litigating separate actions would create a risk of inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the proposed classes.

## CLAIM FOR RELIEF

**I.    Violation of Fifth Amendment Right to Substantive Due Process (Unlawful Punishment; Freedom from Cruel Treatment and Conditions of Confinement; Denial of Reasonable Safety: All classes and subclasses)**

165.   Plaintiffs repeat and reallege all the allegations above and incorporate them by reference here.

166.   The Fifth Amendment of the U.S. Constitution guarantees that civil detainees, including all immigrant detainees, may not be subjected to punishment. The federal government violates this substantive due process right when it subjects civil detainees to conditions of confinement that amount to punishment or create an unreasonable risk to detainees' safety and health.

167.   For no legitimate reason or justification, Defendants are subjecting Plaintiffs to punishment or unreasonable heightened risk of contracting COVID-19, for which there is no vaccine, reliable treatment, or cure. Defendants' practices, including but not limited to maintaining population levels too high for social distancing to be possible, subject Plaintiffs and members of the putative classes to an unreasonable risk of serious harm, including severe illness and death, in violation of their due process rights.

CLASS COMPLAINT AND PETITION FOR
WRIT OF HABEAS CORPUS

1

2

3                          **PRAYER FOR RELIEF**

4    WHEREFORE, Plaintiff-Petitioners respectfully request that the Court:

5        a.       Certify this Petition as a Class Action and appoint named Plaintiffs as

6                 class and subclass representatives and the undersigned counsel as class

7                 counsel;

8        b.       Issue a writ of habeas corpus and order the immediate release of the

9                 Medically   Vulnerable   Subclasses—including   on   an   emergency

10                expedited basis for the Otay Mesa Medically Vulnerable Subclass—and

11                the orderly release, with appropriate precautionary public health and

12                safety measures, of a sufficient number of class members to reduce the

13                population of Otay Mesa and Imperial to levels in each facility that

14                permit   adequate   social   distancing,   maintenance   of   hygiene,   and

15                provision of medical care, on the ground that continued detention of

16                class members under current conditions violates the Due Process Clause

17                of the Fifth Amendment;

18       c.       In the alternative, issue injunctive relief or a temporary restraining order

19                ordering   Defendants,   their   officers,   agents,   servants,   employees,

20                attorneys, and all other persons in active concert or participation with

21                any of the foregoing persons to immediately release the Medically

22                Vulnerable Subclasses—including on an emergency expedited basis for

23                the Otay Mesa Medically Vulnerable Subclass—and the orderly release,

24                with appropriate precautionary public health and safety measures, of a

25                sufficient number of class members to reduce the populations of Otay

26                Mesa and Imperial to levels in each facility that permit adequate social

27                distancing, maintenance of hygiene, and provision of medical care, on

28

CLASS COMPLAINT AND PETITION FOR
                                                           WRIT OF HABEAS CORPUS

the grounds that continued detention of class members under current conditions violates the Due Process Clause of the Fifth Amendment;

d.   Issue an order requiring Defendants to provide to Plaintiffs and the Court, at intervals the Court deems proper, information regarding the ongoing COVID-19 outbreak in Otay Mesa;

e.   Issue a judgment declaring that the conditions under which Defendants have confined Plaintiffs and  Otay Mesa and Imperial Class members place class members at substantial risk of serious illness and death, in violation of the Due Process Clause of the Fifth Amendment;

f.   Grant Plaintiffs their reasonable attorneys' fees and expenses pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412, and other applicable law; and

g.   Grant such other relief as this Court deems just and proper.

Respectfully submitted,

DATED: April 21, 2020                    ACLU FOUNDATION OF SAN
                                          DIEGO & IMPERIAL COUNTIES

                                          **s/ Monika Y. Langarica**
                                          MONIKA Y. LANGARICA
                                          KIMBERLY GRANO
                                          JONATHAN MARKOVITZ
                                          BARDIS VAKILI
                                          Attorneys for Plaintiff-Petitioners

CLASS COMPLAINT AND PETITION FOR
WRIT OF HABEAS CORPUS