**MONIKA Y. LANGARICA** (SBN 308518) (mlangarica@aclusandiego.org)
**JONATHAN MARKOVITZ** (SBN 301767) (jmarkovitz@aclusandiego.org)
**KIMBERLY GRANO** (SBN 328298) (kgrano@aclusandiego.org)
**BARDIS VAKILI** (SBN 247783) (bvakili@aclusandiego.org)
**DAVID LOY** (SBN 229235) (davidloy@aclusandiego.org)
**ACLU FOUNDATION OF SAN DIEGO &
IMPERIAL COUNTIES**
P.O. Box 87131
San Diego, CA 92138-7131
Telephone: (619) 398-4493

Counsel for Plaintiff-Petitioners

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| Adrian RODRIGUEZ ALCANTARA, et. al., <br><br>  Plaintiffs-Petitioners, <br><br> v. <br><br> GREGORY J. ARCHAMBEAULT, San Diego Field Office Director, Immigration and Customs Enforcement, et. al., <br><br> Defendant-Respondents. | Case No. 20cv756 DMS (AHG) <br><br> **PLAINTIFFS-PETITIONERS' RESPONSE TO RESPONDENT LAROSE'S SUPPLEMENTAL FILING** |

Plaintiffs file this Response to Defendants' Supplement to the Opposition to Motion for Class Certification, in which Defendants correct their position as to the number of medically vulnerable individuals in ICE custody at Otay Mesa as of April 28, 2020.

Previously, Defendants identified only eight individuals in Immigration and Customs Enforcement ("ICE") custody at Otay Mesa whose age or medical conditions render them medically vulnerable to COVID-19, and they stated all were housed in the R Housing Unit ("Pod"):

> Presently R Pod (64 detainee capacity), which offers a cell design instead of an open sleeping bay design, houses ICE and USMS male detainees identified by ICE and USMS as having heightened COVID-19 risk factors. …As of April 26, 2020, only 20 detainees (8 ICE detainees and 12 USMS detainees) were assigned to R Pod. Female ICE and USMS detainees previously identified as having heightened COVID-19 risk factors have left OMDC.

Declaration of Warden LaRose, ECF No. 26-1, ¶ 39.

Defendants repeated that statement at the April 28 hearing when the Court asked Defendants to provide factual updates regarding the COVID-19 outbreak at Otay Mesa. Defendants also took the position that Plaintiffs' evidence is "stale," and they updated the Court with information that 93 individuals in ICE custody have tested positive for COVID-19, including one who is now intubated.[1]

The next day, on April 29, 2020, Defendant LaRose stated "it appears that 51-69 ICE detainees may be within the CDC guidelines as being at higher risk for severe illness due to COVID-19." Defendants' Supplement to the Opposition to Motion for Class Certification, ECF No. 34 at 2. This pivotal information undercuts every aspect of Defendants' opposition to Plaintiffs' request for a temporary restraining order ("TRO") and motion for class certification. The information materially undermines Defendants' arguments and exposes their inability to protect even the most vulnerable people in their custody. The belated update is yet another example of Defendants' pattern of chronic delay and negligence in response to the harm posed by COVID-19 at Otay Mesa.

**1. Defendants' Updated Facts Support Plaintiffs' Request for a TRO.**

Defendants' failure to accurately identify or represent the number of putative subclass members at Otay Mesa casts serious doubt on their methodology for identifying medically vulnerable people in their custody, on their understanding of the facts on the ground in Otay Mesa, and, most importantly, on whether Defendants are taking "reasonable available measures to abate [the] risk" of serious illness or death due to COVID-19 for medically vulnerable individuals in their custody. *Gordon v. County of Orange*, 888 F.3d 1118, 1125 (9th Cir. 2018).

---

[1] Defendants have not provided information regarding when or whether the individual was identified as medically vulnerable, what protective measures had been in place for him, if any, or when he first had symptoms, was confirmed positive for COVID-19, or hospitalized.

