UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ADRIAN RODRIGUEZ ALCANTARA; YASMANI OSORIO REYNA; MARIA FLOR CALDERON LOPEZ; MARY DOE; on behalf of themselves and all others similarly situated,<br><br>                 Plaintiffs-Petitioners,<br><br>v.<br><br>GREGORY ARCHAMBEAULT, San Diego Field Office Director, Immigration and Customs Enforcement; et al.,<br><br>                 Defendants-Respondents. | Case No.: 20cv0756 DMS (AHG)<br><br>**ORDER (1) GRANTING IN PART PLAINTIFFS' MOTION FOR CLASS CERTIFICATION AND (2) GRANTING PLAINTIFFS' MOTION FOR SUBCLASS-WIDE EMERGENCY TEMPORARY RESTRAINING ORDER** |

      This case is one of many that have been filed throughout the country concerning the detention of immigration detainees during the COVID-19 pandemic. The facilities at issue in this case are Otay Mesa Detention Center ("Otay Mesa" or "OMDC") and Imperial Regional Detention Facility. Currently there are no COVID-19 cases at Imperial. However, Otay Mesa is "home to the largest confirmed COVID-19 outbreak in any federal immigration detention facility in the entire country[.]" (Compl. ¶4.) As of April 30, 2020, ninety-eight (98) Immigration and Customs Enforcement ("ICE") detainees at Otay Mesa had tested positive for COVID-19. Over the course of the pandemic, six ICE detainees

from Otay Mesa have been hospitalized, four have been discharged, two remain hospitalized, and one, an individual with diabetes, has recently been placed on a ventilator.

One of the Plaintiffs in this case is Adrian Rodriguez Alcantara, a 31-year-old asylum seeker from Cuba with HIV. In February 2020, he passed his credible fear interview, and he is currently awaiting a merits hearing on his asylum claim. (*Id.* ¶33.) When the present case was filed, Mr. Rodriguez Alcantara was detained at Otay Mesa. Since that time, he has been granted parole subject to the posting of a $4,000 bond and final medical clearance, (Fed. Defs.' Opp'n to Mot. at 6), but as of April 28, 2020, he was still in custody. In the present case, Mr. Rodriguez Alcantara seeks to represent "All civil immigration detainees incarcerated at the Otay Mesa Detention Center who are age 45 years or older or who have medical conditions that place them at heightened risk of severe illness or death from COVID-19" ("the Otay Mesa Medically Vulnerable Subclass"). (Compl. ¶155.) Mr. Rodriguez Alcantara alleges Defendants are violating Plaintiffs' Fifth Amendment rights to substantive due process by subjecting Plaintiffs "to punishment or unreasonable heightened risk of contracting COVID-19" for no legitimate reason or justification. (*Id.* ¶167.) He also alleges Defendants' practices, "including but not limited to maintaining population levels too high for social distancing to be possible," subjects Plaintiffs "to an unreasonable risk of serious harm, including severe illness and death, in violation of their due process rights." (*Id.*)

In the present motions, Plaintiffs request that the Court provisionally certify the Otay Mesa Medically Vulnerable Subclass and issue an emergency temporary restraining order, preliminary injunction and writ of habeas corpus securing the immediate release of all members of that Subclass. The Federal Defendants and Defendant Christopher LaRose, the Warden of Otay Mesa, each filed an opposition to the motion, and Plaintiffs filed a reply. The motions came on for hearing on April 28, 2020. After the hearing, Warden LaRose filed a supplemental brief indicating that the number of high risk ICE detainees at Otay Mesa was not the 8 represented in his brief and at oral argument, but was in the range of 51-69. Plaintiffs filed a response to that brief, and the Court thereafter held a status

2

20cv0756 DMS (AHG)

conference with counsel to discuss the newly discovered facts. During that conference, counsel for Warden LaRose represented to the Court that he received the updated numbers from the Federal Defendants as part of their compliance with a preliminary injunction issued in another class action case, *Fraihat v. U.S. Immigration and Customs Enforcement*, ___ F.Supp.3d ___, No. EDCV 19-1546 JGB (SHKx), 2020 WL 1932570 (C.D. Cal. Apr. 20, 2020). At the conclusion of that conference, the Court issued an oral ruling granting in part Plaintiffs' motion to certify the Otay Mesa Medically Vulnerable Subclass and granting the emergency motion for a TRO. In that oral ruling and in the order that followed, (ECF No. 38), the Court stated it would set out its reasoning for those decisions in a more detailed order to follow. This order sets out that reasoning.

