1   STRUCK LOVE BOJANOWSKI & ACEDO, PLC
    Daniel P. Struck, AZ Bar #012377
2   *(admitted pro hac vice)*
    Rachel Love, AZ Bar #019881
3   *(admitted pro hac vice)*
    Nicholas D. Acedo, AZ Bar #021644
4   *(admitted pro hac vice)*
    Jacob B. Lee, AZ Bar #030371
5   *(admitted pro hac vice)*
    3100 West Ray Road, Suite 300
6   Chandler, Arizona 85226
    Tel.: (480) 420-1600
7   Fax: (480) 420-1695
    dstruck@strucklove.com
8   rlove@strucklove.com
    nacedo@strucklove.com
9   jlee@strucklove.com

10  WITHAM MAHONEY & ABBOTT, LLP
    Matt Mahoney, Esq., CA Bar # 211184
11  401 B Street, Suite 2220
    San Diego, CA 92101
12  Tel.: (619) 407-0505
    Fax: (619) 872-0711
13  mahoney@wmalawfirm.com

14  Attorneys for Defendant-Respondent LaRose

15              **UNITED STATES DISTRICT COURT**

16             **SOUTHERN DISTRICT OF CALIFORNIA**

17  Adrian Rodriguez Alcantara, et al.,         NO. 3:20-cv-00756-DMS-AHG

18                   Plaintiffs-Petitioners,    **SUPPLEMENTAL DECLARATION
                                                OF WARDEN C. LaROSE**
19  v.

20  Gregory J. Archambeault, San Diego
    Field Office Director, Immigration and
21  Customs Enforcement, et al.,

22                   Defendants-
                     Respondents.
23

24       I, C. LaROSE, make the following Declaration:

25       1.    I am over the age of 18 years and am competent to testify to the matters

26  set forth in this Declaration. I make this Declaration in support of Respondents'

27

28

Motion for Reconsideration of the Order granting Petitioners' Motion for Temporary Restraining Order.

2.     I am currently employed by CoreCivic as the Senior Warden of CoreCivic's Otay Mesa Detention Center ("OMDC") in San Diego, California, a position I have held since August 2019. I have been employed by CoreCivic since February 2016, when I became the Warden at CoreCivic's Northeast Ohio Correctional Center ("NEOCC") in Youngstown, Ohio, a position I held until July 2019.

3.     Prior to my employment with CoreCivic, Inc., I was employed by the Ohio Department of Rehabilitation and Correction ("ODRC") for approximately 20 years, where I most recently served as Warden at two facilities.

4.     During my career with ODRC, I started as a correctional officer and later served as a lieutenant, captain, administrative captain, and deputy warden of operations.

5.     All document exhibits attached hereto are true and accurate copies of documents generated and/or maintained in the normal course of OMDC's business operations with which I am familiar and have reviewed.

6.     All photos attached hereto fairly and accurately depict the subject matter shown in the photos, as existing on April 24, April 26, and May 1, 2020, and fairly and accurately depict OMDC conditions of confinement.

**OMDC Housing and COVID-19 Test Data**

7.     OMDC is owned and operated by CoreCivic, Inc. CoreCivic is the service provider under a detention service contract with U.S. Immigration and Customs Enforcement ("ICE"), with the United States Marshals Service ("USMS") as an authorized user. OMDC houses both ICE immigration detainees and USMS criminal detainees. These two populations are housed separately and do not intermix except under exceptional circumstances as described herein and in my previous

Declaration in support of Respondents' Response to Motion for Temporary Restraining Order, dated April 27, 2020. (Dkt. 26-1.)

8.      ICE's Health Services Corps ("IHSC") provides healthcare services to OMDC's detainee population.

9.      OMDC is a state-of-the-art, modern detention center with a design capacity of 1,970 detainees. OMDC opened in October 2015 and operates numerous housing pods of varying layouts and designs, to include traditional two-person cell, open sleeping bay, and secure-cell Restricted Housing Unit configurations.

10.      OMDC operates a receiving/discharge unit, medical unit, laundry facility, kitchen, two dining halls, commissary, chapel, library, gymnasium, large recreation yard, separate recreation yards attached to each housing pod, social and legal visitation facilities, ICE immigration court facilities, warehouse, and maintenance department.

