**MONIKA Y. LANGARICA** (SBN 308518)(mlangarica@aclusandiego.org)
**JONATHAN MARKOVITZ** (SBN 301767)(jmarkovitz@aclusandiego.org)
**KIMBERLY GRANO** (SBN 328298)(kgrano@aclusandiego.org)
**BARDIS VAKILI** (SBN 247783)(bvakili@aclusandiego.org)
**DAVID LOY** (SBN 229235)(davidloy@aclusandiego.org)
**ACLU FOUNDATION OF SAN DIEGO &**
**IMPERIAL COUNTIES**
P.O. Box 87131
San Diego, CA 92138-7131
Telephone: (619) 398-4493

Counsel for Plaintiff-Petitioners

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Adrian RODRIGUEZ ALCANTARA, et al., <br><br> Plaintiff-Petitioners, <br><br> v. <br><br> GREGORY J. ARCHAMBEAULT, San Diego Field Office Director, Immigration and Customs Enforcement, et al., <br><br> Defendant-Respondents. | Case No. 20cv756 DMS (AHG) <br><br> **PLAINTIFF-PETITIONERS' SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION** <br><br> DATE: May 22, 2020 <br> TIME: 10:30 a.m. <br> CTRM: 13A <br> Hon. Dana M. Sabraw |

# TABLE OF CONTENTS

I.      INTRODUCTION ...................................................................................... 1

II.     FACTS ...................................................................................................... 2

III.    ARGUMENT ............................................................................................ 8

   A.    Plaintiffs Remain Likely to Succeed on the Merits of Their Claim. ........... 8

      1.    At Minimum, this Court Should Convert the Existing TRO Into a
            Preliminary Injunction Because Defendants Continue to Violate the Due
            Process Rights of Medically Vulnerable People Confined in Otay Mesa. 8

      2.    Defendants' Progress Implementing the TRO Does Not Eliminate the
            Need for a Preliminary Injunction, for Both Released Subclass Members
            and Those Still in Defendants' Custody. ................................................. 13

      3.    Defendants Have Provided No Argument to Defeat the Medically
            Vulnerable Subclass This Court Provisionally Certified, Which Should
            Be Expanded in Any Event. ................................................................. 17

      4.    The Court Should Not Dismiss the Case Based on *Fraihat* ................... 20

   B.    The Remaining Factors Favor an Injunction. ........................................... 22

IV.    CONCLUSION ....................................................................................... 23

# TABLE OF AUTHORITIES

## CASES

*Adams v. California Dep't of Health Servs.*,
   487 F.3d 684 (9th Cir. 2007) ............................................................. 22

*Arizona Dream Act Coal. v. Brewer*,
   757 F.3d 1053 (9th Cir. 2014) ........................................................... 23

*Bell v. Wolfish*,
   441 U.S. 520 (1979) ........................................................................... 9

*Cancino Castellar v. McAleenan*,
   388 F. Supp. 3d 1218 (S.D. Cal. 2019) ............................................. 9

*DeShaney v. Winnebago Cty. Dept. of Soc. Servs.*,
   489 U.S. 189 (1989) ........................................................................... 13

*Doe v. Kelly*,
   878 F.3d 710 (9th Cir. 2017) ............................................................. 9

*Fraihat v. U.S. Immigration & Customs Enf't*,
   No. EDCV191546JGBSHKX, 2020 WL 1932393 (C.D. Cal. Apr.
   20, 2020) ..........................................................2, 5, 20, 21, 22

*Gates v. Collier*,
   501 F.2d 1291 (5th Cir. 1974) ........................................................... 13

*Gordon v. County of Orange*,
   888 F.3d 1118 (9th Cir. 2018) ...................................................... 10, 19

*Helling v. McKinney*,
   509 U.S. 25 (1993) ............................................................................. 13

*Hutto v. Finney*,
   437 U.S. 678 (1978) ........................................................................... 13

*Jones v. Blanas*,
   393 F.3d 918 (9th Cir. 2004) ........................................................ 9, 10

*King v. County of Los Angeles*,
   885 F.3d 548 (9th Cir. 2018) ............................................................. 9

*Kingsley v. Hendrickson*,
   135 S. Ct. 2466 (2015) ...................................................................... 9

*Myers v. Intuit, Inc.*,
   No. 17cv1228-WQH-BLM, 2018 WL 2287425 (S.D. Cal. May 18,
   2018) .................................................................................................. 19

*Pimentel v. Dreyfus*,
   670 F.3d 1096 (9th Cir. 2012) ........................................................... 8

*Rodriguez v. Marin*,
  909 F.3d 252 (9th Cir. 2018) ............................................................... 14

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) ................................................................................... 8

*Xochihua-Jaimes v. Barr*,
  No. 18-71460, 2020 WL 1429877 (9th Cir. Mar. 24, 2020) ............................. 3

*Youngberg v. Romeo*,
  457 U.S. 307 (1982) ............................................................................... 9

*Zadvydas v. Davis*,
  533 U.S. 678 (2001) ............................................................................... 8

*Zelaya Sagastume v. Archambeault*,
  No. 3:20-CV-00658 (S.D. Cal. Apr. 6, 2020) ......................................... 3

*Zepeda Rivas v. Jennings,*
  No. 20 CV 02731-VC, 2020 WL 2059848 (N.D. Cal. Apr. 29,
  2020) .......................................................................................... 13, 21

*Zepeda v. INS*,
  753 F.2d 719 (9th Cir. 1983) ............................................................. 23

## STATUTES

8 U.S.C § 1182(d)(5) ............................................................................... 14

## OTHER AUTHORITIES

Doris Meissner, *Exercising Prosecutorial Discretion*, Immigration and
  Naturalization Services (Nov. 17, 2000) ............................................ 15

*Gov. Newsom updates state's progress toward stage 2 reopening,* San
  Diego County News (May 6, 2020) ...................................................... 8

Greg Morgan, *Hundreds released from jail under new bail rules, but
  prosecutors object to release of nearly 200 more*, San Diego Union
  Tribune (Apr. 15, 2020) ........................................................................ 3

*Groups at Higher Risk for Severe Illness,* Centers for Disease Control
  and Prevention .................................................................................... 20

House Committee on Oversight and Reform, *DHS Officials Refuse to
  Release Asylum Seekers and Other Non-Violent Detainees Despite
  Spread of Coronavirus,* (April 17, 2020) ............................................ 3

*ICE Guidance on COVID-19,* U.S. Immigration and Customs
  Enforcement ......................................................................................... 9

