UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ADRIAN RODRIGUEZ ALCANTARA; YASMANI OSORIO REYNA; MARIA FLOR CALDERON LOPEZ; MARY DOE; on behalf of themselves and all others similarly situated,<br><br>　　　　　　Plaintiffs-Petitioners,<br><br>v.<br><br>GREGORY ARCHAMBEAULT, San Diego Field Office Director, Immigration and Customs Enforcement; et al.,<br><br>　　　　　　Defendants-Respondents. | Case No.: 20cv0756 DMS (AHG)<br><br>**ORDER DENYING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |

On April 30, 2020, this Court granted provisional certification to a subclass of medically vulnerable civil immigration detainees at Otay Mesa Detention Center ("OMDC"), and issued an emergency temporary restraining order ("TRO") directing Defendants to review the records of these subclass members and "release all subclass members suitable for release in the discretion of Defendants after considering the subclass members' health, public safety and mandatory detention requirements, with appropriate conditions to protect the public, and the health, safety and well being of each subclass member." (ECF No. 38 at 2.) Since that time, Defendants have released ninety-two of the 134 subclass members. One subclass member is scheduled for release upon receipt of

sponsorship information. Thirty-four subclass members remain in detention based on Defendants' determination that they pose a danger to the community.[1] One subclass member died after contracting COVID-19.

Although the infection rate at OMDC is declining, and the detainee population has decreased to approximately thirty-eight percent of capacity, OMDC still has the highest number of COVID-19 cases among immigration detention facilities in the nation, with 160 cases as of May 22, 2020. Plaintiffs assert the current situation continues to violate their constitutional rights, and thus the Court should convert the temporary restraining order into a preliminary injunction. Specifically, Plaintiffs seek an injunction (1) prohibiting Defendants from (a) re-detaining subclass members who have been released and (b) accepting new admissions to OMDC, and (2) ordering Defendants to release the remaining subclass members under appropriate release plans.[2] Defendants oppose the motion. They argue the current conditions at OMDC refute a finding that Plaintiffs have a likelihood of success on the merits of their claim, and that the other factors weigh against the issuance of a preliminary injunction. After reviewing the parties' briefs, the record on file, and hearing oral argument from counsel, the Court agrees with Defendants and denies Plaintiffs' motion.

## I.

## BACKGROUND

As set out in the Court's May 1, 2020 Order, OMDC has the capacity to house 1,970 detainees. Before the Court issued the TRO, there were 987 individuals housed at OMDC,

---

[1] The most recent spreadsheet lists thirty-seven subclass members who remain in custody, but three of those individuals have been transferred out of OMDC in preparation for removal.

[2] Plaintiffs also request that the Court expand the subclass definition to include individuals age 45 or older and individuals with any medical condition that places them at heightened risk should they contract COVID-19. The Court addressed these issues in its May 1 Order, and declines to reconsider them on the present motion.

which translated to approximately fifty percent of capacity. As of May 22, 2020, the total number of individuals housed at OMDC had decreased to 758, which is approximately thirty-eight percent of capacity. Of that 758, 489 are civil immigration detainees and 269 are United States Marshals Service criminal detainees. The present case is brought on behalf of the civil immigration detainees only.

As to the thirty-four civil detainee subclass members who remain in custody, the most recent spreadsheet indicates they are housed throughout the facility. Specifically, four are in segregated housing units, one is in the medical unit, twenty-five are in pods with double-bunk cells, and four are in pods with an open, sleeping-bay design.

Only one of these pods, L Pod, has detainees who have tested positive for COVID-19. L Pod is a double-bunk cell unit with a dayroom area containing seventeen affixed tables with four stools each, televisions, and an attached outdoor recreation area. Each cell has its own toilet and sink. The dayroom is 3,686.5 square feet, and the cells are 97.3 square feet. As of May 22, 2020, there were fifteen detainees housed in L Pod, which has capacity for 128, so L Pod is operating at twelve percent of capacity. Four subclass members are currently in L Pod, and all detainees in L Pod are currently in single cells.

