1   ACLU FOUNDATION OF SAN DIEGO &
    IMPERIAL COUNTIES
2   MONIKA Y. LANGARICA (308518)
    (mlangarica@aclusandiego.org)
3   JONATHAN MARKOVITZ (301767)
    (jmarkovitz@aclusandiego.org)
4   KIMBERLY GRANO (328298)
    (kgrano@aclusandiego.org)
5   BARDIS VAKILI (247783)
    (bvakili@aclusandiego.org)
6   DAVID LOY (229235)
    (davidloy@aclusandiego.org)
7   P.O. Box 87131
    San Diego, CA 92138-7131
8   Telephone: (619) 398-4493

9   COOLEY LLP
    JOHN HEMANN (165823)
10  (jhemann@cooley.com)
    ALEXANDER GALICKI (308737)
11  (agalicki@cooley.com)
    ALEXANDRA EBER (*Pro Hac Vice forthcoming*)
12  (aeber@cooley.com)
    ELLIE W. BARCZAK (329180)
13  (ebarczak@cooley.com)
    101 California Street, 5th Floor
14  San Francisco, CA 94111-5800
    Telephone: (415) 693-2000
15  Facsimile: (415) 693-2222

16  Counsel for Plaintiff-Petitioners

17

18              UNITED STATES DISTRICT COURT

19            SOUTHERN DISTRICT OF CALIFORNIA

20

21   Adrian RODRIGUEZ ALCANTARA,        Case No. 20-cv-756-DMS-AHG
     et al.,
                                        **MEMORANDUM OF POINTS AND**
22              Plaintiff-Petitioners,  **AUTHORITIES IN SUPPORT OF**
                                        **PLAINTIFF-PETITIONERS'**
23        v.                            **EMERGENCY MOTION FOR**
                                        **PRELIMINARY INJUNCTION AND**
24   Gregory J. ARCHAMBEAULT, San       **WRIT OF HABEAS CORPUS**
     Diego Field Office Director, Immigration
25   and Customs Enforcement, et al.,   Date:     July 17, 2020
                                        Time:     1:30 p.m.
26              Defendant-Respondents.  Dept:     13A
                                        Judge:    Honorable Dana M. Sabraw
27

28

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ........................................................................1

II.   FACTUAL BACKGROUND ........................................................5

    A.   Imperial Regional Detention Facility. ................................5

    B.   COVID-19 Is Highly Contagious and Extremely Dangerous. ............6

    C.   Individuals in Detention at IRDF Face Heightened Risk of
       Contagion. ........................................................................7

    D.   Transferring Detainees Into IRDF is Particularly Dangerous. ...........10

    E.   The Medically Vulnerable Face a Heightened Health Threat. ...........11

    F.   Nearly All IRDF Detainees are Asylum Seekers Who Do Not
       Pose Risks of Dangerousness. ............................................13

    G.   Proven Steps to Prevent the Spread of COVID-19 – Social
       Distancing; Testing; Provision of Soap, Disinfectant, and PPE –
       Are Not Being Practiced at IRDF......................................14

III.  ARGUMENT..............................................................................16

    A.   The Court Should Grant the Requested Injunction. ..........................16

        1.   Plaintiff-Petitioners Are Likely to Succeed On Their
            Claim That Holding Civil Detainees Under the Current
            Conditions at IRDF Is Unconstitutional. ...............................18

            a.   The Conditions at IRDF Violate Plaintiff-
                Petitioners' Due Process Rights. ..................................18

            b.   The Harm to Class and Subclass Members from the
                Threat of COVID-19 is Excessive in Relation to the
                Government's Interest, in Violation of Substantive
                Due Process. ..............................................................22

            c.   The Court Should Order Release of Subclass
                Members' and Further Population Reduction as the
                Only Effective Remedy for the Constitutional
                Violation. ....................................................................26

            d.   The Court Should Require the Defendants to
                Address the Significant Risk Posed to the
                Remaining Civil Detainees Held at IRDF. ..................28

1

2

**TABLE OF CONTENTS**
(continued)

Page

3

4

       2.    Plaintiff-Petitioners Will Suffer Irreparable Harm If The Conditions Are Not Remedied As Requested in This Motion For a Preliminary Injunction ...................................... 29

5

6

       3.    The Public Interest and Balance of Equities Weigh Heavily in Favor of the Proposed Relief. ................................ 30

7

8

    B.    The Court Should Provisionally Certify the IRDF Class and IRDF Medically Vulnerable Subclass, and Require Notice to Class Members. .................................................................................. 32

9

IV.    CONCLUSION ........................................................................... 33

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1
2

# TABLE OF AUTHORITIES

3

**Page(s)**

4

**Cases**

5

*All. for the Wild Rockies v. Cottrell*,
6
    632 F.3d 1127 (9th Cir. 2011)..........................................................................17
7

*Almeida-Sanchez v. United States*,
    413 U.S. 266 (1973)..........................................................................................24
8

*Arizona Dream Act Coal. v. Brewer*,
9
    757 F.3d 1053 (9th Cir. 2014)..........................................................................30

10

*Basank v. Decker*,
11
    2020 WL 1481503 ............................................................................................26

12

*Bell v. Wolfish*,
13
    441 U.S. 520 (1979)................................................................................... 18, 22

14

*In re Brichard Securities Litigation*,
15
    788 F. Supp. 1098 (N.D. Cal. 1992).................................................................24

16

*Brown v. Plata*,
    563 U.S. 493 (2011)..........................................................................................27
17

*Calderon Jimenez v. Wolf*,
18
    No. 18 Civ. 10225, ECF No. 507-1 (D. Mass. Mar. 26, 2020) ........................26

19

*Cancino Castellar v. McAleenan*,
20
    388 F. Supp. 3d 1218 (S.D. Cal. 2019) ............................................................18

21

*Cancino Castellar v. McAleenan*,
22
    Case No. 3:17-cv-00491-BAS-BGS (July 15, 2019)........................................5

23

*Cooper v. Aaron*,
24
    358 U.S. 1 (1958)..............................................................................................24

25

*Coronel v. Decker*,
26
    2020 WL 1487274 ............................................................................................26

27

*D'Alessandro v. Mukasey*,
28
    628 F. Supp. 2d 368 (W.D.N.Y. 2009).............................................................23

# TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*DeShaney v. Winnebago Cty. Dept. of Soc. Servs.*,
    489 U.S. 189 (1989)...........................................................................................22

*Doe v. Kelly*,
    878 F.3d 710 (9th Cir. 2017).............................................................................19

*Duran v. Elrod*,
    713 F.2d 292 (7th Cir. 1983), *cert. denied*, 465 U.S. 1108 (1984).....................27

*Ferreyra v. Decker*,
    No. 20 CIV. 3170 (AT), 2020 WL 1989417 (S.D.N.Y. Apr. 27,
    2020) ...................................................................................................................21

*Gates v. Collier*,
    501 F.2d 1291 (5th Cir. 1974).............................................................................22

*Gayle v. Meade*,
    2020 WL 3041326 (S.D. Fl. Jun. 6, 2020)...........................................................28

*George v. United States*,
    No. 3:19-cv-01557-BAS-BLM, 2019 WL 4962979 (S.D. Cal. Oct.
    7, 2019)................................................................................................................16

*Gordon v. County of Orange*,
    888 F.3d 1118 (9th Cir. 2018).............................................................................19

*Gutierrez Ventura v. Archambeault*,
    Case No. 20cv0963 GPC AGS (June 9, 2020) .....................................................6

*Helling v. McKinney*,
    509 U.S. 25 (1993)........................................................................................2, 22

*Hernandez v. Sessions*,
    872 F.3d 976 (9th Cir. 2017)................................................................29, 30, 32

*Hutto v. Finney*,
    437 U.S. 678 (1978)............................................................................................22

*In the Matter Manrique*, 2020 WL 1307109 (Hixson, M. J.).................................26

1
2

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

3

*Indep. Living Cent. of S. California, Inc. v. Shewry,*

4

543 F.3d 1047 (9th Cir. 2008)................................................................29

5

*Jimenez v. Wolf,*

6

No. 19-cv-07996-NC, 2020 WL 1082648 (N.D. Cal. Mar. 6 2020) .................27

7

*Jones v. Blanas,*

393 F.3d 918 (9th Cir. 2004).........................................................*passim*

8

9

*Judalang v. Chertoff,*

562 F. Supp. 2d 1119 (S.D. Cal. 2008) ...........................................27

10

11

*Kansas v. Crane,*

534 U.S. 407 (2002)...................................................................25

12

*King v. Cty. of Los Angeles,*

13

885 F.3d 548 (9th Cir. 2018)..........................................................18

14

*Kingsley v. Hendrickson,*

15

135 S. Ct. 2466 (2015)................................................................19

16

*M.R. v. Dreyfus,*

17

663 F.3d 1100 (9th Cir. 2011), *as amended by* 697 F.3d 706 (9th
Cir 2012)............................................................................29

18

19

*Melendres v. Arpaio,*

695 F.3d 990 (9th Cir. 2012).......................................................29, 30

20

21

*Padilla v. U.S. Immigration & Customs Enforcement,*

953 F.3d 1134 (9th Cir. 2020).......................................................29

22

*Pimentel v. Dreyfus,*

23

670 F.3d 1096 (9th Cir. 2012).......................................................16

24

*R.I.L-R v. Johnson,*

25

80 F. Supp. 3d 164 (D.D.C. 2015)..................................................25

26

*Ramos v. Sessions,*

293 F.Supp.3d 1021 (N.D. Cal. Mar. 13, 2018)...................................27

27

28

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Rodriguez v. Marin*,
909 F.3d 252 (9th Cir. 2018)............................................................................24

*Sales v. Johnson*,
No. 16-cv-01745-EDL, 2017 WL 6855827 (N.D. Cal. Sept. 20,
2017) ....................................................................................................................27

*Stone v. City & Cty. of San Francisco*,
968 F.2d 850 (9th Cir. 1992).............................................................................26

*Thakker v. Doll*,
No. 1:20-CV-480, 2020 WL 1671563 (M.D. Pa. Mar. 31, 2020) ......................26

