ACLU FOUNDATION OF SAN
DIEGO & IMPERIAL COUNTIES
JONATHAN MARKOVITZ (301767)
(jmarkovitz@aclu-sdic.org)
P.O. Box 87131
San Diego, California 92138-7131
Telephone:  (619) 398-4493

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
KYLE VIRGIEN (278747)
(kvirgien@aclu.org)
39 Drumm Street
San Francisco, CA 94111-4805
Telephone:  (415) 621-2493

*Counsel for Plaintiff-Petitioners*

COOLEY LLP
JOHN HEMANN (165823)
(jhemann@cooley.com)
ELLIE W. BARCZAK (329180)
(ebarczak@cooley.com)
3 Embarcadero Center, 20th Floor
San Francisco, CA, 94111-4004
Telephone:  (415) 693-2000
Facsimile:   (415) 693-2222

ALEXANDER GALICKI (308737)
(agalicki@cooley.com)
1333 2nd Street, Suite 400
Santa Monica, CA 90401-4100
Telephone:  (310) 883-6400
Facsimile:  (310) 883-6500

ALEXANDRA EBER (*Pro Hac Vice*)
(aeber@cooley.com)
1299 Pennsylvania Ave, NW, Suite 700
Washington, DC 20004-2400
Telephone:  (202) 842-7800
Facsimile:  (202) 842-7899

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Adrian RODRIGUEZ ALCANTARA, et al., <br><br> Plaintiff-Petitioners, <br><br> v. <br><br> Gregory J. ARCHAMBEAULT, San Diego Field Office Director, Immigration and Customs Enforcement, et al., <br><br> Defendant-Defendants. | Case No.: 3:20-cv-00756-DMS-AHG <br><br> **PLAINTIFFS' NOTICE OF SUPPLEMENTAL AUTHORITY IN SUPPORT OF THEIR CONSOLIDATED RESPONSE TO FEDERAL-DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS AND/OR FOR DISMISSAL DUE TO LACK OF SUBJECT MATTER JURISDICTION; AND DEFENDANT SIXTO MARRERO'S MEMORANDUM IN SUPPORT THEREOF** <br><br> Case Filed:  April 21, 2020 |

Plaintiffs-Petitioners ("Plaintiffs") respectfully notify this Court of the recent summary judgment opinion in *Romero-Lorenzo v. Koehn*, 2:20-cv-00901-DJH (D. Ariz. Mar. 30, 2023), ECF No. 231 ("Romero-Lorenzo Order").   A copy of the opinion is attached as **Exhibit A**.   Plaintiffs submit this Notice and authority in support of their Consolidated response to Federal-Defendants' Motion for Judgment on the Pleadings and/or for Dismissal Due to Lack of Subject Matter Jurisdiction and Defendant Sixto Marrero's Memorandum in Support Thereof, ECF No. 209.

*Romero-Lorenzo v. Koehn* supports Plaintiffs' arguments in the following ways:

*First,* Plaintiffs' Response explained that an amended complaint would include a claim that the United States is denying the people they hold in detention access to Paxlovid and seek to "ensure access to this vital medication."   ECF No. 209 at 5. Federal Defendants argue that this would be futile because the medical clinics at the Facilities can "obtain it from local pharmacies."   ECF No. 210 at 3.   In *Romero-Lorenzo v. Koehn*, the court denied the defendants' motion for summary judgment on this issue, rejecting the defendants' argument "that it is sufficient for Fifth Amendment purposes that [they] can obtain these medications from local pharmacies when needed." Romero-Lorenzo Order at 43-45. The court found that "[a] fact finder could … conclude that not having antiviral medications readily available to treat CAFCC COVID-19 positive detainees is not objectively reasonable."   *Id.* at 44.

*Second*, Defendant Marrero argues in his Reply that Plaintiffs' amended complaint would be futile in part because President Biden announced on February 10, 2023, that the national emergency concerning the COVID-19 pandemic will be terminated on May 11, 2023.   ECF No. 212 at 3-4.   In *Romero-Lorenzo v. Koehn*, which was likewise decided after this announcement, the court denied defendants' motion for summary judgment as to defendants' alleged failures to offer and recommend booster doses of COVID-19 vaccines; identify and target at risk or

1  immunocompromised people in detention for vaccines and other protections; and

2  stock and prescribe antiviral treatments for COVID-19 patients who qualify, which

3  remain ongoing issues in the COVID-19 pandemic.  Romero-Lorenzo Order at 46.

4  Dated:        April 5, 2023                    Respectfully Submitted,

5

6                                                By: */s/ Alexander Galicki*

7                                                John Hemann
                                                 Alexander Galicki
8                                                Alexandra Eber (*Pro Hac Vice*)
                                                 Ellie W. Barczak
9                                                jhemann@cooley.com
                                                 agalicki@cooley.com
10                                               aeber@cooley.com
                                                 ebarczak@cooley.com

11                                               COOLEY LLP

12                                               Jonathan Markovitz

13                                               ACLU FOUNDATION OF SAN
                                                 DIEGO & IMPERIAL COUNTIES
14

15                                               Kyle Virgien

16                                               AMERICAN CIVIL LIBERTIES
                                                 UNION FOUNDATION
17

18                                               Counsel for Plaintiffs

19

20

21

22

23

24

25

26

27

28

**PLS.' NOTICE OF SUPPL AUTHORITY IN
SUPPORT OF THEIR CONSOLIDATED RESP. TO
MOTS. FOR JUDGMENT ON THE PLEADINGS**

# Exhibit A

SKC

1

2

3

4

5

6                      IN THE UNITED STATES DISTRICT COURT

7                          FOR THE DISTRICT OF ARIZONA

8

9    Claudia Romero-Lorenzo, et. al.          No.  CV-20-00901-PHX-DJH (ESW)

10                       Plaintiffs,           **ORDER**

11   v.

12   Brian Koehn, et al.,

13                       Defendants.

14

15        Plaintiffs Claudia Romero-Lorenzo, Tracy Ann Peuplie, James Tyler Ciecierski,

16   and Marvin Lee Enos, federal pre-trial detainees who are or were confined in CoreCivic's

17   Central Arizona Florence Correctional Complex (CAFCC), initiated this civil rights class

18   action for declaratory and injunctive relief on behalf of themselves and all similarly situated

19   individuals confined at CAFCC.  (Doc. 1.)  Plaintiffs claim that Defendants failed to take

20   reasonable measures to protect them from exposure to COVID-19 in violation of their Fifth

21   Amendment due process rights.  (*Id.*)[1]  Defendants Van Bayless, Acting United States

22   Marshall for the District of Arizona, Donald Washington, Director of the U.S. Marshall's

23   Service, and Michael Carvajal, Director of the Federal Bureau of Prisons (BOP)

24   _____

25        [1] Some originally named Plaintiffs asserted claims on behalf of all similarly situated
     convicted prisoners confined at CAFCC for alleged violations of their Eighth Amendment
26   rights to be free from cruel and unusual punishment, and the Court certified two sets of
     classes: a Pretrial Class, and a Post-Conviction Class.  (Doc. 69.)  After class certification,
27   the Court dismissed Plaintiffs' Eighth Amendment claims for failure to state a claim.
     (Doc. 89.)  The Court also dismissed Plaintiffs' claims seeking release under § 1331 and/or
28   writs of habeas corpus under § 2241 for lack of subject matter jurisdiction.  (*Id.*)

(collectively "Federal Defendants") and Defendant Kris Kline, Warden of the CAFCC, filed separate Motions for Summary Judgment. (Doc. 187; Doc. 194.) Federal Defendants and Defendant Kline also joined in each others' Motions. (Doc. 195; Doc. 197.) Both Motions are fully briefed. (Doc. 208, 209, 213, 221).

Plaintiffs also filed a Motion to Exclude the Findings and Opinions of Defendants' Expert Dr. Owen J. Murray (Doc. 185) and Defendant Kline's *Daubert* Motion to Exclude the Testimony of Homer Venters (Doc. 189).

The Court will grant the Motion for Summary Judgment in part, deny it in part, and deny the parties' Motions to Exclude.

## I.      Motions to Exclude Expert Opinions

"Under Rule 702 of the Federal Rules of Evidence, [a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion, provided the testimony meets certain criteria." *United States v. Gadson*, 763 F.3d 1189, 1202 (9th Cir. 2014) (quotation marks and citation omitted). An expert witness may rely on information, such as hearsay evidence, that would not be admissible on its own. Fed. R. Evid. 703. Expert testimony is sufficiently "reliable if the knowledge underlying it has a reliable basis in the knowledge and experience of [the relevant] discipline." *United States v. Sandoval-Mendoza*, 472 F.3d 645, 654 (9th Cir. 2006) (quotation marks and citation omitted). The test for admissibility "is not the correctness of the expert's conclusions but the soundness of his methodology." *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010) (quotation marks and citation omitted).

Both parties' experts have relevant knowledge and experience. The parties disagree about the soundness of some experts' methodologies, but those disputes, as well as the appropriate weight to assign to each expert's opinions, are more properly addressed at trial. The parties' expert reports are, therefore, admissible, and the Court will deny both Motions to Exclude.

. . . .

. . . .

## II.     Summary Judgment Standard

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The movant bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323.

If the movant fails to carry its initial burden of production, the nonmovant need not produce anything. *Nissan Fire & Marine Ins. Co.*, *Ltd. v. Fritz Co.*, *Inc.*, 210 F.3d 1099, 1102-03 (9th Cir. 2000). But if the movant meets its initial responsibility, the burden shifts to the nonmovant to demonstrate the existence of a factual dispute and that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmovant. *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 248, 250 (1986); *see Triton Energy Corp. v. Square D. Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995). The nonmovant need not establish a material issue of fact conclusively in its favor, *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968); however, it must "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co.*, *Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal citation omitted); *see* Fed. R. Civ. P. 56(c)(1).

At summary judgment, the judge's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. In its analysis, the court must believe the nonmovant's evidence and draw all inferences in the nonmovant's favor. *Id.* at 255. The court need consider only the cited materials, but it may consider any other materials in the record. Fed. R. Civ. P. 56(c)(3).

## III.    Facts

CAFCC is a private detention facility owned and operated by CoreCivic, Inc., in Florence, Arizona. (Doc. 188, Federal Defendants' Statement of Facts (FDSOF) ¶ 1.) The

United States' Marshals Service (USMS) contracts with CAFCC to house prisoners who have been remanded to USMS custody by a federal judicial officer.  (*Id.* ¶ 2.)  Under this contract, CAFCC must provide secure custody, safekeeping, housing, subsistence, and care of USMS prisoners in accordance with all state and local laws, regulations, policies, and court orders applicable to the operation of the facility, including the Federal Performance Based Detention Standards.  (*Id.* ¶¶ 3−4.)

The USMS follows CDC guidance for responding to COVID-19 at detention facilities holding USMS prisoners and has sent CDC guidance to those facilities.  (*Id.* ¶¶ 5−6.)  The USMS also conducts Quality Assurance Reviews (QARs) or audits at these facilities to ensure compliance with their contract terms and applicable standards and to ensure that non-federal detention facilities are operated in a safe, humane, and secure manner.  (*Id.* ¶¶ 7−8.)  In August 2020, the USMS conducted a QAR of CAFCC and concluded that CAFCC staff were following applicable CDC COVID-19 pandemic guidelines at that time.  (*Id.* ¶ 9.)

### A.  CoreCivic/CAFCC's COVID-19 Response

In January 2020, CoreCivic began monitoring the COVID-19 outbreak.  (Doc. 192, Def. Kline's Statement of Facts (DKSOF) ¶ 33.)  CoreCivic's Facility Support Center (FSC) in Brentwood, Tennessee developed company-wide protocols for responding to COVID-19 at each of its facilities based on recommendations from the CDC, government partners, and state and local health authorities.  (*Id.* ¶ 31.)  The FSC also activated an Emergency Operations Center (EOC) to communicate with all CoreCivic facilities regarding daily developments in COVID-19 information, CDC guidance, and operational management.  (*Id.* ¶ 32.)  CoreCivic's Chief Medical Officer, Dr. Keith Ivans, worked closely with infectious disease specialists and correctional medical professionals to implement up-to-date protocols for preventing the spread of COVID-19 in each CoreCivic correctional facility.  (*Id.* ¶ 34.)

Early in the pandemic, CoreCivic facility administrators had daily and as-needed conference calls with the EOC to review protocols, receive CDC updates, and discuss

concerns and requests related to the COVID-19 response; currently, these calls happen bi-weekly. (*Id.* ¶ 35.)