2

At the April 28 hearing, Defendants assured the Court they were taking reasonable measures to mitigate the risk of harm posed by their failure to contain COVID-19 within Otay Mesa to medically vulnerable people in ICE custody. Specifically, Defendants stated that all "eight" medically vulnerable people in ICE custody are in a so-called "protective cohort" in R Pod, where Defendants supposedly ensure they are kept away from the general population, social distancing is possible, and movement in and out of the housing unit is limited.[2] Although Warden Larose's declaration states that R pod, which is also shared with medically vulnerable individuals in U.S. Marshals custody, can only hold 64 people in locked cells, ECF No. 26-1, ¶ 39, Defendants' supplemental notice failed to address where the other 43-61 medically vulnerable individuals are being detained. This omission is glaring.

Indeed, Defendants' representations about their dangerous "cohorting" strategy—whereby housing units are quarantined after individuals in the unit have been exposed to the virus, Declaration of Captain Farabaugh, ECF No. 23-3 ¶ 14—make it clear that the remaining 43-61 medically vulnerable individuals have likely not been put in R Pod since yesterday and instead remain confined in other housing units in close proximity with people who have been exposed. In fact, upon reviewing their own internal records in light of Defendants' supplemental filing, counsel for Plaintiffs have identified at least 13 medically vulnerable individuals who are in ICE custody at Otay Mesa as of April 29 and who were not in R Pod at the time of last contact. Declaration of Jacqueline Ramos ¶ 6. These include:

    a. Seven individuals who have diabetes, including one age 58 detained in H Pod, one age 54 detained in L Pod, one age 51 detained in C-1 Pod, one detained in H pod who has had two heart attacks, and two others detained in L Pod and Q Pod respectively;

---

[2] According to Plaintiffs' expert Dr. Amon, "The concept of 'protective cohorting' is never defined or referred to in CDC guidance." ECF No. 32, ¶ 7(c)(ii).

      b. One individual who has asthma and is detained in L Pod;

      c. One individual who has asthma and is detained in A Pod;

      d. One individual who has asthma and is detained in C-1 Pod;

      e. One who has cancer and is detained in L Pod; and

      f. Two others age 60 or older, detained in V Pod and K Pod respectively.

*Id.*

Plaintiffs continue to dispute that the measures in R Pod are sufficient to mitigate the risk of harm to putative subclass members, due to, among other things, the insufficient screening of staff or precautions for internal movements. They also continue to dispute that confinement in R pod is reasonable when it results in medically vulnerable *civil* detainees being locked in small cells for extended periods. But even assuming for the sake of argument that Defendants' "protective cohorting" practices in R pod are sufficient and reasonable, Defendants' updated numbers coupled with the likelihood that medically vulnerable individuals are scattered throughout the facility eviscerates the argument that the conditions in R Pod are sufficient to abate the risk for medically vulnerable detainees.

Defendants described other pods in the facility, where it can be assumed putative subclass members are confined, as operating at up to nearly 80% capacity, with over 100 detainees per pod, where they have failed to provide concrete evidence that social distancing is possible. *See* Larose TRO Opp., ECF. No 26 at 10, 11. They also conceded at the April 28 hearing that they are unable to enforce social distancing or mask requirements. Indeed, while Defendants' own photographs display the failure to enforce social distancing or protective equipment in these pods in horrifying detail, they still do not capture the impact on subclass members trapped in those pods like Plaintiff Rodriguez Alcantara, who protects himself by "wait[ing] to be the last individual[] to pick up my tray of food,… eat[ing] in my cell to keep away from

4

others," and "seek[ing] refuge in my cell," because "people are everywhere at all times." Declaration of Adrian Rodriguez Alcantara, ECF No. 1-5 ¶¶ 8, 10.

Additionally, Defendants' updated numbers extinguish their argument that relief is foreclosed because Judge Bernal's order in *Fraihat v. U.S. Immigration & Customs Enf't*, 2020 WL 1932570, at *29 (C.D. Cal. Apr. 20, 2020) covers the relief Plaintiffs seek for subclass members. Plaintiffs continue to dispute the merits of the argument because the proposed subclass here and the *Fraihat* class are not identical and the relief ordered in *Fraihat* falls short of what Plaintiffs seek here. However, even if the Court were otherwise satisfied that the order in *Fraihat* provides sufficient relief for the subclass here, Defendants' failure to properly identify individuals whose underlying conditions squarely fit into the CDC guidelines, as required under the *Fraihat* order, further underscores Defendants' failure to abate risk for those individuals pursuant to the relief obtained in *Fraihat* and the necessity of this Court's intervention to protect subclass members.