## I.

## BACKGROUND

Otay Mesa Detention Center houses both ICE detainees and United States Marshals Service detainees. (Decl. of Warden C. LaRose in Supp. of Opp'n to Mot. ("LaRose Decl.") ¶7.) It has a design capacity of 1,970 detainees, (*id.* ¶8), but as of April 26, 2020, was operating at 50% capacity, with 987 detainees. (*Id.* ¶12.) Six hundred sixty-two of those detainees are ICE detainees, 649 of which are in the general population and 13 of which are assigned to Restricted Housing Units ("RHUs"). (*Id.*)

OMDC has instituted a number of new policies and practices to address the spread of COVID-19 in the facility, including (1) the suspension of new detainee admissions, social visits, volunteer entry and regularly scheduled facility audits, (2) health screening of all persons entering the facility, (3) posting educational materials throughout the facility, (4) increased sanitation, (5) provisions of masks to detainees, and (6) requiring employees to use personal protective equipment.

OMDC has also instituted the practice of protective cohorting and medical quarantine/isolation strategies. (*Id.* ¶28.) "Protective cohorts are considered 'protective areas,' the opposite of a containment area, the objective being to keep the space free of the COVID-19 virus." (*Id.* ¶36.)

> The purpose of establishing protective cohorts is to limit contact between the identified vulnerable detainees and the general population and thus eliminate or decrease COVID-19 exposure and infection to those deemed high-risk. General population detainees who are at heightened risk of infection from COVID-19 due to age (currently 60 or over), heart disease, diabetes, lung disease, etc., but have not been exposed to the virus are moved into housing pods, separate from the lower risk population.

(*Id.* ¶35.) According to Warden LaRose,

> [c]ohort housing/quarantine is not a punitive measure, nor [ ] does it mean that detainees are subjected to conditions of confinement in line with heightened restrictions placed on RHU detainees. Rather, detainees are provided with the same activities and opportunities as their normal general population status, including access to recreation, dayroom time, programming, commissary, legal visitation (including virtual visits when possible,), video court appearances, telephone calls, detainee mail operations, legal research via housing pod kiosks, library access via request/delivery from the librarian, and legal copy requests via the facility librarian, subject to COVID-19 restricted movement protocols that now bring services to the pod versus detainees moving throughout the facility for the same.

(*Id.* ¶42.) During the April 30 status conference, counsel for Warden LaRose acknowledged that OMDC instituted the practice of protective cohorting even though ICE's Health Service Corps ("IHSC"), which provides healthcare service to ICE detainees at Otay Mesa, (*id.* ¶8), does not do so.

Consistent with this practice of protective cohorting, on or about March 23, 2020, IHSC produced "a list of 15 ICE OMDC detainees … identified as having heightened COVID-19 risk-factors." (*Id.* ¶37.) OMDC staff thereafter "moved the identified vulnerable ICE detainees into previously empty units to establish protective cohorts, separated from the rest of the detainee population." (*Id.* ¶38.) Those detainees are currently housed in R Pod. (*Id.* ¶39.) R Pod has capacity for 128 detainees,[1] but as of

---

[1] In his Declaration, Warden LaRose initially represented that R Pod had capacity for 64 detainees, but during the April 30 status conference, his counsel clarified that R Pod is actually a 128-bed unit.

April 26, 2020, was housing only 20 ICE detainees, all male.[2] (*Id.*)  As of April 28, 2020, the number of high-risk detainees in R Pod had decreased to eight.  "Detainees in R Pod have not had any positive COVID-19 tests." (*Id.*)

This practice of protective cohorting, however, does not appear to be working as planned.  As mentioned above, there are somewhere between 43 and 61 additional detainees in Otay Mesa who IHSC has recently identified as being at high risk for severe complications from COVID-19.  As of April 30, 2020, Warden LaRose did not know where those detainees were being housed, *i.e.*, whether they were in a protective cohort or in one of the other ten available housing units,[3] all of which, save one (J Pod), had at least one confirmed case of COVID-19.