11.      While OMDC has a design capacity of 1,970 detainees, as of May 2, 2020, the facility was operating at 48% capacity, with 950 detainees present on-site (with 3 ICE detainees out to the hospital and 2 out to court). Only one detainee being hospitalized is due to COVID-19-related illness and is an ICE detainee. Of the 643 ICE detainees on-site at OMDC as of May 3rd, 636 ICE detainees are assigned to general population (at varying custody levels) and 8 ICE detainees are assigned to Restrictive Housing Units ("RHU") due to safety and security issues that preclude assignment of these detainees to general population (7 males and 1 female).

12.      As of May 3, 2020, 114 ICE detainees have tested positive for COVID-19 at OMDC. Sixteen (16) ICE detainees have recovered from COVID-19. No OMDC detainees have died from COVID-19 infection.

13.      On average, it takes 2-3 days to receive detainee COVID-19 test results.

14.      For both staff and detainees, OMDC engages in efforts to identify anyone within the facility with whom COVID-19-positive detainees and/or staff had close contact leading up to the positive identification.

15.    OMDC has realized an increase in numbers of detainees testing positive for COVID-19, as IHSC has increased the testing numbers and lowered the threshold for testing.

16.    Neither I as Warden of OMDC, nor CoreCivic, determine which ICE detainees are assigned to OMDC. Rather, assignment decisions are made by ICE. Transfer and release determinations are likewise exclusively made by ICE for their detainee population.

17.    ICE and USMS detainees (as well as male and female detainees) are separately housed and do not intermix in housing, programming, recreation, meal service, facility movement, etc. except in special circumstances. For instance, ICE and USMS detainees (separated by gender) may be housed in RHU pods; however, the two jurisdictions are not housed in the same cells and movement/activity is restricted such that the two jurisdictions do not have contact with or access to each other. Additionally, exceptional medical quarantine circumstances may require both jurisdictions of detainees occupy the same living pod under restrictions wherein detainees are celled separately and do not intermix for movement or activity.

18.    As detailed specifically in my previous Declaration submitted in this case at Dkt. 26-1 (signed April 27, 2020), CoreCivic initiated COVID-19 response plans in February 2020, which are continually updated as more becomes known about the virus and updated guidance is provided by the CDC.

19.    On or about March 25, 2020, CoreCivic initiated a Medical Management of COVID-19: Quarantine High Risk Inmates/Detainees plan in order to employ operational strategies to plan for quarantine of detainees who are at higher risk of COVID-19 infection.

20.    COVID-19 cohorting/quarantine strategies have increased as detainees have tested positive for COVID-19. OMDC continues to cohort/quarantine pods from which a COVID-19-positive test derived for a period of at least 14 days from the last date a positive detainee was living in a pod. Moreover, OMDC continues to

quarantine COVID-19-positive detainees in designated housing locations until recovered.

21. Presently, all pods are under cohort/quarantine status and internal pod transfer assignments are suspended except for necessary transfers to the Medical Unit for necessary care, transfer to housing pods dedicated for COVID-19-positive detainees, and transfer to RHU for legitimate disciplinary/safety/security reasons.[1]

22. OMDC continues to update its staff/visitor screening procedures as well as staff and detainee education regarding COVID-19 as the CDC continues to revise its guidelines.

**Conditions of Confinement for ICE Detainee Housing Pods**

23. On or about March 24, 2020, IHSC provided CoreCivic with a list of 15 ICE detainees identified as having heightened COVID-19 risk factors.

24. The identified vulnerable ICE detainees were moved into previously empty housing pods in order to establish protective cohorts, separated from the rest of the detainee population. Several housing pod locations were initially required to prevent mixing of male and female detainees, as well as varying custody levels.

25. Presently, R Pod (128 detainee capacity),[2] which is a double-bunk cell design, houses both USMS and ICE male detainees identified by IHSC on or about March 24, 2020, as having heightened COVID-19 risk factors. The cell configuration of this pod facilitates separation of the two jurisdictions as operations are staggered to allow the two jurisdictions time out of cell on differing schedules.

_____

[1] J Pod was returned to cohort status after a detainee tested positive for COVID-19 on May 1, 2020. The positive detainee was transferred to K Pod where male ICE COVID-19-positive detainees are housed.

[2] In my previous declaration submitted in this matter at Dkt. 26-1 (signed April 27, 2020), I stated at paragraph 41 that the capacity of R Pod was 64. This figure was in error. The total pod occupancy capacity of R Pod is 128 detainees.