*Interim Guidance for COVID-19 and Persons with HIV*, U.S.
  Department of Health and Human Services, National Institute of
  Health, AIDS Info ................................................................................ 19

*Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities*, Centers for Disease Control and Prevention ......................................................... 11

Jeh Charles Johnson, *Policies for the Apprehension, Detention and Removal of Undocumented Immigrants*, U.S. Department of Homeland Security, (Nov. 20, 2014) .............................................. 15

Kate Morrissey, *COVID-19 concerns prompt hunger strikes, protests inside Otay Mesa Detention Center*, The San Diego Union Tribune (Apr. 17, 2020) ................................................................... 4

Kate Morrissey, *First ICE detainee dies from COVID-19 after being hospitalized from Otay Mesa Detention Center,* San Diego Union Tribune (May 6, 2020) ......................................................... 7

*People Who Are at Higher Risk for Severe Illness*, *What to Know About HIV and COVID-19*, Centers for Disease Control and Prevention ................................................................................. 19

*Resilience Roadmap*, California Coronavirus (COVID-19 Response), ................ 7

San Diego County Sheriff's Department, *COVID-19 and County Jails Update* (Apr. 24, 2020) ........................................................... 4

U. S. Immigration  and Customs Enforcement, Enforcement and Removal Operations, *Directive 11071.1: Assessment and Accommodations for Detainees with Disabilities* (Dec. 15, 2016) ................. 15

U.S. Immigration and Customs Enforcement, *Detention Reform*, (last updated July 24, 2018) ....................................................... 14

## I.     __INTRODUCTION__

In granting a temporary restraining order ("TRO") this Court held that Plaintiffs meet requirements identical to those necessary for issuing a preliminary injunction, whether "mandatory" or "prohibitory." ECF No. 41, Order Granting Motion for Class Certification and Temporary Restraining Order ("TRO") at 14, n. 5. In the two weeks that have followed, Defendants have offered nothing to justify holding otherwise now.

This Court has already agreed Plaintiffs are likely to prevail on their claim that continued confinement of medically vulnerable people at Otay Mesa Detention Center ("Otay Mesa") during the largest outbreak of COVID-19 in an immigration detention center nationwide amounts to punishment in violation of the Fifth Amendment:

> Under these circumstances, then, the question becomes whether the continued confinement of the Otay Mesa Medically Vulnerable Subclass is excessive in relation to its purpose . . . or if that purpose could be achieved by less severe alternatives. There is no dispute that such alternatives are available. Accordingly, Plaintiffs have demonstrated a likelihood of success on their due process claim.

*Id.* at 16-17. Plaintiffs continue to demonstrate a likelihood of success on the merits of their due process claim, which warrants converting the TRO into a preliminary injunction forbidding the continued detention of medically vulnerable people in U.S. Customs and Immigration Enforcement ("ICE") custody in Otay Mesa. With appropriate release plans ordered by the Court if the parties cannot agree, this relief must include the 35 people Defendants continue to detain due to their alleged criminal histories, because there is no set of circumstances under which Defendants can adequately protect medically vulnerable people against serious risk of harm given the current situation in Otay Mesa. Regardless of their criminal histories, these individuals remain civil detainees who may not be subject to substantial risk of death or severe harm. They have served their criminal sentences and paid their debt to society. Civil immigration detention cannot become their death sentence.

The injunction should further require Defendants to continue their current policy of forbidding new admissions into Otay Mesa until the State of California once again allows large congregate gatherings. The Court need not disturb its ruling that the nationwide injunction in *Fraihat v. U.S. Immigration & Customs Enf't,* No. EDCV191546JGBSHKX, 2020 WL 1932393 (C.D. Cal. Apr. 20, 2020) does not warrant dismissal of this case, nor should it disturb its provisional class certification other than to expand the medically vulnerable subclass to that originally proposed by Plaintiffs, which includes additional people at heightened risk of serious harm from COVID-19 and therefore tracks more closely with the substantive due process right at issue.

Finally, as the Court already held, irreparable harm, balance of equities, and the public interest support preliminary injunctive relief in this case. *Id.* at 16-18.

## II.   FACTS

Plaintiffs hereby incorporate by reference the factual background discussed in their Memorandum in Support of Plaintiff-Petitioners' Emergency Ex Parte Motion for Subclass-wide Temporary Restraining Order, Preliminary Injunction, and Writ of Habeas Corpus ("Plaintiffs' TRO Brief"). ECF No. 2-1 at 5-19. For ease of reference, Plaintiffs summarize some of the most salient undisputed facts from their initial brief.

On March 19, 2020, Governor Newsom issued an executive order ordering all residents of California to shelter in place. The same day, two medical experts for the Department of Homeland Security Office of Civil Rights and Civil Liberties, Drs. Scott A. Allen and Josiah Rich, wrote to Congress to warn them that, unless detention populations were dramatically reduced to allow social distancing, ICE detention centers would serve as tinderboxes for the rapid spread of the disease. ECF No. 2-2, Allen and Rich Letter at 9.

On March 24, 2020, the Ninth Circuit noted that "public health authorities predict" the "rapidly escalating public health crisis" would "especially impact immigration detention centers." *Xochihua-Jaimes v. Barr*, No. 18-71460, 2020 WL

1429877, at *1 (9th Cir. Mar. 24, 2020). Over the next few weeks, ICE issued various iterations of evolving and conflicting guidance, suggesting reductions in ICE detention population, though Plaintiffs dispute that any such guidance was put into place at Otay Mesa. *See* Plaintiffs' TRO Brief, Pt. II.C, D at pp. 9-15. On April 17, 2020, Defendant Albence reportedly confirmed to Congress that ICE would not voluntarily release any more people to reduce the COVID-19 risks; the agency had released fewer than 700 out of more than 32,000 then in detention.[1] By comparison, San Diego County had released nearly 1,300 people from its jails by April 15, out of 4,345 then in custody.[2]

On March 31, 2020, Defendants confirmed that Otay Mesa had its first case of COVID-19, when a staff member tested positive. Defendants had not yet provided personal protective equipment to detained people.

On April 9, 2020, Captain Philip Farabaugh, Deputy Medical Director with ICE Health Service Corps, reported 14 confirmed cases and 6 suspected cases of COVID-19 among ICE detainees in Otay Mesa. *Zelaya Sagastume v. Archambeault,* No. 3:20-CV-00658 (S.D. Cal. Apr. 6, 2020), Declaration of Captain Farabaugh, ECF No. 24-2, ¶ 12.  Six housing pods, including P-pod, were then under quarantine. *Id.* Captain Farabaugh described the ICE Health Services Corps "cohorting" strategy, whereby Defendants trap all people from one housing unit where there has been exposure to COVID-19 together in close quarters, including the medically vulnerable people in that unit, until 14 days pass after the last known exposure. *Id.* ¶ 10.