As set out in the May 1 Order, OMDC has instituted a number of new policies and practices to address the spread of COVID-19 in the facility, including (1) the suspension of new detainee admissions, social visits, volunteer entry and regularly scheduled facility audits, (2) health screening of all persons entering the facility, (3) posting educational materials on COVID-19 throughout the facility, (4) increased sanitation, (5) provisions of masks to detainees, and (6) requiring employees to use personal protective equipment. All of these measures, including the practice of protective cohorting, remain in place. Social distancing throughout the facility is possible.

Despite all of these measures, OMDC continues to have the highest number of COVID-19 cases among all immigration detention centers: 160 as of May 22, 2020. That is sixty-two more cases than were reported on April 30, 2020, the date the TRO issued. However, the rate of infection at the facility appears to be decreasing. Whereas the

3

20cv0756 DMS (AHG)

infection rate more than tripled between April 15 and April 30 (from twenty-seven to ninety-eight positive cases), the infection rate was considerably lower between April 30 and May 22 (from ninety-eight to 160 positive cases).

## II.

## DISCUSSION

As set out in the Court's May 1 Order, the standard for issuing a preliminary injunction is the same as for issuing a temporary restraining order. *Lockheed Missile & Space Co., Inc. v. Hughes Aircraft Co.*, 887 F. Supp. 1320, 1323 (N.D. Cal. 1995). To meet that standard, Plaintiffs must demonstrate "'[they are] likely to succeed on the merits, that [they are] likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [their] favor, and that an injunction is in the public interest.'" *Am. Trucking Ass'ns v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009) (quoting *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)).

**A.     Likelihood of Success**

"The first factor under *Winter* is the most important—likely success on the merits." *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015). While Plaintiffs carry the burden of demonstrating likelihood of success, they are not required to prove their case in full at this stage but only such portions that enable them to obtain the injunctive relief they seek. *See Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981).

As stated in the Court's previous orders, the only claim alleged in this case is that Defendants are violating Plaintiffs' rights to substantive due process under the Fifth Amendment. To prevail on this claim, Plaintiffs must show their continued confinement or their conditions of confinement amount to punishment. *Bell v. Wolfish*, 441 U.S. 520, 535 (1979). In *Bell*, the Supreme Court stated that "if a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to 'punishment.'" *Id.* at 539. "Conversely, if a restriction or condition is not reasonably related to a legitimate goal-if it is arbitrary or purposeless-a court permissibly may infer that the purpose of the governmental action is punishment that

may not constitutionally be inflicted upon detainees qua detainees." *Id.* The Ninth Circuit, expanding upon *Bell*, has held that a condition or restriction of confinement "is 'punitive' where it is intended to punish, or where it is 'excessive in relation to [its non-punitive] purpose,' or is 'employed to achieve objectives that could be accomplished in so many alternative and less harsh methods[.]'" *Jones v. Blanas*, 393 F.3d 918, 934 (9th Cir. 2004) (citations omitted).

In the May 1 Order granting Plaintiffs' request for a TRO, the Court found Plaintiffs had demonstrated a likelihood of success on their due process claim based on the conditions then in effect at Otay Mesa. Specifically, the Court noted Otay Mesa had the highest number of COVID-19 cases among all immigration detention centers in the country, and that all but one of its housing units was on quarantine status with at least one positive case in each of those quarantined units. The first of those factors has not changed since the Court issued the TRO: Otay Mesa still has the largest number of COVID-19 cases among all immigration detention centers. However, other factors have changed, and lead this Court to conclude that Plaintiffs have not demonstrated a likelihood of success on their claim.

First, with respect to the subclass members who remain in detention, the record reflects the majority of them, thirty to be exact, are currently in housing units with no positive cases. That is a stark contrast to the situation that existed before the TRO issued, where medically vulnerable detainees were being housed throughout the facility with other detainees who had tested positive. As of May 20, 2020, only four subclass members were in that situation. (*See* May 20, 2020 Spreadsheet of Detainees in Continued Detention at Column K, Rows 3, 7, 18, 26) (listing L Pod as "Current Housing Unit"). It appears three of them tested positive for the coronavirus before the TRO was issued and have presumably recovered. (*See id.* at Column N, Rows 7, 18, 26.) The fourth individual may be at increased risk, but other factors mitigate against that risk. Specifically, L Pod is currently at twelve percent of capacity, with just fifteen detainees in a unit designed for 128, and all fifteen detainees are currently in single cells. Thus, the current housing situation for

subclass members is considerably different from the housing situation that was in place before issuance of the TRO.[3]