*United States v. Barkman*,
No. 3:19-cr-0052-RCJ-WGC, 2020 WL 1811343 (D. Nev. March
17, 2020)..............................................................................................................27

*United States v. Raihan*,
No. 20-cr-68, ECF. No. 20 (E.D.N.Y. Mar. 12, 2020)......................................27

*United States v. Stephens*,
No. 15-cr-95 (AJN), 2020 WL 1295155 (S.D.N.Y. Mar. 19, 2020) ................27

*Unknown Parties v. Johnson*,
No. CV-15-00250-TUC-DCB, 2016 WL 8188563 (D. Ariz. Nov.
18, 2016), *aff'd sub nom.*, *Doe v. Kelly*, 878 F.3d 710 (9th Cir.
2017) ..............................................................................................................23, 25

*Vazquez Barrera v. Wolf*,
No. 4:20-CV-1241, 2020 WL 1904497 (S.D. Tex. Apr. 17, 2020)....................21

*Warsoldier v. Woodford*,
418 F.3d 989 (9th Cir. 2005).............................................................................29

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008)...............................................................................................16

*Xochihua-Jaimes v. Barr*,
2020 WL 1429877 ..............................................................................................26

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Youngberg v. Romeo*,
457 U.S. 307 (1982).........................................................................................18

*Zadvydas v. Davis*,
533 U.S. 678 (2001)............................................................................ 18, 23, 24

*Zepeda Rivas v. Jennings*,
No. 20-CV-02731-VC, 2020 WL 2059848 (N.D. Cal. Apr. 29,
2020) .........................................................................................................26, 30, 32

*Zepeda v. I.N.S.*,
753 F.2d 719 (9th Cir. 1983)............................................................................30

**Statutes**

8 U.S.C. §§ 1182(d)(5), 1225(b)(1)(B)(iii)(IV), 1226(a).......................................14

8 U.S.C. §§ 1229a(c)(4), 1225(b)(1)(B)(ii) .............................................................14

**Other Authorities**

8 C.F.R. §§ 208.30, 235.3 .......................................................................................14

Arrington Watkins Architects, *Imperial Regional Detention Facility*,
available at https://www.awarch.com/portfolio-posts/imperial-
regional-detention-facility.....................................................................................5

California Department of Justice's Review of Immigration Detention
in California (Feb. 2019), available at
https://oag.ca.gov/sites/all/files/agweb/pdfs/publications/immigratio
n-detention-2019.pdf.........................................................................................2, 13

CDC, *"Interim Guidance on Management of Coronavirus Disease
2019 (COVID-19) in Correctional and Detention Facilities,"* May
7, 2020, available at https://www.cdc.gov/coronavirus/2019-
ncov/community/correctiondetention/guidance-correctional-
detention.html .....................................................................................................11

*Coronavirus Disease 2019*, Centers for Disease Control and
Prevention, https://www.cdc.gov/coronavirus/2019-ncov/cases-
updates/cases-in-us.html ......................................................................................6

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

Disease Control and Prevention, *Coronavirus Disease 2019: Guidance for Correctional & Detention Facilities*, available at https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html ................................................................................................ 16

Los Angeles Times, *San Diego steps up as Imperial County hospitals are hit by rush of patients with the coronavirus,* available at https://www.latimes.com/california/story/2020-05-19/imperial-county-hospitals-coronavirus ............................................................ 31

Management & Training Corporation, *Imperial Regional Detention Facility: Preparing Detainees for Successful Re-Entry* (Jan. 2020), available at https://www.mtctrains.com/wp-content/uploads/2019/08/IMPERIAL_Overview.pdf .......................................... 6

Management & Training Corporation, *We Take You Inside to Show You MTC's Difference in Detention* (Sept. 5, 2018), available at https://www.mtctrains.com/detention/we-take-you-inside-our-three-ice-facilities-to-show-you-mtcs-difference-in-detention .................................... 6

TRAC Immigration, *About the Data – ICE Detention*, available at https://trac.syr.edu/phptools/immigration/detention/about_data.html ............... 13

TRAC Immigration, *Decline in ICE detainees with Criminal History Could Shape Agency's Response to COVID-19 Pandemic* (Apr. 3, 2020), available at https://trac.syr.edu/immigration/reports/601/ ...................... 13

TRAC Immigration, *Immigration and Customs Enforcement Detention: ICE Data Snapshots, up to July 2019* .............................................. 13

TRAC Immigration, *Immigration and Customs Enforcement Detention: ICE Data Snapshots, up to July 2019*, available at https://trac.syr.edu/phptools/immigration/detention/ ......................................... 13

U.S. Immigration and Customs Enforcement, *Imperial Regional Detention Facility*, available at https://www.ice.gov/detention-facility/imperial-regional-detention-facility ...................................................... 5

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

U.S. Immigration and Customs Enforcement, *Parole of Arriving Aliens
Found to Have a Credible Fear of Persecution or Torture,*
available at https://www.ice.gov/doclib/dro/pdf/11002.1-hd-
parole_of_arriving_aliens_found_credible_fear.pdf;.........................................14

## I.   INTRODUCTION

The coronavirus 2019 (COVID-19) has entered the Imperial Regional Detention Facility ("IRDF"); multiple people in civil detention at the facility have tested positive and unknown others who have not been tested may also have contracted the virus.  At least nine IRDF staff have also tested positive.  The purpose of this motion is to prevent more people at IRDF from being infected with this serious, unpredictable, and potentially fatal infection.  Defendants-Respondents ("Defendants")' actions violate Plaintiff-Petitioners ("Plaintiffs")' constitutional rights because the conditions of their confinement place them at substantial risk of suffering serious harm from the COVID-19 pandemic.   Accordingly, Plaintiffs request that the Court order:

- The release of all IRDF Medically Vulnerable Subclass Members.
- Population reduction for the broader IRDF Class, including:
  - The release of all asylum seekers who do not have active ongoing credible fear or removal proceedings.
  - The cessation of transfers or new admissions into IRDF.
  - The release of additional IRDF Class members as necessary to allow for proper social distancing within all housing units.
- The preparation of a plan that specifically addresses measures to protect the remaining Class Members and addresses gaps in IRDF's response so far, including protocols for  testing every person currently detained, social distancing in each housing unit, hygiene, and use of personal protective equipment.

To date, Defendants have not taken constitutionally adequate measures to protect the life and health of the people in civil detention at IRDF.  If the Court does not act now to require Defendants to implement the requested measures to protect these individuals and limit the spread of COVID-19, people will get sick and some could die, as occurred in Otay Mesa Detention Center ("Otay Mesa").

IRDF is a detention center in Calexico, California that is operated by Management & Training Corporation ("MTC") for U.S. Immigration and Customs Enforcement ("ICE"). It currently confines approximately 365 people in civil detention, most of whom are seeking asylum.[1] At this time, Defendants are not taking reasonable measures to prevent these people from contracting COVID-19. Defendants are not releasing medically vulnerable detained persons or otherwise reducing the population levels in all IRDF housing units, several of which remain at above 75% occupancy; they are not processing credible fear interviews for new asylum cases, which prevents people from seeking their release; they are not allowing for adequate social distancing; they are not ensuring that the individuals in civil detention at IRDF have basic cleaning supplies (soap), or proper personal protective equipment (masks). Staff who come and go from the community continue to circulate through the facility on a daily basis. And they continue to transfer individuals into the facility who can and will bring the virus into IRDF with them. Defendants are facilitating the creation of a COVID-19 hotspot at IRDF. People in civil confinement at IRDF live in actual danger and justifiable fear.

As this Court already has recognized, individuals who are medically vulnerable to COVID-19 infection should not be held in civil detention facilities where they are at a high risk of contracting the virus. The Eighth Amendment protects imprisoned people against "a condition of confinement that is sure or very likely to cause serious illness and needless suffering the next week or month or year." *Helling v. McKinney*, 509 U.S. 25, 33 (1993). As people in civil detention, people in custody at IRDF who are medically vulnerable to COVID-19 infection enjoy greater protections under the Fifth Amendment than imprisoned people do under the Eighth Amendment. *Jones v. Blanas*, 393 F.3d 918, 931 (9th Cir. 2004). Under the Fifth

---

[1] The California Department of Justice's Review of Immigration Detention in California (Feb. 2019), available at https://oag.ca.gov/sites/all/files/agweb/pdfs/publications/immigration-detention-2019.pdf.

Amendment, civil detention must be reasonable under the circumstances in light of its purpose. *Id.*

Medically vulnerable people at IRDF are likely to prevail on claims that Defendants' actions and omissions are unconstitutional.  There is no legitimate justification for their continued detention in light of the risks to their safety and lives. Plaintiffs request that the Court order Defendants to release such individuals from IRDF, just as it did for those at Otay Mesa.

The remaining IRDF Class members are entitled to live in circumstances that do not expose them to an unreasonable and preventable risk from COVID-19.  For the IRDF Class, Defendants can limit that risk by following simple and uncontroversial steps that medical science and recent history have proven to be effective.  First and foremost, Defendants must create conditions of confinement that permit social distancing throughout the facility by reducing the population within each of the housing units.  Some of the housing units at IRDF are 75% full with Class members living and sleeping in close proximity to each other.  The Court should order Defendants to release sufficient IRDF class members to permit people in all housing units to practice social distancing at all times, most notably when they sleep.

The vast majority of IRDF Class members are asylum seekers, who typically have little or no criminal history, for whom Defendants' interest in detention is minimal even under ordinary circumstances.  Normally, asylum seekers are given prompt credible fear interviews and, if they are found to possess a credible fear of persecution or torture in their home country, their case is referred to an immigration judge for a full hearing on their claim.  Only after passing credible fear interviews will Defendants consider those individuals for release from detention, either through bond or parole.  Due to the ongoing COVID-19 pandemic, however, at least some credible fear interviews have not been going forward at IRDF.  Accordingly, such individuals remain in detention not in spite of the ongoing pandemic, but *because of* the pandemic.  With no access to the credible fear process, detention of these

individuals is not rationally related to its non-punitive purpose. The unlawfulness of their detention is further compounded by the risk of exposure to illness and death from COVID-19. This Court should order Defendants to release those individuals, as well as any others necessary to reach population levels that allow for social distancing within each housing unit.