As of May 2020, CAFCC leadership and supervisory staff were holding daily briefings to discuss issues and assign tasks for COVID-19 operational responses. (*Id.* ¶ 38.) CAFCC developed and followed COVID-19 Sanitation Schedules and Protocols for daily facility cleaning and sanitation. (*Id.* ¶ 39.) CAFCC also developed a staffing contingency plan in the event of staffing shortages due to the virus, and restricted detainee movement to prevent COVID-19 exposure, which freed up staff to meet needs in other operational areas. (*Id.* ¶ 40.)

CAFCC monitors changes in guidance from the CDC and the Pinal County Public Health Services District (Pinal County), and Pinal County has reviewed and approved CAFCC's quarantine, isolation, testing, and vaccination plans. (*Id.* ¶¶ 46−47.)

**B.    CAFCC Policies and Practices for Reducing the Spread of COVID-19**

       **1.    Social Distancing**

To limit the spread of the virus, in March and April 2020, CAFCC suspended all social visits and volunteer entry into the facility and stopped transporting detainees for in-person court hearings or non-emergency medical consults, although it has since resumed these activities with certain restrictions. (*Id.* ¶¶ 51−53.)

CAFCC implemented other practices to promote social distancing, consistent with CDC guidelines, including staggering time in recreational spaces, restricting recreation to a single housing unit per area, providing meals inside cells or housing units, suspending group programming, using outdoor facilities for existing group activities, having designated rooms near each housing unit to evaluate detainees with COVID-19 symptoms, and having healthcare staff perform regular rounds. (*Id.* ¶ 59.) Even after detainees began receiving vaccinations, CAFCC's overall policies regarding social distancing and housing have not changed. (*Id.* ¶ 68.)

. . . .

. . . .

1  **2.    Masks and Other Personal Protective Equipment (PPE)**

2       CAFCC's protocols regarding masking and PPE evolved along with CDC guidance.

3  (DKSOF ¶¶ 69−73.)  The May 3, 2022 CDC Guidance provides "Strategies for Everyday

4  Operations," and "Enhanced COVID-19 Prevention Strategies," and explains that

5  correctional facilities should keep strategies for everyday operations in place at all times

6  and should add enhanced COVID-19 prevention strategies "when the COVID-19

7  Community Level is medium or high, or when facility-level factors indicate increased

8  risk." (DKSOF ¶ 75; Doc. 192-2 at 89−90.)  Facility-level factors include (1) vaccination

9  coverage, (2) transmission within the facility, (3) staff/detainee risks of severe health

10 outcomes, and (4) facility structural and operational characteristics.  (DKSOF ¶ 75.)  For

11 everyday operations, the Guidance recommends that facilities offer "well-fitting

12 masks/respirators" to residents and staff, while the enhanced strategies recommend

13 requiring universal indoor masking.  (*Id.* ¶ 74; PSOF ¶ 74.)

14      As of May 2020, CFACC did not require detainees to wear masks inside their

15 housing units but encouraged them to do so and educated them on the reasons to do so.

16 (DKSOF ¶ 85.)  All detainees were provided cloth face masks, with replacements available

17 upon request, and were required to wear paper surgical masks when leaving their pods and

18 going to other areas where social distancing is more difficult.  (*Id.* ¶¶ 84−85, 87.)  Detainee

19 porters, kitchen, commissary, or laundry workers were also provided gloves and masks and

20 other PPE as required by applicable guidelines.  (*Id.* ¶ 90.)

21      Symptomatic or COVID-19 positive detainees in isolation were provided medical

22 grade surgical masks and were required to wear masks when leaving their cells and while

23 in their cells when speaking to medical staff.  (*Id.* ¶¶ 88−89.)  Prior to detainees' outside

24 transports to an offsite hospital or medical clinic, staff were required to screen the detainees

25 for COVID-19 by taking their temperatures and noting them on the transport orders.  (*Id.*

26 ¶ 95.)  Those with temperatures of 100 degrees or higher would be escorted to medical

27 immediately while wearing a paper mask.  (*Id.*)

28 . . . .

Front gate signs advised all visitors that they were required to wear a mask and that, if they did not have one, they were to social distance and obtain a mask in the lobby and put it on immediately; lobby door signs repeated these instructions. (*Id.* ¶¶ 92−93.)

After reviewing the May 3, 2022 CDC Guidance, CoreCivic approved a change from mandatory to voluntary masking for staff, visitors, and detainees based on the CDC's two-factor requirement that (1) the local COVID-19 community level is "low," and (2) the Warden and facility health-care staff agree that the facility-based risk factors support the change. (*Id.* ¶ 97.) After a CoreCivic facility moves to voluntary masking, CoreCivic requires it to monitor COVID-19 community levels daily and return to mandatory masking if the community level returns to medium or high. (*Id.* ¶ 98.) The facility must also have a mask distribution plan in place and communicate it to staff and detainees. (*Id.*)

On May 9, 2022, after determining in consultation with CAFCC medical staff that the CDC factors supported a change from mandatory to voluntary masking, Warden Kline sought and obtained USMS approval for this change. (*Id.* ¶ 99.) On June 30, 2022, based on increases in community and facility transmission, CAFCC returned to mandatory masking. (*Id.* ¶ 100.)

### 3. Enhanced Sanitation Procedures

As of May 2020, CAFCC was following the CDC's March 23, 2020 "Interim Guidance on Management of [COVID-19] in Correctional and Detention Facilities" ("Interim Guidance") for sanitation, which included providing a no-cost supply of soap to detainees to permit frequent handwashing, using household cleaners and EPA-registered disinfectants for cleaning common areas, and increasing the number of staff and detainees trained and responsible for cleaning common areas. (*Id.* ¶¶ 101−104.) CAFCC also updated its facility housekeeping plan to comply with CDC guidance, adding instructions for safe and appropriate use of disinfectants and PPE in areas where the virus may be present. (*Id.* ¶ 106.) Detainees were also educated during town hall meetings on how to safely sanitize common room surfaces, such as telephones and kiosks. (*Id.* ¶ 107.) Defendants claim that detainees were also provided EPA-approved disinfectants, such as

1   HDQC2, to sanitize the common room equipment before and after each use.  (*Id.* ¶¶ 111,

2   113.)  Plaintiffs dispute that they received these cleaning solutions, citing to declarations

3   of the named representatives that, as of May 4, 2020, they only received a small amount of

4   cleaning solution, which was not antibacterial, and when it ran out, they had to resort to

5   using water only without appropriate wipes to clean phones before use.  (PSOF ¶ 113.)

6           **4.**      **Screening and Health Assessments**

7        In its Interim Guidance, the CDC recommended verbal screening and temperature

8   checks for all incoming detainees as well as for all staff and facility visitors.  (DKSOF ¶¶

9   125−26.)

10        In March 2020, CoreCivic developed its first COVID-19 screening tool and has

11   amended it as the CDC has identified new information and symptoms.  (*Id.* ¶ 128.)  During

12   intake, facility medical staff conducted symptom screenings, vitals checks, including

13   temperature and oxygen pulsometer checks, and asked chronic health questions.  (DKSOF

14   ¶ 135.)  Also, on or about April 7, 2020, CAFCC initiated a High-Risk Detainee Plan, that

15   outlined operational strategies to identify, monitor, and care for high-risk detainees.  (*Id.*

16   ¶ 135.)  For a time, a list of high-risk detainees was provided to the Unit Management Chief

17   to ensure continued monitoring and prompt treatment if these detainees were exposed or

18   potentially exposed to COVID-19.  (*Id.* ¶ 136.)

19        At intake, medical staff provided a fact sheet to detainees regarding the Moderna

20   COVID-19 emergency use authorization vaccine, which included information about

21   COVID-19, its symptoms, who should or should not get the vaccine, and the known results

22   and side-effects of the vaccine at that time.  (*Id.* ¶ 132; PSOF ¶ 132; Doc. 192 at 77−81.)

23   If a detainee indicated he or she had already received a dose of the vaccine, medical staff

24   would attempt to verify this using the Arizona State Immunization Information System

25   (ASIIS) online portal for in-state detainees or would attempt to obtain records from a

26   detainee's prior out of state facility.  (*Id.* ¶ 141.)  If a detainee could not document receiving

27   a vaccine, CAFCC identified the detainee as unvaccinated.  (*Id.* ¶ 142.)  If a detainee had

28   received only one dose of either the Pfizer or Moderna vaccine and wanted a second dose,

medical staff would administer a second dose of the Moderna vaccine as close as possible to 28 days after the first dose.  (Doc. 192-2 78.)  For those who received a dose at intake, CAFCC staff provided a CDC vaccine card to the detainee.  (DKSOF ¶ 143.)  Those who declined a vaccine at intake were provided educational materials and informed how to request a vaccine.  (*Id.* ¶ 144.)

### 5.    Cohort/Quarantine Strategies

#### a.    Intake Cohorts

The CDC initially recommended a 14-day quarantine of all new intakes in individual cells before introducing them into the general population, but the CDC's Interim Guidance alternatively recommended placing them into small groups (cohorts) where facilities lacked the space to house each new intake individually.  (*Id.* ¶¶ 146−47.)

Starting on March 19, 2020, CAFCC began cohorting new arrivals and returnees from outside transports for 14 days, and if none of them developed symptoms or tested positive for the virus during that time, the detainees would be released into the general population.  (*Id.* ¶¶ 152−154.)  Within 24 hours of being placed in a cohort, CAFCC detainees were swab tested for COVID-19, unless they arrived on a weekend, then they were swab tested the following Monday.  (*Id.* ¶ 155; 192-2, Ex. 3 (Rose Decl.) ¶ 12.)[2] Cohorted detainees were housed individually as much as possible or, if necessary, with a single cellmate from the same cohort, with signs posted on each cell indicating the cohort group number and the cohort's anticipated release date.  (*Id.* ¶ 158.)

During the cohort period, the detainees received the same activities and opportunities as those in the general population, but they were only allowed out of cell with other members of their cohort; each cohort was put on a schedule to allow access to the dayroom; and the dayrooms and common areas were sanitized between use by each different group.  (DKSOF ¶¶ 158−61, 166.)  If, during the cohort period, a detainee displayed symptoms of COVID-19 or was confirmed positive, the cohort was quarantined,

---

[2] Because the parties do not differentiate between federal detainees and CAFCC detainees more generally, and all detainees are subject to the same policies, the Court uses the term CAFCC detainees unless it is clear the facts only apply to USMS detainees.

and the quarantine period restarted from that date.  (DKSOF ¶ 156.)

The CDC's more recent February 10, 2022 Guidance reduced the duration of intake cohorts from 14 to 10 days, and following this, CAFCC shortened its cohort period to 10 days.  (*Id.* ¶¶ 148, 157.)  The CDC's May 3, 2022 Guidance for normal operations recommended either using a routine observation period (cohort) or testing all detainees at intake.  (*Id.* ¶¶ 148−149; Doc. 201-7 at 7.)  As of June 1, 2022, CAFCC no longer cohorts new intakes.  (*Id.* ¶ 157.)  Instead, effective July 19, 2022, all new CAFCC intakes are swabbed with a rapid test during intake.  (DKSOF ¶ 155; Doc. 192-3, Ex. 7 (Jaramillo Decl.) ¶ 43.)

### b.    Quarantine Housing

Over time, the CDC has reduced the recommended quarantine period for individuals who have tested positive or had close contact with someone who tested positive for COVID-19 from 14 to 8 days.  (*Id.* ¶¶ 181−82.)  Quarantine detainees are generally housed individually but are sometimes placed with a cellmate if they are both confirmed positive or negative for COVID-19.  (*Id.* ¶ 177.)  The quarantined detainees are tested if they show symptoms and consent to a test, and all detainees on the same pod as those quarantined are screened daily for symptoms.  (DKSOF ¶ 179.)[3]  The parties materially dispute whether close contacts of detainees who test positive are also offered tests. Defendants claim that they are, and Plaintiffs point to declaration evidence that CAFCC does not offer testing to close contacts outside the infected detainee's own cell.  (DKSOF ¶ 178; PSOF ¶ 178.)