Defendants' failure to accurately identify or represent the number of putative subclass members also raises serious concerns about access of unidentified medically vulnerable individuals to urgent medical care, given "[t]he transportation of detainees to off-site medical providers has been limited to only essential and/or emergency medical services." Declaration of Warden LaRose, ECF 26-1, at ¶ 73.

Accordingly, Defendants' actions and omissions further support Plaintiffs' request at paragraph (7)(g) of the Proposed Order[3] that Defendants provide class counsel information about individuals who have medical diagnoses but who Defendants do not believe qualify them for the Otay Mesa Medically Vulnerable Subclass.[4] These determinations can be made based on objective criteria through

---

[3] Attached as an exhibit to Plaintiffs' Notice of Supplemental Facts and Authority, ECF No. 12 at 9.

[4] It also bears noting that the records to support class membership are in Defendants' sole custody. "[I]nsofar as defendants are the ones responsible for the
(Footnote continues on next page.)

5

medical experts, with the magistrate assigned to this case resolving any disputes about the matter, as suggested in the Proposed Order.

### 2. This Court Should Certify the Proposed Class and Subclass.

Defendants' concession that there are at least 51-69 medically vulnerable individuals in ICE custody at Otay Mesa demonstrates that numerosity is satisfied. *See Rannis v. Recchia*, 380 Fed. App'x 646, 651 (9th Cir. 2010) ("In general, courts find the numerosity requirement satisfied when a class includes at least 40 members.")

The fact that Defendants failed to identify certain medically vulnerable people also highlights why there is no "ascertainability" requirement for class actions in the Ninth Circuit. *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1124 n. 4 (9th Cir. 2017) ("ConAgra cites no other precedent to support the notion that our court has adopted an 'ascertainability' requirement. This is not surprising because we have not."); *Fraihat v. U.S. Immigration & Customs Enf't*, No. EDCV191546JGBSHKX, 2020 WL 1932570, at *15 n.9 (C.D. Cal. Apr. 20, 2020). An ascertainability requirement in this case would improperly allow Defendants to unilaterally identify class members, which Plaintiffs have now demonstrated they are incapable of doing correctly even for conditions like diabetes that fall squarely within CDC criteria. For individuals whose conditions may require more than a cursory review, like asthma, placing the decision-making authority in Defendants' hands alone risks their lives.

It is not at all unusual in class actions for courts—at times aided by experts—to make factual determinations whether a particular individual is a member of the class. *See, e.g.*, *Franco-Gonzalez v. Holder*, No. CV-10-02211 DMG DTBX, 2014 WL 5475097, at *3 (C.D. Cal. Oct. 29, 2014) (laying out process for determining if

---

absence of more detailed . . . records" about putative class members' health conditions, "they should not benefit from their poor recordkeeping" or their refusal to provide information about the health conditions of the detainee population "by dodging a class action on that basis." *Etter v. Allstate Ins. Co.*, 323 F.R.D. 308, 315 (N.D. Cal. 2017).

individual falls within class of immigration detainees with mental health conditions that qualify them for appointment of counsel); *see also Ms. L. v. U.S Immigration & Customs Enf't*, 331 F.R.D. 529, 541 (S.D. Cal. 2018) ("Defendants are correct that this determination may involve some individualized inquiries, but those inquiries do not detract from the 'indivisible' nature of the claim alleged and the relief sought in this case."). Even when determining class membership requires some factual inquiry, "the language of Rule 23 neither provides nor implies that demonstrating an administratively feasible way to identify class members is a prerequisite to class certification." *Briseno*, 844 F.3d at 1133. Nevertheless, the Proposed Order lays out an administratively feasible process for identifying subclass members.