As for the J Pod, Warden LaRose states it has capacity for 128 detainees, although as of April 26, 2020, it was housing only 102 detainees.  Warden LaRose explains that J Pod is an open sleeping bay unit, which is apparent in the photographs attached to his Declaration. (LaRose Decl., Attach. 12.)  In addition to the open sleeping bays, J Pod has a dayroom area where detainees are allowed to congregate.  Although OMDC promotes social distancing in these areas, it does not require social distancing between detainees, and claims there is no way for it to enforce that practice.  Indeed, OMDC admits that detainees are not social distancing from each other, which is confirmed in the photos of J Pod. (*Id.*)

///
///
///
///
///

---

[2]  According to Warden LaRose, female detainees "identified as having heightened COVID-19 risk factors have left OMDC." (*Id.*)

[3]  It appears there are fifteen housing units at OMDC. (*Id.* ¶102.)  One (R Pod) is currently being used as a protective cohort for high risk detainees.  Four others (Pods E, H, K and L) are currently being used as Medical Unit Housing overflow. (*Id.* ¶52.)

## II.

## MOTION FOR CLASS CERTIFICATION[4]

"The class action is 'an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.'" *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 700-01 (1979)). To qualify for the exception to individual litigation, the party seeking class certification must provide facts sufficient to satisfy the requirements of Federal Rule of Civil Procedure 23(a) and (b). *Doninger v. Pacific Northwest Bell, Inc.*, 564 F.2d 1304, 1308-09 (9th Cir. 1977). "The Rule 'does not set forth a mere pleading standard.'" *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013) (quoting *Dukes*, 564 U.S. at 350). "Rather, a party must not only 'be prepared to provide that there are *in fact* sufficiently numerous parties, common questions of law or fact,' typicality of claims of defenses, and adequacy of representation, as required by Rule 23(a). The party must also satisfy through evidentiary proof at least one of the provisions of Rule 23(b)[.]" *Id.* (quoting *Dukes*, 564 U.S. at 350) (internal citation omitted).

Federal Rule of Civil Procedure 23(a) sets out four requirements for class certification—numerosity, commonality, typicality, and adequacy of representation. A showing that these requirements are met, however, does not warrant class certification. The plaintiff also must show that one of the requirements of Rule 23(b) is met. Here, Plaintiffs assert they meet the requirements of Rule 23(b)(2).

Rule 23(b)(2) allows class treatment when "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole[.]" Fed. R. Civ. P. 23(b)(2). Because the relief requested in a (b)(2) class is prophylactic, enures to the benefit of each class member, and is based on accused conduct that applies uniformly

---

[4] In accordance with the Court's April 24, 2020 Order Setting Hearing and Providing Guidance on Further Briefing, the discussion that follows relates only to the Otay Mesa Medically Vulnerable Subclass.

to the class, notice to absent class members and an opportunity to opt out of the class is not required. *See Dukes*, 564 U.S. at 361-62 (noting relief sought in a (b)(2) class "perforce affect[s] the entire class at once" and thus, the class is "mandatory" with no opportunity to opt out).

The district court must conduct a rigorous analysis to determine whether the prerequisites of Rule 23 have been met. *Gen. Tel. Co. v. Falcon*, 457 U.S. 147, 161 (1982). It is a well-recognized precept that "the class determination generally involves considerations that are 'enmeshed in the factual and legal issues comprising the plaintiff's cause of action.'" *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 469 (1978) (quoting *Mercantile Nat'l Bank v. Langdeau*, 371 U.S. 555, 558 (1963)). However, "[a]lthough some inquiry into the substance of a case may be necessary to ascertain satisfaction of the commonality and typicality requirements of Rule 23(a), it is improper to advance a decision on the merits to the class certification stage." *Moore v. Hughes Helicopters, Inc.*, 708 F.2d 475, 480 (9th Cir. 1983) (citation omitted); *see also Nelson v. United States Steel Corp.*, 709 F.2d 675, 680 (11th Cir. 1983) (plaintiff's burden "entails more than the simple assertion of [commonality and typicality] but less than a prima facie showing of liability") (citation omitted). Rather, the court's review of the merits should be limited to those aspects relevant to making the certification decision on an informed basis. *See* Fed. R. Civ. P. 23 advisory committee notes. If a court is not fully satisfied that the requirements of Rule 23(a) and (b) have been met, certification should be refused. *Falcon*, 457 U.S. at 161.

**B.   Rule 23(a)**

Rule 23(a) and its prerequisites for class certification—numerosity, commonality, typicality, and adequacy of representation—are addressed in turn.