1    26.    As of May 2, 2020, only 20 detainees (8 ICE detainees and 12 USMS
2  detainees) were assigned to R Pod. [3]

3    27.    Detainees in R Pod have not had any positive COVID-19 tests. Staff
4  who enter R Pod wear PPE to include facial mask, eye protection, and gloves.

5    28.    Facility-wide, ICE detainees are housed in the following pod locations
6  as of May 2, 2020:[4]

| POD | GENDER | CUSTODY LEVELS | TOTAL POD CAPACITY | TOTAL ASSIGNED | POD OCCUPANCY %[5] |
|---|---|---|---|---|---|
| A-UNIT | FEMALE | LOW/MOD L | 128 | 60 | 47% |
| C1-UNIT | FEMALE | MOD H/HIGH | 14 | 10 | 71% |
| C2-SEG | FEMALE | SEG | 12 | 1 | 17%[6] |
| D-SEG | MALE | SEG | 64 | 6 | 20%[7] |
| F-UNIT | MALE | LOW/MOD L | 128 | 73 | 57% |
| G-UNIT | MALE | LOW | 128 | 75 | 59% |
| J-UNIT | MALE | LOW/MOD L | 128 | 93 | 73% |
| K-UNIT | MALE | LOW/MOD L | 128 | 59 | 46% |
| L-UNIT | MALE | MODH/HIGH | 128 | 17 | 13% |
| M-UNIT | MALE | MOD H/HIGH | 128 | 69 | 54% |
| N-UNIT | MALE | LOW | 128 | 67 | 52% |
| P-UNIT | MALE | LOW | 128 | 85 | 66% |
| R-UNIT | MALE | LOW | 128 | 8 | 16%[8] |

---

[3] Seven of the original 15 ICE detainees identified as having heightened COVID-19 risk-factors have left OMDC.

[4] It is my understanding that Petitioners' April 29, 2020 filing (Dkt. 36) referenced detainees housed in H, V, and Q Pods. These pods house USMS detainees only.

[5] Occupancy percentages are rounded to the nearest whole number.

[6] This RHU houses both ICE and USMS female detainees. There is also 1 female USMS detainee assigned to this location. Therefore, the pod occupancy percentage stated is based upon a total combined ICE and USMS in-pod population of 2 detainees.

[7] This RHU houses both ICE and USMS male detainees. There are also 7 male USMS detainee assigned to this location. Therefore, the pod occupancy percentage stated is based upon a total combined ICE and USMS in-pod population of 13 detainees.

[8] There are also 12 USMS detainees assigned to R Pod and thus the pod occupancy

29.     In addition to pod housing, as of May 2, 2020, 20 ICE detainees were assigned to Medical Unit housing locations.

30.     On April 28, 2020, after the hearing in this matter took place, I received new information advising that IHSC had identified 50-68[9] ICE detainees (including the detainees in R Pod) that may be within the CDC guidelines as being at higher risk for severe illness due to COVID-19. This information was sent to me by IHSC via email correspondence, received at 2:46 p.m.

31.     The detainees identified in the April 28th correspondence are currently assigned to the following locations set forth in the ICE population location table in Paragraph 27: Pods A, C-1, C-2, D, F, J, K, L, M, N, P, and R; and the Medical Unit.

32.     Because all pods currently remain on cohort or quarantine status, there is no internal housing movement at this time except to move detainees to the Medical Unit for necessary medical care, to move detainees who test positive for COVID-19 to designated COVID-19-positive housing locations, or to move detainees to the RHU for legitimate disciplinary/safety/security reason. To operate otherwise and move heightened-risk detainees into R Pod from other locations would expose R Pod to possible COVID-19. To establish new protective cohorts for these identified detainees would also result in possible cross-exposure where detainees from numerous locations would be rehoused together. Such internal movement would increase exposure risk at this time, not reduce it. ICE is in agreement with the present operational plan restricting internal housing movement.

---

rate stated is based upon a total combined ICE and USMS in-pod population of 20 detainees.

[9] The previous range of 51-69 detainees presented to the Court, which was based on CDC guidelines (i.e., age > 65 and the conditions identified by CDC), inadvertently included 2 USMS detainees. Additionally, 1 new ICE detainee must now be included due to the age threshold being lowered to age > 60 by the Court.

33.     Although it is challenging to always maintain six feet of physical distance in a custodial setting, at OMDC practices have been implemented to promote physical distancing.