On April 9, Captain Farabaugh also declared that new individuals entering Otay Mesa are given an intake screening that ignores the possibilities of

---

[1] House Committee on Oversight and Reform, *DHS Officials Refuse to Release Asylum Seekers and Other Non-Violent Detainees Despite Spread of Coronavirus*, (April 17, 2020), https://oversight.house.gov/news/press-releases/dhs-officials-refuse-to-release-asylum-seekers-and-other-non-violent-detainees.

[2] Greg Morgan, *Hundreds released from jail under new bail rules, but prosecutors object to release of nearly 200 more*, San Diego Union Tribune (Apr. 15, 2020), https://www.sandiegouniontribune.com/news/courts/story/2020-04-15/court-and-jail-releases-draft

asymptomatic and presymptomatic COVID-19 transmission. New arrivals were "assessed for fever and respiratory illness" and then asked to self-report "close contact with a person with laboratory-confirmed COVID-19." *Id.* ¶¶ 8-10. Only if they self-reported such contact were new individuals further monitored; otherwise they were presumably placed straight into general population. *Id.* By comparison, San Diego jails have reduced their population enough to allow all new arrivals to be quarantined from general population for seven days.[3] Notably, Captain Farabaugh also declared facts that have been disproven by the record in this case, including that "CoreCivic [] provides hand sanitizer to detainees and staff and cleans and disinfects each housing unit between shifts." *Id.* ¶ 15. Defendant LaRose has since contradicted that statement, declaring that "detainees are not provided with alcohol-based hand sanitizer," ECF No. 26-1, April 27 Declaration of Warden LaRose ("LaRose Decl. 1") ¶ 114, and detainees alone must "clean and disinfect the dayroom area and communal restrooms throughout the day," *id.* ¶ 119.

By April 21, the day Plaintiffs filed this case, 18 immigration detainees at Otay Mesa had been confirmed positive for COVID-19.[4]

The following additional undisputed facts have since come to light:

- **On March 23**, ICE Health Services Corps, the agency responsible for the health and medical care of people detained at Otay Mesa, "provided CoreCivic with a list of 15 ICE OMDC detainees (13 male and 2 female) identified as having heightened COVID-19 risk factors." LaRose Decl. 1 ¶ 37;

- **On April 26**, Defendant LaRose admitted that Otay Mesa's housing units contain shared sleeping bays and shared dayrooms, that the facility does not

---

[3] San Diego County Sheriff's Department, *COVID-19 and County Jails Update* (Apr. 24, 2020), https://apps.sdsheriff.net/pressrelease/Default.aspx?FileLink=f5940f26-d187-48b5-91ff-eeb28de47780

[4] Kate Morrissey, *COVID-19 concerns prompt hunger strikes, protests inside Otay Mesa Detention Center*, The San Diego Union Tribune (Apr. 17, 2020), https://www.sandiegouniontribune.com/news/immigration/story/2020-04-17/covid-19-concerns-prompt-hunger-strikes-protests-inside-otay-mesa-detention-center

require social distancing among detainees, and that use of personal protective equipment is not enforced, even providing photographic evidence thereof. LaRose Decl. 1, Attachment 12, at 97-98;

- **On April 27**, Defendant LaRose declared that, after CoreCivic initiated a "'Medical Management of COVID-19: Quarantine High Risk Inmates/Detainees Plan'" in order to employ operational strategies to plan for quarantine of detainees who are at higher risk of infection," *id.* ¶ 20, he had identified only eight people in ICE custody at Otay Mesa with heightened risk factors, all were moved into a "protective cohort[]" in R Pod, and "[f]emale ICE and USMS detainees previously identified as having heightened COVID-19 risk factors ha[d] left OMDC." *Id.* ¶¶ 38-39;

- **On April 29**, Defendant LaRose corrected his prior declaration, indicating there were actually between 51 and 69 medically vulnerable people at Otay Mesa. ECF No. 34, Respondent LaRose Supplement to the Opposition Motion for Class Certification at 2;

- **On April 30**, Defendants admitted that they had only looked for and identified these additional medically vulnerable people in ICE custody at Otay Mesa as a result of the court order in *Fraihat*, over one month after IHSC created its inaccurate March 23 list and four weeks after COVID-19 was confirmed present in the facility. Tr. April 30, 2020 Hearing at 8:6-11; 9:10-13. Defendants also reversed themselves on the issue of protective cohorts, admitting the danger of the practice: "IHSC generally does not do protective cohorts. And it is my understanding that they don't want to create a situation where there is a whole pod full of vulnerable detainees, and that if somebody was to bring the virus into that unit it might create a nursing home type situation." *Id*. at 5:22-25, 6:1-3;

- **On May 4**, four days after this court granted the TRO, Defendants again corrected their previous count of medically vulnerable individuals, more than

doubling the previous count to 131, of which it planned to continue detaining 36 and had released only two. Later that day, Defendant LaRose corrected his previous statements once more, indicating there were 50-68 medically vulnerable people at Otay Mesa, and that the previous range of 51-69 included "2 USMS detainees." May 4 Declaration of Warden LaRose (LaRose Decl. 2) ¶ 30, n. 9;

- Warden LaRose also indicated all housing units at Otay Mesa were "cohorted." LaRose Decl. 2 ¶¶ 20-21;

- Defendant LaRose further admitted that he had previously incorrectly reported the capacity of one of the housing units in his facility, stating that "R" pod contained enough cells to hold 128 people, not 64 as he previously declared. LaRose Decl. 2, n.2;

- Defendant LaRose conceded "it is challenging to always maintain six feet of physical distance in a custodial setting," that the facility was only "promoting" physical distancing rather than enforcing it, and that use of personal protective equipment including masks is not enforceable at Otay Mesa. *Id.* ¶¶ 33, 36. Defendant LaRose confirmed people detained at Otay Mesa sleep in cells with others, in beds affixed to the wall such that they cannot be rearranged, and that they use "communal toilets and sinks." *Id.* ¶ 37;

- Photographs show bunkbeds are stacked with fewer than six feet between them, ECF 49-9, LaRose Decl. 2, Attachment 1 Pt. 5 at 2, and social distancing and use of personal protective equipment is not enforced. *See, e.g.,* ECF 49-6, LaRose Decl. 2, Attachment 1 Pt. 2, at 14; ECF No. 49-8, LaRose Decl. 2, Attachment 1 Pt. 4 at 6;