Second, the government interest in the detention of subclass members who remain at OMDC is markedly different from the government interest in the detention of subclass members who have already been released. For subclass members who have been released, the government interest in detention was presumably limited to ensuring those individuals would appear at their deportation proceedings. That interest may be achieved by alternatives to detention, as reflected by Defendants' decision to release those subclass members under appropriate conditions. For subclass members who have not been released, the government interest extends beyond merely ensuring attendance at deportation proceedings. As indicated on the Spreadsheet, those subclass members have demonstrated criminal history, much of it significant, which raises the additional government interest in protecting the community. That interest may not be adequately served by alternatives to detention, and it fundamentally alters the analysis of whether the continued confinement of these subclass members violates their substantive due process rights.

The final factor that changes the Court's analysis of the likelihood of success factor is Defendants' accounting of and for subclass members. Before issuance of the TRO, Defendants were unable to provide the Court with an accurate number of medically vulnerable civil immigration detainees in OMDC, or an accurate accounting of where those detainees were being housed. Since that time, however, Defendants have identified the medically vulnerable civil immigration detainees at OMDC, and they have also identified their locations. The absence of this information was an important component of the Court's analysis of the request for the TRO. Defendants' acquisition and use of that information in their detention and housing decisions since the TRO was issued, and their provision of

---

[3] It also bears noting that none of the four individuals currently housed in L Pod fit within the age requirements of the subclass. (*See id.* at Column E, Rows 3, 7, 18, 26) (listing ages as under 60).

that information to Plaintiffs' counsel and the Court, provides some assurance that the constitutional rights of subclass members are now being protected.

Given the reduction in the population and the current housing situation at OMDC, the policies and procedures instituted at OMDC to address COVID-19, and Defendants' acquisition and use of information concerning medically vulnerable individuals at OMDC, the Court finds Plaintiffs have not demonstrated a likelihood of success on their due process claim. Accordingly, this factor weighs against issuance of a preliminary injunction.

**B.     Remaining Factors**

In light of the Court's finding that Plaintiffs have failed to show, at "an irreducible minimum that there is a fair chance of success on the merits," the Court cannot enter injunctive relief based on the remaining three factors. *Martin v. Int'l Olympic Comm.*, 740 F.2d 670, 675 (9th Cir. 1984). Nevertheless, the Court briefly addresses these factors below.

Given the dearth of information provided by Defendants before issuance of the TRO, the Court found Plaintiffs had made a sufficient showing on the irreparable injury factor. In the abstract, it was undisputed that subclass members were more susceptible to "severe and dire consequences" if they contracted COVID-19. (ECF No. 41 at 17.) The parties disputed whether subclass members were more likely to contract COVID-19 in the first instance, but given the conditions in place prior to the TRO, the Court sided with Plaintiffs that subclass members were at considerable risk.

As explained above, those conditions have now changed, and reflect a lesser risk that subclass members will contract the virus. OMDC is now operating at thirty-eight percent capacity, all but four subclass members are currently housed in units without any positive cases, and the remaining four are in a unit that is at twelve percent capacity with only fifteen detainees in a unit designed for 128, all of whom are in single cells. As mentioned above, three of these four have already contracted the coronavirus and recovered, which may lessen the likelihood they will be reinfected or suffer any "severe and dire consequences" should that happen. Thus, although there remains a chance that

subclass members could contract the virus and suffer irreparable injury, that likelihood is significantly less under the current conditions at OMDC.

The current conditions at OMDC also change the analysis of the balance of equities and the public interest factors. As set out above, Defendants have taken additional measures to mitigate the spread of the virus at OMDC, which lessens the need for court intervention. And Plaintiffs have not shown the public interest, specifically, the need to protect the community, would be served by the issuance of an injunction releasing the remaining subclass members.

## III.
## CONCLUSION

For all of these reasons, the Court denies Plaintiffs' motion for a preliminary injunction. Should circumstances change, Plaintiffs are free to seek relief from the Court.

**IT IS SO ORDERED**.

DATED: May 26, 2020

DANA M. SABRAW
United States District Judge