Additionally, this Court should order Defendants to limit exposure to individuals who may be infected; test for the virus and quarantine individuals who are infected; and provide the supplies necessary to limit the spread of and kill the virus, including personal protective equipment. Even in a world in which everything seems debated, not one of these steps is debatable.

Accordingly, Plaintiff-Petitioners request that the Court issue a Preliminary Injunction as follows:

1.  Defendants shall immediately release all IRDF Medically Vulnerable Subclass members.

2.  Defendants shall immediately reduce the population within all housing units at IRDF to allow for proper social distancing, including by:

    a.  Releasing individuals from IRDF who do not have active underlying credible fear or removal proceedings.

    b.  Suspending the transfer or new admission of individuals into IRDF.

    c.  Releasing additional IRDF Class members as necessary to allow for proper social distancing within all housing units.

3.  Defendants shall formulate a plan for how they will adequately protect those remaining at IRDF from COVID-19. Such plan shall provide for at least the following:

    a.  A testing protocol;

    b.  Social distancing;

    c.  Personal hygiene supplies, including soap and hand sanitizer;

MEMO IN SUPPORT OF EMERGENCY MOTION
FOR PRELIM INJUNCTION
20-CV-756-DMS-AHG

d.    Cleaning and disinfecting living and eating areas; and

e.    The availability and use of personal protective material for detained persons and staff, including but not limited to masks.

In addition, Plaintiffs request that the Court provisionally certify a class of people in civil custody at IRDF and a subclass of medically vulnerable people (the "IRDF Medically Vulnerable Subclass" or "Subclass")[2] and order Defendants to provide appropriate notice to the class members.

By separate *ex parte* application, Plaintiff request that the Court consider this motion on shortened time, conduct a hearing on this motion on June 26, 2020, leaving time to act before conditions worsen at IRDF.

## II.   FACTUAL BACKGROUND

### A.    Imperial Regional Detention Facility.

IRDF is an ICE detention facility located in Calexico, California, just north of the U.S.-Mexico border.[3]  It was designed as a 768-bed facility divided among twelve pods.[4]  According to ICE, "[t]he housing areas have an open living space with bunk beds, shower and bathroom facilities," as well as television area, telephones, a law library, and several courtrooms where asylum and other cases are normally handled

---

[2] *IRDF Medically Vulnerable Subclass:*  All civil immigration detainees incarcerated at the Imperial Regional Detention Center who are age 45 or over or who have medical conditions that place them at heightened risk of severe illness or death from COVID-19.  Class certification briefing was filed concurrently with Plaintiff's Motion for Subclass-Wide Temporary Restraining Order, Preliminary Injunction, and Writ of Habeas Corpus with respect to the Otay Mesa Detention Center on April 21, 2020.  *See* Memorandum of Points and Authorities in Support of Plaintiff-Petitioners' Motion for Class Certification, filed April 21, 2020 (ECF No. 1-3).  As explained in more detail below, Plaintiffs now requests that the Court certify both the IRDF Medically Vulnerable Subclass and the IRDF Class.

[3] U.S. Immigration and Customs Enforcement, *Imperial Regional Detention Facility*, available at https://www.ice.gov/detention-facility/imperial-regional-detention-facility.

[4] Arrington Watkins Architects, *Imperial Regional Detention Facility*, available at https://www.awarch.com/portfolio-posts/imperial-regional-detention-facility.  The facility's "operational capacity" is 704 beds, which does not include beds in the segregation and medical units that were not designed to hold detained people for extended periods.  *See* Answer, ECF No. 66 ¶ 59, *Cancino Castellar v. McAleenan*, Case No. 3:17-cv-00491-BAS-BGS (July 15, 2019).

by video conference.[5]   It employs over 200 staff members.[6]   Currently, IRDF confines approximately 365 people across all housing units—some of which are empty, while others are at over 75% capacity.   Declaration of Sixto Marrero, ECF No. 15 ("Marrero Decl.") ¶¶ 98, 102, *Gutierrez Ventura v. Archambeault,* Case No. 20cv0963 GPC AGS (June 9, 2020).

### B.   COVID-19 Is Highly Contagious and Extremely Dangerous.

COVID-19 has reached global pandemic status, exhibiting rapid escalation and devastating impact.   As of June 11, 2020, it has claimed at least 112,967 lives in the United States and has infected at least 1,994,283 people.[7]   Although these figures grow exponentially every day, they are likely an underestimate.   Declaration of Dr. Jonathan Louis Golob, ECF No. 1-16 ("Golob Decl.") ¶ 2; Declaration of Dr. Joseph Amon, ECF No. 1-14 ("Amon Decl. 1") ¶ 5.   COVID-19 is a serious disease, with results ranging from no symptoms to respiratory failure and death.   Amon Decl. 1 ¶ 6.

COVID-19 is highly infectious, passing from person to person primarily through respiratory droplets when an infected individual coughs, sneezes, or talks. Declaration of Dr. Katherine C. McKenzie, ECF No. 1-15 ("McKenzie Decl.") ¶ 8; Declaration of Dr. Robert B. Greifinger ("Greifinger Decl.") ¶ 5.   It can also be transmitted when respiratory droplets land on a surface, such as a table, doorknob or toilet seat, which a person then touches before touching their nose or mouth. Greifinger Decl. ¶ 5.   The virus is believed to be more durable than other comparable viruses and can remain infectious in the air or on surfaces for hours or days.   *Id.* ¶¶

---

[5] Management & Training Corporation, *We Take You Inside to Show You MTC's Difference in Detention* (Sept. 5, 2018), available at https://www.mtctrains.com/detention/we-take-you-inside-our-three-ice-facilities-to-show-you-mtcs-difference-in-detention.

[6] Management & Training Corporation, *Imperial Regional Detention Facility: Preparing Detainees for Successful Re-Entry* (Jan. 2020), available at https://www.mtctrains.com/wp-content/uploads/2019/08/IMPERIAL_Overview.pdf.

[7] *Coronavirus Disease 2019*, Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html

6-7.  There is also a growing body of evidence that aerosol transmission is possible. *Id.* ¶ 12.

There is no vaccine or cure for COVID-19.  Amon Decl. 1 ¶ 6.  The only known effective measures to reduce risk of death or injury are avoiding contagion by practicing social distancing and proper hygiene.  Amon Decl. 1 ¶ 12; McKenzie Decl. ¶ 8.  Social distancing – avoiding prolonged contact in confined spaces – is "the most crucial tool to limit the individual and community risk of COVID infection."  Greifinger Decl. ¶¶ 5, 10.

### C.  Individuals in Detention at IRDF Face Heightened Risk of Contagion.

People in congregate environments—places like IRDF, where people live, eat, and sleep in close proximity—face increased danger of contracting COVID-19.  Golob Decl. ¶ 12.  The risk is "particularly acute in crowded spaces where people remain for a prolonged period of time," and even more so in indoor areas without adequate ventilation.  Greifinger Decl. ¶ 13.  Detention centers also offer little opportunity for surface disinfection, and security measures force detained persons into close contact with guards.  Amon Decl. 1 ¶ 18.  Dr. Golob, who specializes in infectious diseases and internal medicine, notes that it is reasonable to expect COVID-19 will readily spread in detention centers, particularly when those confined inside cannot engage in proper hygiene and isolation.  Golob Decl. ¶¶ 1, 13.

Witnesses' experiences inside IRDF make clear that Defendants' response has been wholly insufficient in the face of COVID-19.  They document ICE's failure to keep the facility safe from COVID-19 and protect detained persons from transmission within the facility.  Individuals in F pod, for instance, were each issued one single-use mask for the first time in early April 2020, which they had to use and reuse for weeks.  Declaration of Maria del Carmen Portillo Gonzalez ("Portillo Gonzalez Decl.") ¶ 8.  The first week of May 2020, they were issued two cloth masks but had no way to properly wash and dry the masks.  *Id.*  Weeks later, detention center

staff replaced these cloth masks with other cloth masks which appeared to be used. *Id.* They smelled of sweat and dry saliva and had pen markings on them. *Id.* Detention center staff replaced those masks after complaints, then replaced them again with masks that appeared to be unclean. *Id.* A similar situation played out in H pod, where at least one individual has tested positive, Declaration of C. M. ("C. M. Decl.") ¶ 8, as well as in other men's units, Declaration of Kara Watkins ("Watkins Decl.") ¶ 20, many of which are at or above 75% capacity, Marrero Decl. ¶ 102. Even if clean masks were consistently provided to detained persons—which they are not—cloth or surgical masks alone are not sufficient to prevent infection where people are in close contact with one another. Second Supplemental Declaration of Dr. Joseph J. Amon ("Second Suppl. Amon Decl.") ¶ 12. Social distancing measures are crucial to abate the risk of contagion. *Id.* ¶ 11.

Communal living is standard at IRDF. Supplemental Declaration of Elizabeth Lopez ("Suppl. Lopez Decl.") ¶ 4. Housing units typically confine approximately 60 individuals who are unable to practice social distancing in their sleeping quarters or in common areas. *Id.* During mealtime, individuals line up to receive their food and do not maintain a six-foot distance between them, or between themselves and those who serve the meals. Portillo Gonzalez Decl. ¶ 11. Individuals cannot adequately practice social distancing while eating. In dining areas, bolted-down tables and stools are close enough together to touch someone sitting at the next table. Declaration of B. G. ("B. G. Decl.") ¶ 6; Watkins Decl. ¶ 9; C. M. Decl. ¶ 5. They, of course, must remove their masks in order to eat. Portillo Gonzalez Decl. ¶ 11.