### c.    Medical Isolation

CAFCC has three dedicated medical isolation pods.  (DKSOF ¶ 192.)  If a detainee reports symptoms, he or she is moved immediately to medical isolation, where testing and monitoring start.  (*Id.* ¶ 193.)  Although CAFCC's protocols have changed with the CDC's

---

[3] Plaintiffs dispute that all detainees on the pod are screened daily during quarantine. (PSOF ¶ 179.)  They base this dispute on the expert opinion of Dr. Venters, who opines that CAFCC does not have adequate ways of tracking medically vulnerable detainees and speculates that this deficiency could be a problem during a large outbreak, making it difficult for CAFCC staff to prioritize who is at most need of special monitoring and protections.   This  opinion  does  not  controvert  Defendants'  evidence  that,  during quarantine, CAFCC staff conduct daily symptoms checks of all detainees on the same pod.

changed guidance over time, currently, if the detainee tests negative, they are returned to the general population. (*Id.* ¶¶ 198−199.) If the detainee tests positive, they are isolated for 10 days. (*Id.* ¶¶ 193−194.) Isolated detainees receive daily COVID-19 symptoms screenings, including temperature and O2 saturation checks, and are educated to report any new symptoms to the pill call nurses, who conduct pill pass twice a day, or to the officer in the unit. (*Id.* ¶¶ 95−96.) CAFCC also has a 12-bed infirmary licensed by the Arizona Department of Health with 24-hour nursing coverage for higher acuity patients. (*Id.* ¶ 203.)

### 6. COVID-19 Testing

During normal operations, the CDC's May 3, 2022 Guidance recommends testing all incoming detainees at intake or implementing a routine observation period, and when Enhanced Protection Strategies are in place, also testing before transfer or release and before/after community visits. (*Id.* ¶ 205.) Effective July 19, 2022, all new CAFCC intakes are swabbed with a rapid test during the intake process. (*Id.* ¶ 155.) Also consistent with current CDC guidance all detainees are offered a COVID-19 test if they develop symptoms. (*Id.* ¶ 207.) Defendants claim that CAFCC tests all close contacts, but Plaintiffs present evidence that it only routinely tests the COVID-19 positive individual's cellmate. (*Id.* ¶ 206; PSOF ¶¶ 206, 174.) Consistent with USMS requirements, detainees also receive a rapid test if they are transferred to a different facility or transported to court. (DKSOF ¶¶ 209−210.)

If a detainee being transferred tests positive, the onboarding facility is notified and decides whether to continue the transfer. (*Id.* ¶ 211.) Similarly, if a detainee going to court or being transferred refuses a test, the receiving court or facility is notified and decides whether to continue with the court appearance or transfer. (*Id.*) Approximately 95% of CAFCC detainees are transferred to another facility and provided testing before transfer; the other 5% are released, and CAFCC is able to provide testing prior to release. (*Id.* ¶ 213.)[4] If a detainee tests positive on release, CAFCC has no authority to hold them. So

---

[4] Plaintiffs dispute that all detainees are offered a test prior to release, but the excerpt of the Rose Declaration, to which they cite in support, does not contain the cited pages. (PSOF ¶ 213.)

1    they notify the Pinal County Public Health Services District of the release and the
2    detainee's last known address so it can follow up with the detainee; the detainee is also
3    provided PPE prior to release.  (DKSOF ¶ 213.)

4                    **7.**    **Staff Screening**

5            Since the start of the pandemic, all persons entering CAFCC, whether employees,
6    contractors, USMS or other government partner employees, attorneys, or visitors, are
7    subject to screening as a prerequisite to entering the facility.  (*Id.* ¶ 218.)  Early in the
8    pandemic, when an employee had been denied entry or reported a positive test or close
9    contact with a confirmed COVID-19 positive individual, CAFCC performed a contact-
10   tracing analysis, using it's surveillance system to document each close contact of the
11   employee over the past 48 hours to identify any other employees or detainees who may
12   need additional monitoring, testing, or other precautions to minimize the spread of COVID-
13   19 in the facility.  (*Id.* ¶ 222.)  Although CAFCC discontinued using the facility
14   surveillance system for this purpose towards the end of 2020, it conducts contact-tracing
15   by interviewing the infected employee about their contacts over the past 48 hours.  (*Id.* ¶
16   223.)[5]  Defendants claim that the employee is immediately sent home and required to see
17   a healthcare provider for further screening and to obtain clearance prior to being admitted
18   into the facility, but Plaintiffs present declaration evidence that employees are only
19   required to wait five days before returning.  (DKSOF ¶ 224; PSOF ¶ 224.)

20                   **8.**    **COVID-19 Vaccines and Boosters**

21           On January 22, 2021, CAFCC began offering the COVID-19 vaccine to detainees,
22   with designated areas in each housing unit for detainees to get vaccinated and/or privately
23   discuss their concerns about the vaccine with medical staff.  (DKSOF ¶¶ 231−32.)  All
24   vaccination information is documented in the detainees' electronic health records, and if a
25   detainee received the first dose of a two-dose vaccine, the second dose would be ordered

26   _____

27        [5] Plaintiffs dispute that CAFCC continues to contact trace, but the excerpt of the
     Rose Declaration, to which they cite in support, does not contain the cited pages.  (PSOF
28   ¶ 223.)

and administered at the appropriate dose interval if the detainee remained at CAFCC. (*Id.* ¶ 233.) Prior to March 31, 2021, when vaccines were not widely available, CAFCC followed Pinal County Public Health Services District guidelines to prioritize detainees identified as vulnerable. (*Id.* ¶ 235.)

Effective March 31, 2021, vaccines and vaccine boosters are offered to all CAFCC detainees over eighteen without regard to whether they have any identified CDC risk factors. (*Id.* ¶ 236.) CAFCC currently uses the Moderna vaccine, which is provided by Pinal County. (*Id.* ¶ 240.) Since it began offering the COVID-19 vaccine to detainees, CAFCC has never run out of doses of the vaccine, which it orders regularly through the Arizona State Health Department online portal whenever the supply reaches or falls below 100 doses. (*Id.* ¶ 241.) For every order placed, CAFCC also receives supplies from the State, including syringes, alcohol swabs, face shields, and masks. (*Id.*)

When CAFCC started receiving the vaccine, it set vaccination target dates for each housing unit and conducted town hall meetings approximately 5 days prior to vaccinations in that unit to advise detainees that the vaccines are available, provide education on the vaccines, and give detainees an opportunity to ask questions and to consent to or refuse a vaccine. (*Id.* ¶ 243, 245.)[6] Pre-town hall information sheets were also provided to detainees and were posted in each housing unit in English and Spanish. Town hall meetings were conducted in English and Spanish with handouts and language lines available for other languages, if needed. (*Id.* ¶¶ 244−246.)

As of March 1, 2022, 85 "vaccination events" were held in CAFCC housing units, and more than 860 detainees per month, for a total of 8,690 detainees were offered the COVID-19 vaccine in less than one year. (DKSOF ¶ 248.) Since then, no formal "vaccination events" have been scheduled since all detainees have been offered the vaccine, and it is offered to new arrivals during intake. (*Id.* ¶ 249.) Plaintiffs do not dispute

---

[6] Plaintiffs dispute that medical staff were at all meetings, but the excerpt of the Murray Declaration, to which they cite as stating the meetings were "done by security staff," does not contain the cited pages. (PSOF ¶ 245.)

these facts but present declaration evidence from Defendant Kline and CAFCC Complex Health Services Administrator K. Jaramillo, that detainees are not offered boosters on intake, even if they are determined to be eligible, although information on how to obtain a booster is posted and appears in a handbook.  (PSOF ¶ 249.)

To obtain a vaccine or booster, detainees may submit a medical request form to the medical department, or if they verbally request a vaccine from staff, they will be directed to submit a medical request form.  (DKSOF ¶ 253.)  Written requests are triaged within 24 hours by the Communicable and Infectious Disease (CID) nursing staff, and CAFCC nursing staff then have 72 hours to further review and schedule requests; the detainees name is placed in the vaccine log, which tracks when the vaccine or booster was requested and administered.  (*Id.* ¶ 254.)  A detainee cannot receive a vaccination or booster without first acknowledging receiving a fact sheet and signing a consent form.  (*Id.* ¶ 260.)  COVID-19 vaccines are also available to all CAFCC staff.  (*Id.* ¶ 296.)

### 9. COVID-19 Antiviral Treatment

Where antiviral medications, such as Paxlovid and Molnupiravir, are clinically indicated, CAFCC has access to these medications through local pharmacies and therefore does not keep these medications in stock.  (*Id.* ¶¶ 275−78.)  CAFCC detainees must still consent to taking these medications, if prescribed, and always have the right to refuse COVID-19 tests, vaccinations, boosters, antiviral medications, or other therapies for COVID-19 symptoms or related illnesses.  (*Id.* ¶ 278.)

### 10. COVID-19 Education

CAFCC complies with CDC guidelines recommending posting educational signage throughout the facility about COVID-19, and it posted educational materials throughout the facility and in all housing units about COVID-19 symptoms, vaccines, and boosters, what to do if you are sick, hand-washing, sanitation and cleanliness, mask use, steps to reduce exposure to COVID-19, social distancing, and how to report and to whom to report symptoms, which are updated as new information is obtained from the CDC.  (*Id.* ¶¶ 279−281.)  A document titled "Here's the Scoop" is posted throughout the facility and on

the detainee tablet home screens with information about COVID-19 vaccines and boosters and how to request them, and detainees cannot access their tablets without acknowledging having read this information. (*Id.* ¶¶ 291−92.) Plaintiffs dispute, based on photographs taken in the facility on February 28, 2022, that any documents other than the "Here's the Scoop" poster were posted in the housing units, and they point out that the "Here's the Scoop" poster contains only logistical information regarding getting vaccinated, not educational information about the virus or the vaccine. (PSOF ¶¶ 281, 291; Doc. 192-2 at 64−65.)

As of May 2020, unit staff held town hall meetings to discuss any changes in protocols and procedures, such as when social visitation was cancelled and when sanitation schedules and/or mask requirements were updated. (DKSOF ¶ 282.) All unit staff were also instructed on COVID-19 symptoms and to alert medical staff if such symptoms were reported or observed. (*Id.* ¶ 288.) Detention staff are also educated in the normal course of operation how to administer emergency first aid, and medical staff and providers are available around the clock, either on site or on call. (*Id.* ¶ 289.)

### 11. Detainee Programming and Services

In the early days of the pandemic, programming was reduced, but not eliminated, to allow for social distancing. (*Id.* ¶ 297.) Since July 2021, in-person programming has returned to pre-pandemic levels, and recreation has largely gone unchanged due to the size of the recreation yards. (*Id.* ¶¶ 297−98.) All detainees have access to a wide variety of programming and classes, including mental health programming, self-help and job skills classes, and religious programs. (*Id.* ¶ 299.)

### 12. Court Services

CDC recommendations and Arizona court administrative orders have changed over the course of the pandemic, with prior CDC guidance recommending alternatives to in-person court appearances, and courts cancelling in-person appearances and continuing civil and criminal trials set to begin before April 10, 2020. (*Id.* ¶¶ 303−304.) As of May 2020, CAFCC had not cancelled legal visitation, but non-contact visitation, like video

teleconferencing (VTC) was encouraged, and the facility's VTC system was available Monday through Friday, 7:00 a.m. to 9:00 p.m. (*Id.* ¶ 305.) If an attorney requested a contact visit, the visitation area was sanitized before and after the visit. (*Id.* ¶ 306.) Detainees were also permitted to call their attorneys from their housing pods without the call being monitored or recorded if the recipient was designated an attorney. (*Id.* ¶ 307.) The VTC system is also used for court appearances, and at its highest point, CAFCC was facilitating 650−700 VTC appearances weekly. (*Id.* ¶ 308.)

### 13. COVID-19 Statistics

Between April 2020 and July 2022, a total of 44,703 USMS detainees cycled through CAFCC. (*Id.* ¶ 309.) A total of 1,782 of these detainees tested positive for COVID-19 while at CAFCC (560 in 2020, 516 in 2021, and 706 in 2022), meaning about 3.9% of USMS detainees who passed through CAFCC during that period tested positive for COVID-19 since testing became available. (*Id.*) During that period, 2,377, staff worked at CAFCC, with approximately 569 staff employed at CAFCC at any given time. (*Id.* ¶ 311.) Out of the 2,377 staff who worked at CAFCC during that period, 594 tested positive for COVID-19, thus about 2.5% of staff who passed through CAFCC tested positive since testing became available. (*Id.*)

Between January 22, 2021, when CAFCC began offering COVID-19 vaccines, and July 22, 2022, 13,089 detainees were offered a vaccine, including 9,967 USMS detainees. (*Id.* ¶ 314.) As of July 22, 2022, 1,700 USMS detainees had received the (single dose) Johnson & Johnson vaccine, 1,085 USMS detainees received the first dose of the (two-dose) Moderna vaccine, 957 received the second does of the Moderna vaccine, and 256 received boosters while at CAFCC. (*Id.* ¶¶ 314−16.) An additional 8,265 USMS detainees refused the vaccine. (*Id.* ¶ 316.)[7]

As of July 22, 2022, the USMS population at CAFCC was 3,724, and of those detainees, 10% became fully vaccinated while at CAFCC. (*Id.* ¶ 317.) According to

---

[7] It is not clear from Defendants' evidence whether any of the detainees who refused the vaccine at CAFCC had already been vaccinated elsewhere.