This case is materially indistinguishable from *Franco* and other class actions brought on behalf of people with disabilities, which also require inquiry into the underlying conditions of class members. Whether someone meets the statutory definition of disability requires evaluation of their impairment to determine whether it "substantially limits one or more major life activities." 42 U.S.C. § 12102; 29 U.S.C. § 705(9)(B). But the fact that class membership depends on such an evaluation does not bar the routine certification of classes of people with disabilities. *See, e.g.*, *Franco-Gonzales v. Napolitano*, No. CV 10-02211 DMG DTBX, 2011 WL 11705815, at *16 (C.D. Cal. Nov. 21, 2011) (certifying subclass of unrepresented individuals in removal proceedings who "have a serious mental disorder or defect that renders them incompetent to represent themselves in detention or removal proceedings"); *Hernandez v. County of Monterey*, 305 F.R.D. 132, 152 (certifying subclass of inmates with disabilities even though establishing subclass membership would require determining whether individuals had disabilities as defined by state and federal law); *Mays v. Cty. of Sacramento*, No. 218CV02081TLNKJN, 2019 WL 3729815, at *1 (E.D. Cal. Aug. 8, 2019), *report and recommendation adopted*, No. 218CV02081TLNKJN, 2019 WL 3804192 (E.D. Cal. Aug. 13, 2019)

(recommending preliminary approval class action settlement in favor of subclass of incarcerated people with disabilities as defined by state and federal law); *J.R. v. Oxnard Sch. Dist.*, No. LACV1704304JAKFFMX, 2019 WL 4438243, at *20, 29 (C.D. Cal. July 30, 2019) (certifying class of students who have or may have disabilities).

Indeed, earlier today yet another district court in California has recognized that COVID-19 poses such a threat to individuals in ICE detention that provisional class certification and emergency relief are necessary. *Zepeda Rivas v. Jennings*, No. 20 CV 02731-VC, ECF No. 53 (N.D. Cal. April 29, 2020) (provisionally certifying a class of detainees in Mesa Verde Detention Facility and Yuba County Jail and issuing a temporary restraining order providing a two-week process for class members to petition the court for release from custody).[5] As Judge Chhabria observed in issuing that order, "The fact that ICE does not have such a list [of detainees with health vulnerabilities] at the ready, six weeks after Governor Newsom shut down the entire state and one week after this lawsuit was filed, speaks volumes about where the safety of the people at these facilities falls on ICE's list of priorities." *Id.* at *4.

### 3. Court Intervention is Necessary to Save Lives and Preserve Public Health.

By admitting that the estimated number of subclass members exceeds their previous representation by as much as a factor of eight, Defendants underscore the need for this Court's intervention. At best, Defendants do not know who in their custody is medically vulnerable during a pandemic that is spreading rapidly within Otay Mesa, even though Warden LaRose reportedly receives a daily "updated list of high risk detainees" and "adjust[s]" facility plans "as needed." ECF No. 26-1 ¶ 41.

---

[5] Although the court in Zepeda Rivas allowed a two-week process for petitioning the court for release, the facilities in question do not have an active COVID-19 outbreak, much less the largest one in the country. Due to the urgent nature of the threat in Otay Mesa, Plaintiffs have requested a much more expeditious, yet still orderly, release process for medically vulnerable individuals.

This Court cannot entrust them to preserve the health and safety of those in their care, after their supposedly adequate measures have already allowed Otay Mesa to house the nation's largest COVID-19 outbreak in ICE detention. Failure to provide for basic human needs, including reasonable safety, violates the Constitution. *DeShaney v. Winnebago Cty. Dept. of Soc. Servs.*, 489 U.S. 189, 199–200 (1989).

In light of Defendants' repeated failures to protect subclass members during this deadly pandemic, this Court should intervene immediately by provisionally certifying the proposed classes and granting the request for an emergency TRO, including the measures outlined in Plaintiffs' Proposed Order.

Additionally, this Court should immediately order Defendants to provide daily updates regarding its response to COVID-19 at Otay Mesa, including:

a) Total population levels at Otay Mesa broken down by housing unit;

b) Total number of medically vulnerable individuals in ICE custody at Otay Mesa;

c) Total number of cohorted housing units and how long the units have been under quarantine;

d) Total number of individuals tested for COVID-19;

e) Total number of individuals confirmed positive for COVID-19; and

f) Total number of individual hospitalized for COVID-19 treatment.

Dated: April 29, 2020                              Respectfully submitted,

ACLU FOUNDATION OF SAN
DIEGO & IMPERIAL COUNTIES

**s/Monika Y. Langarica**

Attorneys for Plaintiffs-Petitioners

9