1.   <u>Numerosity</u>

Rule 23(a)(1) requires the class to be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1); *Staton v. Boeing Co.*, 327 F.3d 938, 953 (9th Cir. 2003). The plaintiff need not state the exact number of potential class members; nor is a specific minimum number required. *Arnold v. United Artists Theatre Circuit, Inc.*, 158

F.R.D. 439, 448 (N.D. Cal. 1994). Rather, whether joinder is impracticable depends on the facts and circumstances of each case. *Id.*

Here, Plaintiffs asserted in their motion that there were at least 15 detainees in Otay Mesa who were medically vulnerable to COVID-19. (Mot. for Class Cert. at 13.) Defendants initially asserted there were only 8 high risk ICE detainees in Otay Mesa, and based on that number, Defendants argued the numerosity requirement was not satisfied. (Opp'n to Mot. for Class Cert. at 6 n.6.) However, they have withdrawn that argument in light of the updated numbers set out in Warden LaRose's supplemental brief. In light of that filing, the Court finds the numerosity requirement is satisfied.

### 2. Commonality

The second element of Rule 23(a) requires the existence of "questions of law or fact common to the class[.]" Fed. R. Civ. P. 23(a)(2). This element has "'been construed permissively,' and '[a]ll questions of fact and law need not be common to satisfy the rule.'" *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 981 (9th Cir. 2011) (quoting *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir. 1998)). "However, it is insufficient to merely allege any common question[.]" *Id.* Instead, the plaintiff must allege the existence of a "common contention" that is of "such a nature that it is capable of classwide resolution[.]" *Dukes*, 564 U.S. at 350. As summarized by the Supreme Court:

> What matters to class certification ... is not the raising of common 'questions'—even in droves—but, rather the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation. Dissimilarities within the proposed class are what have the potential to impede the generation of commons answers.

*Id.* (quoting Richard A. Nagareda, Class Certification in the Age of Aggregate Proof, 84 N.Y.U. L. Rev. 97, 132 (2009)).

In this case, Plaintiffs assert the commonality requirement is met because all subclass members are confined in Otay Mesa, and all are at high risk for severe illness or death from COVID-19. Defendants do not dispute these assertions. Instead, they raise other arguments, none of which is persuasive.

First, Defendants argue that although each subclass member is at high risk, each has a different risk profile. (Opp'n to Mot. for Class Cert. at 9.) This may be true, but it does not detract from the undisputed common feature of the subclass, which is that each member is at high risk.

Second, Defendants assert Plaintiffs have failed to present evidence that the subclass members are subject to a common practice at Otay Mesa. However, Plaintiffs' claim is not based on any specific policy or practice. Rather, Plaintiffs are challenging their continued confinement and the conditions of that confinement in a congregate environment that is in the midst of the worst outbreak of COVID-19 in any ICE detention facility in the country. As so construed, Defendants' argument does not defeat a finding of commonality.

Third, Defendants contend that commonality does not exist here because "the Court must determine whether the facility was aware of each detainee's vulnerable condition and consider the measures taken to abate their specific risk." (*Id.* at 10.) Contrary to Defendants' argument, however, Plaintiffs' claim does not require a showing that Defendants were aware of the medical vulnerabilities of each subclass member, nor does it require investigation into the measures taken to protect each one individually. The only test for Plaintiffs' claim is whether the continued confinement or conditions of confinement of subclass members in Otay Mesa, in light of the spread of COVID-19 throughout the facility, amounts to punishment. *Bell v. Wolfish*, 441 U.S. 520, 535 (1979). That is a question common to the subclass, and its answer will drive resolution of the case.

Defendants' other arguments about whether each subclass member is suitable for release, and that conditions should be placed on each subclass members' release, are addressed in the Court's temporary restraining order, and thus they do not defeat a finding of commonality. On the contrary, the Court finds there are questions of law and fact common to this subclass.

3.   Typicality

The next requirement of Rule 23(a) is typicality, which focuses on the relationship of facts and issues between the class and its representatives. "[R]epresentative claims are

'typical' if they are reasonably co-extensive with those of absent class members; they need not be substantially identical." *Hanlon*, 150 F.3d at 1020. "The test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992) (citation and internal quotation marks omitted). The typicality requirement will occasionally merge with the commonality requirement, *Parsons*, 754 F.3d at 687, because "[b]oth serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Dukes*, 564 U.S. at 349 n.5.