34.     The dayroom areas of OMDC's housing pods are large and allow ample space for detainees to socially distance themselves from each other. (Photos of Pods A, C-1, C-2, D, F, J, K, L, M, N, P, and R Pods depicting dayroom areas, COVID-19 educational postings and cells at Attachments 1-12.) This is especially so where OMDC's total population is at 48% of design capacity.

35.     Detainees are regularly advised of the importance of wearing facial masks and social distancing during weekly Town Hall meetings and every day interactions with staff.

36.     Staff regularly encourage detainees to wear the provided facial masks and social distance when outside their cells. Taking disciplinary action against detainees who do not voluntarily wear the provided facial masks, to include placement in RHU for disciplinary violation, is largely unworkable where placement in RHU requires internal housing location movement. Internal housing movement is currently restricted except for in certain circumstances noted in Paragraph 31, above, in order to avoid potential COVID-19 cross-exposure. As wearing facial masks is now common place both in the facility and in the community, detainee voluntary use of the provided masks is increasing.

**A Pod**

37.     As of May 2, 2020, A Pod is at 47% capacity. It is an open sleeping bay design pod with a dayroom area containing 8 affixed tables with 6 stools each, plastic sectional couches and ottomans that can be moved about the dayroom, televisions, and an attached outdoor recreation area. Each sleeping bay, which is over 15' deep and over 18' wide, houses 4 detainees, with beds affixed to the walls on each end. Detainees in A Pod use communal toilets and sinks. Staff who enter A Pod wear

appropriate PPE, including face masks, eye protection, and gloves. (Photos of A Pod at Attachment 1.)

38.     All facility-wide COVID-19 response operations for restricted movement, PPE requirements for staff, restricted detainee Voluntary Work Program assignments, provision of medical care, provision of detainee facial masks, provision of soap, provision of cleaning supplies to detainees, COVID-19 detainee education, social distancing opportunities, enhanced sanitation practices, meal service, laundry service, commissary service, library service, and legal visitation as described in my previous declaration at Paragraphs 40–54, 72–133, 146-150, and 153-161 (Dkt. 26-1) are in place for A Pod as well.

### C-1 Pod

39.     As of May 2, 2020, C-1 Pod is at 71% capacity. It is a double-bunk cell design pod with a dayroom area containing 2 affixed tables with 11 stools, a television, and an attached outdoor recreation area. Each cell has its own toilet and sink. Staff who enter C-1 Pod wear appropriate PPE, including face masks, eye protection, and gloves. (Photos of C-1 Pod at Attachment 2.)

40.     All facility-wide COVID-19 response operations for restricted movement, PPE requirements for staff, restricted detainee Voluntary Work Program assignments, provision of medical care, provision of detainee facial masks, provision of soap, provision of cleaning supplies to detainees, COVID-19 detainee education, social distancing opportunities, enhanced sanitation practices, meal service, laundry service, commissary service, library service, and legal visitation as described in my previous declaration at Paragraphs 40–54, 72–133, and 154-161 (Dkt. 26-1) are in place for C-1 Pod as well.

### C-2 Pod

41.     As of May 2, 2020, C-2 Pod is at 17% capacity. It is a double-bunk cell design pod. Each cell has its own toilet and sink. As a segregation pod, it does not

have a dayroom. Staff who enter C-2 Pod wear appropriate PPE, including face masks, eye protection, and gloves. (Photos of C-2 Pod at Attachment 3.)

42.   All facility-wide COVID-19 response operations for restricted movement, PPE requirements for staff, restricted detainee Voluntary Work Program assignments, provision of medical care, provision of detainee facial masks, provision of soap, provision of cleaning supplies to detainees, COVID-19 detainee education, social distancing opportunities, enhanced sanitation practices, meal service, laundry service, commissary service, library service, and legal visitation as described in my previous declaration at Paragraphs 40–54, 72–141, and 154-161 (Dkt. 26-1) are in place for C-2 Pod as well.

### D Pod

43.   As of May 2, 2020, D Pod is at 20% capacity. It is a double-bunk cell design pod. Each cell has its own toilet and sink. As a segregation pod, it does not have a dayroom. Staff who enter D Pod wear appropriate PPE, including face masks, eye protection, and gloves. (Photos of D Pod at Attachment 4.)

44.   All facility-wide COVID-19 response operations for restricted movement, PPE requirements for staff, restricted detainee Voluntary Work Program assignments, provision of medical care, provision of detainee facial masks, provision of soap, provision of cleaning supplies to detainees, COVID-19 detainee education, social distancing opportunities, enhanced sanitation practices, meal service, laundry service, commissary service, library service, and legal visitation as described in my previous declaration at Paragraphs 40–54, 72–141, and 154-161 (Dkt. 26-1) are in place for D Pod as well.