- Instructional flyers for people detained at Otay Mesa direct that masks that are "soiled, torn, or saturated should be thrown away in standard garbage bin as long as you don't show any of the symptoms of COVID-19." ECF 49-6, LaRose Decl. 2, Attachment 1 Pt. 2, at 5. The flyers do not say replacement

masks are available and photographs only depict flyers in English and Spanish;[5]

- **By May 6**, two weeks after this case began, the number of confirmed positive cases among immigration detainees had grown to at least 136;[6]

- **On May 6**, an individual on the list of medically vulnerable people detained at Otay Mesa died from COVID-19 related complications while in Defendants' custody;[7]

- **On May 8**, Defendants confirmed they continued to recommend detention for 35 Otay Mesa Medically Vulnerable Subclass members;[8]

- **On May 8**, Defendants reported to the Court that 145 individuals in ICE detention at Otay Mesa had tested positive—eight times as many as when the case was filed—with 11 tests still pending. Defendants later informed Plaintiffs the population levels in seven housing units remain at 50% capacity and above.

The COVID-19 pandemic continues to impact daily life across the world, including San Diego County. The State of California has outlined a gradual plan for reopening institutions in phases in light of the harm posed by the pandemic.[9] Stage One calls for safety and preparedness to make workplaces safe for essential workers.[10] Stage Two allows for gradual reopening of retail businesses by curbside,

---

[5] In Defendants' May 4 disclosures, they identified 13 languages other than English and Spanish spoken by detained people with medical vulnerabilities at Otay Mesa.

[6] Kate Morrissey, *First ICE detainee dies from COVID-19 after being hospitalized from Otay Mesa Detention Center,* San Diego Union Tribune (May 6, 2020), https://www.sandiegouniontribune.com/news/immigration/story/2020-05-06/first-ice-detainee-dies-from-covid-19-after-being-hospitalized-from-otay-mesa-detention-center

[7] *Id.*

[8] List of Medically Vulnerable Subclass Members submitted in camera to this Court and to Plaintiffs at 10:41 a.m. on May 8, 2020.

[9] *Resilience Roadmap,* California Coronavirus (COVID-19 Response), https://covid19.ca.gov/roadmap/

[10] *Id.*

(Footnote continues on next page.)

manufacturing, and other services with precautions.[11] Stage Three allows for adapting and reopening movie theaters, religious services, and other businesses.[12] It is not until Stage Four that "areas of highest risk," including areas involving high concentrations of people in groups like sporting events, are to be reopened.[13] Counties can transition between stages by attesting that they meet readiness criteria that accounts for public health recommendations.[14] San Diego County has recently transitioned from Stage One to State Two.[15]

## III.   <u>ARGUMENT</u>

The standard for obtaining a preliminary injunction and a TRO are the same. Plaintiffs must establish (1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm; (3) the balance of equities favors them; and (4) an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). A stronger showing of one element may offset a weaker showing of another. *See Pimentel v. Dreyfus*, 670 F.3d 1096, 1105 (9th Cir. 2012). Plaintiffs are likely to prevail on the merits and they will suffer irreparable harm—serious illness or death—in the absence of relief. The balance of hardships is clearly in their favor, and the public interest favors an injunction requiring the government to follow the law and protect the health of the entire community.

**A. Plaintiffs Remain Likely to Succeed on the Merits of Their Claim.**

1. <u>At Minimum, this Court Should Convert the Existing TRO Into a Preliminary Injunction Because Defendants Continue to Violate the Due Process Rights of Medically Vulnerable People Confined in Otay Mesa.</u>

Immigration detainees are civil detainees protected by the Due Process Clause of the Fifth Amendment. *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001). Civil detainees are entitled to greater protections than criminal detainees or people serving

---

[11] *Id.*
[12] *Id.*
[13] *Id.*
[14] *Id.*; *Gov. Newsom updates state's progress toward stage 2 reopening,* San Diego County News, (May 6, 2020), https://sandiegocountynews.com/gov-newsom-updates-states-progress-toward-stage-2-reopening/.
[15] *Id.*

criminal sentences. *Jones v. Blanas*, 393 F.3d 918, 931 (9th Cir. 2004); *cf. Cancino Castellar v. McAleenan*, 388 F. Supp. 3d 1218, 1234 (S.D. Cal. 2019); *Youngberg v. Romeo*, 457 U.S. 307, 321–22 (1982); *see also King v. County of Los Angeles*, 885 F.3d 548, 556–57 (9th Cir. 2018). Such civil detention cannot "amount to punishment of the detainee." *Bell v. Wolfish*, 441 U.S. 520, 535 (1979); *see also Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2473–74 (2015).

When analyzing whether a custodian has imposed a condition that amounts to punishment, courts must inquire whether the detention condition is "reasonably related to a legitimate governmental objective." *Doe v. Kelly*, 878 F.3d 710, 720 (9th Cir. 2017) (quoting *Bell*, 441 U.S. at 539). As this Court noted, the Ninth Circuit, has held that a condition or restriction of confinement "is 'punitive' where it is intended to punish, or where it is 'excessive in relation to [its non-punitive] purpose,' or is 'employed to achieve objectives that could be accomplished in so many alternative and less harsh methods[.]'" TRO at 15 (quoting *Jones*, 393 F.3d at 934) (citations omitted). And as this Court acknowledged, in the Ninth Circuit, "the majority of district courts that have considered [whether, in light of the COVID-19 pandemic, the continued confinement of ICE detainees amounts to punishment in violation of the Fifth Amendment] have concluded there is a likelihood plaintiffs will prevail on those claims." TRO and Class Certification Order at 16 (citations omitted). This Court correctly agreed. *Id.* The current circumstances at Otay Mesa continue to be "anything but normal," with Otay Mesa still leading the country with the highest number of confirmed cases of COVID-19,[16] and the only death related to complications from the virus, rendering continued confinement of the Otay Mesa Medically Vulnerable Subclass "excessive in relation to its purpose[.]" *Id.* at 16-17.

Plaintiffs can prevail on a Fifth Amendment substantive due process violation by showing "an intentional decision" regarding conditions that puts detained people

---

[16] *ICE Guidance on COVID-19,* U.S. Immigration and Customs Enforcement, https://www.ice.gov/coronavirus.

at "substantial risk of suffering serious harm" and a failure to "take reasonable available measures to abate that risk." *See Gordon v. County of Orange*, 888 F.3d 1118, 1125 (9th Cir. 2018).[17] That standard is easily met here.