Individuals sleep in units of 64 beds arranged in two two-person bunkbeds per cubicle. Suppl. Lopez Decl. ¶ 5; Declaration of D. M. ("D. M. Decl.") ¶ 6; Marrero Decl. ¶ 102. The cubicles are separated by a wall that does not reach the ceiling, Suppl. Lopez Decl. ¶ 5, which allows contaminated air to circulate within the dormitory, Greifinger Decl. ¶ 18. There have been no modifications to sleeping arrangements to ensure greater distance between individuals, even in units where a

positive COVID-19 case has been confirmed.  Suppl. Lopez Decl. ¶ 9.  The bunkbeds are positioned much closer together than the ten foot separation recommended by experts.  Greifinger Decl. ¶ 14.  Some individuals report that they sleep only 3.5 feet apart.  Watkins Decl. ¶ 9.  In J pod, individuals sleep three to a cubicle that fits four, while those in H, M and K pods continue to sleep four people per cubicle.  Suppl. Lopez Decl. ¶ 9; C. M. Decl. ¶ 4.  Individuals in F pod are currently sleeping two to a cubicle.  B. G. Decl. ¶ 4; Portillo Gonzalez Decl. ¶ 6.  Even in this case, however, individuals are unable to maintain social distancing.  Second Suppl. Amon Decl. ¶ 11.  There are empty cubicles, but detention center staff will not permit detained persons to move to the empty bays in order to spread out more while sleeping.  B. G. Decl. ¶ 4; Portillo Gonzalez Decl. ¶ 6.

All individuals in a unit share communal living spaces, including toilets, sinks, showers, and phones.  Suppl. Lopez Decl. ¶ 5.  Individuals are forced to clean their own housing units but are not consistently provided with clean rags and protective gear, and often clean using their bare hands.  *Id.* ¶¶ 18-19; Portillo Gonzalez Decl. ¶ 14.  They are not issued separate masks to wear while cleaning, creating the risk that they might bring viral particles from the common spaces back with them to the spaces where they sleep and eat.  Second Suppl. Amon Decl. ¶ 12.  There is liquid soap in the bathroom for individuals to share, however it is not always refilled right away and some have gone an entire day without soap.  Declaration of Maria Flor Calderon Lopez, ECF No. 1-7 ("Calderon Lopez Decl.") ¶ 9; *see also* Watkins Decl. ¶ 21.  If they wish to purchase a bar of soap in commissary, it costs three days' wages.  Calderon Lopez Decl. ¶ 13.

IRDF's procedures for identifying and isolating individuals with suspected COVID-19 infections, including those who have been in close contact with infected people, is plainly inadequate.  In late May 2020, an individual with a bloody nose was removed from H pod and not returned.  Supp. Lopez Decl. ¶ 10.  Staff did not inform individuals in the unit that the person had tested positive for COVID-19 until

some held a hunger strike.  *Id*; C. M. Decl. ¶ 6.  The individuals in H pod are not allowed to leave the unit.  C. M. Decl. ¶ 7.  Dr. Amon explains that, "where social distancing and other measures are not being rigorously implemented, all individuals in a unit where someone is confirmed positive for the coronavirus should be tested," but this has not happened.  Second Suppl. Amon Decl. ¶ 8.  Failure to test individuals in the same room or quarantine close contacts individually "puts all individuals in the unit at high risk of infection."  *Id.*

Nurses come around the units daily to take individuals' temperatures, sometimes lining them up one behind the other without maintaining a six-foot distance.  Suppl. Lopez Decl. ¶ 12; B. G. Decl. ¶ 10.  As of late May, only individuals with fevers are being given COVID-19 tests.  Suppl. Lopez Decl. ¶ 11.  In order to see a doctor, an individual generally needs to submit a request on a shared tablet in the units, which is challenging for non-English speakers and those with low or no literacy.  *Id.* ¶ 20.  It usually takes days before a detainee sees a doctor.  *Id.*  As recently as May 20, 2020, a person in a shared cell was coughing up blood without receiving adequate medical attention, while another could not receive medical treatment until he became so sick that he fainted in the shower.  Watkins Decl. ¶ ¶ 10, 13.  Individuals with symptoms consistent with COVID-19, such as night sweats, difficulty breathing, stomach aches and headaches, are not tested for the virus.  Watkins Decl. ¶ 16; B. G. Decl. ¶ 12.

Under these conditions, it is unsurprising that there are at least two, and perhaps as many as six, confirmed cases of COVID-19 at IRDF, and many more individuals displaying potential symptoms of the virus.  Suppl. Lopez Decl. ¶¶ 6, 10; D. M. Decl. ¶ 5; Watkins Decl. ¶ 7; C. M. Decl. ¶ 6; Marrero Decl. ¶ 99.  At least nine staff have tested positive for the virus.  Marrero Decl. ¶ 100.

**D.     Transferring Individuals Into IRDF is Particularly Dangerous.**

The CDC and Dr. Greifinger agree that "transfers between jails or detention centers in the middle of this pandemic are very ill-advised and should only happen

in extraordinary circumstances."[8]  Greifinger Decl. ¶ 26.  This is because COVID-19 "spreads through the movement of infected individuals, with a particularly heightened risk of infectious spread where individuals are moving between congregate living environments."  *Id.*  If transfers into the facility are "absolutely necessary," newly transferred individuals should be isolated for 14 days and there should be rigorous screening measures in place that account for all of the manifestations of COVID-19.  Second Suppl. Amon Decl. ¶ 9.  Continuing to transfer individuals into IRDF, particularly without sufficient screening measures, puts those confined inside at even greater risk of contracting the virus.

IRDF continues to accept individuals into the facility.  Suppl. Lopez. Decl. ¶¶ 8-9.  New arrivals are held for 14 days in isolation prior to being placed into the general population in various units, *id.*, however there do not appear to be sufficient screening measures in place to account for the range of manifestations of COVID-19 or detect asymptomatic or presymptomatic cases.  Second Suppl. Amon Decl. ¶ 9.

### E.   Medically Vulnerable Subclass Members Face a Heightened Health Threat.

Subclass members are people confined in civil immigration detention at IRDF who are 45 and over or have medical conditions that place them at heightened risk of severe illness or death from COVID-19.  People 45 and over are high risk for severe disease and certain underlying medical conditions increase the risk of serious symptoms for people of any age.  Amon Decl. 1 ¶¶ 8-9.  For people with heightened risk factors, the consequences of COVID-19 can be severe, including temporary or permanent damage to the heart, lungs, and kidneys, or death.  Golob Decl. ¶¶ 4, 7.  The fatality rate of COVID-19 for people in higher risk populations is about fifteen percent, or one in seven.  *Id.*

---

[8] CDC, *"Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities,"* May 7, 2020, available at https://www.cdc.gov/coronavirus/2019-ncov/community/correctiondetention/guidance-correctional-detention.html.

Because risk mitigation is the only known strategy that can protect vulnerable groups from COVID-19, and because it is virtually impossible to sufficiently mitigate transmission risk in a congregate environment, public health experts agree that "the most effective mitigation strategy" is to reduce crowding by releasing individuals from custody.  Ltr. from Scott A. Allen, MD and Josiah Rich, MD, MPH to Cong'l Cmte. Chairpersons (Mar. 19, 2020) ("Allen & Rich Ltr.") (Exh. A to Langarica Declaration, ECF No. 2-2) at 5. ("*it is essential to consider releasing all detainees who do not pose an immediate risk to public safety*").

Plaintiff Maria Flor Calderon Lopez  suffers from bronchial asthma as a result of complications from a pregnancy during which amniotic fluid from her uterus leaked out into her lungs.  Calderon Lopez Decl. ¶ 5.  Dr. Katherine C. McKenzie reviewed Ms. Calderon Lopez's COVID-19-related infection risk and concluded that, if she contracts COVID-19, her asthma increases her risk of severe disease and death. McKenzie Decl. ¶ 23.  Many if not most of the CDC's recommended steps to prevent infection and optimize care for individuals with asthma during the COVID-19 pandemic could not have been followed by Ms. Calderon Lopez while she was in detention.[9]  *Id.*  Ms. Portillo Gonzalez, who remains detained at IRDF, similarly suffers from asthma, yet IRDF staff have not given her an inhaler.  Portillo Gonzalez Decl. ¶ 7.  The conditions under which Defendants confine her prevent Ms. Portillo Gonzalez from practicing expert-recommended steps to prevent infection and serious illness.

Similarly situated Subclass members are at high risk for developing severe COVID-19 disease and death.  McKenzie Decl. ¶ 24.  Yet they are unable to "practice any of the measures recommended by the CDC to prevent COVID-19" while in detention.  *Id.*  High risk individuals like Subclass members should be released from the detention facilities and permitted to self-quarantine, as Ms. Calderon Lopez was. *Id.* ¶ 25.

---

[9] After Plaintiffs filed this suit, Defendants released Ms. Calderon Lopez.

**F.  Nearly All Individuals Detained at IRDF are Asylum Seekers Who Do Not Pose Risks of Dangerousness.**

The overwhelming majority of individuals in detention at IRDF are people seeking asylum.  As of February 2019, approximately 80 percent of those confined at IRDF were asylum seekers.[10]  As of July 2019, 620 people were in custody at IRDF.[11] Of those, 88 percent had no criminal history[12] and 523, or 84 percent, had been in the United States for one year or less.[13]  The vast majority of them are likely to be asylum seekers.[14]  Of these 523 individuals, 491, or nearly 94 percent, have no criminal conviction, and another 16 individuals (bringing the total to nearly 97 percent) have only a "Level 3" conviction,[15] defined as "misdemeanors, including petty and other minor violations of the law," including immigration-related convictions for unlawful entry under 8 U.S. Code § 1325.[16]  The proportion of the population at IRDF that is comprised of individuals seeking asylum does not appear to have changed materially since these reports, and IRDF remains a facility used almost entirely for the detention of asylum seekers with no criminal history.

Under normal circumstances, asylum seekers are given a credible fear interview and, if they are found to possess a credible fear of persecution or torture in

---

[10] The California Department of Justice's Review of Immigration Detention in California (Feb. 2019), available at https://oag.ca.gov/sites/all/files/agweb/pdfs/publications/immigration-detention-2019.pdf.

[11] TRAC Immigration, *Immigration and Customs Enforcement Detention: ICE Data Snapshots, up to July 2019*, available at https://trac.syr.edu/phptools/immigration/detention/.

[12] TRAC Immigration, *Decline in ICE detainees with Criminal History Could Shape Agency's Response to COVID-19 Pandemic* (Apr. 3, 2020), available at https://trac.syr.edu/immigration/reports/601/.