Defendants, there is no reliable way to confirm whether new intakes are either partially or fully vaccinated, so the total number and percentage of fully vaccinated USMS detainees is likely higher than 10%.  (*Id.*)[8]  Plaintiffs dispute that CAFCC is unable to confirm the vaccination status of new intakes, which Defendants elsewhere claim CAFCC staff attempt to do via the State's vaccination database or via the transfer records of new detainees, and Plaintiffs argue that, without this information, Defendants' claims that the percentage of USMS detainees who are fully vaccinated is higher than 10% are merely speculative. (PSOF ¶ 317.)  As of July 22, 2022, 61 % of CAFCC staff had received the COVID-19 vaccine.  (DKSOF ¶ 318.)[9]

Since the start of the pandemic through April 20, 2022, two detainee deaths and five staff member deaths at CAFCC have been attributed to COVID-19, making the mortality rate among CAFCC detainees about 0.0015 % (2/1332).[10]  By comparison, mortality rate estimates for COVID-19 infections are 1.2% in the U.S., 1.5% in Arizona, and 1.25% in Pinal County.  (*Id.*)  Defendants attribute the lower mortality rate at CAFCC to effective mitigation and healthcare strategies.  (*Id.*)  Plaintiffs dispute this claiming evidence suggests that the latter statistics are unreliable due to underreporting of COVID-19 cases in the community; Plaintiffs also dispute the reliability of CAFCC's official records attributing only two detainee deaths to COVID-19.  (PSOF ¶¶ 312, 313.)

**IV.   Defendants' Motions for Summary Judgment**

Defendant Kline and Federal Defendants argue they are entitled to summary

---

[8] Defendants do not provide any data about the vaccination rate of non-USMS detainees at CAFCC.

[9] It is not clear from Defendants' evidence whether this is only the percent of staff who were vaccinated at CAFCC or the total percent of staff vaccinated, either at CAFCC or elsewhere.  It is also not clear whether this percentage includes staff who were partially vaccinated or only those who were fully vaccinated.

[10] This estimate comes from Dr. Murray's declaration (Doc. 192-3, Ex. 6 (Murray Decl.) ¶ 134).  Dr. Murray calculated this percentage based on a total of 1,332 detainees who tested positive for COVID-19 from the start of testing up to April 20, 2020.  (*Id.*) Elsewhere, Defendants state that a total of 1,782 USMS detainees tested positive for COVID-19.  (*See* DKSOF ¶ 309.)  This discrepancy appears to be because the higher number includes at least two additional months of data, up to June 2022.  (*Id.*)  It is also not clear when Dr. Murray made this calculation or what available data he used to do so.

judgment based on Plaintiffs' alleged failures to exhaust administrative remedies, mootness, and on the merits of their Fifth Amendment claim. (Docs. 192, 194.)

### A. Exhaustion of Administrative Remedies

#### 1. Legal Standard

Under the Prison Litigation Reform Act (PLRA), a prisoner must exhaust "available" administrative remedies before filing an action in federal court. *See* 42 U.S.C. § 1997e(a); *Vaden v. Summerhill*, 449 F.3d 1047, 1050 (9th Cir. 2006); *Brown v. Valoff*, 422 F.3d 926, 934-35 (9th Cir. 2005). The prisoner must complete the administrative review process in accordance with the applicable rules. *See Woodford v. Ngo*, 548 U.S. 81, 92 (2006). Exhaustion is required for all suits about prison life, *Porter v. Nussle*, 534 U.S. 516, 523 (2002), regardless of the type of relief offered through the administrative process, *Booth v. Churner*, 532 U.S. 731, 741 (2001).

The defendant bears the initial burden to show that there was an available administrative remedy and that the prisoner did not exhaust it. *Albino v. Baca*, 747 F.3d 1162, 1169, 1172 (9th Cir. 2014); *see Brown*, 422 F.3d at 936-37 (a defendant must demonstrate that applicable relief remained available in the grievance process). Once that showing is made, the burden shifts to the prisoner, who must either demonstrate that he, in fact, exhausted administrative remedies or "come forward with evidence showing that there is something in his particular case that made the existing and generally available administrative remedies effectively unavailable to him." *Albino*, 747 F.3d at 1172. The ultimate burden, however, rests with the defendant. *Id.* Summary judgment is appropriate if the undisputed evidence, viewed in the light most favorable to the prisoner, shows a failure to exhaust. *Id.* at 1166, 1168; *see* Fed. R. Civ. P. 56(a).

A class of prisoner-plaintiffs satisfies the PLRA's administrative exhaustion requirement through "vicarious exhaustion," i.e., when "one or more class members ha[s] exhausted his administrative remedies with respect to each claim raised by the class." *Chandler v. Crosby*, 379 F.3d 1278, 1287 (11th Cir. 2004) (internal quotation marks and citations omitted). "[T]his rule advances the purpose of administrative exhaustion, which

1  . . . 'is to put the [administrative authority] on notice of all issues in contention and to allow
2  the [authority] an opportunity to investigate those issues.'" *Id.* (quoting *Griffin v. Carlin,*
3  755 F.2d 1516, 1531 (11th Cir.1985)).  It is therefore sufficient for class-wide exhaustion
4  that at least one class member has exhausted each relevant claim, permitting the
5  administrative entity an opportunity to resolve the alleged class-wide issues internally prior
6  to court intervention.  *Chandler,* 379 F.3d at 1287; *cf. Oatis v. Crown Zellerbach Corp.,* 398
7  F.2d 496, 499 (5th Cir.1968) ("[T]o require a multiplicity of separate, identical charges
8  before the EEOC, filed against the same employer, as a prerequisite to relief through resort
9  to the court would tend to frustrate our system of justice and order.").

10      If the defendants move for summary judgment for failure to exhaust and the
11  evidence shows that the plaintiff did, in fact, exhaust all available administrative remedies,
12  it is appropriate for the court to grant summary judgment sua sponte for the nonmovant.
13  *See Albino*, 747 F.3d at 1176 (pro se prisoner did not cross-move for summary judgment
14  on issue of exhaustion, but because he would have succeeded had he made such a motion,
15  sua sponte grant of summary judgment was appropriate).

16      **2.    Facts Relevant to Exhaustion**

17          **a.    CoreCivic/CAFCC Administrative Remedy Process**

18      CoreCivic/CAFCC Policy 14-103 sets forth the administrative remedies available
19  to federal detainees for complaints regarding facility conditions, treatment, and policies.
20  (DKSOF ¶ 324.)  This policy is included in the Detainee Handbook, which is provided to
21  detainees during intake and is available to detainees upon request at the law library.  (*Id.*)
22  Detainees are given instructions on the grievance process during orientation and on an
23  ongoing basis "as needed."  (*Id.* ¶ 326.)  Grievance forms are available in all the housing
24  units, and for detainees in restrictive housing, in the indoor recreation enclosures, or from
25  staff upon request.  (*Id.* ¶ 327.)[11]  Detainees may seek assistance from a staff member or
26  another detainee when completing a grievance form.  (*Id.* ¶ 328.)

27  _____

28      [11] Plaintiffs dispute that grievance forms are always available (PSOF ¶ 327), but the
    evidence Plaintiffs cite either does not address the availability of grievance forms or is not
    specific enough to controvert these facts.

The grievance process consists of three steps: (1) informal resolution (optional), in which detainees are encouraged to resolve their issues informally with appropriate staff before filing a formal grievance, (2) formal grievance (required); and (3) appeal (required). (*Id.* ¶¶ 340−41.) If a detainee chooses to use the informal resolution process, he or she must submit an Informal Resolution Form 14-5A within seven calendar days of the incident giving rise to the complaint and must place the Informal Resolution Form (IRF) in the grievance box located in each housing unit. (*Id.* ¶ 242.) Absent unusual circumstances, the detainee will receive a response from the housing Unit Manager within ten calendar days of submission of the informal resolution. (*Id.* ¶ 343.) If unusual circumstances exist, the Unit Manager will provide written documentation to the detainee extending the response deadline. (*Id.*)

If a detainee is unsatisfied with the informal resolution process result or chooses to forgo that process, he or she may proceed to the formal grievance stage at any time while the informal grievance is still pending or within 5 days of a response; if she bypasses the informal resolution stage, she must file a formal grievance within seven calendar days of the alleged incident. (*Id.* ¶¶ 345−46.) The detainee must complete page 1 of the Grievance Form and place it in the grievance mailbox in the housing unit. (*Id.* ¶ 347.) Unless a time extension has been granted, the detainee will receive a response to the formal grievance within ten calendar days of submission. (*Id.* ¶ 348.)

If a detainee is not satisfied with the formal grievance response, he or she must complete the Appeal section of the Grievance Form 14-5B and resubmit the grievance in the grievance mailbox within five calendar days of the response. (*Id.* ¶ 349.) The Grievance Officer must then forward the grievance appeal to the Warden, and the Warden will have ten calendar days to issue a final response. (*Id.* ¶ 350.) Unless unusual circumstances are present, the total time for the grievance process from the filing of a Grievance Form to a final Appeal decision is 27 days. (*Id.* ¶ 351.)

Detainees must submit their grievances in their housing unit's grievance mailbox, which is checked each night, except Saturdays, Sundays, and holidays. (*Id.* ¶ 335; PSOF

¶ 335.) Utility staff must collect the grievances and place them in a locked drop box the same night for the Grievance Coordinator to pick up the following morning, Monday through Friday. (DKSOF ¶ 335.)

If the subject matter of a grievance is such that compliance with the regular timeframes would create a risk of personal injury, the detainee may request that the grievance be considered an emergency grievance by filling out the Grievance Form and placing it a sealed envelope with "Emergency Grievance" on the outside. (*Id.* ¶¶ 353−55.) Emergency grievances must be placed in the grievance box or, if after hours or on weekends, given directly to the Unit Manager or Shift Supervisor and delivered to the designated Administrative Duty Officer, who will review it and determine if it is an emergency. (DKOF ¶ 356.) If it is determined to be an emergency, the grievance must be resolved and responded to within 24 hours of receipt. (*Id.*)

Upon receipt by staff, all informal resolutions, grievances, and appeals must be entered into an electronic database called CoreCivic Apps, to include the detainee's name, number, and housing assignment and the date, category of the complaint, and the type of form used. (*Id.* ¶ 329.) This information must also be entered into a Grievance Log, which is in Excel format.[12] The CoreCivic Apps database is searchable by name or detainee number and allows the user to view every submitted grievance that was logged. (*Id.* ¶ 331.) Grievance forms are in triplicate with one copy for the detainee; one for the detainee's institutional file, and one for CoreCivic. (*Id.* ¶ 333.)

### b. Plaintiffs' Grievance Histories

CAFCC Grievance Coordinator A. Partain reviewed the grievance files in CoreCivic Apps and the Grievance Log for the named Plaintiffs and found that only James Tyler Ciecierski submitted an IRF about CAFCC's COVID-19 protocols, and only Marvin Lee Enos submitted a Formal Grievance regarding the same. (*Id.* ¶¶ 358−59; Doc. 16-8 (Partain Decl.) ¶¶ 1, 33−35.)

---

[12] Plaintiffs do not dispute that these are the required procedures, but they dispute that this was done in their cases. (PSOF ¶¶ 329−30.)

### i. Mr. Ciecierski's Grievances

Plaintiff Ciecierski was booked into CAFCC on February 27, 2020 (DKSOF ¶ 322), and Plaintiffs filed this action on May 8, 2020. (Doc. 1.) Four days prior to initiating this action, on May 4, 2020, Mr. Ciecierski submitted an IRF, which was assigned No. W-US-2020-0487 and entered on the Grievance Log, in which he alleged that, due to his severe asthma and housing conditions that did not allow social distancing, he could die if he contracted COVID-19. (*Id*. ¶¶ 360, 362.) He requested a single cell and hand sanitizer. (*Id.* ¶ 360.)

On May 8, 2020, Unit Manager L. Meyer responded that CAFCC was following all CDC guidelines for sanitation and was providing masks and that no housing change would be made at that time. (*Id.* ¶ 361.) Unit Manager Meyer encouraged Mr. Ciecierski to notify staff immediately if he began to display any symptoms, in which case he would be seen by medical. (*Id.*) Mr. Ciecierski noted on the IRF that he wanted to appeal, but there is no record he ever filed a Formal Grievance or any other Informal Resolutions related to COVID-19 prior to Plaintiffs filing their Complaint on May 8, 2020. (*Id.* ¶¶ 363, 365.)