Here, Plaintiffs rely on the arguments raised on commonality to support a showing of typicality, namely, that Mr. Rodriguez Alcantara is detained in Otay Mesa and is medically vulnerable to COVID-19. Again, Defendants do not dispute these facts, but they argue Mr. Rodriguez Alcantara is nonetheless atypical of the proposed subclass. Specifically, they assert he does not meet the CDC guidelines for medical vulnerability because he has not shown his HIV is "poorly controlled." (Opp'n to Mot. for Class Cert. at 13.)

In support of their argument, Defendants cite to a CDC website, but that link is no longer active. Based on the Court's review of the CDC website, people who are immunocompromised, including those having "HIV with a low CD4 cell count or not on HIV treatment," may be at higher risk. https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html. In his Declaration, Mr. Rodriguez Alcantara states OMDC staff have tested his blood, but they have not provided him with the results of those tests, including his CD4 count and viral load. (Decl. of Adrian Rodriguez Alcantara in Supp. of Mot. for Class Cert. ¶5.) Thus, Mr. Alcantara does not know whether he is currently suffering from a low CD4 cell count. Defendants did not provide that

information in their briefing, therefore the Court is also unable to make that determination. Nevertheless, Mr. Rodriguez Alcantara's HIV status, in itself, appears to place him in the category of "immunocompromised" individuals who may be at higher risk from COVID-19. As such, his claim is typical of the claims of subclass members.

### 4. Adequacy of Representation

The final requirement of Rule 23(a) is adequacy. Rule 23(a)(4) requires a showing that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). This requirement is grounded in constitutional due process concerns; "absent class members must be afforded adequate representation before entry of a judgment which binds them." *Hanlon*, 150 F.3d at 1020 (citing *Hansberry v. Lee*, 311 U.S. 32, 42-43 (1940)). In reviewing this issue, courts must resolve two questions: "(1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *Id.* (citing *Lerwill v. Inflight Motion Pictures, Inc.*, 582 F.2d 507, 512 (9th Cir. 1978)). The named plaintiffs and their counsel must have sufficient "zeal and competence" to protect the interests of the rest of the class. *Fendler v. Westgate-California Corp.*, 527 F.2d 1168, 1170 (9th Cir. 1975).

Here, Plaintiffs assert there is no conflict between Mr. Rodriguez Alcantara and his counsel and other subclass members, and that they will vigorously represent the class. Defendants do not dispute that the adequacy requirement is met, and the Court so finds.

**C. Rule 23(b)**

Having satisfied the requirements of Rule 23(a), the next issue is whether Plaintiffs have shown that at least one of the requirements of Rule 23(b) is met. *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 614-15 (1997). Here, Plaintiffs assert they have met the prerequisites of certification for a class under Rule 23(b)(2).

Under Rule 23(b)(2), class certification may be appropriate where a defendant acted or refused to act in a manner applicable to the class generally, rendering injunctive and declaratory relief appropriate to the class as a whole. Fed. R. Civ. P. 23(b)(2).

> The key to the (b)(2) class is "the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them." [citation omitted]  In other words, Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class.  It does not authorize class certification when each individual class member would be entitled to a *different* injunction or declaratory judgment against the defendant.

*Dukes*, 564 U.S. at 360.

Here, Plaintiffs argue the subclass is particularly suited for certification under Rule 23(b)(2) because Defendants are acting on grounds generally applicable to the subclass, and the injunctive relief sought is appropriate for the subclass as a whole.  Defendants do not address Rule 23(b)(2), but the Court agrees with Plaintiffs that this case meets its requirements.

The only other issue on certification is whether the *Fraihat* decision precludes certification of the subclass in this case.  In *Fraihat*, the court granted provisional class certification to two subclasses that could possibly overlap with the Otay Mesa Medically Vulnerable Subclass proposed here.  Those subclasses include detainees in ICE custody who (1) are over 55 years of age and have certain Risk Factors that place them at heightened risk of severe illness and death upon contracting COVID-19 and (2) have certain disabilities that place them at heightened risk of severe illness and death upon contracting COVID-19.  *Fraihat v. Immigration and Customs Enforcement*, No. EDCV 19-1546 JGB (SHKx), 2020 WL 1932393, at *1 (C.D. Cal. Apr. 20, 2020).  Plaintiffs here argue the Otay Mesa Medically Vulnerable Subclass is different in that it includes people age 45 and older.  They also assert the relief sought in this case is different from that ordered in *Fraihat*.