### F Pod

45.   As of May 2, 2020, F Pod is at 57% capacity. It is an open sleeping bay design pod with a dayroom area containing 8 affixed tables with 6 stools each, plastic sectional couches and ottomans that can be moved about the dayroom, televisions, and an attached outdoor recreation area. Each sleeping bay, which is over 15' deep

and over 18' wide, houses 4 detainees, with beds affixed to the walls on each end. Detainees in F Pod use communal toilets and sinks. Staff who enter F Pod wear appropriate PPE, including face masks, eye protection, and gloves. (Photos of F Pod at Attachment 5.)

46.     All facility-wide COVID-19 response operations for restricted movement, PPE requirements for staff, restricted detainee Voluntary Work Program assignments, provision of medical care, provision of detainee facial masks, provision of soap, provision of cleaning supplies to detainees, COVID-19 detainee education, social distancing opportunities, enhanced sanitation practices, meal service, laundry service, commissary service, library service, and legal visitation as described in my previous declaration at Paragraphs 40–54, 72–133, 146-150, and 153-161 (Dkt. 26-1) are in place for F Pod as well.

## J Pod

47.     As of May 2, 2020, J Pod is at 73% capacity. It is an open sleeping bay design pod with a dayroom area containing 8 affixed tables with 6 stools each, plastic sectional couches and ottomans that can be moved about the dayroom, televisions, and an attached outdoor recreation area. Each sleeping bay, which is over 15' deep and over 18' wide, houses 4 detainees, with beds affixed to the walls on each end. Detainees in J Pod use communal toilets and sinks. Staff who enter J Pod wear appropriate PPE, including face masks, eye protection, and gloves. (Photos of J Pod at Attachment 6.)

48.     All facility-wide COVID-19 response operations for restricted movement, PPE requirements for staff, restricted detainee Voluntary Work Program assignments, provision of medical care, provision of detainee facial masks, provision of soap, provision of cleaning supplies to detainees, COVID-19 detainee education, social distancing opportunities, enhanced sanitation practices, meal service, laundry service, commissary service, library service, and legal visitation as described in my

previous declaration at Paragraphs 40–54, 72–133, 146–150, and 153–161 (Dkt. 26-1) are in place for J Pod as well.

### **K Pod**

49.    As of May 2, 2020, K Pod, one of two pods that houses ICE detainees who are positive for COVID-19, is at 46% capacity. It is an open sleeping bay design pod with a dayroom area containing 8 affixed tables with 6 stools each, plastic sectional couches and ottomans that can be moved about the dayroom, televisions, and an attached outdoor recreation area. Each sleeping bay, which is over 15' deep and over 18' wide, houses 4 detainees, with beds affixed to the walls on each end. Detainees in K Pod use communal toilets and sinks. Staff who enter K Pod wear appropriate PPE, including N-95 respirators, eye protection, gloves, and gowns/coveralls. (Photos of K Pod at Attachment 7.)

50.    All facility-wide COVID-19 response operations for restricted movement, PPE requirements for staff, restricted detainee Voluntary Work Program assignments, provision of medical care, provision of detainee facial masks, provision of soap, provision of cleaning supplies to detainees, COVID-19 detainee education, social distancing opportunities, enhanced sanitation practices, meal service, laundry service, commissary service, library service, and legal visitation as described in my previous declaration at Paragraphs 40–54, 72–133, 146–150, and 153–161 (Dkt. 26-1) are in place for K Pod as well.

### **L Pod**

51.    As of May 2, 2020, L Pod, one of two pods that houses ICE detainees who are positive for COVID-19, is at 13% capacity. It is a double-bunk cell design pod with a dayroom area containing 17 affixed tables with 4 stools each, televisions, and an attached outdoor recreation area. Each cell has its own toilet and sink. Staff who enter L Pod wear appropriate PPE, including N-95 respirators, eye protection, gloves, and gowns/coveralls. (Photos of L Pod at Attachment 8.)

52. All facility-wide COVID-19 response operations for restricted movement, PPE requirements for staff, restricted detainee Voluntary Work Program assignments, provision of medical care, provision of detainee facial masks, provision of soap, provision of cleaning supplies to detainees, COVID-19 detainee education, social distancing opportunities, enhanced sanitation practices, meal service, laundry service, commissary service, library service, and legal visitation as described in my previous declaration at Paragraphs 40–54, 72–133, and 154-161 (Dkt. 26-1) are in place for L Pod as well.