First, Defendants concede they have made a number of intentional decisions regarding the treatment of detained people during the COVID-19 outbreak. Among other things, they decided, in the absence of court orders directing them otherwise, not to voluntarily reduce the population of Otay Mesa to the point where social distancing is permissible. They affirmatively decided to engage in a strategy of cohorting early in the outbreak, LaRose Decl. 1 ¶ 36  and reconfirmed cohorting as practice for medically vulnerable individuals, LaRose Decl. 2 ¶ 25,   even after admitting that cohorting medically vulnerable people is extremely unsafe, Apr. 30 Tr. 5:22-25, 6:1-3.

Defendants have intentionally forced all people detained at Otay Mesa, medically vulnerable or otherwise, to live in a congregate environment in which they must share toilets, common spaces, and shared equipment. LaRose Decl. 2 ¶ 37. Defendants have decided not to enforce social distancing or use of personal protective equipment among detainees. *See, e.g.,* LaRose Decl. 2 ¶¶ 33, 36. They have decided to engage in screening protocols for staff and new intakes that rely on self-reporting and fail to account for asymptomatic or presymptomatic transmission. *See* ECF No. 23-3, Declaration of Captain Farabaugh ("Farabaugh Decl."), ¶ 19. Until April 2, when they stopped taking new arrivals, they decided to place new arrivals at the facility into general population. ECF No. 23-2, Declaration of Kelley Beckhelm ("Beckhelm Decl.") ¶ 8. They decided to not distribute masks until April 10. LaRose Decl. 1 ¶ 82. They created fliers instructing individuals to discard dysfunctional

---

[17] Because the *Gordon* framework applies to pre-trial detainees, Plaintiffs do not concede is sets the minimum standard for analyzing conditions for people civilly detained, who are presumptively entitled to better treatment. *Jones*, 393 F.3d at 931. However, Defendants appear to argue this framework applies, ECF No. 49, LaRose Motion to Reconsider at 5, and Plaintiffs easily meet it.

masks, rather than request new ones, if they do not show symptoms of COVID-19. LaRose Decl. 2, Attachment 1 Pt. 2, at 5.

Second, these decisions have placed medically vulnerable subclass members – indeed all people confined at Otay Mesa – at substantial risk of serious harm. Such conditions of civil confinement are questionable under normal circumstances. But as this Court has found, these are "anything but normal" circumstances. TRO at 16. Each intentional decision listed above flies in the face of CDC recommendations. For instance, the CDC warns that "[c]ohorting multiple quarantined close contacts of a COVID-19 case could transmit COVID-19 from those who are infected to those who are uninfected," and "should only be practiced if there are no other available options."[18] Although the CDC states "those who are at higher risk of severe illness from COVID-19… should not be cohorted with other quarantined individuals,"[19] Defendants concede their cohorting practices do precisely this.

When cohorting is necessary, the CDC strongly recommends cohorting "in single cells," but in all cohorting situations it recommends "at least 6 feet of personal space assigned to each individual in all directions."[20] Defendants have provided no evidence this is possible. "[C]ohorted, quarantined individuals should wear face masks at all times (to prevent transmission from infected to uninfected individuals),"[21] but Defendants admit they do not enforce this within their cohorts, endangering everyone. "Quarantined individuals should be monitored for COVID-19 symptoms twice per day, including temperature checks."[22] Defendants have produced no evidence to counter Plaintiffs' voluminous evidence that this does not occur. Instead, Defendants merely encourage people to self-report symptoms to

---

[18] *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities*, Centers for Disease Control and Prevention at 19, *available at* https://www.cdc.gov/coronavirus/2019-ncov/downloads/guidance-correctional-detention.pdf.
[19] *Id.*
[20] *Id.* at 20.
[21] *Id.*
[22] *Id.* at 21.

(Footnote continues on next page.)

detention center staff, who then are to contact medical personnel. LaRose Decl. 1 ¶¶ 44-45. Furthermore, the CDC recommends "quarantining all new intakes for 14 days before they enter the facility's general population,"[23] but Defendants placed all new intakes into general population until they stopped taking new intakes on April 2. Beckhelm Decl. ¶ 8.

Although some practices, like receiving new intakes, are no longer in place and there has been some reduction in the overall population at Otay Mesa, those measures occurred weeks too late. The delay significantly contributed to the spread of COVID-19 into all corners and housing pods of the facility, which in turn created substantial risk of harm that remains today. Such risks do not turn off like a light switch when the offending policy is ended far too late: hundreds have contracted COVID-19 and one person has already died following intubation.

Third, Defendants failed to take reasonable measures available to them. Because of the continued heightened risk of serious illness faced by the Otay Mesa Medically Vulnerable Subclass, and the numerous release options available to ICE, release is the only reasonable measure to abate the risk of harm. Defendants have the authority to release but declined to even consider it until under court order to do so. They could have employed alternatives to detention, but instead they forced medically vulnerable people to remain confined in the middle of the nation's largest outbreak in ICE detention. Defendants further trapped medically vulnerable people in housing units that put them in close quarters with people known to have been in close contact with confirmed COVID-19 cases.

Indeed, the bare minimum measure Defendants could have taken would have been to at least *identify* the medically vulnerable people in their custody without a court forcing them to do it. Yet they failed to accurately do that even after they were sued in this case. "The fact that" Defendants did "not have such a list [of detainees with medical vulnerabilities] at the ready, six weeks Governor Newsom shut down

---

[23] *Id.* at 14.

the entire state and one week after this lawsuit was filed," not to mention one month after COVID-19 was first confirmed in the facility, "speaks volumes about where the safety of the people at" Otay Mesa "falls on [their] list of priorities." *Zepeda Rivas v. Jennings,* No. 20 CV 02731-VC, ECF No. 53, 2020 WL 2059848 (N.D. Cal. Apr. 29, 2020) (issuing classwide TRO to reduce ICE detention population in Mesa Verde Detention Facility and Yuba County Jail in light of COVID-19). Even now, Defendants insist they will continue to keep at least 35 medically vulnerable people in custody under such conditions. As explained below, there is no condition under which they can be confined without unreasonable risk of serious illness.