[13] *Id.*

[14] The data does not list these individuals as asylum seekers, however the report clarifies that asylum information "is not recorded by ICE for a significant number of individuals."  TRAC Immigration, *About the Data – ICE Detention*, available at https://trac.syr.edu/phptools/immigration/detention/about_data.html.

[15] TRAC Immigration, *Immigration and Customs Enforcement Detention: ICE Data Snapshots, up to July 2019*.

[16] TRAC Immigration, *About the Data – ICE Detention*, available at https://trac.syr.edu/phptools/immigration/detention/about_data.html.

their home country, their case is referred to an immigration judge for a full hearing on their claim.  8 U.S.C. §§ 1229a(c)(4), 1225(b)(1)(B)(ii); 8 C.F.R. §§ 208.30, 235.3.  After passing credible fear interviews, asylum seekers may seek release from detention through parole or bond.[17]  Due to the ongoing COVID-19 pandemic, however, at least some credible fear interviews have not been going forward at IRDF, leaving asylum seekers who have recently arrived at the facility trapped at IRDF with no ongoing credible fear or immigration proceedings and no mechanism to seek release through the normal immigration process.  Suppl. Lopez Decl. ¶ 16. Accordingly, such individuals are continuing in detention not in spite of the ongoing pandemic, but *because of* the pandemic.

### G. Proven Steps to Prevent the Spread of COVID-19 – Social Distancing; Testing; Provision of Soap, Disinfectant, and PPE – Are Not Being Practiced at IRDF.

While there is no vaccine for COVID-19 and no one who has not been previously infected is immune, there are a number of proven practices that reduce the transmission of the virus and protect communities from pandemic spread: social distancing; testing and contract tracing; handwashing and disinfecting surfaces; and use of personal protective equipment ("PPE").

Social distancing is "the most critical tool to limit the individual and community risk of COVID infection."  Greifinger Decl. ¶ 5; Amon Decl. 1 ¶ 12 (describing social distancing as the "main strategy for limiting disease transmission.").  For social distancing to be effective, "it must occur before individuals display symptoms."  Amon Decl. 1 ¶ 12.

Social distancing "first and foremost incorporates the idea of avoiding prolonged contact in confined spaces."  Greifinger Decl. ¶ 10.  Dr. Greifinger concludes that, in congregate settings such as a detention facility, there should be a

---

[17] U.S. Immigration and Customs Enforcement, *Parole of Arriving Aliens Found to Have a Credible Fear of Persecution or Torture,* available at https://www.ice.gov/doclib/dro/pdf/11002.1-hd-parole_of_arriving_aliens_found_credible_fear.pdf; *see also* 8 U.S.C. §§ 1182(d)(5), 1225(b)(1)(B)(iii)(IV), 1226(a).

minimum of ten feet between beds due to the prolonged exposure to those nearby during sleep, and six feet between individuals during all other interactions, such as while standing in line, eating, or passing by other individuals.  *Id.* ¶ 14.

Dr. Greifinger explains that "[i]t is not reasonable to suggest that anything approaching appropriate risk mitigation is possible with the facility operating so close to full capacity."  Greifinger Decl. ¶ 25.  For this reason, reducing the population "is the single most important means of reducing the risk of transmission."  *Id.* ¶ 14. Releasing individuals will also allow for easier provision of preventive measures such as handwashing and disinfecting surfaces for remaining detained persons. Amon Decl. 1 ¶ 12.

Also critical to controlling COVID-19 is the "prompt identification of cases and their immediate isolation."  Second Suppl. Amon Decl. ¶ 8.  Individuals in correctional facilities have been recognized as in the highest priority for testing and contact tracing since the beginning of the epidemic.  *Id.*  Dr. Amon explains, however, that "far too few detainees [at IRDF] have been tested and many individuals who are positive are likely not being tested . . . yet they remain a risk for transmission of the coronavirus to others."  *Id.*  Accordingly, in addition to implementing clear guidelines for testing, Dr. Amon recommends that, "all individuals in a unit where someone is confirmed positive for the coronavirus should be tested to allow for close medical monitoring and presymptomatic isolation of infected individuals as a strategy to ensure proper medical care and prevent further spread."  *Id.*  He further explains, "The failure to test individuals in the same room as someone identified as a confirmed positive case . . . puts all individuals in the unit at high risk of infection."  *Id.*

Where comprehensive testing and tracing is not taking place and social distancing is not rigorously practiced, rigorous cleaning and personal hygiene and the use of PPE – particularly masks – is especially important.  *Id.* ¶ 12.  The CDC recommends frequent handwashing with soap and water or using hand sanitizer, and

avoiding touching one's eyes, nose and mouth with unwashed hands.[18]  They also recommend enhanced cleaning and disinfecting practices in detention facilities, including cleaning and disinfecting surfaces and objects that are frequently touched several times per day, and ensuring adequate cleaning supplies are available.[19]

Wearing masks also provides some protection from transmission, however it is not sufficient on its own.  *Id.*  In addition, it is critical that masks be properly handled, including washing after every use, either in a washing machine with hot water or by hand using a bleach solution, and not reused until thoroughly dry.  *Id.*  Using a single-use mask for multiple weeks may facilitate rather than prevent infection, as viral particles may collect on the mask, and washing the mask may reduce its effectiveness.  *Id.*  At IRDF, however, it appears that single-use masks are worn repeatedly and fabric masks are not washed and dried after each use.  Portillo Gonzalez Decl. ¶ 8.

## III.   ARGUMENT

### A.   The Court Should Grant the Requested Injunction.

To obtain a preliminary injunction, Subclass members must establish (1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in the absence of relief; (3) the balance of equities tips in their favor; and (4) an injunction is in the public interest.  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *George v. United States*, No. 3:19-cv-01557-BAS-BLM, 2019 WL 4962979, at *4 (S.D. Cal. Oct. 7, 2019).  The Ninth Circuit employs a sliding scale approach, under which a stronger showing of one element may offset a weaker showing of another.  *See Pimentel v. Dreyfus*, 670 F.3d 1096, 1105 (9th Cir. 2012).  Thus, a preliminary injunction may issue where "serious questions going to the merits

---

[18] Centers for Disease Control and Prevention, *Coronavirus Disease 2019: Guidance for Correctional & Detention Facilities*, available at https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html.

[19] *Id.*

[are] raised and the balance of hardships tips sharply in [plaintiffs'] favor." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011) (internal quotation marks omitted).  To succeed under the "serious question" test, plaintiffs must show that they are likely to suffer irreparable injury and that an injunction is in the public's interest.  *Id.* at 1132.  Class members and Subclass members are likely to prevail on the merits and they will suffer irreparable harm—serious illness or death—in the absence of relief.  The balance of hardships is clearly in their favor, and the public interest favors an injunction requiring the government to follow the law and protect the health of the entire community.

The requested injunction has three major components.  The first is to order IRDF to release Medically Vulnerable Subclass Members whose ongoing detention is unconstitutional.  No argument can justify their ongoing detention at the risk of contracting a potentially fatal virus.  The real and present risk to their health far outweighs any cognizable reasons Defendants could articulate to support continued civil detention.

The second component of the requested injunction is to order Defendants to reduce the population within all housing units to allow for social distancing among all Class members. This includes releasing IRDF Class members who are asylum seekers with no underlying credible fear or removal proceedings, and thus whose detention bears no relationship to its non-punitive purpose.  It also includes prohibiting defendants from transferring or admitting new individuals into IRDF, consistent with CDC recommendations.  Such admissions will continue increasing the population levels in housing units, making social distancing even more difficult, and it will create an extremely high risk of spreading the infection.  Finally, it includes the release of enough of the remaining population, most of whom are people seeking asylum with no or minimal criminal histories, so that people in each housing pod can practice social distancing at all times, particularly when they sleep.

The final component of the requested injunction is to require Defendants to formulate a plan to protect the remaining individuals detained at IRDF. The Court should require Defendants' plan to follow and take into account undisputable medical consensus around preventing the spread of COVID-19: testing; social distancing; personal hygiene; and use of adequate personal protective equipment (including masks) for detained persons and staff.

  1. *Plaintiff-Petitioners Are Likely to Succeed On Their Claim That Holding Civil Detainees Under the Current Conditions at IRDF Is Unconstitutional.*

    a. *The Conditions at IRDF Violate Plaintiff-Petitioners' Due Process Rights.*

The IRDF Class members and IRDF Medically Vulnerable Subclass members are likely to succeed on their claim that Defendants' actions violate their Due Process rights by subjecting them to conditions that expose them to unreasonable risk of serious harm from infectious disease with potentially lethal consequences. The escalating outbreak of COVID-19 at IRDF places them at even greater and more imminent risk.

People in immigration custody are civil detainees protected by the Due Process Clause of the Fifth Amendment. *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001). Civil detainees are entitled to greater protections than people in criminal custody or people serving criminal sentences. *Jones*, 393 F.3d at 931; *cf. Cancino Castellar v. McAleenan*, 388 F. Supp. 3d 1218, 1234 (S.D. Cal. 2019) (rejecting Defendant-Respondents' argument "that the features and rights afforded to persons detained by the government pending removal proceedings are not the constitutional rights afforded to persons in criminal proceedings, and, thus, they cannot give rise to the substantive due process claim recognized in the authorities upon which Plaintiff-Petitioners rely"); *Youngberg v. Romeo*, 457 U.S. 307, 321–22 (1982); *see also King v. Cty. of Los Angeles*, 885 F.3d 548, 556–57 (9th Cir. 2018). Such civil detention cannot "amount to punishment of the detainee." *Bell v. Wolfish*, 441 U.S. 520, 535

(1979); *see also Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2473–74 (2015).  When analyzing whether a custodian has imposed a condition that amounts to punishment, courts must inquire whether the detention condition is "reasonably related to a legitimate governmental objective." *Doe v. Kelly*, 878 F.3d 710, 720 (9th Cir. 2017) (quoting *Bell*, 441 U.S. at 539).  Where that condition is "arbitrary or purposeless," the government violates an immigrant detainee's rights.  *Id.* (quoting *Bell*, 441 U.S. at 539).