In his Declaration, Mr. Ciecierski states that he filed a grievance around April 15, 2020, asking for conditions that would reduce the risk of COVID-19 in his pod, but he never received a response, so he filed another grievance on April 30, 2020, but as of May 4, 2020, when he executed his declaration, he had not received a response. (PSOF ¶ 366.) CAFCC has no record that Mr. Ciecierski filed any grievance forms around April 15, 2020 or on April 30, 2020. (DKSOF ¶ 365.)

### ii. Mr. Enos' Grievances

Plaintiff Enos was booked into CAFCC on August 6, 2019. (DKSOF ¶ 322.) On April 20, 2020, he submitted a Grievance Form, No. W-US-2020-0402, as an "emergency grievance," alleging that the facility was not taking proper COVID-19 precautions, such as providing hand sanitizer to detainees, face masks to staff, or cleaning supplies for detainees to clean their cells; detainees were unable to socially distance and porters were not cleaning the day room as often. (*Id.* ¶ 367; PSOF ¶ 367.) He alleged that he believed his life was

1    in danger due to the threat of contracting COVID-19.  (*Id.*)  According to his declaration

2    in this action, Mr. Enos also filed an emergency grievance regarding the same issues on

3    April 22, 2022.  (PSOF ¶ 371.)

4         On April 27, 2020, Unit Manager Fernandez responded that CAFCC had several

5    precautions in place for staff and detainees to clean and sanitize, each cell had an assigned

6    spray bottle, the facility was following CDC guidelines pertaining to sanitation, masks had

7    been given to all detainees, staff would wear masks, and the supervisors in the units would

8    adjust porter schedules to allow for day room and shower sanitation and cell cleaning.

9    (DKSOF ¶ 368.)  There is no record that Mr. Enos ever appealed this response.  (*Id.* ¶ 370.)

10   According to Mr. Enos, grievance forms were rarely available.  (*Id.*)

11                      **iii.    Ms. Peuplie's Grievances**

12        Plaintiff Peuplie was booked into CAFCC on February 27, 2020.  (*Id.* ¶ 321.)

13   CAFCC has no record Ms. Peuplie ever submitted any grievances about the facility's

14   COVID-19 response protocols while at CAFCC or any other CoreCivic-operated facility

15   prior to Plaintiffs filing their Complaint in this action on May 8, 2020.  (*Id.* ¶¶ 372−74.)

16   According to her declaration, Ms. Peuplie filed emergency grievances stating her concerns

17   that she would contract COVID-19 around April 22, 2020 and on April 30, 2020, but as of

18   May 4, 2020, she had not received any response.  (PSOF ¶ 371.)  Ms. Peuplie stated that

19   she gave her April 30, 2020 emergency grievance directly to staff and asked about the

20   status of her first emergency grievance, and the staff member replied that they receive about

21   400 grievances a day and stated, "we'll get to it whenever we get to it."  (*Id.* ¶ 373.)

22                          **3.    Discussion**

23        Defendants have met their initial burden of showing that administrative remedies

24   were available to Plaintiffs to raise concerns about CAFCC's COVID-19 prevention

25   protocols, and no named Plaintiff exhausted those remedies before filing this action.

26   Grievance Coordinator Partain's search of CAFCC grievance records showed that Mr.

27   Ciecierski submitted IRF No. W-US-2020-0487 regarding his asthma and concerns of

28   contracting COVID-19 while housed without social distancing, and on May 4, 2020, he

received a response, denying his request for a single cell, but he did not file a Formal Grievance.  Additionally, Mr. Enos submitted Grievance Form No. W-US-2020-0402 regarding his concerns about contracting COVID-19 on April 20, 2020, and he received a response on April 27, 2020, which he did not appeal.  Finally, Grievance Coordinator Partain searched CAFCC's electronic database and Grievance Log and found no record that Ms. Peuplie filed any COVID-19 grievances before Plaintiffs filed this action.

Based on this showing, the burden shifts to Plaintiffs to come forth with evidence that they did, in fact, exhaust their administrative remedies or that "something in [their] particular case[s] . . . made the existing and generally available administrative remedies effectively unavailable to [the]m."  *Albino*, 747 F.3d at 1172.

Plaintiffs have made this showing at least as to Ms. Peuplie.  According to her declaration, Ms. Peuplie submitted two emergency grievances stating her concerns about contracting COVID-19: first, on April 22, 2020, and then on April 30, 2020, when she handed her emergency grievance directly to staff and requested to know the status of her prior emergency grievance because she had not received a response.  Even if CAFCC staff chose not to treat Ms. Peuplie's emergency grievance as an emergency requiring a 24-hour response, according to policy, Ms. Peuplie should have received a response to her first emergency grievance within 10 days, or by May 2, 2008, two days after she spoke to the staff member, but as of May 4, 2020, when she executed her declaration, she still had not received a response.

There is also no evidence that staff required additional time to respond to Ms. Peuplie's emergency grievance or that, if this was the case, anyone informed her of an extension to the normal timeframes for a response, and Defendants do not point to any provision in CAFCC's grievance policies that permit or instruct detainees to move to the next level of the grievance process if they do not receive a timely response.  Additionally, the policy requires the grievant to fill out the appeal section of the grievance form and it is not clear how the grievant would be able to complete this step without first receiving a response.  Thus, without a timely response, Ms. Peuplie's only recourse for her urgent

- 24 -

COVID-19 concerns was to submit another emergency grievance, which she did on April 30, 2020. This time, she spoke to the staff member who took her emergency grievance, but instead of assuring Ms. Peuplie that she would receive a response to her emergency grievance within 24-hours, or even within 10 days if her grievance was determined not to be an emergency, the staff member told her CAFCC received 400 grievances a day and, "we'll get to it whenever we get to it." (PSOF ¶ 373.)

Four days later, when she executed her declaration, Ms. Peuplie still had not received a response, to either of her grievances, and based on what staff told her, she had no reason to expect she would receive a response anytime soon, even if she continued to file emergency grievances. *See Brown*, 422 F.3d at 937 ("information provided the prisoner is pertinent because it informs our determination of whether relief was, as a practical matter, 'available.'") (internal citation omitted). The Supreme Court has recognized that administrative remedies are effectively unavailable when, despite what the regulations may state, the grievance process "operates as simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *Ross v. Blake*, 136 S. Ct. 1850, 1859 (9th Cir. 2016). Plaintiffs have created a question of fact that administrative remedies were effectively unavailable in this instance, and Ms. Peuplie's failure to exhaust should therefore be excused. For class-wide exhaustion purposes, it is enough that Plaintiffs can make this showing as to at least one class member—they need not do more to demonstrate exhaustion or a lack of available administrative remedies to proceed as a class. *See Chandler*, 379 F.3d at 1287 ("requiring all class members to exhaust their administrative remedies, 'could impose an intolerable burden upon the inmate complaint review system'" and could make it "extraordinarily difficult" for all class members to exhaust where the composition of the class is subject to constant change beyond the class members control) (quoting *Jones 'El*, 172 F.Supp.2d at 1133). The Court will deny summary judgment to Defendants on exhaustion.

. . . .

. . . .

- 25 -

1      **B.**     **Mootness**

2         **1.**     **Legal Standard**

3        Under Article III of the Constitution, the jurisdiction of a federal court depends on

4 the existence of a "case or controversy"; without a case or controversy, a claim is moot.

5 *Pub. Util. Comm' n of State of Cal. v. FERC*, 100 F.3d 1451, 1458 (9th Cir. 1996). A claim

6 is considered moot if it is no longer a present and live controversy or if no effective relief

7 can be granted. *Mitchell v. Dupnik*, 75 F.3d 517, 527–28 (9th Cir. 1996). When a question

8 before the court has been mooted by changes in circumstances after the complaint is filed,

9 there is no justiciable controversy. *Flast v. Cohen*, 392 U.S. 83, 95 (1968).

10        Questions of mootness regarding injunctions are viewed "in light of the present

11 circumstances." *Id.* at 528. "[A] suit for injunctive relief is normally moot upon the

12 termination of the conduct at issue." *Demery v. Arpaio*, 378 F.3d 1020, 1025-26 (9th Cir.

13 2004). Thus, if a prisoner is no longer subjected to prison officials' allegedly unlawful

14 activity, the complaint for injunctive relief becomes moot. *Wiggins v. Rushen*, 760 F.2d

15 1009, 1011 (9th Cir. 1985). A case becomes moot only "if subsequent events ma[ke] it

16 *absolutely clear* that the allegedly wrongful behavior could not reasonably be expected to

17 recur." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189

18 (2000) (internal quotation marks and citations omitted) (emphasis added).

19         **2.**     **Discussion**

20           **a.**     **Releases of Named Class Representatives**

21        Since Plaintiffs initiated this action, all three named representatives of the detainee

22 class have been released or transferred to other facilities. (*See* Doc. 194 at 15; DKSOF

23 ¶¶ 31−323.) Defendants argue that this, alone, moots Plaintiffs' class-wide claims. (Doc.

24 194 at 15.) The Court rejected a similar argument when it granted Plaintiffs' Motion for

25 Class Certification despite the need for a change in class representatives at that time, stating

26 that,

27              In the incarceration context, in which the duration of the
             individual class representatives' time in custody is by nature

28              transitory, "the termination of a class representative's claim

does not moot the claims of the unnamed members of the class." *Cnty. of Riverside v. McLaughlin*, 500 U.S. 44, 51 (1991) (quoting *Gerstein v. Pugh*, 420 U.S. 103, 110 n.11 (1975)). In *Gerstein*, the Supreme Court noted . . . that "pretrial detention is by nature temporary" and could be "ended at any time by release on recognizance, dismissal of the charges, or a guilty plea, as well as by acquittal or conviction after trial," making it "by no means certain that any given individual, named as plaintiff, would be in pretrial custody long enough for a district judge to certify the class." 420 U.S. at 110 n.11.

(Doc. 69 at 18.)

The Court went on to find, as also applies here, that,

if a named Plaintiff's circumstances materially change and, as a result, his or her interests diverge from the remainder of the class or he or she is otherwise no longer personally interested in or capable of continuing to represent that class, other unnamed class members may be appointed to serve in his or her place, allowing for continued adequate representation by those who remain in custody and continue to share the same interests as the respective class.

(*Id.* at 18 (citing *Gerstein*, 420 U.S. at 110 n.11; *Sosna v. Iowa*, 419 U.S. at 402 n.11; *Schall v. Martin*, 467 U.S. at 256, n. 3; *Cnty. of Riverside*, 500 U.S. at 52); Doc. 89 at 6 n.2.)

Defendants' reliance on cases dismissing as moot individual conditions-of-confinement claims and habeas petitions when the plaintiffs/petitioners in those cases were released (*see* Doc. 194 at 15) does not compel a different conclusion here. Such cases simply do not apply in the class action context where the plaintiff class may continue to have viable class-wide claims even after the class representatives' situations materially change. Accordingly, Plaintiffs' claims are not moot simply because the named representatives have been released, and the Court will deny summary judgment to Defendants on this ground. *Cnty. of Riverside*, 500 U.S. at 51; *Gerstein*, 420 U.S. at 110 n.11. If this case proceeds to trial, Plaintiffs will be permitted to substitute new named Plaintiffs at that time.

. . . .

**b.  Change in Pandemic**

Defendants next argue that changes in the pandemic and the widespread availability of COVID-19 vaccines moot Plaintiffs' claims. (Doc. 194 at 15.) Defendants rely, in part, on *Martinez v. CoreCivic*, a detainee class action lawsuit for habeas and injunctive and declaratory relief, in which the district court opined that

> every time a staff member, or pre-trial detainee, or prisoner is vaccinated, the overall risk of outbreak at CCCC decreases. Approaching this issue pragmatically, rather than through a clouded political lens, the vaccine must smother all attempts by prisoners or pre-trial detainees to request COVID-19-related relief based upon the theory that the risk of infection violates the constitution; persons in custody who refuse the vaccine are now imperiled solely as a result of their own free will and not because a detention center allegedly offended the Fifth, Eighth, and Fourteenth Amendments by failing to sufficiently implement prophylactic measures.