Although there is some overlap between this case and *Fraihat*, this Court declines to find that *Fraihat* precludes certification of the Otay Mesa Medically Vulnerable Subclass.  As stated in a recent decision addressing this issue, "It does not appear that Judge Bernal intended, by the general nationwide relief he ordered, to interfere with the ability of facility-specific litigation to proceed.  Nor, in any event, does a nationwide class action

covering specific relief at specific facilities seem manageable." *Zepeda Rivas v. Jennings*, ___ F.Supp.3d ___, No. 20-cv-02731-VC, 2020 WL 2059848, at *4 (N.D. Cal. Apr. 29, 2020). This Court agrees with that reasoning, and thus declines to deny the present motion in light of *Fraihat*.

In light of the above, the Court grants Plaintiffs' motion for certification of the Otay Mesa Medically Vulnerable Subclass, with one modification: Plaintiffs request certification of a subclass of detainees age 45 years or older on the ground that people in this age group may be at higher risk of severe illness or death from COVID-19. Notably, CDC guidelines do not cover this age group. Rather, they define "older adults" at higher risk from COVID-19 as persons "65 years old and older[,]" https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults.html, and ICE considers detainees at higher risk if they are age 60 or older. (Decl. of Kelley Beckhelm Assistant Officer in Charge of Immigration and Customs Enforcement Enforcement and Removal Operations Otay Mesa Detention Facility ¶21 n.3.) Given the CDC and ICE guidelines, and the lack of accepted evidence to support a finding that people between the ages of 45 and 59 are at the same heightened risk as those 60 years old and above, the Court declines to include them in the Otay Mesa Medically Vulnerable Subclass. With that modification, the Court provisionally certifies the following subclass under Federal Rule of Civil Procedure 23(b)(2):

> All civil immigration detainees incarcerated at the Otay Mesa Detention Center who are age 60 or over or who have medical conditions that place them at heightened risk of severe illness or death from COVID-19 as determined by CDC guidelines.

Plaintiff Rodriguez Alcantara is appointed as Subclass Representative, and Counsel from the ACLU Foundation of San Diego and Imperial Counties are appointed as counsel for this Subclass pursuant to Federal Rule of Civil Procedure 23(g).

/ / /

/ / /

/ / /

# III.

# EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER

Turning to Plaintiffs' motion for a TRO, the purpose of a TRO is to preserve the status quo before a preliminary injunction hearing may be held; its provisional remedial nature is designed merely to prevent irreparable loss of rights prior to judgment. *Granny Goose Foods, Inc. v. Brotherhood of Teamsters & Auto Truck Drivers*, 415 U.S. 423, 439 (1974). The standard for issuing a temporary restraining order is identical to the standard for issuing a preliminary injunction. *Lockheed Missile & Space Co., Inc. v. Hughes Aircraft Co.*, 887 F. Supp. 1320, 1323 (N.D. Cal. 1995). Injunctive relief is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). To meet that showing, Plaintiffs must demonstrate "'[they are] likely to succeed on the merits, that [they are] likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [their] favor, and that an injunction is in the public interest.'" *Am. Trucking Ass'ns v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009) (quoting *Winter*, 555 U.S. at 20).[5]

---

[5] Warden LaRose argues Plaintiffs are requesting a mandatory injunction rather than a prohibitory injunction. The Ninth Circuit applies separate standards for injunctions depending on whether they are prohibitory, *i.e.* they prevent future conduct, or mandatory, *i.e.* "they go beyond 'maintaining the status quo[.]'" *Hernandez v. Sessions*, 872 F.3d 976, 997 (9th Cir. 2017). To the extent Plaintiffs are requesting mandatory relief, that request is "subject to a higher standard than prohibitory injunctions," namely that relief will issue only "when 'extreme or very serious damage will result' that is not capable of compensation in damages,' and the merits of the case are not 'doubtful.'" *Id.* at 999 (quoting *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 879 (9th Cir. 2009)). The Ninth Circuit recognizes that application of these different standards "is controversial[,]" and that other Circuits have questioned this approach. *Id.* at 997-98. This Court need not, and does not, address that discrepancy here. To the extent some portion of Plaintiffs' requested relief is subject to a standard higher than the traditional standard for injunctive relief, Plaintiffs have met their burden for the reasons set out below.

A.     **Likelihood of Success**[6]

"The first factor under *Winter* is the most important—likely success on the merits." *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015). While Plaintiffs carry the burden of demonstrating likelihood of success, they are not required to prove their case in full at this stage but only such portions that enable them to obtain the injunctive relief they seek. *See Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981).