**M Pod**

53. As of May 2, 2020, M Pod is at 54% capacity. It is a double-bunk cell design pod with a dayroom area containing 17 affixed tables with 4 stools each, televisions, and an attached outdoor recreation area. Each cell has its own toilet and sink. Staff who enter M Pod wear appropriate PPE, including face masks, eye protection, and gloves. (Photos of M Pod at Attachment 9.)

54. All facility-wide COVID-19 response operations for restricted movement, PPE requirements for staff, restricted detainee Voluntary Work Program assignments, provision of medical care, provision of detainee facial masks, provision of soap, provision of cleaning supplies to detainees, COVID-19 detainee education, social distancing opportunities, enhanced sanitation practices, meal service, laundry service, commissary service, library service, and legal visitation as described in my previous declaration at Paragraphs 40–54, 72–133, and 154-161 (Dkt. 26-1) are in place for M Pod as well.

**N Pod**

55. As of May 2, 2020, N Pod is at 52% capacity. It is an open sleeping bay design pod with a dayroom area containing 8 affixed tables with 6 stools each, plastic sectional couches and ottomans that can be moved about the dayroom, televisions, and an attached outdoor recreation area. Each sleeping bay, which is over 15' deep and over 18' wide, houses 4 detainees, with beds affixed to the walls on each end.

Detainees in N Pod use communal toilets and sinks. Staff who enter N Pod wear appropriate PPE, including face masks, eye protection, and gloves. (Photos of N Pod at Attachment 10.)

56.     All facility-wide COVID-19 response operations for restricted movement, PPE requirements for staff, restricted detainee Voluntary Work Program assignments, provision of medical care, provision of detainee facial masks, provision of soap, provision of cleaning supplies to detainees, COVID-19 detainee education, social distancing opportunities, enhanced sanitation practices, meal service, laundry service, commissary service, library service, and legal visitation as described in my previous declaration at Paragraphs 40–54, 72–133, 146–150, and 153–161 (Dkt. 26-1) are in place for N Pod as well.

## P Pod

57.     As of May 2, 2020, P Pod is at 66% capacity. It is an open sleeping bay design pod with a dayroom area containing 8 affixed tables with 6 stools each, plastic sectional couches and ottomans that can be moved about the dayroom, televisions, and an attached outdoor recreation area. Each sleeping bay, which is over 15' deep and over 18' wide, houses 4 detainees, with beds affixed to the walls on each end. Detainees in P Pod use communal toilets and sinks. Staff who enter P Pod wear appropriate PPE, including face masks, eye protection, and gloves. (Photos of P Pod at Attachment 11.)

58.     All facility-wide COVID-19 response operations for restricted movement, PPE requirements for staff, restricted detainee Voluntary Work Program assignments, provision of medical care, provision of detainee facial masks, provision of soap, provision of cleaning supplies to detainees, COVID-19 detainee education, social distancing opportunities, enhanced sanitation practices, meal service, laundry service, commissary service, library service, and legal visitation as described in my previous declaration at Paragraphs 40–54, 72–133, 146–150, and 153–161 (Dkt. 26-1) are in place for P Pod as well.

**R Pod**

59.     As of May 2, 2020, R Pod is at 16% capacity. It is a double-bunk cell design pod with a dayroom area containing 17 affixed tables with 4 stools each, televisions, and an attached outdoor recreation area. Each cell has its own toilet and sink. Staff who enter R Pod wear appropriate PPE, including face masks, eye protection, and gloves. (Photos of R Pod at Attachment 12.)

60.     All facility-wide COVID-19 response operations for restricted movement, PPE requirements for staff, restricted detainee Voluntary Work Program assignments, provision of medical care, provision of detainee facial masks, provision of soap, provision of cleaning supplies to detainees, COVID-19 detainee education, social distancing opportunities, enhanced sanitation practices, meal service, laundry service, commissary service, library service, and legal visitation as described in my previous declaration at Paragraphs 40–54, 72–133, and 154-161 (Dkt. 26-1) are in place for R Pod as well.

I declare under penalty of perjury under the laws of the United States and the State of California that the foregoing is true and correct to the best of my knowledge.

EXECUTED this 4th day of May, 2020, in San Diego, California.

_____
C. LaROSE

3701106