Even under the Eighth Amendment, the government must "provide for … basic human needs—e.g, food, clothing, shelter, medical care, and reasonable safety." *DeShaney v. Winnebago Cty. Dept. of Soc. Servs.*, 489 U.S. 189, 199–200 (1989). The government cannot "ignore a condition of confinement that is sure or very likely to cause serious illness and needless suffering the next week or month or year." *Helling v. McKinney*, 509 U.S. 25, 33 (1993). For example, inmates cannot be comingled with others having "infectious diseases such as hepatitis and venereal disease." *Hutto v. Finney*, 437 U.S. 678, 682 (1978); *Gates v. Collier*, 501 F.2d 1291, 1300 (5th Cir. 1974). Such comingling establishes an Eighth Amendment violation even if the petitioner cannot yet "prove that he is currently suffering serious medical problems caused by" the exposure. *Helling*, 509 U.S. at 32. The same is necessarily true under Fifth Amendment due process. Plaintiffs are therefore likely to prevail on the merits.

2. Defendants' Progress Implementing the TRO Does Not Eliminate the Need for a Preliminary Injunction, for Both Released Subclass Members and Those Still in Defendants' Custody.

Defendants cannot avoid a preliminary injunction by contending they have so far released 70 Otay Mesa Medically Vulnerable Subclass members. They have merely done what the Court ordered, which is no defense. Unless the TRO is converted into a preliminary injunction, Defendants would be permitted to re-detain

each person when the TRO expires and to continue to detain medically vulnerable individuals still in custody.

The rights and remedies outlined in the TRO should continue to apply to Otay Mesa Medically Vulnerable Subclass members who have not yet been released, including those categorized in Defendants' May 8 list of subclass members as pending medical clearance and those recommended for continued detention due to criminal histories.

A preliminary injunction is essential to protect the rights of Otay Mesa Medically Vulnerable Subclass members still in detention by requiring their release under appropriate release plans. There is no set of circumstances that can eliminate the substantial risk of contracting COVID-19 in a facility facing an ongoing outbreak of the virus. For Medically Vulnerable Subclass members, the risk of contracting COVID-19 improperly exposes them to significant risk of severe illness or death. Prior convictions do not change the risk of harm and the right to be protected from that harm. As the Ninth Circuit has noted, so-called "mandatory" detention pursuant to § 1226(c) can violate due process rights in certain common circumstances. *Rodriguez v. Marin*, 909 F.3d 252, 256 (9th Cir. 2018) ("We have grave doubts that any statute that allows for arbitrary prolonged detention without any process is constitutional or that those who founded our democracy precisely to protect against the government's arbitrary deprivation of liberty would have thought so."). As Plaintiffs have argued and Defendants have not disputed, Defendants have the discretion to release any person in their custody, including those with prior criminal histories and those subjected to so-called "mandatory" detention.[24]

---

[24] *See, e.g.,* 8 U.S.C § 1182(d)(5); U.S. Immigration and Customs Enforcement, *Detention Reform*, (last updated July 24, 2018), https://www.ice.gov/detention-reform#tab1 (referencing use of risk classification assessment tools that "require[] ICE officers to determine whether there is any special vulnerability that may impact custody and classification determinations"); U.S. Immigration and Customs Enforcement, Enforcement and Removal Operations, *Directive 11071.1:*

(Footnote continues on next page.)

Not a single person in ICE custody at Otay Mesa, including those subclass members recommended for continued detention, is serving time for a crime. Many individuals for whom ICE has recommended continued detention have no recent criminal history.[25] Regardless, all have served their time, paid their debt to society, and have been deemed suitable by the criminal legal system to be living in the community. They are only now detained because ICE has chosen to charge them with civil grounds of removability. This Court must not allow civil detention to result in a *de facto* death sentences for any more subclass members.

Any argument that Defendants can confine remaining Otay Mesa Medically Vulnerable Subclass members under safe conditions is unsupported by the record. Defendants cannot cohort remaining medically vulnerable people in a manner that would adequately protect their health and safety. Indeed, Defendants have conceded that cohorting or quarantining medically vulnerable people together could result in a deadly "nursing home type situation." Apr. 30 Tr. at 5:22-25, 6:1-3. Defendants' spreadsheet indicates those recommended for continued detention are scattered across eight pods, including in three pods (M, P, and C) that are more than 50% capacity.[26]

Defendants agree that it is too dangerous to adjust or transfer housing for medically vulnerable people at this point because doing so would "result in possible

---

*Assessment and Accommodations for Detainees with Disabilities* (Dec. 15, 2016), at 9 (providing for release as an option for detainees with disabilities); Doris Meissner, *Exercising Prosecutorial Discretion*, Immigration and Naturalization Services (Nov. 17, 2000), at 11 (citing "Aliens with a serious health condition" as a trigger for the favorable exercise of discretion); Jeh Charles Johnson, *Policies for the Apprehension, Detention and Removal of Undocumented Immigrants*, U.S. Department of Homeland Security, at 5 (Nov. 20, 2014), https://www.dhs.gov/sites/default/files/publications/14_1120_memo_prosecutorial_discretion.pdf (indicating that detention resources should not be used for people who are elderly, disabled, pregnant, nursing, or seriously ill).

[25] *See supra* note 8.
[26] *Id.*

cross-exposure where detainees from numerous locations would be rehoused together. Such internal movement would increase exposure risk at this time, not reduce it." LaRose Decl. 2 ¶ 32. This Court has already agreed that conditions of confinement place Otay Mesa Medically Vulnerable Subclass members at undue risk of serious harm, TRO at 16, and Defendants cannot now adjust housing accommodations without exposing subclass members and others to danger. Accordingly, Defendants' release of 70 subclass members pursuant to this Court's order is not evidence of a sufficient reduction in population to render ongoing detention safe for remaining medically vulnerable people who remain detained.

Moreover, even if social distancing were more possible than before given the recent releases, other features of congregate living, including shared living quarters and commonly used equipment and facilities, remain the unavoidable reality at Otay Mesa and threaten the lives of medically vulnerable people. Staff and vendors continue to come and go from the facility. Like any segment of the population, those staff and vendors may vary widely in their adherence to the shelter in place orders in their private lives. Because they can carry COVID-19 without having symptoms and will not necessarily know if they have been exposed to a confirmed case, there are no screening procedures based on self-reporting and temperature checks that can eliminate the risk of COVID-19 entering the facility. For medically vulnerable people, this risk presents too high a possibility of serious illness or death.

As the CDC notes, detention centers are, by their nature, "congregate environments [that] heighten[] the potential for COVID-19 to spread once introduced,"[27] which for subclass members translates to a risk of serious illness or death. Because Otay Mesa is, by design, a facility that imposes congregate living, Defendants cannot detain Otay Mesa Medically Vulnerable Subclass members in a manner that protects their constitutional rights to be free from substantial risk of

---

[27] *See supra* note 18 at 2; *see also* ECF No. 1-14, Apr. 21 Declaration of Dr. Joseph Amon (Amon Decl. 1), ¶ 18.

serious harm. Accordingly, they must be released under appropriate release plans.