The Ninth Circuit has held that a condition or restriction of confinement "is 'punitive' where it is intended to punish, or where it is 'excessive in relation to [its non-punitive] purpose,' or is 'employed to achieve objectives that could be accomplished in so many alternative and less harsh methods[.]'"  ECF No. 41 at 15, Order (1) Granting in Part Plaintiffs' Motion for Class Certification and (2) Granting Plaintiffs' Motion for Subclass-Wide Emergency Temporary Restraining Order ("Otay Mesa TRO") (quoting *Jones*, 393 F.3d at 934) (citations omitted).  And as this Court has acknowledged, in the Ninth Circuit, "the majority of district courts that have considered [whether, in light of the COVID-19 pandemic, the continued confinement of ICE detainees amounts to punishment in violation of the Fifth Amendment] have concluded there is a likelihood plaintiffs will prevail on those claims."  Otay Mesa TRO, ECF No. 41 at 16 (citations omitted).  Plaintiffs can prevail on a Fifth Amendment substantive due process violation by showing "an intentional decision" regarding conditions that puts detained people at "substantial risk of suffering serious harm" and a failure to "take reasonable available measures to abate that risk."  *See Gordon v. County of Orange*, 888 F.3d 1118, 1125 (9th Cir. 2018).[20]  That standard is easily met here.

---

[20] Because the *Gordon* framework applies to pre-trial detainees, Plaintiffs do not concede is sets the minimum standard for analyzing conditions for people civilly detained, who are presumptively entitled to better treatment. *Jones*, 393 F.3d at 931. However, Defendants appear to argue this framework applies, ECF No. 49, LaRose Motion to Reconsider at 5, and Plaintiffs easily meet it.

MEMO IN SUPPORT OF EMERGENCY MOTION
FOR PRELIM INJUNCTION
20-CV-756-DMS-AHG

Here, Defendants' intentional actions put Class members and Medically Vulnerable Subclass members at substantial risk of imminent harm of serious illness or death due to their risk of exposure and potential complications based on their age or underlying medical conditions. ICE has failed to take reasonable available measures to adequately respond to the public health crisis posed by COVID-19. *See supra* Pt. II.C.

Defendants have intentionally forced all people detained at IRDF, medically vulnerable or otherwise, to live in a congregate environment in which they must share toilets, common spaces, and shared equipment. *Id.* They have decided to place new arrivals, including people transferred from other facilities, into general population. *Id.* Class and Subclass members cannot engage in adequate physical distancing in living quarters or common areas; they do not have consistent access to adequate personal protective equipment or hygiene supplies including soap; and Defendants expose them to staff who leave and enter the facility on a daily basis without consistent distancing. *Id.* Maria Del Carmen Portillo Gonzalez shares, "I am scared being detained during coronavirus. I worry a lot about my health and well-being." Portillo Gonzalez Decl. ¶ 7. Similarly, Plaintiff Calderon Lopez explained: "I am scared of getting sick and that if I get sick medical staff will not attend to me in time. If I get sick my asthma will act up. In detention I have no access to an inhaler. Without access to an inhaler I know that I will not be able to breathe." Calderon Lopez Decl. ¶ 15.

Second, these decisions have placed all people confined at IRDF at substantial risk of serious harm. Such conditions of civil confinement are questionable under normal circumstances but, during this pandemic, they could be deadly. Each intentional decision listed above flies in the face of CDC recommendations. For instance, the CDC recommends "suspend[ing] all transfers of incarcerated/detained persons to and from other jurisdictions and facilities . . . unless necessary for medical evaluation, medical isolation/quarantining, care, extenuating security concerns, or to

prevent overcrowding." Greifinger Decl. ¶ 26. For Medically Vulnerable Subclass members, these decisions have placed them at heightened risk of serious illness or death. McKenzie Decl. ¶ 24.

Third, Defendants failed to take reasonable measures available to them. ICE has a number of alternatives to detention at its disposal to ensure people do not abscond, which it has regularly used and which it can and should exercise here. *See* ECF No. 2-1, Plaintiffs' TRO Brief at 18-19; *Vazquez Barrera v. Wolf*, No. 4:20-CV-1241, 2020 WL 1904497, at *7 (S.D. Tex. Apr. 17, 2020) ("ICE has a number of alternative tools available to it to ensure enforcement, which it is free to use with Plaintiffs if they are released from detention. For example, ICE's conditional supervision program uses a combination of electronic ankle monitors, biometric voice recognition software, unannounced home visits, employer verification, and in-person reporting requirements to supervise individuals released from detention."); *see also Ferreyra v. Decker*, No. 20 CIV. 3170 (AT), 2020 WL 1989417, at *11 n.6 (S.D.N.Y. Apr. 27, 2020) (collecting cases where courts imposed alternatives to detention in light of COVID-19). Because of the continued heightened risk of serious illness faced by the Medically Vulnerable Subclass, the risk of serious illness to the entire IRDF Class, and the numerous release options available to ICE, release of Medically Vulnerable Subclass members, overall population reduction, and protections for those who will remain confined, are the only reasonable measures to abate the risk of harm.

Conditions at IRDF are not sufficient to ensure the safety of those in their custody. Defendants already failed to prevent the introduction of COVID-19 into the facility, and if they continue they will fail to prevent its further transmission among individuals in detention and staff.

The Due Process Clause provides protection significantly greater than the Eighth Amendment's ban on cruel and unusual punishment.[21] Even under the Eighth

---

[21] While the Eighth Amendment prohibits punishment against convicted prisoners

MEMO IN SUPPORT OF EMERGENCY MOTION
FOR PRELIM INJUNCTION
20-CV-756-DMS-AHG

Amendment, the government must "provide for … basic human needs—e.g, food, clothing, shelter, medical care, and reasonable safety." *DeShaney v. Winnebago Cty. Dept. of Soc. Servs.*, 489 U.S. 189, 199–200 (1989).   Conditions that pose an unreasonable risk of future harm violate the Eighth Amendment's prohibition against cruel and unusual punishment, even if that harm has not yet come to pass. Thus, the government cannot "ignore a condition of confinement that is sure or very likely to cause serious illness and needless suffering the next week or month or year." *Helling*, 509 U.S. at 33.   For example, inmates cannot be comingled with others having "infectious diseases such as hepatitis and venereal disease." *Hutto v. Finney*, 437 U.S. 678, 682 (1978); *Gates v. Collier*, 501 F.2d 1291, 1300 (5th Cir. 1974).   Such comingling establishes an Eighth Amendment violation even if the petitioner cannot yet "prove that he is currently suffering serious medical problems caused by" the exposure. *Helling*, 509 U.S. at 32.  Conditions that violate the Eighth Amendment are more than enough to violate a civil detainee's Fifth Amendment due process rights.   If subjecting a person serving a criminal sentence to an elevated risk of potentially lethal infection constitutes "cruel and unusual punishment" in violation of the Eighth Amendment, it necessarily violates the Fifth Amendment. Accordingly, Defendants are violating Class and Subclass members' Fifth Amendment rights.   Indeed, in the wake of COVID-19, a court has held "[a] civil detainee's constitutional rights are violated if a condition of his confinement places him at substantial risk of suffering serious harm, such as the harm caused by a pandemic." *Castillo* TRO at 6.

     b. *The Harm to Class and Subclass Members from the Threat of COVID-19 is Excessive in Relation to the Government's Interest, in Violation of Substantive Due Process.*

  A condition of civil immigration confinement violates due process "if it

_____

that is "cruel and unusual," the Fifth Amendment's due process protections do not allow "punishment" at all. *Bell*, 441 U.S. at 535 n.16.  Unlike in an Eighth Amendment claim, there is no requirement for civil detainees to prove "deliberate indifference" on the part of government officials. *Jones*, 393 F.3d at 934.

imposes some harm to the detainee that significantly exceeds or is independent of the inherent discomforts of confinement and is not reasonably related to a legitimate governmental objective or is excessive in relation to [that] governmental objective." *Unknown Parties v. Johnson*, No. CV-15-00250-TUC-DCB, 2016 WL 8188563, at *5 (D. Ariz. Nov. 18, 2016), *aff'd sub nom.*, *Doe v. Kelly*, 878 F.3d 710, 714 (9th Cir. 2017) (citing *Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2473–74 (2015)).

As older adults and people who have serious underlying medical conditions, Subclass members are at higher risk of severe disease and death if they contract COVID-19, which is more likely to occur in immigration detention.  Amon Decl. 1 ¶ 44.  Their imminent danger vastly outweighs any government interest in Subclass members' confinement.  Because immigration proceedings are civil and non-punitive, "[t]here is no sufficiently strong special justification . . . for indefinite civil detention." *Zadvydas*, 533 U.S. at 690.  If the government's interest in effectuating removal and protecting the community cannot justify indefinite detention, it cannot justify continuing to expose medically vulnerable people to "potentially permanent" harm and death. *See id*. at 690–91; *cf. D'Alessandro v. Mukasey*, 628 F. Supp. 2d 368, 399 (W.D.N.Y. 2009) (considering immigrant's age and "constellation of serious, debilitating, and progressive health problems" to weigh against any interest in continued detention).

The remaining Class members are entitled to live in circumstances that do not violate their constitutional rights.

For individuals seeking asylum who do not have active underlying credible fear or removal proceedings, the violation of their due process rights is particularly glaring. Asylum seekers at IRDF, who largely do not have underlying criminal histories, but whose credible fear interviews have been indefinitely postponed or rescheduled due to COVID-19, do not have underlying immigration proceedings that justify their ongoing detention, which can only serve the non-punitive purpose effectuating removal and protecting the community during removal proceedings.

Because immigration proceedings are civil and non-punitive, "[t]here is no sufficiently strong special justification . . . for indefinite civil detention" of individuals seeking asylum who do not have active underlying immigration proceedings. *Zadvydas*, 533 U.S. at 690. The danger of contracting COVID-19 to detained individuals at IRDF who are seeking asylum but do not have active underlying proceedings is substantial and vastly outweighs any government interest in their continued confinement.