2021 WL 2550319, No. CV 20-1309 WJ/CG, at *8 (D.N.M. June 22, 2021).

Defendants point to evidence that the COVID-19 Omicron variant is now the dominant variant in the United States and that, while Omicron spreads more rapidly than prior variants, current vaccines are effective at protecting against Omicron, which generally causes less severe disease.  (*Id.* at 16; DKSOF ¶¶ 26−28.)  Defendants also argue that, due to the undisputed availability of vaccines to CAFCC detainees, Plaintiffs—like the class members in *Martinez*—have either reduced their risks of infection through vaccination or, by not getting vaccinated, accept those risks. (Doc. 194 at 16−17.)  Defendants assert that the risk to any class members who have already contracted COVID-19 and recovered or who had asymptomatic COVID-19 that did not show up on tests is significantly less now than when Plaintiffs filed this action, particularly if these detainees have received the vaccine. (Doc. 194 at 17 (citing *U.S. v. Bolton*, 2021 WL 4812971, at *2 (C.D. Ill. Oct. 15, 2021) (finding inmate's "prior asymptomatic infection and subsequent vaccination make it unlikely that he will contract COVID19 again or suffer severe complications if he

does."); *U.S. v. Stone*, 2021 WL 4343439, at *3 (W.D. Ky. Sept. 23, 2021) ("A prior positive Covid-19 test reduces Stone's medical concerns about remaining in prison.")).)

Plaintiffs argue that Defendants fail to account for medically vulnerable class members with underlying conditions that place them at high risk of serious illness or death from COVID-19. (Doc. 200 at 7.) They point to evidence that medically vulnerable people may still develop severe disease, need hospitalization, and potentially die from exposure to Omicron. (*Id.*) They also argue that, even with vaccines, class members are still subject to unsafe conditions of confinement, and they claim without discussion that "serious failures in policies and practices by the Defendants have kept these medical advances from large numbers of class members." (*Id.* at 5−7.) Plaintiffs refer to CDC guidance stating that, even with vaccines, people in congregate settings require added prevention in the event of a facility outbreak. (*Id.* at 6.) They further point to the evidence that, as of July 22, 2022, only 10% of class members were fully vaccinated while at CAFCC, which they attribute to "Defendants' flawed policies around vaccination." (*Id.*) Plaintiffs also point to evidence that Defendants have not administered a single treatment of Paxlovid or other antiviral to any of the 1,782 detainees at CAFCC who tested positive for COVID-19 as of July 22, 2022. They assert that this shows their claims are not moot. (*Id.*)

Plaintiffs' arguments are mostly conclusory and unsupported. For purposes of mootness, however, Defendants' burden is high: they must show there is no remaining relief the court can order. *See Halet v. Wend Inv. Co.*, 672 F.2d 1305, 1308 (9th Cir. 1982) ("The defendant bears a heavy burden to demonstrate mootness"); *Lasar v. Ford Motor Co.*, 399 F.3d 1101, 1108 (9th Cir. 2005) ("To determine whether a case is moot, a court must ask whether a change in the circumstances existing at the beginning of the litigation has 'forestalled any occasion for meaningful relief' that the court could grant") (internal citation omitted). Thus, Plaintiffs need not show they will prevail on the merits of their claims, only that there is a remaining case or controversy and, if they prevail, there is a potential for the Court to order at least some relief.

At a minimum, and as fully discussed below, there are genuine issues of material fact about some of Defendants' COVID-19 response measures, which, if shown to rise to the level of a Fifth Amendment violation, entitle Plaintiffs to prospective injunctive relief.

Accordingly, the Court will deny summary judgment to Defendants on mootness grounds.

## C. The Merits

### 1. Fifth Amendment Legal Standard

The Fifth Amendment's Due Process Clause prohibits the federal government from depriving "any 'person . . . of . . . liberty . . . without due process of law,'" and its protections extend "to all 'persons' within the United States." *Zadvydas v. Davis*, 533 U.S. 678, 690, 693 (2001). Freedom from physical restraint falls at the core of the liberty interest protected from arbitrary governmental action by the Due Process Clause. *Youngberg v. Romeo*, 102 457 U.S. 307, 316 (1982).

The government deprives an individual of this substantive liberty interest without due process when it restrains his "freedom to act on his own behalf—through incarceration, institutionalization, or other similar restraint of personal liberty," thereby "render[ing] him unable to care for himself, and at the same time fails to provide for his basic human needs— e.g., food, clothing, shelter, medical care, and reasonable safety." *DeShaney v. Winnebago County Dept. of Social Services*, 489 U.S. 189, 200 (1989); *see also Alvarez-Machain v. United States*, 107 F.3d 696, 701 (9th Cir. 1996) ("Pretrial detainees are entitled to 'adequate food, clothing, shelter, sanitation, medical care, and personal safety.'" (quoting *Hoptowit v. Ray*, 682 F.2d 1237, 1246 (9th Cir. 1982)).

To support a claim against a government official in his/her official capacity or against a private entity performing a traditional public function, such as providing medical care to prisoners, a plaintiff must show that his constitutional rights were violated under a policy, decision, or custom promulgated or endorsed by the private entity. *See Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1138–39 (9th Cir. 2012) (extending the "official policy" requirement for municipal liability under *Monell v. Dep't of Soc. Servs.*, 436 U.S.

658, 691 (1978), to private entities acting under color of law. Under *Monell*, a plaintiff must show: (1) he suffered a constitutional injury; (2) the entity had a policy or custom; (3) the policy or custom amounted to [reckless disregard] to the plaintiff's constitutional right; and (4) the policy or custom was the moving force behind the constitutional injury. *See Monell*, 436 U.S. at 691–94; *Mabe v. San Bernardino Cnty., Dep't of Pub. Soc. Servs.*, 237 F.3d 1101, 1110–11 (9th Cir. 2001).

### 2. Discussion

#### a. Constitutional Violation

The government or private entity is found to have violated its constitutional duty under the Due Process Clause to provide a detainee "conditions of reasonable health and safety" when:

> (i) [It] made an intentional decision with respect to the conditions under which the plaintiff was confined;
>
> (ii) those conditions put the plaintiff at substantial risk of suffering serious harm;
>
> (iii) the [government or private entity] did not take reasonable available measures to abate that risk, even though a reasonable official in the circumstances would have appreciated the high degree of risk involved . . . ; and
>
> (iv) by not taking such measures, the [government or private entity] caused the plaintiff's injuries.

*Roman*, 977 F.3d at 943 (alternations in original) (quoting *Gordon v. County of Orange*, 888 F.3d 1118, 1125 (9th Cir. 2018) (discussing the "objective deliberate indifference standard")).

It is undisputed that based on CDC guidance, Defendants (1) made intentional decisions on the conditions under which USMS detainees were confined at CAFCC. From the start of the COVID-19 pandemic, Federal Defendants made intentional decisions on what to require of CAFCC, and CoreCivic/CAFCC implemented numerous policies and practices for how to respond to the pandemic. Given that 1,782 CAFCC detainees tested positive and two CAFCC detainees died from COVID-19 since the start of the pandemic,

there are also genuine issues of material fact that (2) the conditions of confinement at CAFCC put Plaintiffs at substantial risk of serious harm.

Finding Plaintiffs suffered a constitutional violation rests on whether Plaintiffs can show that (3) Defendants failed to take reasonable available measures to avert the risk of harm, even though reasonable officials in the circumstances would have appreciated the high degree of risk involved, and that (4) by failing to respond reasonably to the risk, Defendants caused an "imminent" danger to Plaintiffs' health and safety. *See Roman*, 977 F.3d at 943 ("To satisfy the fourth element, a plaintiff need only prove a 'sufficiently imminent danger[],' because a 'remedy for unsafe conditions need not await a tragic event.'") (alternation in original) (quoting *Helling*, 509 U.S. at 33-34).

To show that Defendants failed to take reasonable available measures to abate the risk of harm, "the conduct must be objectively unreasonable, a test that will necessarily 'turn[] on the facts and circumstances of each particular case.'" *Castro v. County of Los Angeles*, 833 F.3d 1060, 1071 (9th Cir. 2016) (en banc) (alteration in original) (quoting *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015)). Objective unreasonableness is "more than negligence but less than subjective intent—something akin to reckless disregard"; "mere lack of due care" is not enough. *Gordon*, 888 F.3d at 1125 (quoting *Castro*, 833 F.3d at 1071).

Defendants have made an initial showing that they took reasonable available measures to abate the risk of harm to Plaintiffs of contracting COVID-19 while detained at CAFCC. Federal Defendants have shown they require CAFCC to comply with Federal Performance Based Detention Standards, all state and local laws, regulations, and court orders, and, more specifically, to follow COVID-19 CDC guidance. (FDSOF ¶¶ 3−6.) Federal Defendants conducted a QAR audit of CAFCC in August 2020 and determined the facility was following applicable CDC protocols at that time. (*Id.* ¶¶ 7−9.) Additionally, Federal Defendants joined in Defendant Kline's Motion and Statement of Facts regarding the responsive measures CoreCivic/CAFCC has taken since the start of the pandemic.

Defendant Kline has shown that, from the start of the pandemic, CoreCivic created a Facility Support Center, developed company-wide and facility-specific protocols based on CDC guidance and the recommendations of infectious disease specialists. They established regular communications between facility and supervisory staff to monitor, update, and adapt operational responses to COVID-19 based on changes in CDC guidance. (DKSOF ¶¶ 31−47.) CAFCC also implemented policies and practices for numerous protective measures, including social distancing in the housing units and recreation yards; masking and PPE use; enhanced sanitation; cohorting or testing new arrivals at intake; regular medical rounds and symptoms checks; quarantines and medical isolation for those who test positive or have symptoms; and screening staff and visitors upon entry to the facility. Since the development of the vaccine, CAFCC has offered COVID-19 vaccines to all existing and incoming detainees. Taken together, these efforts are enough to initially show that Defendants have taken reasonable available measures to abate the risks to Plaintiffs from COVID-19 of which reasonable officials would have known and have not recklessly disregarded those risks.

Now, the burden shifts to Plaintiffs to create a genuine issue of material fact that Defendants failed to take reasonable available measures to mitigate the risk to Plaintiffs of contracting COVID-19 and of thereby suffering serious harm or an imminent threat of serious harm, though reasonable officials would have appreciated the risk. Plaintiffs argue several ways in which Defendants responses have been objectively unreasonable. Plaintiffs assert that though CAFCC's vaccination rate remains extremely low, Defendants have not implemented effective strategies for identifying immunocompromised detainees who should be targeted for the vaccine, their educational materials are ineffective, they do not offer boosters to booster-eligible individuals on intake, and they do not track or inform detainees of when they are eligible for a booster. (Doc. 200 at 17−21.) Plaintiffs also argue that Defendants' failures to follow the CDC's enhanced protection strategies for intake cohorts is unreasonable where the vaccination level at CAFCC remains low and turnover

in the facility is high.  (*Id.* at 22−25.)  Finally, they argue that it is objectively unreasonable not to stock or administer antiviral therapies for those who test positive.  (*Id.* at 25−27.)

### i.  Vaccination Policies

As stated in Defendants' Statement of Facts, CAFCC's 10% vaccination rate pertains to the percentage of the USMS detainee population who had become fully vaccinated while at CAFCC as of July 22, 2022.  (DKSOF ¶ 317.)  This figure is not useful because it fails to account for any USMS detainees who had already been fully vaccinated prior to entering the facility or those who became partially vaccinated at CAFCC but were released or transferred before receiving a second dose of the two-dose vaccine.  In his deposition, defense expert Dr. Murray testified that, due to the transient nature of the detainee population, the vaccination rate at CAFCC continually fluctuates, and based on his discussions with medical staff, is generally around 16 to 30 percent, which Dr. Murray still described as "low."  (Doc. 200 at 19; Doc. 201-1 (Murray Dep.) at 34:13−23.)

In comparison, Plaintiffs point to published vaccination rates of 80% in the Arizona Department of Corrections, Rehabilitation, and Reentry (ADCRR) and 81% in California's prison system.  (Doc. 200 at 16−17.)  They argue that CAFCC's vaccination rate falls "far below other, comparable rates" and that this "flows from missteps in CAFCC's vaccination program."  (*Id.*.)[13]  To elaborate, Plaintiffs rely on the opinion of Plaintiffs' expert Dr. Venters that, to increase COVID-19 vaccinations, CAFCC medical staff should schedule individual outreach appointments with high-risk detainees to attempt to increase vaccinations among the most vulnerable.  (*Id.* at 17.)  Plaintiffs cite to a journal article stating such outreach efforts increased vaccination acceptance rates in the California prison system, and they cite to Dr. Venter's declaration that the BOP's implementation of his recommendation of one-on-one outreach to high-risk unvaccinated prisoners at the BOP's Lompoc facility resulted in more high-risk prisoners getting questions answered and

---

[13] These figures do not present an apt comparison because prisons do not have the same inherently high turnover rate of pretrial detention facilities that makes it more difficult to fully vaccinate all detainees who come through the facility.  Nonetheless, Defendants do not dispute that CAFCC's vaccination rate is extremely low or cite to any comparable rates at other pre-trial detention facilities.