As stated above, the only claim alleged in this case is that Defendants are violating Plaintiffs' rights to substantive due process under the Fifth Amendment. To prevail on this claim, Plaintiffs must show their continued confinement or their conditions of confinement amount to punishment. *Bell*, 441 U.S. at 535. In *Bell*, the Supreme Court stated that "if a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to 'punishment.'" *Id.* at 539. "Conversely, if a restriction or condition is not reasonably related to a legitimate goal-if it is arbitrary or purposeless-a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees qua detainees." *Id.* The Ninth Circuit, expanding upon *Bell*, has held that a condition or restriction of confinement "is 'punitive' where it is intended to punish, or where it is 'excessive in relation to [its non-punitive] purpose,' or is 'employed to achieve objectives that could be accomplished in so many alternative and less harsh methods[.]'" *Jones v. Blanas*, 393 F.3d 918, 934 (9th Cir. 2004) (citations omitted).

Numerous courts across the country have considered whether, in light of the COVID-19 pandemic, the continued confinement of ICE detainees or conditions of confinement at federal detention facilities amounts to punishment in violation of the Fifth

---

[6] Defendants argue the Court lacks jurisdiction over Plaintiffs' habeas petition, therefore Plaintiffs' do not have a likelihood of success on the merits of their claim. Defendants raised this same argument in *Habibi v. Barr*, No. 20cv0618 BAS(RBB), 2020 WL 1864642 (S.D. Cal. Apr. 14, 2020). The *Habibi* court rejected the argument, *id.* at *2 n.2, and this Court adopts that reasoning and conclusion here.

Amendment's substantive due process clause. *See*, *e.g.*, *Zepeda Rivas*, ___ F.Supp.3d ___, 2020 WL 2059848 (N.D. Cal. Apr. 29, 2020); *Doe v. Barr*, No. 20-CV-02263-RMI, 2020 WL 1984266 (N.D. Cal. Apr. 27, 2020); *Martinez Franco v. Jennings*, No. 20-CV-02474-CRB, 2020 WL 1976423 (N.D. Cal. Apr. 24, 2020); *Fraihat*, 2020 WL 1932570; *Singh v. Barr*, No. 20-CV-02346-VKD, 2020 WL 1929366 (N.D. Cal. Apr. 20, 2020); *Lopez-Marroquin v. Barr*, No. 20cv0682 LAB(MDD), 2020 WL 1905341 (S.D. Cal. Apr. 17, 2020); *Habibi*, 2020 WL 1864642; *Perez v. Wolf*, No. 5:19-CV-05191-EJD, 2020 WL 1865303 (N.D. Cal. Apr. 14, 2020); *Bent v. Barr*, No. 19-CV-06123-DMR, 2020 WL 1812850 (N.D. Cal. Apr. 9, 2020); *Ortuño v. Jennings*, No. 20-CV-02064-MMC, 2020 WL 1701724 (N.D. Cal. Apr. 8, 2020); *Dawson v. Asher*, No. C20-0409JLR-MAT, 2020 WL 1704324 (W.D. Wash. Apr. 8, 2020); *Xuyue Zhang v. Barr*, ___ F.Supp.3d ___, No. ED CV 20-00331-AB(RAOX), 2020 WL 1502607 (C.D. Cal. Mar. 27, 2020); *Castillo v. Barr*, ___ F.Supp.3d ___, No. CV 20-00605 TJH (AFMX), 2020 WL 1502864 (C.D. Cal. Mar. 27, 2020). In the Ninth Circuit, the majority of district courts that have considered the issue have concluded there is a likelihood plaintiffs will prevail on those claims. *See*, *e.g.*, *Zepeda Rivas*, 2020 WL 2059848; *Doe*, 2020 WL 1984266; *Singh*, 2020 WL 1929366; *Fraihat*, 2020 WL 1932570; *Perez*, 2020 WL 1865303. This Court agrees with that majority.