Additionally, this Court should enjoin Defendants from allowing any new individuals to be confined by ICE in Otay Mesa until the risks posed by COVID-19 have dissipated. Defendants have already recognized the need to halt new detentions at Otay Mesa. Beckhelm Decl. ¶ 8. However, without a Court order, Defendants could repopulate the facility immediately, placing remaining subclass members at risk of substantial harm and exposing newly detained medically vulnerable people at risk of serious illness or death. Accordingly, this Court should order Defendants to preserve the status quo and continue halting new admissions until San Diego County has reached Stage Four reopening that allows for activities prone to highest risk, including  congregate environments like concerts, to become operational.[28] Such an injunction would preserve the status quo, conform to public health guidelines, reduce the risk of harm for Otay Mesa Medically Vulnerable Subclass members, and avoid needless additional risk of harm to newly detained medically vulnerable people.

   3. <u>Defendants Have Provided No Argument to Defeat the Medically Vulnerable Subclass This Court Provisionally Certified, Which Should Be Expanded in Any Event.</u>

In granting the TRO, the Court provisionally certified a medically vulnerable subclass that hewed closely to the CDC guidelines for individuals at heightened risk from COVID-19. Defendants have raised no arguments that should cause it to hold otherwise. Although Plaintiffs will address Defendants' arguments in more detail in reply to Defendants' forthcoming opposition to class certification, they address the main challenges to the provisionally certified class here.

The Court's commonality analysis was correct: while each subclass member may have a different risk profile, it "does not detract from the undisputed common feature of the subclass, which is that each is at high risk." TRO at 9. Similarly, parsing out individuals' conditions or specific practices does not undermine the question common to the subclass, for which a single answer will drive resolution of the case:

---

[28] *See supra* Pt. II; note 9.

whether continued confinement of medically vulnerable subclass members in Otay Mesa, in light of the spread of COVID-19 throughout the facility, amounts to punishment. *Id.*

In addition, Plaintiff Adrian Rodriguez Alcantara is typical of the subclass. As this Court correctly noted, "Mr. Rodriguez Alcantara's HIV status, in itself, appears to place him in the category of immunocompromised" individuals who may be at higher risk from COVID-19. As such, his claim is typical of the claims of subclass members." *Id.* at 10-11. As Dr. Robert Cohen, an expert with "35 years of experience in correctional medicine and care of persons living with HIV," has further explained, "[t]he risks for incarcerated and detained populations living with HIV should be understood as particularly high." Declaration of Dr. Robert Cohen ¶¶ 1, 20. Features of detention, including transfers that may interrupt medication, failure to monitor T cells, and the likelihood that detained people have received inconsistent HIV treatment—due to income levels, mental illness, lack of access to health care prior to arriving in the United States, or poor access to care for other reasons support that proposition. *Id.* ¶¶ 20-21. Further, Dr. Cohen explains that meeting the criteria for minimal known additional risk from COVID-19 is difficult to ascertain due to strains on healthcare settings even outside of detained environments. *Id.* ¶ 23. Moreover, "even people with well-controlled HIV have higher risk for certain comorbid conditions, including pulmonary and cardiovascular disease, that also make people particularly vulnerable to severe symptoms, hospitalization, and death from COVID-19." *Id.* at 17. Indeed, major public health institutions have recommended treating individuals with HIV with significant caution:

> [B]ecause of a lack of conclusive studies about the relationship between HIV and COVID-19, the CDC and April 21, 2020 interim guidance from the National Institute of Health (NIH) recommend caution for all people living with HIV, and special caution for people living with poorly-controlled or advanced HIV, as well as for those living with HIV who are medically vulnerable because of comorbid conditions.

*Id.* at 22.[29] Mr. Rodriguez Alcantara's risk of harm is thus typical of the subclass.[30]

Indeed, in converting the TRO to a preliminary injunction, the Court should expand the class definition in two important ways. First, the Court should lower the age for inclusion in the class to begin at 45, to coincide with the legal standard applicable to due process violations in this context. Specifically, a due process violation occurs if Defendants place subclass members at "substantial risk of suffering serious harm." *Gordon*, 888 F.3d at 1125. Although the CDC guidelines outline who in the general population is at "higher risk for severe illness" from COVID-19, that is a narrower category than those who are at "substantial risk of serious harm."

Plaintiffs' expert Dr. Amon relies on CDC statistics to demonstrate that, although those over age 65 are at highest risk of severe disease or death, the age 45-65 group is also at high risk of severe disease when compared to the rest of the population. Amon Decl. 1 ¶ 9. He went on to explain that a similar number of cases were subject to hospitalization, intensive care unit admission, and case-fatality percentages among individuals age 45-54 and 55-64, and that these rates were significantly higher than those for younger age groups, highlighting "potential for high disease burden across age ranges." ECF No. 32, Apr. 28 Declaration of Dr. Joseph Amon ("Amon Decl. 2") ¶ 8. Dr. Amon's report, which relies on CDC statistics, does not contradict the explicit CDC guidance, which is understandably focused on the most high-risk group. The Fifth Amendment standard does not require

---

[29] *See also Interim Guidance for COVID-19 and Persons with HIV*, U.S. Department of Health and Human Services, National Institute of Health, AIDS Info, https://aidsinfo.nih.gov/guidelines/html/8/covid-19-and-persons-with-hiv--interim-guidance-/0?utm_source=AIDSinfo&utm_medium=email&utm_campaign=3-20-20-COVID19; *People Who Are at Higher Risk for Severe Illness*, *What to Know About HIV and COVID-19*, Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/hiv.html.

[30] In any event, other subclass members could easily be substituted as class representatives. *Myers v. Intuit, Inc.*, No. 17cv1228-WQH-BLM, 2018 WL 2287425, at *7 (S.D. Cal. May 18, 2018) (noting that once "a class has been certified," courts "regularly allow replacement of the named plaintiff").

a showing of the highest relevant risk, only substantial risk of serious harm, which in this case includes "severe disease." Indeed, other courts have certified classes that extend beyond the factors outlined by the CDC, including pregnant people and individuals age 55 and above. *Fraihat*, 2020 WL 1932393, at *1.