Further, "[t]he risk that [Class members], here, will flee, given the global pandemic, is very low, and reasonable conditions can be fashioned to ensure their future appearance at deportation proceedings." *Castillo* TRO at 10. The government's interest in detention is further undermined by the fact that Medically Vulnerable Subclass members and people seeking asylum are unlikely to flee during this pandemic, especially considering they have places available to them where they can practice social distancing and other preventative measures.

Even for Subclass and Class members who the government alleges are subject to "mandatory" detention under any statute, the due process violation presented by these exceptional circumstances overrides any statutory detention authority. *Cooper v. Aaron*, 358 U.S. 1, 18 (1958) (explaining U.S. Constitution's role as "supreme law of the land"); *In re Brichard Securities Litigation*, 788 F. Supp. 1098, 1112 (N.D. Cal. 1992) ("[C]oncerns" about legislative intent "cannot override the Constitution."). "It is clear, of course, that no Act of Congress can authorize a violation of the Constitution." *Almeida-Sanchez v. United States*, 413 U.S. 266, 272 (1973). Indeed, the Ninth Circuit recently noted that due process overrides § 1226(c) in certain common circumstances. *See Rodriguez v. Marin*, 909 F.3d 252, 256 (9th Cir. 2018) ("We have grave doubts that any statute that allows for arbitrary prolonged detention without any process is constitutional or that those who founded our democracy precisely to protect against the government's arbitrary deprivation of

liberty would have thought so.").  Defendants cannot rely on a claim of "mandatory" detention to justify continued detention in violation of due process rights.

Class members are entitled to live in circumstances that do not expose them to an unreasonable and preventable risk from COVID-19.  As discussed, a condition of civil immigration confinement violates due process "if it imposes some harm to the detainee that significantly exceeds or is independent of the inherent discomforts of confinement and is not reasonably related to a legitimate governmental objective or is excessive in relation to [that] governmental objective."  *Unknown Parties v. Johnson*, 2016 WL 8188563, at *5.  The risk of COVID-19 "significantly exceeds or is independent of the inherent discomforts of confinement."  *Id.*  Exposing the IRDF Class to the risk of contracting COVID-19 "is not reasonably related to a[ny] legitimate governmental objective."  Despite ICE's assertions that its decision to keep individuals locked up during this deadly pandemic is so as to not send the wrong message about enforcement priorities,[22] general deterrence is not a valid justification for civil immigration detention.  *See R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 188–89 (D.D.C. 2015) (rejecting argument that "one particular individual may be civilly detained for the sake of sending a message of deterrence" to other individuals "who may be considering immigration"); *cf. Kansas v. Crane,* 534 U.S. 407, 412 (2002) (civil detention may not "become a 'mechanism for retribution or *general deterrence*'—functions properly those of criminal law, not civil commitment") (quoting *Kansas v. Hendricks*, 521 U.S. 346, 372–73 (1997) (Kennedy, J., concurring)) (emphasis added).

Plaintiff-Petitioners are likely to succeed on their claim that, until Defendants develop and implement a realistic containment plan that includes these four steps, their due process rights are being violated.

---

[22] *See* House Committee on Oversight and Reform, *supra* note 1.

c.   *The Court Should Order Release of Subclass Members' and Further Population Reduction as the Only Effective Remedy for the Constitutional Violation.*

This Court has recognized its power to direct the release of such individuals from detention.  ECF No. 38, Order Granting Plaintiff-Petitioners' Emergency *Ex Parte* Motion for Subclass-Wide Temporary Restraining Order.  Other courts have as well.  "Federal courts possess whatever powers are necessary to remedy constitutional violations because they are charged with protecting these rights." *Stone v. City & Cty. of San Francisco*, 968 F.2d 850, 861 (9th Cir. 1992).  Federal courts across the country have already ordered the immediate release of individuals in immigration custody confined under similar circumstances.  *See, e.g.*, *Xochihua-Jaimes v. Barr*, 2020 WL 1429877 (ordering release "[i]n light of the rapidly escalating public health crisis, which public health authorities predict will especially impact immigration detention centers[.]"); *Castillo* TRO (granting temporary restraining order and ordering the government to "forthwith and without delay, release Petitioners"); *Coronel v. Decker*, 2020 WL 1487274 (ordering release of four medically vulnerable immigration detainees due to threat of COVID-19); *Thakker v. Doll,* No. 1:20-CV-480, 2020 WL 1671563, at *9 (M.D. Pa. Mar. 31, 2020) (same for 13 medically vulnerable petitioners); *Basank v. Decker*, 2020 WL 1481503 (same for 10 medically vulnerable petitioners); *Calderon Jimenez v. Wolf,* No. 18 Civ. 10225, ECF No. 507-1, at 3-4 (D. Mass. Mar. 26, 2020) (ordering grant of bail for an immigrant detainee held in Plymouth County, Massachusetts because "being in jail enhances risk"); *Zepeda Rivas v. Jennings,* No. 20-CV-02731-VC, 2020 WL 2059848, at *3-4 (N.D. Cal. Apr. 29, 2020) (ordering ICE to create and maintain list of medically vulnerable detainees for expedited release).  Courts have also ordered release from confinement and modifications of supervised release in non-civil immigration detention contexts under circumstances similarly related to COVID-19 risks and public health considerations.[23]

---

[23] *See In the Matter Manrique*, 2020 WL 1307109, at *1 (Hixson, M. J.) (ordering release of vulnerable 74-year-old on bail due to "risk of serious illness or death if he

Moreover, the principle that a federal court may release individuals to remedy unconstitutional conditions is well established.  *See Brown v. Plata*, 563 U.S. 493, 511 (2011) ("When necessary to ensure compliance with a constitutional mandate, courts may enter orders placing limits on a prison's population."); *Duran v. Elrod*, 713 F.2d 292, 297–98 (7th Cir. 1983), *cert. denied*, 465 U.S. 1108 (1984) (concluding that court did not exceed its authority in directing release of low-bond pretrial detainees as necessary to reach a population cap).  Courts also regularly order outright release of immigration detainees when continued detention would violate their due process rights.  *See Jimenez v. Wolf*, No. 19-cv-07996-NC, 2020 WL 1082648 (N.D. Cal. Mar. 6 2020) (granting motion to enforce habeas of immigrant detainee charged with drug trafficking and convicted of accessory after the fact and ordering release of petitioner with appropriate conditions of supervision); *Ramos v. Sessions*, 293 F.Supp.3d 1021, 1030–31 (N.D. Cal. Mar. 13, 2018); (same for immigrant detainee with two prior DUI convictions); *Sales v. Johnson*, No. 16-cv-01745-EDL, 2017 WL 6855827 (N.D. Cal. Sept. 20, 2017) (same for immigrant detainee with prior second-degree murder conviction); *Judalang v. Chertoff*, 562 F. Supp. 2d 1119 (S.D. Cal. 2008) (same for immigrant detainee with prior voluntary manslaughter conviction).

Thus, this Court has authority to order release of the IRDF Medically Vulnerable Subclass and enough Class members, including all of those with no active credible fear or removal proceedings, to permit as much social distancing as possible

---

remains in custody"); *United States v. Barkman*, No. 3:19-cr-0052-RCJ-WGC, 2020 WL 1811343, at *1, 3 (D. Nev. March 17, 2020) (modifying probation conditions to suspend requirement of intermittent confinement where jail "simply lack[s] the resources necessary to engage in aggressive screening and testing of inmates" and concluding that "we must take every necessary action to protect vulnerable populations and the community at large"); *United States v. Stephens*, No. 15-cr-95 (AJN), 2020 WL 1295155, at *1 (S.D.N.Y. Mar. 19, 2020) (granting reconsideration of bail determination and ordering release of criminal defendant previously found to be inappropriate for release on danger grounds because of risk posed by COVID-19); *United States v. Raihan*, No. 20-cr-68, ECF. No. 20, at 10:12-19 (E.D.N.Y. Mar. 12, 2020) (continuing defendant on pretrial release rather than remanding him in part because "[t]he more people we crowd into that facility, the more we're increasing the risk to the community").

MEMO IN SUPPORT OF EMERGENCY MOTION
FOR PRELIM INJUNCTION
20-CV-756-DMS-AHG

in all housing pods, particularly when sleeping.  Indeed, it is the only effective remedy for the constitutional violations Subclass members and Class members face.

             d.      *The Court Should Require the Defendants to Address the Significant Risk Posed to the Remaining Civil Detainees Held at IRDF.*

Even after releasing Medically Vulnerable Subclass members and additional Class members, including asylum applicants with no active underlying proceedings, the remaining detained persons at IRDF will remain at risk from COVID-19.  This risk could be mitigated, but Defendants are failing to take the simple and obvious steps necessary under the circumstances.

First, the Court should order that Defendants suspend all transfers or admissions of new individuals into IRDF.[24]  New admissions will not permit the population at IRDF to remain at levels sufficient to permit social distancing, and transferring individuals between congregate living environments like IRDF and other ICE or carceral facilities or jails creates a "particularly heighted risk" of spreading COVID-19.  Greifinger Decl. ¶ 26.  This is especially true where, as here, there are insufficient screening protocols in place to detect the full range of manifestations of COVID-19, including asymptomatic cases.  Second Suppl. Amon Decl. ¶ 9.

Second, the Court should order that Defendants prepare and submit to the Court a plan that details the protocols that they will put in place in order to mitigate the spread of COVID-19 among the remaining individuals.  Specifically, the plan should detail ICE's plans for adequate testing, social distancing, personal hygiene and surface disinfection, and the distribution and cleaning of adequate personal protective equipment, including masks.  Defendants' social distancing plans should include details of how they will create enough distance between individuals while

---

[24] At least one District Court recently exercised its authority to restrict the transfer of individuals detailed by ICE due to COVID-19.  *Gayle v. Meade*, 2020 WL 3041326, *24 (S.D. Fl. Jun. 6, 2020).

sleeping, when the risk of transmission is particularly acute due the prolonged exposure to those sleeping nearby.  Greifinger Decl. ¶ 14.