1   getting vaccinated.  (*Id.* at 17; Doc. 203, Venters Decl. ¶ 48.)

2       Plaintiffs argue that CAFCC does not have an adequate system in place for

3   identifying high-risk or immunocompromised people, whom the CDC recommends should

4   receive more boosters than the general population.  (Doc. 200 at 18.)  They reference

5   CAFCC Clinical Supervisor C. Rose's testimony that CAFCC used to, but no longer

6   maintains a "list" of immunocompromised individuals at the facility because doing so

7   became too burdensome.  (*Id.* at 18−19; Doc. 201-1 (Rose Dep.) at 10:13−11:21.)  Rose

8   testified the medical director treats patients and reviews their charts and has discretion to

9   recommend an immunocompromised person for a third primary dose of the vaccine, and

10  to Rose's knowledge, he did so for at least one patient.  (Rose Dep. at 10:13−11:21.)  Rose

11  did not identify any other means CAFCC uses to track and recommend additional vaccines

12  to immunocompromised detainees other than those patients potentially being on the "radar"

13  of the medical director.  (*Id.*)

14      Plaintiffs also argue that CAFCC does not use appropriate educational materials,

15  arguing that official vaccine fact sheets given at intake and CAFCC's "Here's the Scoop"

16  poster, which contains only logistical information about how to get the vaccine, not

17  educational information about the vaccine, are not designed to increase vaccine uptake.

18  (Doc. 200 at 18−19, nn.16, 17.)  Plaintiffs cite to Dr. Venters' recommendation that

19  CAFCC should improve its educational efforts with materials written with an incarcerated

20  audience in mind, such as those developed by *AMEND*, a project at the University of

21  California which prepared materials in English and Spanish in collaboration with

22  incarcerated and formerly incarcerated people.  (*Id.*; Doc. 203, Venters Decl. ¶ 56.d.)  Dr.

23  Venters also recommended more uniform placement of such materials throughout the

24  facility.  (*Id.*)

25      Last, Plaintiffs argue that Defendants' booster policies are inadequate.  (Doc. 200 at

26  20.)  Plaintiffs cite to Defendants' evidence that, between April 2020 and July 2022,

27  CAFCC administered 256 boosters, which is a "miniscule fraction of the '44,703 USMS

28  detainees [who] have cycled through CAFCC,' . . . and a small fraction even when

compared against the woefully small group of 2,785 people who have received their initial dose at CAFCC." (*Id.*; citing DKSOF ¶¶ 309, 315.) Plaintiffs retort that this low rate is due, in part, to CAFCC's failures to offer boosters to incoming detainees even when their intake responses show they are eligible for one. Nor do medical staff include notations in CAFCC's electronic medical records system of the date someone is booster eligible. (Doc. 200 at 20.) They argue that it is unreasonable in the incarceration context, where individuals do not have access to their own medical records, to expect detainees to track their own eligibility and request boosters. For example, they note that it is a long-established practice for practitioners to notify incarcerated individuals when they are eligible for medical procedures, such as pneumovax and shingles vaccines. (*Id.*) In support, Plaintiffs reference Defense expert, Dr. Murray, who testified that the correctional facilities in Texas regularly notify people when they become eligible for an annual TB test and take them to be tested. (*Id.* at 21.) Plaintiffs also rely on Dr. Venter's statements in his declaration that:

> [s]ome of the most basic functions of correctional health departments involve scheduling healthcare measures after particular time intervals, even when this healthcare might not be scheduled in this way in the community. For example, in carceral settings, tuberculosis tests are recommended on an annual interval. Correctional healthcare systems generally take affirmative efforts to schedule these tests after a year has passed, rather than waiting for individual detained people to request them. Correctional healthcare systems also generally perform affirmative outreach to people eligible for certain vaccinations, such as the pneumovax and shingles vaccine, both of which are available to a subset of the population.

(*Id.*; Doc. 203 (Venters Decl.) ¶ 53.)

Given the primacy of vaccines in reducing risks from COVID-19 (*see* Doc. 201-7 at 16, CDC May 3, 2022 Guidance ("Vaccination remains the best tool to prevent severe illness and death from COVID-19")), there is a genuine issue of material fact that "a reasonable official in the circumstances [at CAFCC] would have appreciated the high degree of risk involved" to USMS detainees from the facility's low vaccination rates,

including low booster rates. *Roman*, 977 F.3d at 943. Showing a due process violation therefore depends on whether Defendants have failed to take "reasonable available measures to abate that risk." *Id.*

Plaintiffs' criticisms that CAFCC's educational materials, including its "Here's the Scoop" poster, do not specifically encourage detainees to get the vaccine and, unlike the *AMEND* project materials, are not tailored to an incarcerated audience, are insufficient to make this showing. In addition to the official vaccination information sheets and the "Here's the Scoop" poster—which also appears on the sign-in page of detainee tablets— Plaintiffs do not dispute that, prior to holding vaccination events, CAFCC officials held town hall meetings in the housing units to answer questions about the vaccine and provided multiple opportunities for detainees to obtain the vaccine or discuss their medical concerns and questions about the vaccine with a medical professional in a confidential setting.

As to ongoing education, it is not disputed that new detainees are offered vaccinations on intake and instructed how to request a vaccine. Taking as true that using the *AMEND* project, rather than CAFCC's educational materials would better inform and encourage detainees to get the vaccine, Plaintiffs have not produced any evidence that these or similar materials were reasonably available to Defendants and Defendants made a conscious decision to reject them. Moreover, merely pointing out new or novel approaches to promote vaccinations within incarcerated populations does not create a genuine issue of material fact that Defendants' approaches are objectively unreasonable. Where it is undisputed that CAFCC makes vaccinations available to all detainees and provides information in the housing units and on detainee tablets about how to request vaccinations, CAFCC's failure to use more robust or better targeted materials does not show a reckless disregard for the risks of detainees not being fully vaccinated. "[T]he Supreme Court has instructed that 'mere lack of due care by a [government] official' does not 'deprive' an individual of life, liberty, or property under the Fourteenth Amendment." *Castro*, 833 F.3d at 1071 (quoting *Daniels v. Williams*, 474 U.S. 327, 330–31 (1986) (internal quotation marks and citation omitted).

Plaintiffs' arguments about boosters and targeting immunocompromised individuals for vaccines present a closer question. Plaintiffs have raised a genuine issue of material fact that CAFCC does not offer COVID-19 boosters to detainees on intake, even when it is clear from the intake responses that they are eligible for a booster. (PSOF ¶ 249.) It is also undisputed that CAFCC staff do not enter notes or reminders in their electronic medical system to track a detainees' eligibility for boosters and/or schedule them for boosters and instead only provide boosters when detainees specifically request them. Expert testimony from Dr. Murray and Dr. Venters also shows that correctional healthcare systems generally make affirmative efforts to track and schedule medically recommended tests and vaccinations in other contexts and do not rely on individual detainees to do so on their own.

Defendants argue that it is reasonable to expect detainees to know when they are eligible for a booster in the COVID-19 context because detainees who receive vaccinations at CAFCC are given a vaccination card stating the type of vaccine they received and when they received it. (Doc. 221 at 19.) But this only accounts for the subset of detainees who become fully vaccinated at CAFCC and does not address the unknown number of CAFCC detainees who received their vaccinations elsewhere and who are not eligible for boosters. So, a reasonable fact finder could conclude that relying on detainees to know and track their booster eligibility based on their vaccination cards, even if in their possession, instead of taking measures to track and offer boosters to detainees like correctional institutions routinely use for other recommended tests and vaccinations, is objectively unreasonable. Therefore, a question of fact remains about whether these deficiencies amount to a due process violation.

Similarly, there is a question of fact whether Defendants fail to effectively track and target high risk or immunocompromised detainees for vaccinations. And there is a question of fact whether failure to do so constitutes reckless disregard to the heightened risk of harm to these detainees of contracting COVID-19, of which a reasonable official would know. Defendants point out that Clinical Director Rose only stated that, due to high detainee

turnover, maintaining a current "list" of detainees with COVID-19 risk factors became impractical; she did not state that high-risk detainees would not otherwise be flagged for boosters. (Doc. 221 at 17.) Rose clarified that, even though CAFCC no longer attempts to keep a running list of all high-risk detainees, "individual medical files still contain information about each detainee's medical conditions such that providers are aware of the detainee's risk factors while they are treating them" and medical staff can produce reports of detainees by risk factor when there is a need to do so. (*Id.*; Doc. 192-2, Ex. 3 (Rose Decl.) ¶¶ 46−47.) But this evidence falls short of showing that Defendants have developed any strategies to affirmatively identify high risk or immunocompromised detainees. It suggests that such individuals are not specifically targeted for vaccines, boosters, or any other protective measures unless they seek out a medical appointment or otherwise come across the "radar" of the Medical Director or another provider, even though CAFCC clearly has an ability to track and target such individuals. Given the well-established heightened health risks to such individuals who contract COVID-19, coupled with the low rate of vaccinations and boosters at CAFCC overall, a reasonable fact finder could determine that failing to use reasonable available measures to track and reach out to immunocompromised individuals is reckless disregard to a serious risk of harm that any reasonable correctional official would appreciate. Therefore, a question of fact remains about whether CAFCC's failure to take reasonable available measures to track and target high risk individuals for vaccines and other COVID-19 protections amounts to a due process violation.

### ii.     Intake Cohorts

Plaintiffs argue that CAFCC's discontinuation of intake cohorts as of June 1, 2022 was objectively unreasonable because the CDC continues to recommend routine observation periods under its Enhanced COVID-19 Prevention Strategies, and a number of factors at CAFCC call for enhanced prevention. (Doc. 200 at 21−25.)

In addition to whether Community levels are medium or high, the CDC's May 3, 2022 Guidance sets forth four facility-level factors staff should consider when deciding whether to add or remove enhanced protective strategies. First, "[f]acilities that do not

have high up to date vaccination coverage should consider applying enhanced prevention strategies even when the COVID-19 Community Level is low." (Doc. 201-7 at 5.) Second, staff should consider shifting to enhanced protection strategies when any staff or resident in the facility tests positive for COVID-19 and follow-up testing of close contacts identifies "one or more additional cases," indicating transmission is occurring within the facility. (*Id.*) Third, staff should consider "risk of severe health outcomes," by first determining whether staff or residents are "likely to get very sick from COVID-19," and, if so, consider switching to enhanced protective measures if staff are "unable to do one of the following: (a) assess and administer COVID-19 therapeutics on site to prevent severe health outcomes among residents more likely to get very sick from COVID-19, OR (b) assess residents' risk for severe outcomes and ensure timely access to care outside the facility." (*Id.*) Fourth, staff are to consider whether facility and structural characteristics, such as dense housing arrangements or frequent turnover may require some enhanced prevention strategies, even when the COVID-19 community level is low. (*Id.*)

Plaintiffs argue that each of these factors support enacting enhanced prevention strategies at CAFCC, including the resumption of intake cohorts. (Doc. 200 at 23−25.) As to vaccination rates, Plaintiffs' expert Dr. Venters states that "CAFCC has not sufficiently tracked its vaccination rates, and the available data suggest that CAFCC lacks high vaccination rates and the willingness to track them," which Dr. Venters opines triggers the need for enhanced protection measures. (Doc. 200 at 23; Doc. 203, Venters Decl. ¶ 30.) In addition to its low vaccination rates, Plaintiffs argue that the transmission rate at CAFCC also calls for enhanced protection measures. (Doc. 200 at 24.) Based on the 1,782 COVID-19 positive cases Defendants have identified over the more than two years of this litigation, Plaintiffs calculate that CAFCC averages more than 2 new cases each day, with a higher amount occurring in the past year, which they argue represents a high degree of internal spread.[14] Dr. Venters also cites to charts showing multiple units at CAFCC on quarantine

---

[14] Plaintiffs claim, based on a mortality rate calculation in Dr. Murray's April 29, 2022 report of "0.15 % (2/1332)," that CAFCC had 1,322 positive cases as of the date of that report, compared to 1,782 in Defendants' Statement of Facts, and therefore added 450

at any given time as indicative that, at any given time, there has been recent transmission in the facility, from which he opines that "it is highly likely" that the transmission rate inside CAFCC calls for enhanced protections. (Venters Decl. ¶ 31.) As to the risk of severe health outcomes, Plaintiffs argue that CAFCC's failures to identify and track who is high risk and the unavailability of therapeutic medications on site also call for enhanced prevention strategies. (Doc. 200 at 24.) Finally, as to operational characteristics, Plaintiffs argue that high turnover at CAFCC also calls for applying some enhanced protective measures. (*Id.* at 24−25.)