Although "under normal circumstances" the confinement of ICE detainees "pending removal proceedings is rationally related to the legitimate governmental interest of ensuring their appearance for their deportation proceedings and preventing danger to the community[,]" *Lopez-Marroquin*, 2020 WL 1905341, at *5, the current circumstances, and in particular, the circumstances at Otay Mesa, are anything but normal. As of April 30, 2020, there have been 490 confirmed cases of COVID-19 among those in ICE custody out of 1,030 detainees who have been tested, https://www.ice.gov/coronavirus, which translates to a near fifty-percent infection rate. Otay Mesa currently has the highest number of cases (98) in any ICE detention facility, *id.*, and all but one of its available housing units are currently under quarantine with at least one confirmed case of COVID-19.

Under these circumstances, then, the question becomes whether the continued confinement of the Otay Mesa Medically Vulnerable Subclass is excessive in relation to its purpose, namely preventing danger to the community and ensuring appearance at deportation hearings, or if that purpose could be achieved by less severe alternatives. There is no dispute that such alternatives are available. Accordingly, Plaintiffs have demonstrated a likelihood of success on their due process claim.

**B.     Irreparable Injury and Balance of Equities**

Turning to the next two factors, Plaintiffs must show they are "'likely to suffer irreparable harm in the absence of preliminary relief[,]'" and demonstrate that "'the balance of equities tips in [their] favor.'" *Hernandez*, 872 F.3d at 995 (quoting *Winter*, 555 U.S. at 20). Plaintiffs have met their burden.

The subclass at issue here is comprised of individuals who are medically vulnerable to severe illness and death if they contract COVID-19. That these individuals are more susceptible to severe and dire consequences is not reasonably in dispute. Defendants do dispute whether these individuals are at any greater risk of contracting COVID-19 in the first place, but given the circumstances under which these individuals are being held, it is clear they are at high risk. As stated above, Otay Mesa currently has the highest number of confirmed COVID-19 cases among all ICE detention facilities. The number of positive cases has gone from 25 on April 15 to 98 as of April 30, which is nearly a four-fold increase. Furthermore, although Defendants have instituted new policies and procedures in response to the COVID-19 outbreak, it is clear those policies and procedures are insufficient to protect the medically vulnerable population. Indeed, Warden LaRose admitted he did not have an accurate count of the medically vulnerable detainees in Otay Mesa until yesterday, and he was unable to tell the Court where the overwhelming majority of those detainees were currently being housed. Given the significant number of additional medically vulnerable detainees identified yesterday (43-61), the evidence that only two pods are currently free of COVID-19 infection, and one of those pods, the J Pod, is currently at near 80% capacity and detainees in that Pod are not practicing social distancing, the Otay Mesa

Medically Vulnerable Subclass is at great risk of contracting COVID-19. Thus, there is a likelihood of irreparable harm in the absence of a TRO.

The balance of equities also weighs in favor of a TRO. On Plaintiffs' side, the issuance of a TRO will reduce the likelihood that subclass members will contract COVID-19, and hopefully mitigate the spread of the virus in Otay Mesa. Defendants argue the equities weigh in their favor, as the government has an interest in addressing flight risk and protecting the public from dangerous persons. As stated above, however, flight risk may be addressed through alternatives to detention, and the Court's TRO preserves Defendants' discretion to maintain custody of individuals who may present a danger to the community. The Court's TRO also addresses Defendants' concern about setting appropriate conditions for release. For these reasons, the Court finds the balance of equities weighs in favor of issuance of the TRO.

### C. Public Interest

The final factor for consideration is the public interest. *See Hernandez*, 872 F.3d at 996. To obtain the requested relief, "[p]laintiffs must demonstrate that the public interest favors granting the injunction 'in light of [its] likely consequences,' i.e., 'consequences [that are not] too remote, insubstantial, or speculative and [are] supported by evidence.'" *Id.* (quoting *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1139 (9th Cir. 2009)).

As with the balance of equities discussed above, the public interest here also weighs in favor of issuing the TRO. As Plaintiffs point out, the public has an interest in preventing the spread of the coronavirus, both in the general population and elsewhere. It also has an interest in protecting the most vulnerable from the severe repercussions they face if infected with the coronavirus. These interests, combined with Defendants' continued ability to exercise their discretion to determine who is to be released and under what conditions, are all served by the issuance of the TRO.

///

///

///

## IV.
## CONCLUSION

For these reasons, and for the reasons set out during the April 30 status conference and the order that followed, the Court grants in part Plaintiffs' motion for class certification, as set out above. The Court also confirms its issuance of the TRO set out in its April 30, 2020 Order (ECF No. 38).

**IT IS SO ORDERED**.

DATED: May 1, 2020

DANA M. SABRAW
United States District Judge