Second, the Court should expand the class to include anyone with a medical condition that places them at heightened risk of serious illness or death from COVID-19, even if the condition does not fall within an explicit category of medical conditions listed on the CDC website, such as pregnancy.[31] Furthermore, there may be medical conditions which, although they may not place a free person at heightened risk, place incarcerated persons at substantial risk of serious harm due to the nature of their confinement. For instance, Warden LaRose admits that hospital visits for medically vulnerable people have been curtailed. However, the CDC strongly recommends that medically vulnerable people "[d]o not delay in getting emergency care for your underlying condition."[32] Incarcerated people have no control over their emergency care, and Defendants' current policies seem to indicate that emergency care may indeed be delayed. There will likely be few such cases, and any disputes about the relative risk posed by a particular individual's condition can be brought to the Court for resolution. This court should adopt the definition offered in Plaintiffs' original class certification motion, which would allow for unforeseen conditions that nevertheless render people medically vulnerable in confinement in light of inconsistent access to medical care and other limitations posted by confinement.

4. The Court Should Not Dismiss the Case Based on *Fraihat*.

As this Court and others have already found, *Fraihat* does not preclude class certification or relief in this case. TRO at 12. "It does not appear that Judge Bernal

---

[31] Although Defendants have stated that there are no pregnant people in custody, a preliminary injunction recognizing a class that includes pregnancy would protect against pregnant people being detained in Otay Mesa until the COVID-19 crisis has abated sufficiently for the injunction to be lifted.

[32] *Groups at Higher Risk for Severe Illness,* Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html

intended, by the general nationwide relief he ordered, to interfere with the ability of facility specific litigation to proceed. Nor, in any event, does a nationwide class action covering specific relief at specific facilities seem manageable." *Zepeda*, No. 2020 WL 2059848, at \*4. Indeed, as Plaintiffs have detailed, the seriousness of the outbreak unfolding at Otay Mesa as well as the specific conditions within the facility down to the housing pod level require this Court's attention and focused intervention.

Moreover, as was the case when Plaintiffs sought a TRO, the class here differs from the class certified in *Fraihat*,[33] as does the relief sought in each case: whereas Judge Bernal ordered, among other things, the government to perform custody determination for class members, Plaintiffs in this case have sought an order directing release outright, under appropriate release plans in a manner that comports with public health guidelines, as the only available remedy to cure Defendants' violations. ECF No. 2, Memorandum of Points and Authorities in Support of TRO at 29-30. Indeed, if required to comply with *Fraihat* only, Defendants could continue to violate the rights of anyone they declined to release, including the 35 Otay Mesa Medically Vulnerable Subclass members they continue to detain. Furthermore, nothing in the

---

[33] The applicable *Fraihat* subclass is defined as: all people who are detained in ICE custody who have one or more of the Risk Factors placing them at heightened risk of severe illness and death upon contracting the COVID-19 virus. The Risk Factors are defined as being over the age of 55; being pregnant; or having chronic health conditions, including: cardiovascular disease (congestive heart failure, history of myocardial infarction, history of cardiac surgery); high blood pressure; chronic respiratory disease (asthma, chronic obstructive pulmonary disease including chronic bronchitis or emphysema, or other pulmonary diseases); diabetes; cancer; liver disease; kidney disease; autoimmune diseases (psoriasis, rheumatoid arthritis, systemic lupus erythematosus); severe psychiatric illness; history of transplantation; and HIV/AIDS. *Fraihat* at \*1 (C.D. Cal. Apr. 20, 2020).

The Otay Mesa Medically Vulnerable Subclass Plaintiffs sought to certify in this case is defined as: all civil immigration detainees incarcerated at the Otay Mesa Detention Center who are 45 and over or have medical conditions that place them at heightened risk of severe illness or death from COVID-19. Class certification briefing is filed concurrently with this emergency request. ECF No. 2 at fn. 3. The definition of the subclass as certified by this Court is: All civil immigration detainees incarcerated at the Otay Mesa Detention Center who are age 60 or over or who have medical conditions that place them at heightened risk of severe illness or death from COVID-19 as determined by CDC guidelines. TRO and Class Certification Order at 13.

*Fraihat* order requires Defendants to submit facility-specific information regarding how conditions of ongoing detention in Otay Mesa would comport with the due process rights of any medically vulnerable people forced to remain confined in the facility, an issue about which this Court has invited briefing.

Further, as Defendants have conceded, dismissal is only appropriate where two actions are "identical." ECF No. 27, Defendant LaRose Opp. to Class Cert., at 16. Plaintiffs have brought the instant action based on facts specific to the rapidly escalating COVID-19 outbreak at Otay Mesa. Even if the two cases have some similarities, they are not identical. Moreover, even if this Court were to find that the two cases are sufficiently similar to warrant dismissal, nothing requires this Court to dismiss this case. *See Adams v. California Dep't of Health Servs.*, 487 F.3d 684, 693 (9th Cir. 2007). The Court declined to find Plaintiffs' claim is precluded by *Fraihat* in ruling on the TRO and should do the same here.

### B.   The Remaining Factors Favor an Injunction.

Defendants assert nothing to refute the Court's prior holding that irreparable harm, balance of the equities, and public interest favor an injunction in this case. TRO at 17-18. Given the conditions of confinement to which they are subjected, "the Otay Mesa Medically Vulnerable Subclass is at great risk of contracting COVID-19. Thus, there is a likelihood of irreparable harm in the absence of" injunctive relief. *Id.* Because "the issuance of [injunctive relief] will reduce the likelihood that subclass members will contract COVID-19, and hopefully mitigate the spread of the virus in Otay Mesa[,]" the balance of the equities weighs in favor of Plaintiffs. Finally, "the public has an interest in preventing the spread of the coronavirus, both in the general population and elsewhere. It also has an interest in protecting the most vulnerable from the severe repercussions they face if infected with the coronavirus." Nothing in the record since the TRO was issued should disturb this Court's holdings in this case. Finally, the government suffers no cognizable harm from being compelled to follow the law, and the balance of equities and public interest always favor protecting

fundamental rights. *Arizona Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1069 (9th Cir. 2014); *Zepeda v. INS*, 753 F.2d 719, 727 (9th Cir. 1983). The public interest is also protected by appropriate release plans. Irreparable harm, the balance of the equities, and public interest all favor a preliminary injunction.

## IV.   <u>CONCLUSION</u>

For the foregoing reasons, Plaintiffs respectfully request that the court grant their motion for preliminary injunction.

DATED: May 11, 2020                    ACLU FOUNDATION OF SAN
                                                         DIEGO & IMPERIAL COUNTIES

                                                         **<u>s/ Monika Y. Langarica</u>**
                                                         MONIKA Y. LANGARICA

                                                         Attorneys for Plaintiff-Petitioners