>    2.    *Plaintiff-Petitioners Will Suffer Irreparable Harm If The Conditions Are Not Remedied As Requested in This Motion For a Preliminary Injunction.*

It is well established that the deprivation of constitutional rights constitutes irreparable injury.  *Hernandez v. Sessions*, 872 F.3d 976, 994 (9th Cir. 2017); *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012); *Warsoldier v. Woodford*, 418 F.3d 989, 1001–02 (9th Cir. 2005).  The Ninth Circuit recently recognized that dangerous conditions of detention also constitute irreparable harm supporting injunctive relief.  *Padilla v. U.S. Immigration & Customs Enforcement*, 953 F.3d 1134, 1147 (9th Cir. 2020); *see also Hernandez*, 872 F.3d at 995 (recognizing the "irreparable harms imposed on anyone subject to immigration detention" including the "evidence of subpar medical and psychiatric care in ICE detention facilities").  The Ninth Circuit also has recognized that irreparable harm exists where the government's actions threaten an individual's health.  *M.R. v. Dreyfus*, 663 F.3d 1100, 1111 (9th Cir. 2011), *as amended by* 697 F.3d 706 (9th Cir 2012); *Indep. Living Cent. of S. California, Inc. v. Shewry*, 543 F.3d 1047, 1049–50 (9th Cir. 2008) (recognizing that Medi-Cal beneficiaries would suffer irreparable harm where new policy would limit access to pharmaceuticals).  And just last month, this Court granted an emergency temporary restraining order with respect to individuals in civil immigration custody at Otay Mesa, holding that there was a likelihood of irreparable harm stemming from the risk of contracting COVID-19.  *See* Order, filed May 1, 2020 (ECF No. 41).

Here, continued detention of IRDF Medically Vulnerable Subclass and Class members threatens their health and lives as well as public health.  Like Plaintiff Calderon Lopez, Subclass members, including Ms. Portillo Gonzalez, have underlying medical conditions that predispose them to contracting the virus and/or life-threatening complications in the event of contagion.  *See supra* Pt. II.E.;

McKenzie Decl. ¶ 22; Amon Decl. 1 ¶ 44.  The fatality rate for people in the highest risk category is 15 percent, and those in the same category who survive face permanent damage and prolonged recovery.  Golob Decl. ¶ 4.  The urgency is particularly high given that Subclass members are detained at IRDF, where multiple detained persons and several members of staff have tested positive.  Watkins Decl. ¶ 7.

The living conditions at IRDF also threaten the lives of IRDF Class members more generally.  "Nor is there a need to recount the health risks posed by the virus—not just for people in high-risk categories but for healthy people as well." *Zepeda Rivas* 2020 WL 2059848, at *2.  Plaintiff-Petitioners will suffer irreparable harm if the conditions at IRDF are not remedied as requested in this motion, and outlined in the attached proposed order.

> 3. *The Public Interest and Balance of Equities Weigh Heavily in Favor of the Proposed Relief.*

Given the "preventable human suffering" at issue, the "balance of hardships tips decidedly in plaintiffs' favor."  *Hernandez*, 872 F.3d at 996 (quotation omitted).  Moreover, on Plaintiff-Petitioners side, the issuance of the injunction will reduce the likelihood that individuals at IRDF will contract COVID-19, and hopefully mitigate the spread of the virus at IRDF, and in the broader community.  The government "cannot reasonably assert that it is harmed in any legally cognizable sense" by being compelled to follow the law. *Zepeda v. I.N.S.*, 753 F.2d 719, 727 (9th Cir. 1983).  The balance of equities thus favors preventing the violation of "requirements of federal law."  *Arizona Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1069 (9th Cir. 2014).  Finally, it is always in the public interest to prevent violations of fundamental rights.  *Melendres*, 695 F.3d at 1002.

Here, "the impact of an injunction reaches beyond the parties, carrying with it a potential for public consequences."  *Hernandez*, 872 F.3d at 996 (quotation omitted).  It is in both the Defendants' and the broader public interest to release IRDF

Medically Vulnerable Subclass members and asylum seekers with no ongoing underlying immigration proceedings, and to provide the remaining individuals at IRDF with living conditions that do not expose them to an unreasonable and preventable risk from COVID-19, including by reducing the population to permit social distancing in each housing unit.

Release of Medically Vulnerable Subclass members and additional Class members will reduce their risk of serious illness or death, the overall health risk for remaining individuals and facility staff at IRDF, and the risk to the surrounding community. Allen & Rich Ltr. at 5; Amon Decl. 1 at ¶ 43. This is especially true if the Court issues release pursuant to the Plaintiff's Proposed Order or otherwise tailors its order to ensure compliance with local health protocols for self-quarantine and social distancing by Subclass members and asylum seekers upon release.

ICE also has an interest in mitigating spread of COVID-19 among detained persons and detention center staff, and the government has an interest in preventing a collapse of the surrounding healthcare ecosystem. As discussed, immigration detention facilities face greater risk of infectious spread because of crowding, the high percentage of detained people vulnerable to serious illness in the event of COVID-19 transmission, and limited availability of medical care, particularly in Imperial County, where medical resources have already been stretched thin by the pandemic.[25] Amon Decl. 1 ¶¶ 18, 41, 43. "Even with the best-laid plans to address the spread of COVID-19 in detention facilities, the release of individuals who can be considered at high-risk. . . is a key part of a risk mitigation strategy." *Id.* at ¶ 49. Moreover, the burden of caring for ill individuals will shift to local hospitals. *Id.* at ¶ 43. Inundating already-overwhelmed local hospitals will result in hospitals "likely not be[ing] able to provide care to all infected individuals with serious cases, whether

---

[25] Los Angeles Times, *San Diego steps up as Imperial County hospitals are hit by rush of patients with the coronavirus,* available at https://www.latimes.com/california/story/2020-05-19/imperial-county-hospitals-coronavirus

1   or not those cases come from the detention center, increasing the likelihood that
2   [they] will suffer severe complications or die." *Id.* "The conditions of confinement
3   do not merely threaten detainees; they also threaten facility staff, not to mention the
4   greater community whose health is put at risk by the congregation of large groups in
5   cramped spaces." *Zepeda Rivas,* 2020 WL 2059848, at *3.

6       As the Court in *Castillo* explained, "The public has a critical interest in
7   preventing the further spread of the coronavirus.  An outbreak at [the detention
8   center] would, further, endanger all of us – [detention center] detainees, [detention
9   center] employees, residents of [the surrounding] County, residents of the State of
10  California, and our nation as a whole." *Castillo* TRO at 11.  Indeed, it appears "ICE
11  officials . . have not adequately grasped this in their response to the crisis, and as a
12  result they have put entire communities at greater risk." Amon Decl. 1 ¶ 43.  Subclass
13  members' and additional population reduction , along with requiring Defendants to
14  formulate a plan as to the remaining individuals that will provide adequate protection
15  from COVID-19, imposes minimal (if any) harm to the government, and protects the
16  community.  Moreover, Subclass and Class members can be released on reasonable
17  conditions, to the extent necessary.  *See, e.g.*, *Hernandez*, 872 F.3d at 995 (finding
18  that ICE had put forth no evidence regarding the administrative burdens of
19  considering alternatives to detention).

20      **B.    The Court Should Provisionally Certify the IRDF Class and IRDF**
21      **Medically Vulnerable Subclass, and Require Notice to Class**
        **Members.**

22      Plaintiffs seek certification of the proposed IRDF Class, comprised of all
23  individuals in civil custody at the IRDF facility, and the proposed IRDF Medically
24  Vulnerable Subclass[26] to effectively execute the requested injunctive relief.  On April
25  21, 2020, Plaintiff-Petitioners filed a formal Motion for Class Certification for two
26  classes, and two subclasses, including the IRDF Class and the IRDF Medically
27

28  ───────────────
    [26] *See supra* at n.2

Vulnerable Subclass.  ECF No. 1-2.  Additional briefing and hearing on issues of class certification was continued with the consent of the parties until after the court ruled on Plaintiffs' motion for preliminary injunction with respect to Otay Mesa. ECF No. 67, Order Following Telephonic Status Conference ¶ 1.  That decision having now been issued, ECF No. 77, Plaintiffs now seek certification of the IRDF Class and IRDF Medically Vulnerable Subclass.

Both the proposed IRDF Class and IRDF Medically Vulnerable Subclass meet the requirements of numerosity, commonality, typicality and adequacy of representation under Fed. R. Civ. P. 23(a), and the proposed class and subclass meet the requirements of Fed. R. Civ. P. 23(b)(2), for the reasons stated in Plaintiffs' Memorandum of Points and Authorities in Support of Plaintiff-Petitioners' Motion for class Certification, ECF No. 1-3.

## IV.  CONCLUSION

For the foregoing reasons, the Court should provisionally certify the IRDF Class and IRDF Medically Vulnerable Subclass.

The Court should issue a preliminary injunction and writ of habeas corpus directing Defendants as follows:

1. Defendants shall immediately release all members of the Medically Vulnerable Subclass from IRDF.

2. Defendants shall immediately reduce the population within all housing units at IRDF to allow for proper social distancing, including by:

    a. Releasing individuals from IRDF who do not have active underlying credible fear or removal proceedings.

    b. Suspending the transfer or new admissions of individuals into IRDF.

    c. Releasing additional IRDF Class members as necessary to allow for proper social distancing within all housing units.

3.      Defendants shall formulate a plan for how they will adequately protect those remaining at IRDF from COVID-19.  Such plan shall provide for at least the following:

     a.      A testing protocol;

     b.      Social distancing in each housing unit;

     c.      Personal hygiene supplies, including soap and hand sanitizer;

     d.      Cleaning and disinfecting living and eating areas; and

     e.      The availability and use of personal protective material for detained persons and staff, including but not limited, to masks.

Dated:      June 12, 2020                    Respectfully Submitted,

By: */s/ John Hemann*
_____
John Hemann
Alexander Galicki
Alexandra Eber (*Pro Hac Vice forthcoming*)
Ellie W. Barczak

Monika Y. Langarica
Jonathan Markovitz
Kimberly Gano
Bardis Vakili
David Loy

ACLU FOUNDATION OF SAN DIEGO & IMPERIAL COUNTIES          COOLEY LLP

Counsel for Plaintiff-Petitioners          Counsel for Plaintiff-Petitioners