Plaintiffs also claim that Defendants' decision to return to mandatory masking on June 30, 2022 based on increases in community and facility transmission (*see* DKSOF ¶ 99) shows that "Defendants admit they are currently required to put another enhanced protection, universal masking, in place," and they argue that, by "fail[ing] to implement the other enhanced protections, including intake quarantining, [Defendants] recklessly declined to make use of this important, available protective measure." (Doc. 200 at 25.)

Defendants argue that Plaintiffs misconstrue the CDC Guidance as "requir[ing]" intake cohorting whenever any of the identified community and facility factors point to increased risk, and they point out that "nothing in the guidelines is mandatory." (Doc. 221 at 19.) The Guidance itself states that it is "intended to provide guiding principles" and that "facilities and agencies might adapt CDC guidance for correctional and detention facilities based on their specific populations and operational needs." (*Id.*; Doc. 201-7 at 3.) As to facility-level factors, the Guidance also makes clear that "guidance is not available to set specific thresholds for these factors, or to specify how many factors to consider before shifting to enhanced prevention measures." (*Id.* at 4.) So, Defendants argue that "a 10% vaccination rate does not automatically require enhanced prevention

---

positive cases between April 29, 2022 and July 2022, or a rate of over 4 new cases per day in a two-month period. Absent any discussion of when Dr. Murray made the mortality rate calculation in his report and what data he relied on at the time, the claim that CAFCC added 450 positive cases between April 29, 2022 and July 2022 is too speculative to credit. Nonetheless, it is undisputed that CAFCC had a higher number of identified COVID-19 infections in 2022, overall, than in the two previous years (560 in 2020, 516 in 2021, and 706 in 2022). (DKSOF ¶ 310.)

measures . . . nor does the fact that CAFCC experiences frequent detainee turnover." (Doc. 20 at 20−21.) Defendants also argue that Plaintiffs overemphasize the rise in transmissions in 2022. (Doc. 20 at 25.) They argue that the number of COVID-19 cases at CAFCC in 2022 was not significantly higher than in 2020 and 2021 (560 in 2020, 516 in 2021, and 706 in 2022), and even with the increase in 2022, only 3.9% of the 44,703 USMS detainees who have cycled through CAFCC since the start of the pandemic (and since testing became available) have tested positive for COVID-19, with mortality rates at a low 0.15 %. (Doc. 221 at 20−21.)

There are, at a minimum, genuine issues of material fact that at least some or all of the CDC's enumerated facility factors calling for consideration of enhanced prevention strategies are met at CAFCC. Moreover, Defendants do not dispute that the vaccination rates at CAFCC are low, detainee turnover is high, and that other factors—such as the rates of community and facility transmission—prompted CAFCC to return to mandatory masking on June 30, 2022. (Doc. 221 at 20, n.14.)

Nonetheless, Plaintiffs have not created a triable issue of fact that Defendants' decision not to re-institute mandatory intake cohorting, in particular, is objectively unreasonable now that COVID-19 testing is widely available.[15] It is undisputed that, as of July 2022, CAFCC tests all incoming detainees at intake, and it offers tests to all existing detainees if they develop symptoms. (DKSOF ¶¶ 155, 207.) CAFCC also quarantines or medically isolates all detainees who test positive or display COVID-19 symptoms, and it conducts daily symptom screenings of detainees on the same pod as those quarantined. (*Id.* ¶¶ 179.) Intake observation periods are included among the enhanced protection strategies the CDC currently recommends facilities "consider" in response to heightened community and facility risk factors. But, the Guidance, itself, is discretionary and expressly calls for individualized assessments. Moreover, it is undisputed that CAFCC continues to

---

[15] The cases Plaintiffs discuss as emphasizing the importance of quarantining new arrivals to correctional facilities (*see* Doc. 200 at 22−23) are inapplicable here because they are all from 2020 and predate the widespread availability of COVID-19 rapid tests, which the evidence shows CAFCC staff began using to screen all new arrivals in July 19, 2022. (DKSOF ¶¶ 148−149, 155.)

implement all standard prevention strategies—including intake testing—and has adopted other enhanced prevention strategies, such as universal masking, based on its monitoring and assessment of community and facility transmissions. Plaintiffs have not put forth any evidence from which a reasonable fact finder could conclude that opting for only some, not all, of the CDC-recommended advanced strategies is objectively unreasonable or that the failure to specifically re-institute intake cohorts where CAFCC already requires testing at intake for the same purpose recklessly disregards a serious risk of harm to Plaintiffs.

### iii. Antiviral Medications

Plaintiffs argue that Defendants' choice not to stock and administer Paxlovid and other antiviral medications and its failure to prescribe even a single dose of these therapies despite hundreds of positive COVID-19 tests since these medications became available is objectively unreasonable. (Doc. 200 at 25−27.) The CDC May 3, 2022 Guidance states that "antiviral medications are available that are effective in preventing severe health outcomes in persons with COVID-19" and explains that "[t]hese medications can be ordered at no cost through the [] Department of Health Services, from the manufacturer, or in some cases through the facilities' usual medication procurement mechanisms." (Doc. 201-7 at 16.) The Guidance refers to the National Institute of Health (NIH) COVID-19 Treatment Guidelines for information about these medications, and the NIH Treatment Guidelines, in turn, recommend Paxlovid or Remdesivere as the top two preferred medications for all unhospitalized COVID-19 patients who are at high risk of progressing to severe COVID-19. (Doc. 200 at 25; Doc. 201-10 at 3.)

According to Defendants' expert, Dr. Murray, the NIH Treatment Guidelines set out a standard of practice that correctional healthcare providers should consider when determining when to prescribe antiviral treatment. (Doc. 200 at 25; Doc. 201-1 at 36 (Murray Dep. at 165:11−24).) Dr. Murray also agreed that a detainee who tests positive for COVID-19 and has at least one CDC identified risk factor should be evaluated for Paxlovid within five days of symptom onset. (Doc. 201-1 at 39 (Murray Dep. at 172:12−18).) CDC-identified risk factors include age, being unvaccinated, and having

1    underlying conditions, such as asthma, cancer, diabetes, and obesity.[16]

2         Defendants argue that Plaintiffs do not provide legal authority requiring CAFCC to

3    stock Paxlovid or other antiviral medications or to prescribe them to detainees, and that it

4    is sufficient for Fifth Amendment purposes that CAFCC can obtain these medications from

5    local pharmacies when needed.  They also argue that Plaintiffs have not produced evidence

6    showing that the amount of time it would take for CAFCC staff to obtain such medications

7    from a local pharmacy as opposed to having them stocked in the facility's internal

8    pharmacy would put detainees at risk of serious harm.  (Doc. 221 at 21−22.)

9         Plaintiffs need not show that Defendants failed to comply with a specific legal

10   requirement to demonstrate a due process violation; they need only show that Defendants

11   "did not take reasonable available measures to abate th[e] risk" of harm to detainees under

12   their care, "even though a reasonable official in the circumstances would have appreciated

13   the high degree of risk involved." *Roman*, 977 F.3d at 943.  As already discussed, there is

14   a question of fact that a reasonable official would have appreciated the high degree of risk

15   involved in not providing COVID-19 positive detainees with antiviral treatments,

16   particularly to those with identified risk factors making them more vulnerable to severe

17   illness and death.

18        A fact finder could also conclude that not having antiviral medications readily

19   available to treat CAFCC COVID-19 positive detainees is not objectively reasonable.

20   Guidance from the CDC and NIH make clear that such medications are available to

21   detention facilities, potentially at no cost, and are recommended and effective for treating

22   COVID-19 positive individuals and preventing severe health outcomes.  Dr. Murray's

23   opinion that COVID-19 positive detainees with at least one risk factor should be assessed

24   for antivirals within five days of symptoms onset further suggests that it is not objectively

25   reasonable for a correctional facility not to acquire and stock these treatments for those

26   _____

27        [16] "Underlying Medical Conditions Associated with Higher Risk for Severe
     COVID-19: Information for Healthcare Professionals," available at https://www.cdc.gov/
28   coronavirus/2019-ncov/hcp/clinical-care/underlyingconditions.html (last visited March
     10, 2023.)

1    who need them.

2        Even though Defendants argue CAFCC medical staff can obtain these medications

3    when prescribed, and Plaintiffs have not shown that the added time it would take to do so

4    puts detainees at serious risk of harm, a reasonable fact finder could still infer that requiring

5    this extra step where such medications are reasonably available is not objectively

6    reasonable.  Dr. Murray acknowledged that anyone with at least one risk factor should be

7    evaluated for such treatment within five days of symptoms.  Yet it is undisputed that

8    CAFCC medical providers have never prescribed Paxlovid or any other antivirals to any

9    of the hundreds of patients who have tested positive for COVID-19 at CAFCC since these

10   medications became available.  So there is at least a question of fact that CAFCC providers

11   either fail to make this evaluation or simply choose not to prescribe these treatments, even

12   when the standard of care may call for them, creating a question of fact that CAFCC's

13   COVID-19 treatment practices are also objectively unreasonable.

14       To conclude, there are questions of fact whether Plaintiffs suffered a constitutional

15   violation based on Defendants' failures to (1) offer boosters to detainees at intake and use

16   detainees' electronic health records to track and recommend/schedule booster-eligible

17   detainees for boosters, (2) utilize detainees' electronic health records to identify and target

18   at risk/immunocompromised detainees for vaccinations and other COVID-19 protections,

19   and (3) stock and prescribe CDC- and NIH-recommended antiviral treatments for COVID-

20   19 positive patients with at least one CDC-identified risk factor.  There are questions of

21   fact on whether these failures constitute reckless disregard to risks of serious harm to

22   Plaintiffs' health from COVID-19 of which a reasonable official would know, and these

23   alleged failures are directly tied to Defendants' COVID-19 policies.  There are also

24   questions of fact that the related policies amount to reckless disregard for Plaintiffs'

25   constitutional rights and present an "imminent" danger to Plaintiffs' health and safety.  *See*

26   *Roman*, 977 F.3d at 943.  All the requirements of a *Monell* claim are therefore met, and the

27   Court will deny summary judgment to Defendants, in part, based on these alleged

28   violations.

Because Plaintiffs have not raised genuine issues of material fact that any other aspects of Defendants' COVID-19 protections are objectively unreasonable, the Court will grant Defendants' Motion in part as to any remaining bases for their Fifth Amendment claims.

**IT IS ORDERED:**

(1)     The reference to the Magistrate Judge is **withdrawn** as to Defendants' Motions for Summary Judgment (Doc. 187; Doc. 194), Plaintiffs' Motion to Exclude the Findings and Opinions of Defendants' Expert Dr. Owen J. Murray (Doc. 185) and Defendant Kline's *Daubert* Motion to Exclude the Testimony of Homer Venters (Doc. 189).

(2)     Plaintiffs' Motion to Exclude the Findings and Opinions of Defendants' Expert Dr. Owen J. Murray (Doc. 185) and Defendant Kline's *Daubert* Motion to Exclude the Testimony of Homer Venters (Doc. 189) are **denied**.

(3)     Defendants' Motions for Summary Judgment (Doc. 187; Doc. 194) are granted in part and **denied in part** as follows:

        (a)     The Motions are **denied in part** as to Defendants' alleged failures to (i) offer boosters to CAFCC detainees at intake and use available electronic health records to recommend/schedule boosters for booster-eligible detainees, (ii) utilize available electronic health records to identify and target at risk/immunocompromised detainees for vaccinations and other COVID-19 protections, and (iii) stock and prescribe CDC- and NIH-recommended antiviral treatments for COVID-19 positive patients with at least one CDC-identified risk factor.

        (b)     The Motions are **granted in part** as to any remaining bases for Plaintiffs' Fifth Amendment claims.

1    (4)    This action is referred by random lot to Magistrate Judge for the purpose of

2 conducting a settlement conference.

3    (5)    The parties must jointly contact the chambers of Magistrate Judge Michael

4 T. Morrissey at 602 322-7680 within 14 days of the date of this Order to schedule a

5 settlement conference.

6    Dated this 29th day of March, 2023.

7

8

9                                                    _____
                                                     Honorable Diane J. Humetewa
10                                                   United States District Judge

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28