# EXHIBIT 1

SKC

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Jason Fenty, et al., | No. CV 20-01192-PHX-SPL (JZB) |
| Plaintiffs, | |
| v. | **ORDER** |
| Paul Penzone, et al., | |
| Defendants. | |

Plaintiffs/Petitioners (hereinafter "Plaintiffs") Jason Fenty, Brian Stepter, Douglas Crough, Edward Reason, Jesus Tequida, Ramon Avenenti, Anthony Scroggins, Dale Perez, and Tamara Ochoa, who are or were confined in a Maricopa County jail, and the Puente Human Rights Movement ("Puente"), filed through counsel a class "Petition for Writ of Habeas Corpus and Complaint for Injunctive and Declaratory Relief" pursuant to 28 U.S.C. § 2241 and 42 U.S.C. § 1983 based on alleged violations to their federal and constitutional rights. Plaintiffs' claims arise from Defendants Maricopa County and Maricopa County Sheriff Paul Penzone's allegedly deficient responses to the COVID-19 pandemic in the Maricopa County Sheriff's Office (MCSO) jails and the alleged risks to Plaintiffs of contracting COVID-19 while held in MCSO jails. Pending before the Court are Plaintiffs' Motion for Partial Summary Judgment and Defendants Maricopa County and Sheriff Penzone's Motion for Summary Judgment. (Doc. 287, 294.) Both Motions are fully briefed. (Doc. 328, 330, 340.)

Also before the Court are Defendants' *Daubert* Motion to Exclude the Testimony of Homer Venters (Doc. 285) and Plaintiffs' Motion to Exclude the Findings and Opinions of Defendants' Expert Dr. Owen J. Murray (Doc. 296).

The Court will deny the Motions to Exclude and Plaintiffs' Motion for Partial Summary Judgment and grant Defendants' Motion for Summary Judgment.

## I.    Background

Plaintiffs filed this action on June 12, 2020, presenting seven claims for relief stemming from Defendants' alleged deliberate indifference to their health and welfare during the COVID-19 pandemic as well as violations of Title II of the Americans with Disabilities Act (ADA) and Section 504 of the Rehabilitation Act (RA).   (Doc. 1.) Plaintiffs seek declaratory and injunctive relief and/or writs of habeas corpus requiring the release of certain subclass members and injunctive relief "to abate the risk of the spread of COVID-19." (*Id.* at 47-50.)

Plaintiffs also filed a Motion for Class Certification (Doc. 14), and the Court granted the Motion and certified a Pretrial Class and a Post-Conviction Class, each with two subclasses.  (Doc. 67.)

**The Pretrial Class** is defined as "[a]ll current and future persons held by Defendants in pretrial detention at the five jails operated by the Maricopa County Sheriff's Office, known as the 4th Avenue, Saguaro, Estrella, Lower Buckeye, and Towers jails (together, the "Maricopa County jails")."  (*Id.* at 22.)  Within the Pretrial Class are the following Subclasses:

(1) **Pretrial Medically Vulnerable Subclass**, defined as

Members of the Pretrial Class who are aged 50 years or older or who have medical conditions that place them at heightened risk of severe illness or death from COVID19 such as lung disease, heart disease, chronic liver or kidney disease (including hepatitis and dialysis patients), diabetes, hypertension, compromised immune systems (such as from cancer, HIV, or autoimmune disease), blood disorders (including sickle cell disease), developmental disability, severe obesity, and/or moderate to severe asthma.

(2)     **Pretrial Disability Subclass**, defined as

> All current and future pretrial detainees who are people with disabilities as defined under the Americans with Disabilities Act (ADA) and Section 504 of the Rehabilitation Act ("Section 504"), and whose disabilities put them at increased risk of serious illness or death if they contract COVID-19. The Pretrial Disability Subclass includes all members of the Pretrial Medically Vulnerable Subclass except those vulnerable solely on the basis of age or obesity.

(*Id.* at 21−22.)

The **Post-Conviction Class** is defined as "[a]ll current and future persons held by Defendants in post-conviction detention at the Maricopa County jails." (*Id.* at 22.) Within the Post-Conviction Class are the following Subclasses:

> (1) **Post-Conviction Medically Vulnerable Subclass,** defined as

> Members of the Post-Conviction Class who are aged 50 years or older or who have medical conditions that place them at heightened risk of severe illness or death from COVID-19 such as lung disease, heart disease, chronic liver or kidney disease (including hepatitis and dialysis patients), diabetes, hypertension, compromised immune systems (such as from cancer, HIV, or autoimmune disease), blood disorders (including sickle cell disease), developmental disability, severe obesity, and/or moderate to severe asthma.

> (2) **Post-Conviction Disability Subclass**, defined as

> All current and future post-conviction detainees who are people with disabilities as defined under the ADA and Section 504, and whose disabilities put them at increased risk of serious illness or death if they contract COVID-19. The Post-Conviction Disability Subclass includes all members of the Post-Conviction Medically Vulnerable Subclass except those vulnerable solely on the basis of age or obesity.

(*Id.* at 22.)

Plaintiffs bring seven claims: (1) unconstitutional conditions of confinement in violation of the Fourteenth Amendment on behalf of a Pretrial Class and Puente;

(2) unconstitutional conditions of confinement in violation of the Eighth Amendment on behalf of a Postconviction Class and Puente; (3) punishment in violation of the Fourteenth Amendment as to a pretrial subclass and Puente; (4) petition for writ of habeas corpus for confinement in violation of the Fourteenth Amendment as to a pretrial medically vulnerable subclass; (5) unconstitutional conditions of confinement in violation of the Eighth and Fourteenth Amendments as to a pretrial medically vulnerable and postconviction medically vulnerable subclasses and Puente; (6) discrimination in violation of Title II of the Americans with Disabilities Act on behalf of pretrial disability and postconviction disability subclasses and Puente; and (7) discrimination in violation of the Rehabilitation Act as to a pretrial disability and postconviction disability subclasses and Puente.

## II.    Motions to Exclude

Both parties move to exclude each other's expert witness reports.  (Docs. 285, 296.) "Under Rule 702 of the Federal Rules of Evidence, [a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion, provided the testimony meets certain criteria."  *United States v. Gadson*, 763 F.3d 1189, 1202 (9th Cir. 2014) (quotation marks and citation omitted).  An expert witness may rely on information, such as hearsay evidence, that would not be admissible on its own. Fed. R. Evid. 703.  Expert testimony is sufficiently "reliable if the knowledge underlying it has a reliable basis in the knowledge and experience of [the relevant] discipline."  *United States v. Sandoval-Mendoza*, 472 F.3d 645, 654 (9th Cir. 2006) (quotation marks and citation omitted).   The test for admissibility "is not the correctness of the expert's conclusions but the soundness of his methodology."  *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010) (quotation marks and citation omitted).

Here, both parties' experts have relevant knowledge and experience.  The parties disagree regarding the soundness of some experts' methodologies, but those disputes, as well as the appropriate weight to assign to each expert's opinions, are more properly addressed at trial.  The parties' expert reports are, therefore, admissible, and the Court will

1    deny both Motions to Exclude.

2    **III.**    **Summary Judgment Legal Standard**

3         A court must grant summary judgment "if the movant shows that there is no genuine

4    dispute as to any material fact and the movant is entitled to judgment as a matter of law."

5    Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The

6    movant bears the initial responsibility of presenting the basis for its motion and identifying

7    those portions of the record, together with affidavits, if any, that it believes demonstrate

8    the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323.

9         If the movant fails to carry its initial burden of production, the nonmovant need not

10   produce anything. *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Co., Inc.*, 210 F.3d 1099,

11   1102-03 (9th Cir. 2000). But if the movant meets its initial responsibility, the burden shifts

12   to the nonmovant to demonstrate the existence of a factual dispute and that the fact in

13   contention is material, i.e., a fact that might affect the outcome of the suit under the

14   governing law, and that the dispute is genuine, i.e., the evidence is such that a reasonable

15   jury could return a verdict for the nonmovant. *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S.

16   242, 248, 250 (1986); *see Triton Energy Corp. v. Square D. Co.*, 68 F.3d 1216, 1221 (9th

17   Cir. 1995). The nonmovant need not establish a material issue of fact conclusively in its

18   favor, *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968); however,

19   it must "come forward with specific facts showing that there is a genuine issue for trial."

20   *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal

21   citation omitted); *see* Fed. R. Civ. P. 56(c)(1).

22         At summary judgment, the judge's function is not to weigh the evidence and

23   determine the truth but to determine whether there is a genuine issue for trial. *Anderson*,

24   477 U.S. at 249. In its analysis, the court must believe the nonmovant's evidence and draw

25   all inferences in the nonmovant's favor. *Id.* at 255. The court need consider only the cited

26   materials, but it may consider any other materials in the record. Fed. R. Civ. P. 56(c)(3).

27   ///

28   ///

IV.     **Facts**

    A.     **Maricopa County Jail System**

The Maricopa County Jail system contains multiple jails, including 4th Avenue, Estrella, Lower Buckeye (LBJ), Towers, and Watkins.  (Doc. 292, Defs.' Statement of Facts (DSOF) ¶ 1.)  The total design capacity for all MCSO jails is 8,773 inmates.  (*Id.* ¶ 12.)  In March 2020, MCSO worked with the Maricopa County Attorney's Office to reduce the inmate population in all jail facilities by reducing the number of new intakes; the purpose was to promote social distancing and mitigate the spread of COVID-19 within the jails.  (*Id.* ¶¶ 14−15.)  As a result, average daily bookings went from 150 per day to 100 per day, and the average daily population decreased from over 7,100 inmates in January 2020 to 4,597 inmates.  (*Id.* ¶ 16.)

    B.     **CDC COVID-19 Guidance for Correctional Facilities**

On March 23, 2020, the Centers for Disease Control and Prevention (CDC) issued its first "Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities."  (DSOF ¶ 17.)  The Guidance stated that it "may need to be adapted based on individual facilities' physical space, staffing, population, operations, and other resources and conditions."  (*Id.* ¶ 18.)  The CDC issued revisions to its Guidance on July 14, 2020, February 19, 2021, May 6, 2021, June 9, 2021, February 10, 2022, and May 3, 2022.  (*Id.* ¶ 19.)

The May 3, 2022 CDC Guidance, like the earlier versions, notes that the Guidance may need to be adapted based on facility and community factors, resources, and other conditions, and states that

> [b]ecause of variations across facilities (e.g., differences in layout, infrastructure, security level, mission, population health needs, on-site healthcare, and staffing levels) and shifting epidemiologic trends due to new SARS-CoV-2 variants and other factors, there is no single COVID-19 prevention plan that will apply across all facilities or time periods.

(*Id.* ¶¶ 21−22.)

### C. MCSO Response to COVID-19

Before the CDC issued its first Guidance, MCSO and Correctional Health Services (CHS) began strategizing ways to minimize the risk to inmates and staff of COVID-19. (*Id.* ¶ 29.) CHS Medical Director, Dr. Phillips, first received notice of COVID-19 in January 2020, and he alerted CHS staff to be aware of and watch for symptoms in MCSO facilities. (*Id.*) In February 2020, Dr. Phillips began coordinating with CHS staff on how to respond if a patient presents with possible COVID-19 symptoms. (*Id.* ¶ 30.)

In March 2020, CHS staff began screening all incoming inmates to MCSO jails for COVID-19 symptoms, using screening forms developed by CHS to allow staff to identify and isolate those with possible COVID-19 symptoms or risk factors, such as out-of-state/country travel or close contact with someone infected. (*Id.* ¶ 31.) Staff also screened for other medical conditions, such as hypertension, diabetes, cancer, and lung problems, and performed temperature and vitals checks, including heart rate, blood pressure, respiratory rate, and oxygenation level. (*Id.* ¶ 32.) Staff identified inmates as Persons Under Investigation (PIU) if they had a fever equal to or above 100.4, lower respiratory symptoms, or had had close contact with a confirmed COVID-19 individual in the past 14 days. (*Id.* ¶ 34.)

In March 2020, MCSO and CHS began cohorting new arrivals for 14 days before introducing them into the general population to mitigate the potential spread of COVID-19. (*Id.* ¶ 36.) MCSO also suspended in-person visitation, volunteer/supplemental services, and all in-person group programming, classes and activities, and limited non-employee jail access to legal or other essential personnel. (*Id.* ¶¶ 37−38, 41.) Attorney visits could still take place in non-contact, glass partitioned rooms, and inmates could communicate electronically with family, friends, and community members under MCSO's newly established tablet policies. (*Id.* ¶ 39.) Educational and religious opportunities were also made available on the tablets. (*Id.* ¶ 41.) MCSO follows court directives for transporting inmates to court and allows inmates in medical isolation to appear telephonically. (*Id.* ¶ 40.)

MCSO curtailed most inmate work assignments to limit movement within the facilities with exceptions for those deemed essential workers, including kitchen and laundry workers, who were housed as a cohort in worker dorms and transported to work locations as a group. (*Id.* ¶ 42.) Officers working in medical observation, closed custody, and administrative segregation were permanently assigned to those units, and in other areas, officers were assigned the same posts for a 90-day period to mitigate the risk of spreading COVID-19. (*Id.* ¶ 43.)

In March 2020, MCSO and CHS began contacting private industry suppliers to locate and obtain additional personal protective equipment (PPE) and cleaning supplies, which were globally in short supply due to the pandemic and overwhelming demand by public and private consumers. (*Id.* ¶ 44.) At around the same time, MCSO issued guidance on enhanced sanitation procedures within MCSO facilities and inmate transport vehicles. (*Id.* ¶ 45.)

## 1.     Policies, Procedures, and Practices

In late February and early March 2020, the CHS Infection Control Coordinator, Director of Nursing, and Medical Director Dr. Phillips worked together with MCSO and the Maricopa County Department of Health to develop a standard operating procedure, known as the Management Plan SOP (SOP), to create a comprehensive approach for responding to the COVID-19 pandemic. (*Id.* ¶ 46−47; Doc. 292-2, Ex. 3, Crutchfield Decl. ¶ 14.)[1]  Components of the SOP include COVID-19 education, identifying criteria of COVID-19, and implementation of surveillance, prevention, and control measures. (DSOF ¶ 47.)[2]  The SOP has been revised six times since the original March 13, 2020 version, which predated the first CDC Guidance. (*Id.* ¶ 48.)  Revisions were made to reflect

---

[1] Plaintiffs claim to dispute that MCSO was involved in this process, but they do not identify the location of the Phillips deposition they cite in support of their opposition. (Doc. 317, Plaintiffs' Statement of Controverting Facts (PSOCF) ¶ 46.)

[2] Plaintiffs claim to dispute that the SOP contains components regarding education or that it is a "comprehensive approach" to COVID-19 (PSOCF ¶ 47); however, the page numbers from Dr. Crutchfield's deposition that Plaintiffs cite in support are not in the copy of the Crutchfield deposition Plaintiffs produced. (Doc. 292-4, Ex. 5.)

revisions to the CDC Guidance; guidance from other federal, state, and local entities; development of testing, vaccines, and treatments; and other rapidly evolving circumstances impacting jail and medical operations. (*Id.*) The latest version of the SOP was issued on February 8, 2020. (*Id.* ¶ 49.)[3] All CHS staff are expected to review, understand, and comply with the procedures in the SOP. (*Id.* ¶ 50.) Additionally, although the SOP is not binding on MCSO staff, housing decisions and inmate moves are made by a housing committee comprised of both CHS and MCSO staff in accordance with procedures set forth in the SOP, and MCSO also follows CHS recommendations for testing, screening, and prevention strategies. (*Id.* at 51.) MCSO also developed and continually revises a handout for MSCO staff regarding housing strategies outlined in the SOP. (*Id.* ¶ 52.) Plaintiffs materially dispute that housing decisions are made in accordance with the SOP based on declarations of class members that the jails disregard policies by combining quarantined units or placing new residents into units on quarantine status. (PSOCF ¶ 51.)

### 2. Communication and Coordination

Consistent with CDC Guidance, CHS established contacts with the Maricopa County Department of Public Health and the Arizona Department of Health Services (ADHS) and regularly consults with these agencies to address changing circumstances and new CDC Guidance. (DSOF ¶ 54.)

### 3. Social Distancing

Consistent with CDC Guidance, MCSO and CHS have implemented numerous social distancing strategies, including restricting outdoor recreation to dedicated areas per housing unit, staggering times for use of adjacent recreation spaces, limiting the number of inmates who can go outdoors at any one time, delivering meals directly to the housing units, suspending in-person group programing and activities and, instead, offering programs on tablets, replacing in-person with video visitation, designating rooms in each housing unit where staff could evaluate inmates with symptoms, and having healthcare

---

[3] Plaintiffs note that this was after the close of discovery in this action, leaving them unable to develop a full factual record regarding this version of the SOP, and they reserve the right to introduce controverting evidence at trial. (PSOCF ¶¶ 448−49.)

staff perform regular rounds, particularly to high risk patients.  (*Id.* ¶ 65.)

Plaintiffs do not dispute that MCSO took these measures, but they dispute that the tablets are available to all incarcerated individuals, noting that the tablets are provided as a "privilege," not a right, and they argue that the programming is not "robust" and there are fees and technical hurdles to inmates using tablets as a means for communication.  (PSOCF ¶ 65.)  Plaintiffs also point to evidence that medical staff have had to cancel clinics and medication passes for inmates due to MCSO staff shortages.  (*Id.*)  As of its May 3, 2022 Guidance, the CDC no longer recommends physical distancing as a strategy for everyday operations or makes any reference to maintaining a 6-foot distance between individuals within the facility.  (DSOF ¶ 64.)

### 4.  PPE and Sanitation Supplies

Despite challenges obtaining PPE and sanitation products early in the pandemic, MCSO was able to obtain sufficient masks, gloves, respirators, face shields, gowns, and sanitation products to meet all staff and inmate needs.  (*Id.* ¶ 72.)  MCSO has continued to add to its inventory of these products and has not had any issues maintaining sufficient PPE and sanitation supplies for any of its facilities or services.  (*Id.* ¶¶ 73, 75.)

Inmates are provided masks at intake, and all MCSO inmates are distributed new masks on Saturdays with the ability to request a new mask at any time.  (*Id.* ¶ 80.)  Staff have always been required to wear masks when treating patients, even before the pandemic, and at the start of the pandemic, CHS required staff to wear masks at all times within the building; MCSO staff were also strongly encouraged to wear masks at all times inside the facility, and in May 2020, MCSO made doing so mandatory.  (*Id.* ¶ 82.)  Information regarding masking requirements is posted on the entrances to facilities and in the housing units.  (*Id.* ¶ 83.)  Staff change PPE when entering a cell, having physical contact with an inmate, or when leaving a medical observation housing unit; there is a red bio waste container in all the housing unit sallyports for disposing of used PPE.  (*Id.* ¶¶ 85−87.)  These requirements meet or exceed the CDC's May 3, 2022 Guidance, which recommends offering masks/respirators to inmates and staff based on personal preference and that those

suspected or confirmed to have COVID-19 should wear well-fitting masks or respirators immediately upon a positive test of symptoms and continue to wear a mask in isolation if another individual enters or the inmate leaves isolation.  (*Id.* ¶ 71.)

### 5.    Enhanced Sanitation Procedures

MCSO stocks ample supplies of Triad III, Virex II, and Waxie 764 Lemon Quat cleaners, all of which are effective at killing the COVID-19 virus, at all its facilities.  (*Id.* ¶ 91.)  Since March 2020, MCSO housekeeping staff have increased sanitation protocols, including concentrating on cleaning high-touch areas, and MCSO purchased sprayers to sanitize mattress, holding cells, and living spaces. (*Id.* ¶¶ 92−93.)  Common areas are fully sanitized between use by successive cohorts, and medical observation cells are also fully sanitized between use.  (*Id.* ¶ 93.)  Plaintiffs produce declaration evidence that housing units are not always cleaned between use by quarantined groups.  (PSOCF ¶ 103.)

Inmates are responsible for cleaning their own cells and are collectively responsible for cleaning the dayrooms in most housing units.  (DSOF ¶ 99.)  The parties dispute whether inmates have access to the same cleaners as staff, with Defendants claiming inmates have access to the same EPA-registered and approved cleaners for disinfecting surfaces potentially contaminated by COVID-19, and Plaintiffs citing inmate declarations stating that cleaning supplies run out quickly, are not always replenished right away, are watered down, or inmates are only given empty spray bottles.  (PSOCF ¶ 98.)  All inmates have access to soap and water in their cells and common areas, are issued personal soap at no cost, and can receive more soap at no cost upon request.  (DSOF ¶¶ 107−109.)  Under current CDC Guidance, access to hand sanitizer is not required where inmates have ready access to soap and water.  (*Id.* ¶ 109.)

### 6.    Inmate Screening and Health Assessments

Beginning in March 2020, CHS added additional protocols to its intake screening procedures to identify new arrivals with possible symptoms of or exposure to COVID-19.  (DSOF ¶¶ 113−14.)  Any inmate who is identified during intake as having a current medical condition or current medications is flagged for a prioritized health assessment.  (*Id.* ¶ 115.)

During the health assessment, any chronic medical conditions are identified and flagged in the inmate's TechCare chart, where they are readily visible when logging into that chart; the inmate is also scheduled for regular follow-ups at the appropriate chronic care clinics. (*Id.* ¶ 116.)  Providers and nursing staff become well acquainted with chronic care inmates and their medical conditions and risk factors through chronic care visits.  (*Id.* ¶ 117.)  If a chronic care inmate's housing unit is placed on quarantine for COVID-19, healthcare staff follow up with the inmate daily, and such patients may be moved to the infirmary where they will receive 24/7 care.  (*Id.*)[4]  Severely immunocompromised patients are generally housed in the infirmary throughout their incarcerations at MCSO.  (*Id.* ¶ 118.)

### 7.      Housing Strategies

In March 2020, CHS and MCSO began working together to create new housing categories to mitigate the spread of COVID-19.  (*Id.* ¶ 119.)[5]  The categories include (1) intake cohort housing, (2) quarantine housing, (3) medical observation, (4) recovered housing, (5) negative housing (for those who went to medical observation and tested negative), and (6) quarantine cleared housing.  (*Id.* ¶ 120.)

#### a.      Intake Cohort Housing

In March 2020, CHS and MCSO began cohorting all new intakes for 14 days before introducing them into the general jail population, in accordance with CDC Guidance at that time. (*Id.* ¶¶ 121, 126.)  If an inmate presented with possible COVID-19 symptoms, he/she was immediately transported to medical observation.  (*Id.* ¶ 126.)  The inmates had access to health needs request (HNR) forms to seek medical care, or they could make a verbal request to an officer or CHS staff member who regularly delivered medications during med

---

[4] Plaintiffs claim to dispute these facts, but they cite only to evidence of MCSO staffing shortages that have caused some medical visits or clinics to be cancelled.  (PSOCF ¶ 117.)  This evidence does not controvert that medical staff check on chronic care inmates daily when their housing units are on quarantine.

[5] Plaintiffs claim to dispute that MCSO was involved in this effort, just as they previously disputed, without proper support, that MCSO was involved with CHS and the Maricopa County Department of Health in creating the SOP.  (*See* PSOCF ¶¶ 46, 119.)  As before, Plaintiffs cite to the Phillips deposition, and this time they include a reference to Doc. 297, Ex. 7, but Exhibit 7 is not Dr. Phillips' deposition; nor does this exhibit contain the page numbers Plaintiffs cite.

pass. (*Id.* ¶ 127.) MCSO staff could report any symptomatic inmates to CHS for evaluation and follow up. (*Id.* ¶ 128.) CHS conducted testing on day 4 or 5 of the cohort period and again on day 14. (*Id.* ¶ 129.) On rare occasions, two partially full cohorts of the same custody level and similar cohort release dates were combined to free up pod space for new cohorts. (*Id.* ¶ 132.) In these cases, testing was conducted based on the schedule of earliest cohort to ensure no one had to be quarantined more than 14 days. (*Id.*; PSOCF ¶ 129; Doc. 297-1, Ex. 6, Crutchfield Dep., at 31:3−33:10.) The newest intakes were still tested twice, once at the earlier intakes' day 4 or 5, which may have been their day 2 or 3, and again at the earlier intakes' day 14, meaning they could be quarantined for less than 14 days. (*Id.*) In February 2022, the CDC Guidance changed to recommend a 10-day cohort period, and CHS followed suit; inmates were still tested on day 4 or 5 and then on day 10 before being released into the general population. (DSOF ¶ 130.)

In its May 3, 2022 Guidance, the CDC recommended universal testing at intake instead of cohorts. (*Id.* ¶ 134.) In accordance with this revision, CHS and MCSO planned to implement universal testing at intake with those who refuse testing or test positive being moved to medical isolation. (*Id.* ¶ 134.)[6]

### b. Medical Observation

The CDC's March 2020 Guidance recommended that inmates who develop COVID-19 symptoms immediately be placed into medical isolation in a separate environment from other inmates and set criteria for when inmates in medical isolation could be released. (*Id.* ¶ 135, 138; Doc. 292-2 at 73−74.) The CDC's May 3, 2022 Guidance recommends that inmates with suspected COVID-19 should be tested and ideally should be housed in isolation while awaiting test results, and those who test positive may be housed in medical isolation as a cohort. (Doc. 292-3 at 18.) Following this Guidance, MCSO houses those with suspected COVID-19 in medical observation in single cells and may house those who test positive together if necessary due to space constraints. (DSOF

---

[6] Because these facts are based on developments that post-date the close of discovery, Plaintiffs reserve the right to introduce evidence at trial to controvert the stated facts. (PSOCF ¶ 134.)

¶ 140.)  CHS performs daily temperature and symptoms checks of all inmates in medical observation.  (*Id.* ¶ 141.)  COVID-19 positive inmates remain in medical observation for 10 days after symptom onset, provided they have been fever-free for at least 24 hours, and severely ill or immunocompromised inmates remain in medical observation for 21 days. (*Id.* ¶ 142.)  Inmates who are placed in medical observation due to potential exposure remain there for 10 days or until they receive a negative test.  (*Id.* ¶ 143.)

### c.  Quarantine Housing

When an inmate tests positive for COVID-19 and is placed in medical observation, the rest of the housing unit is placed on quarantine status, and all inmates in that housing unit will be offered COVID-19 tests the next business day and on or after day 14 of the quarantine.  (*Id.* ¶¶ 148−49; PSOF ¶ 15.)  In its February 2022 Guidance, the CDC began recommending 10-day quarantining, and CHS followed suit.  (DSOF ¶ 151.)  CHS conducts tests on day 4 or 5 and again on day 10.  (*Id.* ¶ 152.)  Whenever quarantine units with two different end dates are combined to open space for cohorts of new intakes, the earlier end date is used.  (PSOCF ¶ 153.)  According to CHS Medical Director, Dr. Crutchfield, combining quarantined units is rare, but due to the transient nature of the jail population, with an average length of stay less than 30 days, some quarantined units may be only half-full while intake cohort pods are full or close to capacity, leading to the need to combine partially filled quarantine units to make room for cohorting new arrivals.  (*Id.* ¶ 153; Doc. 292-2, Ex. 1, Crutchfield Decl. ¶ 45.)[7]

Quarantined individuals are placed on Movement Restriction, which limits their movements outside their quarantined housing unit to emergencies, court dates and other essential services, and releases from custody.  (PSOF ¶¶ 16, 17.)

### 8.  COVID-19 Testing

In May 2020, CHS Director Phillips began discussions with the Maricopa County Department of Public Health's Director for Disease Control to develop a plan to provide

---

[7] Plaintiffs claim to dispute that combining quarantined housing units is rare, but they do not adequately cite the Venters declaration they rely on in support for the Court to readily locate this evidence.  (PSOCF ¶ 153.)

widespread testing of all MCSO inmates at all five jails. (DSOF ¶ 157.) At that time, the Maricopa County Department of Public Health was also developing a plan to provide COVID-19 testing and training to the public, and it contracted with a vender (CSRV) to provide these services. (*Id.* ¶¶ 158, 161.) Under an addendum to this contract, CHS also began receiving COVID-19 testing and training at the MCSO jails. (*Id.* ¶ 162.) CHS now contracts with CSRV to perform most of the testing in MCSO jails. (*Id.* ¶ 163.) CSRV uses PCR testing and comes on site six days a week, with test results generally available within 24−36 hours. (*Id.* 165.) Each medical clinic also maintains a supply of rapid tests. (*Id.* ¶ 166.)

The CDC's May 3, 2022 Guidance now recommends that facilities either test all incoming inmates at intake or implement a routine observation period. (*Id.* ¶ 155.) CHS is currently finalizing plans with a third-party vendor to perform rapid tests at intake, and starting June 2022, will begin administering rapid tests to all intakes and moving anyone who tests positive to medical observation or the infirmary. (*Id.* ¶ 167.) Inmates who refuse a test will be moved to medical observation housing. (*Id.*)

### 9. Staff Screening

The CDC's March 2020 Guidance recommended reminding staff to stay home if they were sick and ensure they knew they would not be able to enter the facility if they had COVID-19 symptoms and were expected to leave the facility as soon as possible if they developed symptoms while on duty. (Doc. 292-2 at 70.) The Guidance also recommended verbal screening and temperature checks of all staff entering the facility but stated "in very small facilities with only a few staff" to consider self-monitoring or virtual monitoring. (*Id.*) Early in the pandemic, CHS and MCSO evaluated whether to conduct screening checks of all staff entering the jails or to rely on self-screening and reporting and decided in consultation with the Maricopa County Department of Public Health to rely on self-screening and reporting. (*Id.* ¶¶ 172, 175, 177.) This was intended to limit large numbers of staff congregating at a central point during shift changes to limit the potential spread of COVID-19; it was also intended to allow CHS staff to continue their primary

responsibilities of treating patients instead of requiring them to staff each entrance at each facility. (Doc. 292-2, Ex. 3, Crutchfield Decl. ¶¶ 27−28.) When MCSO staff log in for their shifts, they must complete a self-screening "healthy situation report," which contains a series of screening questions. (DSOF ¶ 183.)

All CHS staff must sign an Attestation declaring that if they are sick or have a fever, they will immediately notify their direct supervisor, self-quarantine, and seek medical attention. (DSOF ¶ 178.) CHS employees who develop symptoms or a fever at work must report to their direct supervisors and immediately leave the facility. (*Id.*) Maricopa County Human Resources has provided guidance on return-to-work criteria, which follows CDC guidelines. (*Id.* ¶ 180.) Under this criteria, CHS staff who test positive for COVID-19 should self-quarantine for 10 days and be fever and symptom-free for 72 hours before returning to work; they are also advised to see their primary care provider. (*Id.* ¶ 180.) CHS staff who are exposed to a confirmed COVID-19 patient at work are to contact the CHS-contracted occupational health provider for guidance. (*Id.* ¶ 181.)

### 10. Vaccines and Boosters

Vaccines help limit the spread and severity of COVID-19 and are an important protective measure in carceral settings. (Doc. 288, Pls.' Statement of Facts (PSOF) ¶¶ 1−4.) Boosters are also important in maximizing protection against COVID-19. (PSOF ¶ 5.) The CDC's May 3, 2022 Guidance recommends that facilities ensure COVID-19 vaccines and boosters are available for all inmates and staff; promote COVID-19 vaccinations by educating on effectiveness, safety, and importance of vaccines; seek input regarding why individuals choose not to get vaccinated; and work with local health departments on ways to increase vaccine uptake. (DSOF ¶ 184.)

Beginning in late January/early February 2021, CHS/MCSO received limited supplies of vaccines from the Arizona Department of Health Services (ADHS), and they prioritized distribution to high-risk individuals. (DSOF ¶ 186; Doc. 314, Defs' Statement of Controverting and Additional Facts (DSOCF) ¶ 23.) As soon as CHS was allocated more vaccines, it began offering them to all inmates regardless of risk factors. (DSOF

¶ 188.)[8]

CHS Director Dr. Crutchfield personally participated in the Pfizer vaccination trial and shared his experiences with CHS medical staff and providers. (*Id.* ¶ 189.) He also attended several workshops regarding vaccinations and developed a presentation for CHS staff regarding the available vaccinations. (*Id.* ¶ 190.) CHS worked with MCSO to get vaccine educational materials on inmate tablets and posted in the housing units at the jails, including handouts in English and Spanish from the CDC website. (*Id.* ¶ 191.) CHS staff and inmates are also provided vaccine information sheets from the respective vaccine providers. (*Id.* ¶ 192.) When offering vaccinations to inmates, Dr. Crutchfield explains the information from the CDC and vaccine manufacturers in laymen's terms. (*Id.* ¶ 193.)

In late 2020 and early 2021, CHS began its widespread vaccine rollout, and Dr. Crutchfield began making presentations to inmates in the dayrooms of the housing units where security classifications permitted dayroom access. (*Id.* ¶ 194.) In maximum custody and segregation units, Dr. Crutchfield went cell-to-cell during vaccine clinics to explain the vaccines, answer questions, and counsel interested inmates on the benefits and any contraindications of the vaccines. (*Id.* ¶ 195.) In the first several months after vaccines became widely available, Dr. Crutchfield and other CHS administrative staff held vaccine clinics nearly every day. (*Id.* ¶ 196.) Dr. Crutchfield also requested and received assistance from a group of Army National Guard medics who canvassed the housing units and educated inmates and administered the vaccine. (*Id.* ¶ 197.) At the time of his December 10, 2021 deposition, Dr. Crutchfield still went to the jails, usually once a week, and if he did not go, Dr. Gan or a nurse practitioner would go to give vaccines and attempt to increase vaccine uptake. (PSOCF ¶ 196.) During vaccine clinics, staff have a list of inmates who requested vaccines, and they bring enough vaccines and booster doses to administer to those on the list and additional inmates who request a vaccine or booster. (DSOCF ¶¶ 29−30.)

---

[8] Plaintiffs do not materially dispute that CHS made vaccines available to all interested inmates, but they dispute the effectiveness of its attempts to offer the vaccines in the housing units. (PSOCF ¶ 188.)

CHS continues to hold vaccine clinics every week, which are currently run primarily by a dedicated COVID-19 nurse practitioner hired by CHS with the assistance of a licensed practical nurse. (*Id.* ¶ 198.) Site-Level CHS staff also run vaccine clinics as needed. (*Id.*) At these clinics, CHS also offers and educates inmates on boosters. (*Id.* ¶ 199.) CHS has a goal to vaccinate inmates as soon as possible after they request a vaccination and does not charge copays for a vaccine. (*Id.* ¶ 200.)[9]

Inmates are also asked about their vaccination status at intake and are offered vaccines or boosters based on their prior vaccination history. (*Id.* ¶ 201.) Inmates who express interest in a vaccine or booster are scheduled for the next vaccine clinic. (*Id.*) If an incoming inmate does not know his/her vaccination status, CHS can attempt to determine their status using the Arizona State Immunization Information System (ASIIS) but does not routinely do so unless the inmate declines a vaccination or requests an update booster; if the inmate claims to be vaccinated, CHS takes their word for it and does not routinely attempt to verify this. (*Id.* ¶ 203; PSOCF ¶ 203.)

CHS tracks inmates' vaccine status in TechCare, and a vaccine flag is available to show if an inmate is fully vaccinated, partially vaccinated, or declining vaccinations. (DSOF ¶ 204.) Dr. Crutchfield regularly reminds CHS providers to discuss vaccines/boosters with all patients during sick calls and chronic care appointments. (*Id.* ¶ 207.) An inmate who initially refuses a vaccine can later request and receive one. (*Id.* ¶ 205.) Inmates can request a vaccine or booster through an HNR. (*Id.* ¶ 206.) Both parties' medical experts agree that it is reasonable for the jails to provide vaccinations within 7 days of a request. (PSOF ¶ 9.) MCSO/CHS do not have a policy that sets forth a

---

[9] Plaintiffs purport to offer clarifying and controverting facts to DSOF ¶ 200, but the pages to which they cite from Dr. Crutchfield's deposition are not in evidence. (*See* DSOCF ¶ 200; Doc. 381-1, Ex. 5.) Throughout their PSOCF, Plaintiffs cite to various depositions, including multiple different depositions from the same individual, such as Dr. Crutchfield, which appear as attachments to three different declarations of Plaintiffs' counsel Kyle Virgien. (Docs. 289, 297, 318.) Plaintiffs unhelpfully identify all three "main" documents only as "Virgien Decl." without identifying which of the three contains the attachments to which they cite. Where the Court cannot readily identify which document purportedly contains the cited material or cannot locate the cited pages within those attachments, the Court will consider Plaintiffs' facts or disputes of fact unsupported.

specific timeframe that vaccinations must be given after a request.  (*Id.* ¶ 7.)  If an inmate uses the sick call process to request a COVID-19 vaccine, medical staff sees them in the time set for any sick call request.  (*Id.* ¶ 8.)

### 11.    COVID-19 Treatment

The FDA has issued emergency use authorizations (EUAs) for several antivirals recommended for treatment of patients with mild to moderate COVID-19 symptoms who are at high risk of progression to severe COVID-19.  (DSOF ¶ 220.)  CHS applied for and received allocations of both Paxlovid and Remdevisir from ADHS for each clinic and can order more at any time.  (*Id.* ¶ 226.)  As of June 15, 2022, CHS had prescribed antivirals to seven MCSO inmates, four of whom had finished the treatment, one of whom was scheduled to start Paxlovid on June 15, 2022, and two of whom refused antiviral treatment.  (*Id.* ¶ 228.)  CHS continues to assess all COVID-19 positive patients for antiviral treatment and will prescribe antivirals when clinically indicated.  (*Id.* ¶ 231.)

### 12.    COVID-19 Education

Upon intake, CHS staff educate inmates on the proper use of masks, hand hygiene, and social distancing.  (*Id.* ¶ 244.)  CHS staff also educate inmates on the common signs and symptoms of COVID-19 and how to report them.  (*Id.*)  Educational materials on COVID-19 symptoms, masking, and handwashing are available on inmate tablets in English and Spanish and must be acknowledged by inmates; these materials are also posted throughout the jails.  (*Id.* ¶ 245.)  Inmates also receive one-on-one counselling during medical visits.  (*Id.* ¶ 246.)  Inmates who test positive and are released are given verbal instructions on appropriate protocols to follow, including self-quarantine and follow up with the Maricopa Department of Health Services, and are instructed to remain in home isolation for 10 days after testing positive, provided any fever and acute symptoms have been resolved for at least 72 hours.  (*Id.* ¶¶ 247−48.)

### 13.    Programming and Services

In March 2020, MCSO began restricting outside access to the jails, and all volunteer services ceased.  (*Id.* ¶ 250.)  In-person group classes, group counselling, and religious

services have been replaced with a wide variety of programming and classes on inmate tablets, including content in English and Spanish produced by a third-party vendor and additional content produced by MCSO staff. (*Id.* ¶¶ 251−53.)

### 14. Court Services

Early in the pandemic, the courts issued administrative orders cancelling most in-person appearances. (*Id.* ¶ 256.) MCSO cannot transport an inmate to court without a court order; nor can it disregard a court order to transport inmates to court. (*Id.* ¶¶ 256−57.)

### 15. COVID-19 Statistics

In 2020, CHS administered 27,756 COVID-19 tests and retests with 1,871 positive results, and there were no hospitalizations or deaths. (*Id.* ¶ 266.) In 2021, CHS administered 63,766 tests and retests with 3,101 positive results, and there were two COVID-19 related hospitalizations and three COVID-19 related deaths, which occurred outside of MCSO. (*Id.* ¶¶ 256, 260−62.) The first death occurred in the hospital after the inmate refused all recommended treatment, including high-flow oxygen, and elected against medical advice to receive only palliative care. (*Id.* ¶ 260.) The second inmate died of a drug overdose 6 days after release from MCSO, and environmental heat exposure with hyperthermia, COVID-19, and pneumonia were listed as contributing factors. (*Id.* ¶ 261.) The third inmate died in the hospital of COVID-19 and other causes. (*Id.* ¶ 262.)

In the first half of 2022, CHS administered 33,817 tests and retests, with 2,121 positive results (a positivity rate of 6.27%), and there have been no COVID-19 related hospitalizations or deaths. (*Id.* ¶¶ 263, 266.) Maricopa County's positivity rate over the same period was 25%. (*Id.* ¶ 266.) MCSO's hospitalization rate through the pandemic is 0.05%, and Maricopa County's rate for the same period is 5%. (*Id.*)

### D. Named Plaintiffs

#### 1. Pre-Trial Class

On August 5, 2020, Plaintiff Fenty tested positive for COVID-19 at Watkins Jail and was transferred to medical observation at LBJ. (*Id.* ¶ 268.) While there, Fenty did not report any symptoms and was released from medical observation on August 15, 2020. (*Id.*)

On June 6, 2021, Fenty refused the COVID-19 vaccine, and on December 12, 2021, he was released from MCSO custody. (*Id.*) Plaintiff Stepter received both doses of the Moderna vaccine in February and March 2020, and he was released from MCSO custody on October 19, 2021. (*Id.* ¶ 269.) Plaintiff Crough was housed in the infirmary while in MSCO custody, and he refused the vaccine on April 30, 2020 but subsequently received the single-dose Johnson & Johnson (J&J) vaccine on May 4, 2021 and was released from MCSO custody on May 11, 2021. (*Id.* ¶ 270.) Plaintiff Scroggins received the J&J vaccine on April 29, 2021 and was released from MCSO custody on December 21, 2021. (*Id.* ¶ 271.) Plaintiff Perez was transferred to the Arizona Department of Corrections, Rehabilitation and Reentry (ADCRR) on April 29, 2021, and he received two doses of the Moderna vaccine in ADCRR custody. (*Id.* ¶ 272.) Plaintiff Ochoa tested positive for COVID-19 on July 7, 2020 and was asymptomatic. (*Id.* ¶ 273.) She received the J&J vaccine on March 25, 2021 and was released on May 25, 2021. (*Id.* ¶ 273.) Ochoa was dismissed from this lawsuit on January 20, 2022. (Doc. 235.)

### 2. Post-Conviction Class

Plaintiff Reason was released on probation on July 11, 2020 and rebooked into MCSO custody in April 2021. (DSOF ¶ 275.) He received the J&J vaccine on May 4, 2021 and was transferred to ADCRR custody on June 30, 2021. (*Id.*) Plaintiff Tequida was released from MCSO custody on September 22, 2020 before COVID-19 vaccines were widely available. (Id. ¶ 275.) Plaintiff Avenenti tested positive for COVID-19 on June 4, 2020 and was asymptomatic. (*Id.* ¶ 276.) He was released from MCSO custody on October 23, 2020, before COVID-19 vaccines were widely available. (*Id.*)[10]

## V. Motions for Summary Judgment

Plaintiffs argue that they are entitled to partial summary judgment on two distinct claims: (1) Defendants' failures to guarantee that inmates who request a COVID-19 vaccine receive one within 7 days, and (2) Defendants' failures to follow the policies set

---

[10] The Court will include additional facts regarding these Plaintiffs' efforts to exhaust their administrative remedies in its discussion of exhaustion and will include facts about Puente in its discussion of organizational standing.

forth in the SOP. (Doc. 287.) Defendants argue they are entitled to summary judgment on all claims because Plaintiffs failed to exhaust administrative remedies, Puente lacks standing, Plaintiffs claims are moot, and Plaintiffs' habeas, constitutional and ADA/RA claims fail on the merits (Doc. 294.)

### A. Exhaustion of Administrative Remedies

#### 1. Legal Standard

Under the Prison Litigation Reform Act (PLRA), a prisoner must exhaust "available" administrative remedies before filing an action in federal court. *See* 42 U.S.C. § 1997e(a); *Vaden v. Summerhill*, 449 F.3d 1047, 1050 (9th Cir. 2006); *Brown v. Valoff*, 422 F.3d 926, 934-35 (9th Cir. 2005). The prisoner must complete the administrative review process in accordance with the applicable rules. *See Woodford v. Ngo*, 548 U.S. 81, 92 (2006). Exhaustion is required for all suits about prison life, *Porter v. Nussle*, 534 U.S. 516, 523 (2002), regardless of the type of relief offered through the administrative process, *Booth v. Churner*, 532 U.S. 731, 741 (2001).

The defendant bears the initial burden to show that there was an available administrative remedy and that the prisoner did not exhaust it. *Albino v. Baca*, 747 F.3d 1162, 1169, 1172 (9th Cir. 2014); *see Brown*, 422 F.3d at 936-37 (a defendant must demonstrate that applicable relief remained available in the grievance process). Once that showing is made, the burden shifts to the prisoner, who must either demonstrate that he, in fact, exhausted administrative remedies or "come forward with evidence showing that there is something in his particular case that made the existing and generally available administrative remedies effectively unavailable to him." *Albino*, 747 F.3d at 1172. The ultimate burden, however, rests with the defendant. *Id.* Summary judgment is appropriate if the undisputed evidence, viewed in the light most favorable to the prisoner, shows a failure to exhaust. *Id.* at 1166, 1168; *see* Fed. R. Civ. P. 56(a).

A class of prisoner-plaintiffs satisfies the PLRA's administrative exhaustion requirement through "vicarious exhaustion," i.e., when "one or more class members ha[s] exhausted his administrative remedies with respect to each claim raised by the class."

*Chandler v. Crosby*, 379 F.3d 1278, 1287 (11th Cir. 2004) (internal quotation marks and citations omitted). "[T]his rule advances the purpose of administrative exhaustion, which . . . 'is to put the [administrative authority] on notice of all issues in contention and to allow the [authority] an opportunity to investigate those issues.'" *Id.* (quoting *Griffin v. Carlin,* 755 F.2d 1516, 1531 (11th Cir.1985)).  It is therefore sufficient for class-wide exhaustion that at least one class member has exhausted each relevant claim, permitting the administrative entity an opportunity to resolve the alleged class-wide issues internally prior to court intervention.  *Chandler*, 379 F.3d at 1287; *cf. Oatis v. Crown Zellerbach Corp.,* 398 F.2d 496, 499 (5th Cir.1968) ("[T]o require a multiplicity of separate, identical charges before the EEOC, filed against the same employer, as a prerequisite to relief through resort to the court would tend to frustrate our system of justice and order.").

  If the defendants move for summary judgment for failure to exhaust and the evidence shows that the plaintiff did, in fact, exhaust all available administrative remedies, it is appropriate for the court to grant summary judgment sua sponte for the nonmovant on the issue.  *See Albino*, 747 F.3d at 1176 (pro se prisoner did not cross-move for summary judgment on issue of exhaustion, but because he would have succeeded had he made such a motion, sua sponte grant of summary judgment was appropriate).

**2.**   **Facts Relevant to Exhaustion**

**a.**   **Administrative Remedy Process**

  MCSO Policy DJ-3 provides a multilevel grievance process, which is detailed in the *Rules and Regulations for Inmates* ("*Rules and Regulations*") that is given to each detainee upon admission to any MCSO facility and which each named Plaintiff acknowledged receiving.  (Doc. 292, Defs.' Statement of Facts (DSOF) ¶¶ 304−305.)

  As detailed in the *Rules and Regulations*, MCSO's Grievance Procedures provide an opportunity for detainees to seek redress for their complaints regardless of disciplinary status, security level, housing category, or other administrative status, and includes three levels of complaints: an *Inmate Grievance*, an *Institutional Grievance Appeal*, and an

*External Grievance Appeal*.  (Doc. 30-1 at 33)[11]

### i.    Inmate Grievance

To begin the grievance process, a detainee may request an *Inmate Grievance* form from an officer and must submit the completed form to an officer within **48 hours** of the event being grieved.  (Doc. 30-1 at 34.)  The *Inmate Grievance* form is broken into five sections: I. Grievance, II. Officer Action, III, Sergeant Action, IV. Shift Commander Action, Custody Bureau Hearing Unit Action).  (*Id.*, Doc. 30-1 at 76. 81.)  Upon receipt, the officer must sign the form and return the pink copy to the detainee with the officer's serial number, date, and time received.  (*Id.*)  The officer will attempt to resolve the issue within **72 hours**, and if unable to do so, will forward the *Inmate Grievance* to a Shift Supervisor for review.  (*Id.*)  The Shift Commander will also review and attempt to resolve the grievance.  (*Id.*)  If the grievance is not resolved by the Shift Commander within **seven working days** of receipt, it will be forwarded to the Hearing Unit Sergeant as a formal complaint, and the Hearing Unit Sergeant will attempt to resolve the grievance within **11 working days** of receipt.  (*Id.*)  If the detainee does not receive any response to his/her *Inmate Grievance* within seven working days, or if the detainee is not satisfied with the Hearing Unit Sergeant's response, he/she may file an *Institutional Grievance Appeal* form within **24 hours** of that response and must attach the yellow copy of the *Institutional Grievance*, including all four prior responses, and any attachments.  (*Id.*)  Added together, the amount of time to process an initial Institutional Grievance can take up to **21 days**.

### ii.    Institutional Appeal

Within **7 working days** of receipt of an *Institutional Grievance Appeal*, the Jail

---

[11] In their Statement of Facts Defendants rely on a summary of the grievance process by MSCO staff member B. Williams, in which Williams describes a six-step grievance process.  (DSOF ¶¶ 310−311.)  Williams' assertions are not consistent with the copy of DJ-3, effective date 08-08-18, she cites in support; nor is this copy of DJ-3 consistent with the Grievance Procedures for detention and medical grievances set forth in Sections 13 and 19 of the *Rules and Regulations* that Defendants claim was provided to Plaintiffs.  Because the steps articulated in Williams' declaration and Defendants' Statement of Facts are long, convoluted, and are, in part, materially inconsistent with the facts given to Plaintiffs in the *Rules and Regulations*, the Court has relied on the processes set forth in the *Rules and Regulations* to set forth the relevant facts.

Commander will issue a response, and when the response is returned to the Hearing Unit, staff will have **one working day** to process the response and return it to the detainee.  (*Id.*)  Added up, the Institutional Appeal can take up to an additional **8 working days** from the *Inmate Grievance*.

### iii.    External Grievance Appeal

If the problem is still unresolved at the institutional appeal stage, the detainee has **24 hours** from receipt of the Jail Commander's response to his/her *Institutional Grievance Appeal* to file an *External Grievance Appeal*, including all responses and attachments.  (*Id.*)  The Bureau Hearing Unit Commander or designee will then review the *External Grievance Appeal* and forward any issues deemed valid to the External Referee within **7 working days** of receipt of that appeal.  (*Id.* at 35.)

If the Bureau Hearing Unit Commander or designee concludes that the *External Grievance Appeal* is repetitive, without merit, or non-grievable, this will be noted and forwarded to the appropriate Bureau Chief.  (*Id.*)  If the Bureau Chief agrees with these findings and determines not to forward the *External Grievance Appeal* to the External Referee, this concludes the grievance process.  (*Id.*)  If the Bureau Chief decides to forward the *External Grievance Appeal* to the External Referee, the External Referee will have **25 calendar days** from the date of that appeal to give the detainee a written response.  (*Id.*)  Added up, the External Grievance Appeal can take up to an additional **33 days** from the *Internal Grievance Appeal*.  Taken together, the entire timeframe to complete the written grievance process can be up to **62 days**.

If staff fails to timely respond to a grievance within the time allowed, the inmate may proceed to the next step in the grievance process by attaching his/her pink copy of the grievance to the appeal form.  (*Id.* at 33.)  Time limits may be extended upon request.  (*Id.*)  The *Rules and Regulations* also state that "[i]f your complaint or grievance is of an emergency nature, . . . the on[-]duty shift supervisor will be advised and appropriate action will be taken."  (*Id.*)

///

### iv.    Electronic Grievance

An Addendum to the *Rules and Regulations*, effective 04/09/2020, governing electronic tablets, also provides procedures whereby inmates may submit their grievances electronically. (Doc. 30-1 at 73−79.)  To utilize this process, inmates must submit an initial electronic grievance within **72 hours** of the event.  (*Id.* at 76.)  The initial electronic grievance is subjected to four levels of staff review and responses: "Level 1 Response/MCSO Personnel," who must respond in **7 business days**, "Level 2 Response/Supervisor," who must respond in **7 business days**, "Level 3 Response/Shift Commander," who must respond in **7 business days**, and "Level 4 Response/CBHU Sergeant," who must respond in **11 business days**.  (Doc. 30-1 at 76.)  The inmate has **72 hours** between each response to accept or appeal/forward to the next level, thus equating to a possible **44 days** at the initial grievance stage.  (*Id.*)

### v.    Electronic Institutional Grievance Appeal

If the inmate is unsatisfied with the Level 4 grievance response, he/she has **72 hours** to file an *Electronic Institutional Grievance Appeal*, and the Facility Jail Commander or designee has **7 business days** to respond.  (*Id.* at 77.)  Thus, the institutional appeal level can take up to an additional **10 days** to complete.  (*Id.* at 76−77)

### vi.    Electronic External Grievance Appeal

Finally, if the inmate is not satisfied with the Level 4 response of the Facility Commander or designee, he/she must complete the electronic external grievance appeal process by submitting an *External Grievance Appeal* within **72 hours** of the response of Facility Commander or designee.  (*Id.* at 77.)  The CBHU Commander, Bureau Chief, or External Referee then has up to **30 business days** to review, respond, or prepare additional information.  Added to the previous steps, the electronic grievance process can take **87 business days** to complete.

### b.    Plaintiffs' Grievance Records

MCSO staff member B. Williams reviewed the grievance files of all the named Plaintiffs in MCSO's various databases to determine whether any of them exhausted their

administrative remedies regarding their claims in this action before filing suit. (Doc. 30, Williams Decl. ¶¶ 27−28.) Williams did not find any grievances relating to COVID-19 from Plaintiffs Crough or Reason. (*Id.* ¶ 48.) Plaintiffs do not dispute that these Plaintiffs did not file any COVID-19 related grievances. (PSOCF ¶ 318.)

### i. Tequida

On June 8, 2020, Mr. Tequida submitted *Inmate Grievance* No 2020-04920 in which he raised concerns about contracting COVID-19 due to his age (65) and medical conditions, complained about a lack of testing, gloves, and disinfectant, and requested immediate release and/or implementation of certain protections. (DSOF ¶ 319; Doc. 30-1 at 136.) Tequida handed the grievance to a detention officer who returned it 30 minutes later with a response, stating that Tequida could not be released without a court order, detainees receive disinfectant daily, and Tequida already had a mask; Tequida marked the grievance unresolved and asked that it be forwarded up the chain of command. (PSOCF ¶ 319; Doc. 41-1, Tequida Decl. ¶¶ 14−15.) Eight days later, on June 16, 2020, Tequida had not received a response, so he filed an *Institutional Grievance Appeal*, asking that his grievance be forwarded to the next level, and on June 23, 2020, the Hearing Officer dropped off a response stating that the appeal had been rejected because Tequida's issue was resolved on May 26, 2020. (Tequida Decl. ¶ 15.) Tequida thought the denial of his *Institutional Grievance Appeal* was a mistake, and he resubmitted his *Institutional Grievance Appeal* with the pink copy of his original grievance attached that same day, June 23, 2020, which was seven days after Plaintiffs filed this action. (Tequida Decl. ¶¶ 15−16; Doc. 30-1 at 137.)

### ii. Avenenti

On May 26, 2020, Mr. Avenenti submitted *Inmate Grievance* No 20-04409, complaining that MCSO was failing to protect him and others from "the COVID-19 Outbreak" and was introducing new detainees off the streets into locations with no positive cases, putting Avenenti at risk of immediate harm; Avenenti requested full implementation of public health guidelines. (Doc. 30-1 at 81.) That same day, an officer responded in

writing that Mr. Avenenti's proposed resolution was to be released from custody and that MCSO does not have the authority to release detainees. (*Id.* at 82.)[12] Section II, "Officer Action Taken to Resolve" contains check boxes for (1) resolved informally, (2) withdrawn by the inmate, and (3) forwarded to the next level, and the officer checked "Forwarded to the next level." (*Id.*) Later that same day, a Sergeant responded under section III, "I concur with the officer. MCSO does not have the legal authority to release inmates without a court order" and checked "Forwarded to the next level." (*Id.* at 81.) On May 27, 2020, under Section IV, the Shift Commander also checked that he/she concurred and forwarded the Inmate Grievance to the next level. (*Id.*) On June 3, 2020, the Custody Bureau Housing Sergeant, Sgt. Houston, attached an addendum stating that Avenenti had "no proof of [his] claim" and that "MCSO has implemented new policies and procedures to ensure the inmate population[']s safety as much as possible," which he explained included putting in place "very strict mandates" to prevent anyone who is sick from entering the facility, providing masks to all officers and inmates, and offering testing. (*Id.* at 81, 83.) Sgt Houston also stated that MCSO does not have authority to release inmates and for Avenenti to "speak with [his] attorney/public defender." (*Id.* at 83.) On June 4, 2020, Avenenti signed that he had received this response. (*Id.* at 81.) There is no record Avenenti appealed to the next level. (Doc. 30, Williams Decl. ¶ 29.)

On June 8, 2020, Avenenti submitted a separate, electronic *Inmate Grievance*, No.09227439, stating that he had contracted COVID-19. (Doc. 30-1 at 84−86.) On June 17, 2020, one day after Plaintiffs filed this action, a staff member responded, advising Avenenti to submit a health needs request to medical, and on June 18, 2020, Avenenti appealed, alleging that staff had failed to address MCSO's failure to protect him from COVID-19. (*Id.* at 86.) On June 19, 2020, staff responded to the appeal, discussing the policies MCSO had implemented to protect detainees from the spread of COVID-19. (*Id.*) That same day, Avenenti appealed again, and on June 23, 2020, seven days after Plaintiffs

---

[12] Mr. Avenenti's Inmate Grievance does not contain a request for release. (Doc. 30-1 at 81)

filed this lawsuit, staff responded with further information about MCSO's COVID-19 protections, including that the facility quarantined inmates for the first 14 days of incarceration, and Avenenti appealed two more times, first on June 23, 2020, and again on June 29, 2020. (*Id.* at 84−85.)

### iii.   Fenty

On April 3, 2020, Mr. Fenty submitted a 4-page *Inmate Grievance* No. 20-03780, complaining that inmates with active COVID-19 symptoms were being placed into the jail population and that he was concerned for his health and safety because of his underlying health conditions. (DSOF ¶ 324.) The grievance was denied and forwarded at each of the initial Inmate Grievance levels with addendums attached; on April 20, 2020, the *Inmate Grievance* was returned to Fenty. (*Id.*; Doc. 30-1 at 92−97.) There is no record Fenty appealed the denials of this *Inmate Grievance*. (DSOF ¶ 324.)

On June 8, 2020, Fenty initiated an electronic *Emergency Grievance* "concerning covid-19 and underlying health conditions of myself and surrounding environment." (*Id.*; Doc. 30-1 at 100.) That same day, a staff member responded, explaining that MCSO was following CDC guidelines, and on June 23, 2020, seven days after Plaintiffs filed this action, Fenty responded that his issue was not resolved. (Doc. 30-1 at 99.) Fenty continued the electronic grievance process after Plaintiffs filed this action. (*Id.* at 98−99.)

### iv.   Perez

On May 29, 2020, Mr. Perez submitted *Inmate Grievance* No. 20-04394, complaining that his health and life were in jeopardy because the facility was not properly testing detainees or following other COVID-19 protections. (DSOF ¶ 325; Doc. 30-1 at 123.) The grievance was denied and forwarded at each level with addendums attached; on June 3, 2020, the *Inmate Grievance* was returned to Perez. (*Id.*; Doc. 30-1 at 123−25.) On June 4, 2020, Perez filed an *Inmate Institutional Grievance Appeal*, which the Jail Commander denied the next day, and on June 11, 2020, Perez checked that the issue was unresolved and to forward the issue to the External Referee. (Doc. 30-1 at 126.) There is no record that Perez submitted an *External Grievance Appeal*. (DSOF ¶ 325.)

**v.    Scroggins**

On June 10, 2020, Mr. Scroggins submitted electronic Grievance No. 092518143, complaining that MCSO was not providing shots or treatment for COVID-19, and he was not safe. (DSOF ¶ 326; Doc. 30-1 at 128.) Scoggins received a staff response on his tablet on June 16, 2020, the same day Plaintiffs filed this action. (*Id.*) From June 15 through about July 9, 2020, Scroggins asked jail staff for appeal forms nearly every day when they came by with soap, but they told him they did not have any appeal forms. (PSOF ¶ 326; Doc. 41-1, Ex. 7, Scroggins Decl. ¶ 16.)

**vi.    Stepter**

On March 30, 2020, Mr. Stepter submitted *Inmate Grievance* No. 20-02541, alleging he was under duress due to his health conditions and COVID-19 and requesting release. (DSOF ¶ 334.) The grievance was denied and forwarded at each level with addendums attached; on May 5, 2020, the *Inmate Grievance* was returned to Stepter. (*Id.*; Doc. 30-1 at 130−31.) On May 6, 2020, Stepter filed an *Institutional Grievance Appeal*, which the Jail Commander denied the next day, May 7, 2023, and on June 23, 2020, seven days after Plaintiffs filed this action, Stepter filed an *External Grievance Appeal*; on July 8, 2020 the External Referee denied the *External Grievance Appeal*, and Stepter acknowledged receipt. (*Id.* at 133−34.)

**3.    Discussion**

Defendants have met their initial burden of showing that administrative remedies were available to Plaintiffs to raise concerns regarding MCSO's lack of COVID-19 protections, and none of the named Plaintiffs exhausted those remedies before filing this action. Although several named Plaintiffs started and moved through numerous steps of MCSO's grievance process before Plaintiffs filed this action, none of them had completed the process through the final external appeal level before filing suit.

The burden therefore shifts to Plaintiffs to come forth with evidence that they did, in fact, exhaust their administrative remedies or that "something in [their] particular case[s] . . . made the existing and generally available administrative remedies effectively

unavailable to [the]m." *Albino*, 747 F.3d at 1172. Plaintiffs do not argue that any Plaintiff exhausted his/her administrative remedies before filing this action; instead, they argue their failures to exhaust should be excused because MCSO's grievance procedures were incapable of providing emergency relief during the rapid and dangerous spread of COVID-19 in the Spring of 2020, thereby making administrative remedies effectively unavailable to them. (Doc. 330 at 33.)

Plaintiffs rely in part on *Brown*, in which the Ninth Circuit acknowledged that "[d]elay in responding to a grievance, particularly a time-sensitive one, may demonstrate that no administrative process is in fact available." 422 F.3d at 943, n. 18. *Brown* involved an alleged one-time staff-on-prisoner assault for which the Ninth Circuit did not find the plaintiff's failure to exhaust should be excused, reasoning that there were "no facts suggesting that [the plaintiff] was prejudiced by the long time it took to conclude the investigation into his staff complaint" before he could file his lawsuit. *Id.* The threat of imminent and/or continuing harm from COVID-19 distinguishes the facts presented here from the facts in *Brown*, however, involving "time-sensitive" issues as to which *Brown* contemplated a prison's lengthy grievance process may demonstrate administrative remedies are effectively unavailable. *Id.* at 943, n. 18

*McPherson v. Lamont*, 457 F. Supp. 3d 67 (D. Conn. 2020), which dealt with exhaustion specifically in the COVID-19 context, is in accord. In *McPherson*, the district court found that the Connecticut Department of Corrections' administrative remedy process, which required two levels of appeal, took "a minimum of 75 *business* days, and up to 105 *business* days" to complete, and had no provision for emergency grievances, was "'practically speaking, incapable of use' for resolving COVID-19 grievances." 457 F. Supp. 3d at 81 (emphasis in original) (quoting *Ross*, 136 S. Ct. at 1859). The court clarified that it was not creating an exception to the exhaustion requirement for COVID-19 cases, noting that, "[i]n contrast to the judicially-created exhaustion requirement governing § 2241 petitions, the PLRA's exhaustion requirement may not be excused under any judicially created exception doctrine." *Id.* at 79 (citing *Ross*, 136 S. Ct. at 1855 (rejecting

"an unwritten 'special circumstances' exception" to the PLRA which would have "permit[ed] some prisoners to pursue litigation even when they have failed to exhaust available administrative remedies")). The court instead concluded that, under the lengthy, four-stage grievance process required in that case, prisoners had no ability to resolve an imminent risk of harm; therefore, there were no "available" remedies to exhaust. *McPherson*, 457 F. Supp. 3d at 81.

As set forth above, MCSO's written grievance procedures can take up to 62 business days, and the electronic grievance procedures can take an even longer 87 business days to complete. While not as lengthy as the process discussed in *McPherson*, absent an explicit emergency grievance process, these timeframes are still impractical for attempting to resolve threats of imminent harm posed by actual illness or exposure to COVID-19. Also, like the procedures the *McPherson* court found were, "practically speaking, incapable of use," 457 F. Supp. 3d at 81, MCSO's grievance procedures involve two levels of appeals, and they require numerous back-and-forth steps at each stage, with multiple gaps of up to 7 or 11 days in between steps and up to 30 days for a response to a final *External Grievance Appeal*.

Defendants argue that MCSO's grievance process provides for expedited responses in emergencies, and they point to the statement in the *Rules & Regulations* informing detainees that "if their grievance is of an emergency nature, the on[-]duty supervisor will be advised and appropriate action will be taken." (Doc. 341 at 25.) They also point out that "Policy DJ-3 (3) provides: '**Grievances of an Emergency Nature**: If failure to act promptly in response to an inmate's complaint or grievance may result in serious physical or psychological harm to an inmate or threaten the safety or security of a jail facility, detention personal shall take **immediate action**.'" (*Id.* (quoting Doc. 30-1 at 3(3) (second emphasis by Defendants)).)[13] Finally, Defendants cite to the second Williams declaration, in which Williams declares,

---

[13] There is no evidence MCSO inmates are given or have access to Policy DJ-3.

> The grievance form (electronic or paper) is just one of multiple methods of notifying staff of emergencies. In any emergency situation, however, whether in a jail setting or elsewhere, a verbal request will receive the quickest response. No matter how the inmate chooses to notify an officer of an emergency, it is dealt with promptly.

(Doc. 341 at 26 (citing Doc. 50, Second Williams Decl., ¶ 49.)

These citations are too vague to demonstrate that MCSO has any established emergency grievance procedures. The *Rules & Regulations* vaguely state that, in emergency situations, a supervisor will be advised and "appropriate action will be taken." (Doc. 30-1 at 33.) They say nothing about how an inmate is to designate a grievance an emergency; nor do they set forth any expedited timeframes whereby an inmate can expect a response. Policy DJ-3, is equally vague, stating only that, in emergencies, detention personnel will take "immediate action," without setting forth any procedures or timeframes for inmates or staff to follow. Williams's declaration statements likewise fail to point to any substantive policies or procedures of which MCSO inmates are made aware for obtaining an expedited response to an emergency issue.[14]

Absent any written policies or assurances to MCSO inmates that they could file time-sensitive complaints and have these complaints addressed within expedited timeframes, MCSO's administrative remedies were effectively unavailable to grieve the imminent risk of harm caused by exposure to COVID-19. Plaintiffs' failures to exhaust are therefore excused, and the Court will deny summary judgment to Defendants on exhaustion.

---

[14] Williams fails to cite to any support for the statements that inmates can address emergencies both through paper and electronic grievances, but "a verbal request will receive the quickest response," or that "[n]o matter how the inmate chooses to notify an officer of an emergency, it is dealt with promptly." Moreover, even if a verbal request is the quickest way inmates can get their emergencies addressed, this is irrelevant in the administrative remedy context where Defendants do not provide any evidence that, under MCSO policy, an emergency verbal request satisfies any component of the grievance process detainees are required to pursue to exhaust their administrative remedies before filing a lawsuit. Therefore, if the inmate deems the response inadequate, he/she must still pursue the written or electronic grievance process through two levels of appeal, without any assurance of expedited responses at any level of the grievance process.

**B.** **Puente Standing**

Defendants argue that Plaintiff Puente's claims fail because Puente lacks standing as an organization and Puente did not plead associational standing. (Doc. 294 at 44.)

**1.** **Legal Standards**

Organizations have direct standing only where they have suffered a "concrete and demonstrable injury to the organization's activities—with the consequent drain on the organization's resources." *Havens Realty Corp. v. Coleman,* 455 U.S. 363, 379 (1982). "[A]n organization may satisfy the Article III requirement of injury in fact if it can demonstrate: (1) frustration of its organizational mission; and (2) diversion of its resources to combat the [effects of the particular law] in question." *Smith v. Pac. Properties & Dev. Corp.*, 358 F.3d 1097, 1105 (9th Cir. 2004) (citing *Fair Hous. of Marin v. Combs*, 285 F.3d 899, 905 (9th Cir.2002)). An organization cannot, however, "manufacture the injury by incurring litigation costs or simply choosing to spend money fixing a problem that otherwise would not affect the organization at all. It must instead show that it would have suffered some other injury if it had not diverted resources to counteracting the problem." *Valle del Sol v. Whiting,* 732 F.3d 1006, 1018 (9th Cir. 2013) (citation and internal quotation omitted).

As for associational standing, the Supreme Court has "found that, under certain circumstances, injury to an organization's members will satisfy Article III and allow that organization to litigate in federal court on their behalf." *Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am. v. Brock*, 477 U.S. 274, 281 (1986). To bring suit on behalf of its members, an association must show "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Washington State Apple Advertising Comm'n,* 432 U.S. 333, 343 (1977).

///

///

## 2. Discussion

Defendants present undisputed evidence that Puente's mission is to promote justice, human dignity, nonviolence, and interdependence and to empower and educate community members to acquire political power to help them obtain relief and assistance for their needs. (Doc. 292 ¶¶ 277-78; Doc. 317 ¶¶ 277-78.)  In 2020 and 2021, Puente hired one additional person who was solely responsible for answering Puente's crisis hotline because of an increase in call volume from people concerned that family members were incarcerated or detained during COVID-19.  (Doc. 292 ¶ 280; Doc. 317 ¶ 280.)  Puente also hired personnel to respond to an increase in letters from people in jail or their family expressing "a fear of contracting COVID-19 and dying."  (Doc. 292 ¶ 282; Doc. 317 ¶ 282.)  The parties dispute whether Puente knows how many hotline calls or letters it received related to COVID-19 within the MCSO jails, with Plaintiffs relying on Defendants' evidence stating that Puente maintained documents tracking the crisis line calls and there were over 400 calls. (Doc. 292 ¶ 284; Doc. 317 ¶ 284.)  Plaintiffs, though, do not provide any additional facts about the nature of the calls to Puente's hotline, including whether the calls concerned COVID-19 in the MCSO jails, and Plaintiffs do not identify the number or nature of any letters Puente received.

Defendants present undisputed evidence that Puente's "Free Them All" campaign was in response to the global COVID-19 pandemic and its effect on those incarcerated or in detention, and the campaign included demands such as the release of everyone in ADOC and ICE detention, beginning with the most vulnerable people; demanded a moratorium on deportations by ICE and CBP; and demanded an end to the jailing of anyone charged with an offense that does not involve a serious physical injury.  (Doc. 292 ¶ 288; Doc. 317 ¶ 288.)  As part of the Free Them All campaign, Puente held four rallies or caravans at the Eloy Detention Center and at facilities holding state prisoners in April and May 2020 before holding its first caravan at the MCSO Fourth Avenue Jail on May 12, 2020. (Doc.  292 ¶¶ 289-292; Doc. 317 ¶¶ 289-292.)  The purpose of the rallies was to target and expose inhumane conditions in immigration detention centers and prisons.  (Doc. 292

¶¶ 290; Doc. 317 ¶ 290.)  Photographs of the rallies show that Puente's campaign advanced other broad, ideological, and political interests, such as ending deportation and abolishing ICE, defunding the police, ending private prisons, protesting the ADOC, supporting Black Lives Matter, ending imprisonments, supporting Deferred Action for Childhood Arrivals, and recalling Governor Ducey from office.  (Doc. 292 ¶ 293; Doc. 317 ¶ 293.)

According to Defendants, "Puente has no knowledge of whether as an organization it was claiming any damages or injuries because of M[CS]O's COVID-19 response." (Doc. 292 ¶ 298.)  Plaintiffs say they "do not dispute that this statement was made by a Puente employee at deposition as to her personal knowledge of Puente's legal contentions in this case but note that the cited evidence does not support the fact."[15]  (Doc. 317 ¶ 298.) Puente does not dispute Defendants' fact that "Puente has no knowledge of what relief it hopes or seeks to obtain by being in this lawsuit."  (Doc. 292 ¶ 299; Doc. 317 ¶ 299.)

Defendants argue that Puente cannot claim organizational standing because the increase in calls to Puente's crisis hotline and letters were not caused by MCSO's COVID-19 response but rather from the fear of COVID-19 itself.  (*Id*. at 45.)  Defendants contend that, while Puente's Free Them All campaign was in response to the global COVID-19 pandemic and its effect on those incarcerated or in detention, photographs show that the campaign also advanced other social and political interests that were completely unrelated to MCSO's COVID-19 response.  (*Id*. at 45.)  Defendants argue that the COVID-19 pandemic, not MCSO's response to the pandemic, caused Puente's alleged injury, and Puente cannot manufacture an injury to create standing.  (*Id*.)

---

[15] Plaintiffs do not say how the cited evidence does not support DSOF ¶ 298.  In DSOF ¶¶ 298−300, Defendants cite to the deposition responses of Puente representative Nataly Cruz, who stated no Puente employees visited MCSO jails from February 2020 to the present or had any telephone calls with MCSO staff regarding its COVID-19 responses; she was not sure if any Puente employees had any calls with CHS staff; did not know if Puente had ever mailed questionnaires to people in MCSO jails, tracked whether any loved ones of its members were hospitalized or had passed away at an MCSO jail due to COVID-19, or was claiming any organizational damages in this lawsuit; and she did not know whether MCSO's COVID-19 policies had discouraged Puente members from continuing to be part of Puente or whether any of the named Plaintiffs in this lawsuit were Puente members.  (Doc. 292-4, Ex. 14, Cruz Dep at 86:11−90:14.)

1      Plaintiffs respond that this Court has already found that Puente alleged both

2  organizational and associational standing in this case, and Defendants offer no basis for the

3  Court to reconsider this prior settled ruling.  (Doc. 329 at 7, citing Doc. 52 at 10.)  Plaintiffs

4  argue that standing is based on the facts as they existed at the time a complaint is filed and

5  not later in the case.  (*Id.* at 7-8.)  Plaintiffs argue that Puente has associational standing

6  because the jails' failures injured Puente's members, Puente's members were incarcerated

7  from 2020 to 2201, and Puente's members had family members incarcerated in the MCSO

8  system from 2020 to 2022.  (*Id.* at 8-9.)  Plaintiffs further argue that Puente has

9  organizational standing because the jail's failures injured Puente directly by causing Puente

10  to divert its resources to address Defendants' failure to control COVID-19 in its facilities.

11  (*Id.* at 9.)

12      The Court's prior Order at the Motion to Dismiss stage found that Plaintiffs alleged

13  sufficient facts to support that Puente had standing in its own right, i.e., organizational

14  standing.[16]  (Doc. 52 at 9-10.)  For example, the Court noted that Plaintiffs alleged that

15  "[a]s a result of Defendants' failure to adequately protect individuals incarcerated at the

16  Maricopa County jails from the dangers of COVID-19, Puente has launched a full-fledged

17  public campaign to support incarcerated people at the Maricopa County jails and raise

18  public awareness about COVID-19 for incarcerated people and their families."  (*Id.*)

19  Puente further alleged that "[t]his effort has come at the expense of other programming,

20  requiring Puente to divert resources to this campaign while scaling down other campaigns,"

21  including by "setting up a hotline to monitor conditions inside of the jails and respond to

22  the concerns of incarcerated people and their families, organizing regular protests, creating

23  petitions, drafting letters to public officials, and producing communications materials."

24  (*Id.*)

25      Plaintiffs, though, have presented no evidence at the summary judgment stage

26  supporting that it has organizational standing by demonstrating either that its organizational

27  mission has been frustrated or that it has actually diverted resources from other activities

28

---

[16] The Court did not say that Puente sufficiently alleged associational standing.

to support its campaign to protect people in the MCSO jails from the dangers of COVID-19. *See Smith*, 358 F.3d at 1105. A plaintiff opposing summary judgment on a standing issue ordinarily must "support, with affidavits or other evidence, the factual allegations underlying the assertion of standing because such allegations must ultimately be proven for a plaintiff to prevail." *La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest*, 624 F.3d 1083, 1088 (9th Cir. 2010) (quoting *Fernandez v. Brock,* 840 F.2d 622, 625–26 (9th Cir.1988)). Plaintiffs here have presented no such evidence.

Nor have Plaintiffs presented evidence supporting that it has associational standing. Plaintiffs assert in their Response that the evidence shows that Puente members have had family member in MCSO jails since 2020, but the evidence they cite does not support this statement. (Doc. 329 at 9, citing Virgien Decl., Ex. 4 (Cruz Dep.) at 18:23-19:3, 34:1-6.) The cited portion of the deposition of Puente's Interim Director, Natally Cruz, says nothing about Puente members having family in MCSO jails since 2020 but instead relates to whether Puente members must make donations to Puente and a program called "[K]now Your Rights." (Doc. 319-1 at 106-107 (Cruz Dep. at 18:23-19:3).)[17] The other cited excerpt addresses another Puente program, possibly gardening, that was sometimes canceled if there was a caravan happening on the weekend. (*See* Doc. 318-1 at 108 (Cruz. Dep. at 34:1-5).) Cruz also states in a Declaration that "[w]hen the COVID-19 pandemic began, we had Puente members inside of MCSO jails. We were also contacted by members who had family and friends in MCSO jails." (Doc. 322 at 1 ¶ 3.)

Accepting as true Cruz's Declaration statement that Puente members had family and friends in MCSO jails at the start of the pandemic, this evidence is simply too vague and conclusory to demonstrate that any Puente members would have standing to sue in their own right to support associational standing. *See Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007) ("[c]onclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary

---

[17] The pages are not in order in the deposition excerpts provided by Plaintiffs, and the deposition appears to be a rough draft because many words are incomplete.

judgment"); *Nilsson v. City of Mesa*, 503 F.3d 947, 952 n.2 (9th Cir. 2007) ("a conclusory, self-serving affidavit, lacking detailed facts and any supporting evidence, is insufficient to create a genuine issue of material fact"). Cruz does not identify a single Puente member in the MCSO jails at the start of the pandemic or any Puente members who had family and friends in the MCSO jails at that time.

Absent a showing of either organizational or associational standing, Puente lacks standing to pursue its claims, and the Court will dismiss Puente from this action.

## C. Mootness

### 1. Legal Standard

Under Article III of the Constitution, the jurisdiction of a federal court depends on the existence of a "case or controversy"; without a case or controversy, a claim is moot. *Pub. Util. Comm' n of State of Cal. v. FERC*, 100 F.3d 1451, 1458 (9th Cir. 1996). A claim is considered moot if it is no longer a present and live controversy or if no effective relief can be granted. *Mitchell v. Dupnik*, 75 F.3d 517, 527–28 (9th Cir. 1996). When a question before the court has been mooted by changes in circumstances after the complaint is filed, there is no justiciable controversy. *Flast v. Cohen*, 392 U.S. 83, 95 (1968).

Questions of mootness regarding injunctions are viewed "in light of the present circumstances." *Id.* at 528. "[A] suit for injunctive relief is normally moot upon the termination of the conduct at issue." *Demery v. Arpaio*, 378 F.3d 1020, 1025-26 (9th Cir. 2004). Thus, if a prisoner is no longer subjected to prison officials' allegedly unlawful activity, the complaint for injunctive relief becomes moot. *Wiggins v. Rushen*, 760 F.2d 1009, 1011 (9th Cir. 1985). A case becomes moot only "if subsequent events ma[ke] it *absolutely clear* that the allegedly wrongful behavior could not reasonably be expected to recur." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000) (internal quotation marks and citations omitted) (emphasis added).

For class action lawsuits in the incarceration context, in which the duration of the individual class representatives' time in custody is by nature transitory, "the termination of a class representative's claim does not moot the claims of the unnamed members of the

class." *Cnty. of Riverside v. McLaughlin*, 500 U.S. 44, 51 (1991) (quoting *Gerstein v. Pugh*, 420 U.S. 103, 110 n.11 (1975) (noting that "pretrial detention is by nature temporary" and could be "ended at any time by release on recognizance, dismissal of the charges, or a guilty plea, as well as by acquittal or conviction after trial"). Instead, "other unnamed class members may be appointed to serve . . . allowing for continued adequate representation by those who remain in custody and continue to share the same interests as the respective class." *Gerstein*, 420 U.S. at 110 n.11; *see also Sosna v. Iowa*, 419 U.S. 393, 402 n.11 (1975); *Schall v. Martin*, 467 U.S. 253, 256, n. 3 (1984); *Cnty. of Riverside*, 500 U.S. at 52. "In such cases, the 'relation back' doctrine is properly invoked to preserve the merits of the case for judicial resolution." *Cnty. of Riverside*, 500 U.S. at 52.

### 2. Discussion

Defendants first argue incorrectly that Plaintiffs' claims are moot solely because the named representatives have been released or transferred. (Doc. 294 at 29.) As noted, release of the named representatives, which routinely happens in jails, does not moot a detainee/prisoner class action. Defendants, however, ignore the relevant caselaw and, instead, rely solely on individual habeas, conditions-of-confinement, and ADA/RA cases to argue that release from custody moots Plaintiffs' class-wide claims. (*Id.*) Such cases simply do not apply here, and Defendants arguments to the contrary are not well taken. *See Cnty. of Riverside*, 500 U.S. at 51; *Gerstein*, 420 U.S. at 110 n.11. If this case proceeds to trial, Plaintiffs will be permitted to substitute new named class representatives at that time.

Defendants also argue that changes in the pandemic and the widespread availability of COVID-19 vaccines moot Plaintiffs' claims. (Doc. 294 at 29−30.) Defendants rely, in part, on *Martinez v. CoreCivic*, a detainee class action lawsuit for habeas, injunctive and declaratory relief, in which the district court opined that

> every time a staff member, or pre-trial detainee, or prisoner is vaccinated, the overall risk of outbreak at CCCC decreases. Approaching this issue pragmatically, rather than through a clouded political lens, the vaccine must smother all attempts by prisoners or pre-trial detainees to request COVID-19-

related relief based upon the theory that the risk of infection violates the constitution; persons in custody who refuse the vaccine are now imperiled solely as a result of their own free will and not because a detention center allegedly offended the Fifth, Eighth, and Fourteenth Amendments by failing to sufficiently implement prophylactic measures.

2021 WL 2550319, No. CV 20-1309 WJ/CG, at *8 (D.N.M. June 22, 2021).

Defendants argue that changes in the pandemic and in CDC guidance and MCSO/CHS' response, including the widespread availability of vaccines and effective medications, have significantly curbed the risk of serious illness or death from COVID-19 exposure.  (Doc. 294 at 30; DSOF ¶¶ 17−45, 215, 220−224, 226−228.)  They also cite evidence that the less virulent Omicron variant is now the dominant COVID-19 variant in the United States, and the vast majority of those infected suffer only mild symptoms.  (Doc. 294 at 30; DSOF ¶ 229.)  Defendants further note that, prior to release, none of the named Plaintiffs suffered serious illness or death, including Fenty, Ochoa, and Avenenti, who tested positive for COVID-19 but were asymptomatic.  (Doc. 294 at 30; DSOF ¶¶ 268, 273, 276.)

Plaintiffs take issue with Defendants facts, including that the Omicron variant only produces mild symptoms, citing evidence that Omicron still presents a substantial threat, particularly for immunocompromised individuals.  (Doc. 330 at 5−6.)  Plaintiffs also argue that there are questions of fact regarding whether Defendants have made the medical advances they cite widely available to MCSO inmates and that "breakdowns" in Defendants' COVID-19 protections, including combining quarantined units, show there is still a substantial risk of serious harm, and the risk of harm, even without a showing of actual injury or death, is enough to support claims for injunctive relief.  (*Id.* at 6−7.)

For purposes of mootness, Defendants' burden is high: they must show there is no remaining relief the court can order.  *See Halet v. Wend Inv. Co.*, 672 F.2d 1305, 1308 (9th Cir. 1982) ("The defendant bears a heavy burden to demonstrate mootness"); *Lasar v. Ford Motor Co.*, 399 F.3d 1101, 1108 (9th Cir. 2005) ("To determine whether a case is moot, a court must ask whether a change in the circumstances existing at the beginning of the

litigation has 'forestalled any occasion for meaningful relief' that the court could grant")
(internal citation omitted).  At a minimum, there are factual disputes regarding some of
Defendants' COVID-19 response measures, which, if shown to rise to the level of a
constitutional or ADA/RA violation, would entitle Plaintiffs to prospective injunctive
relief.  Accordingly, the Court will deny summary judgment to Defendants on mootness
grounds.

### D.   Habeas

Plaintiffs allege that Defendants "have subjected the Pretrial Class to conditions of
confinement that place Plaintiffs at substantial risk from COVID-19, a disease for which
there is no known vaccine, treatment, or cure" and "[b]y not taking such measures,
Defendants have placed the Pretrial Class at risk of irreparable harm or even death."  (Doc.
1 ¶¶ 166-67.)  Count Four seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2241 on
behalf of all Pretrial Medically Vulnerable Subclass Plaintiffs for their release or
"enlargement."  (Doc. 1 ¶¶ 181-188.)  Plaintiffs allege the continued confinement of these
subclass members violates the Fourteenth Amendment because "there are no conditions of
confinement that will adequately protect members of the Pretrial Medically Vulnerable
Subclass from the risk of infection, serious injury and death from COVID-19," that release
or enlargement will reduce the incarcerated population at the MCSO jails "to enable proper
social distancing to reduce transmission for all class members and the wider public," and
release or enlargement will reduce the burden on the region's health care infrastructure.
(Id. ¶ 184-187.)  In their request for relief, Plaintiffs seek "a temporary restraining order
and/or writs of habeas corpus requiring Defendants to immediately release the members of
the Pretrial Medically Vulnerable and Disability Subclass who are incarcerated solely due
to their inability to afford a financial condition of release, or whose release Defendants do
not object to," and a "temporary restraining order, preliminary and permanent injunction,
and/or writ of habeas corpus imposing a process . . . to consider the release or enlargement"
of the remaining members of those subclasses.  (Id. at 47.)

Defendants argue that Plaintiffs' habeas claims fails for several reasons: (1) the

habeas claims are merely derivative of their Fourteenth Amendment claims, which also fail; (2) Plaintiffs are not challenging the government's legal authority to detain them for their criminal charges—the core of habeas corpus—but are attempting to repackage their § 1983 Fourteenth Amendment challenge to their conditions of confinement; (3) success on the merits will not necessarily require Plaintiffs' immediate release; and (4) Plaintiffs' allegations that no conditions of confinement will adequately protect medically vulnerable inmates from the risk of a serious illness or death have not proven true. (Doc. 294 at 44.) Defendants also argue that all named Plaintiffs have been released or transferred to ADCRR custody, which moots their claims. (*Id*. at 29.) Those released include Plaintiffs Fenty, Ochoa, and Avenenti, who tested positive for COVID-19 but were asymptomatic. (*Id*. at 30.) Defendants further argue that changes in the pandemic and the widespread availability of a vaccine moots the claims seeking release due to the risk of COVID-19 exposure. (*Id*. at 29.)

Plaintiffs respond that the petition for release of the Pretrial Medically Vulnerable Subclass lies at the heart of habeas corpus and that Defendants mischaracterize their claims. (Doc. 329 at 10.) Plaintiffs argue that "[i]mmediate release is the only effective remedy because no set of conditions will adequately protect the Pretrial Medically Vulnerable Subclass from COVID-19." (*Id*. at 11.)

A federal district court is authorized to grant a writ of habeas corpus under 28 U.S.C. § 2241 where a petitioner is "in custody under or by color of the authority of the United States . . . in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. §§ 2241(c)(1), (3). In general, "[h]abeas corpus proceedings are the proper mechanism for a prisoner to challenge the 'legality or duration' of confinement. A civil rights action, in contrast, is the proper method of challenging 'conditions of . . . confinement.'" *Badea v. Cox*, 931 F.2d 573, 574 (9th Cir. 1991) (citation omitted); *see also Muhammad v. Close*, 540 U.S. 749, 750 (2004) ("Federal law opens two main avenues to relief on complaints related to imprisonment: a petition for habeas corpus . . . and a complaint under . . . 42 U.S.C. § 1983.") Thus, [c]hallenges to the validity of any

confinement or to particulars affecting its duration are the province of habeas corpus; requests for relief turning on circumstances of confinement may be presented in a § 1983 action." (*Id.*) For this reason, when a federal detainee believes the *fact* of his detention is unconstitutional, he may seek release by filing a habeas corpus petition under 28 U.S.C. § 2241. *See also Trinidad y Garcia v. Thomas*, 683 F.3d 952, 956 (9th Cir. 2012) ("The writ of habeas corpus historically provides a remedy to non-citizens challenging executive detention"). In contrast, when a federal detainee or prisoner wishes to challenge the *conditions* in which he is being held, the usual vehicle for asserting such a claim is a civil rights action.

The United States Supreme Court, however, has not explicitly or implicitly foreclosed the use of habeas corpus for conditions-of-confinement claims. *See Ziglar v. Abbasi*, 582 U.S. 120, 144 (2017) (leaving open the question of whether alien detainees challenging "large-scale policy decisions concerning the conditions of confinement imposed . . . might be able to challenge their confinement conditions via a petition for a writ of habeas corpus"); *Boumediene v. Bush*, 553 U.S. 723, 792 (2008) (declining to determine "the reach of the writ with respect to claims of unlawful conditions of treatment or confinement"); *Bell v. Wolfish*, 441 U.S. 520, 526, n. 6 (1979) (leaving for "another day the question of the propriety of using a writ of habeas corpus to obtain review of the conditions of confinement").[18]

The Ninth Circuit has found as to a federal prisoner's combined civil rights/habeas action challenging the conditions—not the *fact*—of his confinement that dismissal of the habeas petition was appropriate under the "traditional interpretation" that a "writ of habeas corpus is limited to attacks upon the legality or duration of confinement." *Crawford v.*

---

[18] *See also Brown v. Plata,* 563 U.S. 493, 563 (2011) (Scalia, J., dissenting) (stating that prisoner-release injunction was "the functional equivalent of 46,000 writs of habeas corpus" and release should be ordered only if it is determined "that the prisoner is suffering from a violation of his constitutional rights, and that his release, and no other relief, will remedy that violation. Thus, if the court determines that a particular prisoner is being denied constitutionally required medical treatment, and the release of that prisoner (and no other remedy) would enable him to obtain medical treatment, then the court can order his release").

*Bell*, 599 F.2d 890, 891 (9th Cir. 1979) (citing *Preiser v. Rodriguez,* 411 U.S. 475, 484−86 (1973)). However, since *Crawford*, other Ninth Circuit cases have not expressly foreclosed the ability of courts to order habeas relief under 28 U.S.C. § 2241 in response to alleged civil rights violations. *See Badea*, 931 F.2d at 574 (declining to address "whether Badea should have sought relief through a habeas petition or a civil rights complaint" because his release on parole made the issue moot); *Nettles v. Grounds*, 830 F.3d 922, 931-32 (9th Cir. 2016) (observing that the PLRA reflects statutory intent to make § 1983 the exclusive remedy for state inmate suits "about prison life," but declining to address whether its holding applied "to relief sought by prisoners in federal custody"). And Courts of Appeals in other circuits have recognized the applicability of habeas relief to remedy unconstitutional conditions of confinement caused by COVID-19. *See Hope v. Warden York Cnty. Prison*, 972 F.3d 310, 325 (3d Cir. 2020) (holding "Petitioners' claim that unconstitutional conditions of confinement at York and Pike require their release [was] cognizable in habeas"); *Wilson v. Williams*, 961 F.3d 829, 838 (6th Cir. 2020) (holding that "[b]ecause petitioners [sought] release from confinement, 'the heart of habeas corpus,' . . . jurisdiction [was] proper under § 2241." (internal citation omitted)).

Although Plaintiffs alleged in their Complaint that there are no conditions of confinement that will adequately protect members of the Pretrial Medically Vulnerable Subclass from the risk of infection, serious injury and death from COVID-19," thereby appearing to challenge the very fact of their confinements, Plaintiffs seek writs of habeas corpus only to the extent that other forms of relief may prove inadequate to remedy the alleged unconstitutional conditions in MCSO jails. This is highlighted by the way Plaintiffs frame their request for relief in the alternative as either a temporary restraining order, preliminary or permanent injunction, "and/or writ of habeas corpus." Because Plaintiffs implicitly agree that the alleged unconstitutional conditions in this action can be cured through other forms of injunctive relief short of release, their claims do not challenge the very "fact or duration" of their confinements, and they are not entitled to habeas relief under § 2241. Moreover, as set forth more fully in the Court's discussion of the merits of

Plaintiffs' constitutional and ADA/RA claims, Plaintiffs have failed to create a question of fact that their conditions-of-confinement entitle them to any Court-ordered relief. The Court will therefore grant summary judgment to Defendants on Plaintiffs' habeas claims.

### E.  Conditions-of-Confinement Claims

Plaintiffs challenge their conditions of confinement under the Eighth and Fourteenth Amendments. To succeed under either amendment, Plaintiffs must establish "deliberate indifference" on the part of Defendants. *Farmer v. Brennan*, 511 U.S. 825, 846, (1994) (Eighth Amendment); *Kingsley v. Hendrickson*, 576 U.S. 389, 398 (2015) (Fourteenth Amendment). "Deliberate indifference is the conscious or reckless disregard of the consequences of one's acts or omissions. It entails something more than negligence but is satisfied by something less than acts or omission for the very purpose of causing harm or with knowledge that harm will result." *Gantt v. City of Los Angeles*, 717 F.3d 702, 708 (9th Cir. 2013). To succeed on their Eighth Amendment claims, Plaintiffs must prove both objective and subjective deliberate indifference. *Farmer*, 511 U.S. at 842. Their Fourteenth Amendment claim, however, requires only that they prove objective deliberate indifference. *Gordon v. Cnty. of Orange*, 888 F.3d 1118, 1124–25 (9th Cir. 2018).

Further, to support a claim against a municipality or a public official in his official capacity, a plaintiff must show that his constitutional rights were violated under a policy, decision, or custom promulgated or endorsed by the entity. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978). Under *Monell*, a plaintiff must show: (1) he suffered a constitutional injury; (2) the entity had a policy or custom; (3) the policy or custom amounted to [reckless disregard] to the plaintiff's constitutional right; and (4) the policy or custom was the moving force behind the constitutional injury. 436 U.S. at 691–94; *Mabe v. San Bernardino Cnty., Dep't of Pub. Soc. Servs.*, 237 F.3d 1101, 1110–11 (9th Cir. 2001).

### 1.  Constitutional Violation

To show a Fourteenth Amendment violation, the Ninth Circuit has established a four-part test to determine objective deliberate indifference:

(i) the defendant made an intentional decision with respect to the conditions under which the plaintiff was confined;

(ii) those conditions put the plaintiff at substantial risk of suffering serious harm;

(iii) the defendant did not take reasonable available measures to abate that risk, even though a reasonable official in the circumstances would have appreciated the high degree of risk involved—making the consequences of the defendant's conduct obvious; and

(iv) by not taking such measures, the defendant caused the plaintiff's injuries.

*Gordon*, 888 F.3d at 1125. "With respect to the third element, the defendant's conduct must be objectively unreasonable, a test that will necessarily 'turn[ ] on the facts and circumstances of each particular case.'" *Id.* (quoting *Kingsley*, 135 S. Ct. at 2473; *Graham v. Connor*, 490 U.S. 386, 396 (1989)). The "'mere lack of due care by a state official' does not deprive an individual of life, liberty, or property under the Fourteenth Amendment." *Id.* (quoting *Daniels v. Williams*, 474 U.S. 327, 330–31 (1986)). Therefore, Plaintiffs must "prove more than negligence but less than subjective intent—something akin to reckless disregard." *Id.*

To show an Eighth Amendment violation, Plaintiffs must make a higher showing of subjective deliberate indifference. The subjective prong requires "more than ordinary lack of due care for the prisoner's interest or safety." *Farmer*, 511 U.S. at 835 (quotation omitted). To prove subjective deliberate indifference, a plaintiff must show that the official knew of and deliberately disregarded an excessive risk to inmate safety. *Id.* at 837.[19]

As to Plaintiff's Fourteenth Amendment claims, it is undisputed that Defendants (1) made intentional decisions on the conditions under which inmates were confined at MSCO jails. From the start of the pandemic, MCSO/CHS began formulating policies and

---

[19] Because the Fourteenth Amendment requires a lesser showing of objective deliberate indifference, the Court will first address Plaintiffs' claims under the Fourteenth Amendment standard, and to the extent Plaintiffs can establish a triable issue of fact that Defendants were objectively deliberately indifferent to a substantial threat of serious harm, the Court will address whether Plaintiffs have also created a triable issue of fact that Defendants were subjectively deliberately indifferent under the Eighth Amendment.

practices for how to respond to the threat of the virus within MCSO Jails, and the evidence shows they have continued to make intentional decisions about how to adapt those policies in response to changes in the pandemic and CDC guidance. Given that thousands of MCSO inmates have tested positive and there have been three COVID-19 related deaths of MCSO inmates since the start of the pandemic, there are also genuine issues of material fact whether (2) the conditions of confinement within MCSO jails put Plaintiffs, particularly those in the medically vulnerable subclasses, at substantial risk of serious harm.

Whether Plaintiffs suffered a Fourteenth Amendment violation therefore rests on whether Plaintiffs can show that (3) Defendants failed to take reasonable available measures to avert the risk of harm, even though reasonable officials in the circumstances would have appreciated the high degree of risk involved, and that (4) by failing to respond reasonably to the risk, Defendants caused an "imminent" danger to Plaintiffs' health and safety. *See Roman*, 977 F.3d at 943 ("To satisfy the fourth element, a plaintiff need only prove a 'sufficiently imminent danger[],' because a 'remedy for unsafe conditions need not await a tragic event.'") (alteration in original) (quoting *Helling*, 509 U.S. at 33-34).

Defendants have made an initial showing that MCSO/CHS took reasonable available measures to abate the risk of harm to Plaintiffs of contracting COVID-19. From the start of the pandemic, MCSO and CHS worked together with the Maricopa County Department of Health to develop standard operating procedures (the SOP) for recognizing and identifying COVID-19 and implementing surveillance, prevention, and control measures; they also regularly revised the SOP in accordance with changes in CDC guidance. (DSOF ¶¶ 46−48.) In addition to working closely with the Maricopa County Department of Public Health, they also established contacts at ADHS and regularly consulted with these agencies to address changing circumstances and new CDC Guidance. (*Id.* ¶ 54.) MCSO and CHS also implemented specific policies and practices for numerous protective measures, including social distancing in the housing units and recreation yards; masking and PPE use; enhanced sanitation; cohorting new arrivals; medical observation for those who test positive or have symptoms; quarantining housing units when an inmate

tests positive; and requiring staff to self-screen before entering the facility and immediately leave and self-quarantine if they develop COVID-19 symptoms at work. CHS also contracts with a third-party vender, CSRV, to perform PCR testing at all six MCSO jails and made plans with another vender to begin widespread rapid testing in June 2022. (*Id.* ¶¶ 163−67.) Since the development of vaccines, CHS also began holding educational sessions and vaccine clinics to offer vaccines and boosters to all current inmates, and it offers vaccines and boosters to new inmates at intake. (*Id.* ¶ 201.) Also, since the development of antivirals, CHS applied for and received allocations of Paxlovid and Remdevisir for each of its clinics, and as of June 15, 2022, had treated five inmates with antivirals. (*Id.* ¶¶ 226, 228.) CHS also educates inmates during intake on such things as proper mask use, hand hygiene, and how to recognize and report symptoms of COVID-19, and it provides educational materials on inmate tablets and throughout MCSO facilities on the same; CHS providers also provide one-on-one medical counselling regarding COVID-19 and available vaccinations at medical and chronic care visits. (*Id.* ¶¶ 244−46.) Taken together, these efforts are enough to make an initial showing that MCSO/CHS have taken reasonable available measures to abate the risks to Plaintiffs from COVID-19 of which reasonable officials would have known and have not recklessly disregarded those risks.

The burden now shifts to Plaintiffs to create a genuine issue of material fact that Defendants failed to take reasonable available measures to mitigate the risk to Plaintiffs of contracting COVID-19 and thereby suffering serious harm or an imminent threat of serious harm, even though reasonable officials would have appreciated the risk.

In their Motion for Partial Summary Judgment, Plaintiffs argue that Defendants have failed to establish any reasonable timeframes for class members to receive a vaccination, once requested, and they argue that Defendants fail to follow their own SOP by combining cohorts and quarantined units. (Doc. 287.) In their Response to Defendants' Motion for Summary Judgment, Plaintiffs reassert these arguments and additionally argue that Defendants fail to do enough to increase vaccine uptake, do not specifically offer boosters, and have only administered antivirals to five patients as of June 2022, which they

1    argue is "extremely low relative to the nearly three thousand cases in the Jail in [2022]."

2    (Doc. 330 at 18−27.)[20]

3                                    **i.    Vaccinations**

4         It is undisputed that Defendants have no set policy for how soon COVID-19

5    vaccinations must be given following an inmate request.  According to Plaintiffs' expert,

6    Dr. Murray, if an inmate requests a vaccination through the sick call process, CHS follows

7    the 24-hour timeframe for responding to sick call requests, and the inmate could then be

8    scheduled for a vaccination anywhere from that day or a week later during a scheduled

9    vaccine clinic.  (Doc. 287 at 13.)

10        Plaintiffs argue that Defendants' failure to establish an explicit timeframe has

11   "resulted in long delays in vaccination."  (Doc. 287 at 11.)  As evidence, they cite to the

12   declaration of class member Loretta Johnson, who was detained at Estrella Jail in April

13   2021.  (*Id.*)  Johnson claims she was not offered a vaccine, despite being 67 years old and

14   having several underlying medical conditions, until she saw a medical provider for an

15   unrelated matter in late 2021 or early 2022, and the medical provider counselled her to get

16   the vaccine.  (Doc. 248-2, Johnson Decl. ¶¶ 1−4.)  Although she then requested the

17   vaccine, and the medical provider told her a dose would be ordered for her, Johnson

18   received no further information, and her name was not called when she witnessed staff

19   providing the vaccine to other inmates in her housing unit.  (Johnson Decl. ¶¶ 4−6.)  On

20   February 8, 2022, Johnson was told by other inmates that her name was on the vaccine

21   list, but she was away at court, and as of February 10, 2022, she still had not received a

22   vaccine.  (*Id.* ¶ 7.)[21]  Another class member, Ashley Wilkeyson, initially declined the J&J

23   vaccine in March 2021 but contracted COVID-19 in October 2021, and thereafter, despite

24   _____

25        [20] The evidence to which Plaintiffs cite shows that CHS has prescribed antivirals to
     7 patients, two of whom refused.  (DSOF ¶ 292.)

26        [21] Defendants produced evidence that Johnson discussed the vaccine with a provider
27   during a medical visit on January 28, 2022 and again requested the Moderna vaccine,
     received the first dose of the Moderna vaccine on February 10, 2022, and was scheduled
28   for a second dose on March 10, 2022, but was released from MCSO custody on March 9,
     2022, before the second dose could be administered.  (DSOCF ¶¶ 45−46.)  Johnson did not
     test positive for COVID-19 in MCSO custody.  (*Id.* ¶ 47.)

making multiple requests for the vaccine, was not given the first dose of the Moderna vaccine until February 1, 2022. (Doc. 248-3, Wilkinson Decl. ¶¶ 2−9.) Plaintiffs also point to evidence that, in the first three weeks of January 2022, only 15 vaccinations were administered, two vaccine clinics had to be cancelled due to shortages of MCSO staff to escort the vaccination teams, and there were some weeks between then and May 2022 when no vaccines were administered. (Doc. 287 at 12; Doc. 330 at 23.)

Plaintiffs have not created a genuine issue of material fact that Defendants' COVID-19 vaccination policies, including having no set timeframe for fulfilling vaccination requests, are objectively deliberately indifferent. Plaintiffs do not materially dispute that, in late 2020 and early 2021, when vaccines first became readily available, CHS began a widespread vaccine rollout in the MCSO jails and began holding nearly daily vaccine clinics where inmates could learn about the vaccine and get vaccinated in their housing units. (DSOF ¶¶ 194−197.) Vaccination teams also bring enough doses with them to vaccinate both the inmates who have already requested vaccinations and any additional inmates who decide to get vaccinated that day. (DCSOF ¶¶ 29−30.) CHS also hired a dedicated COVID-19 nurse practitioner to run vaccine clinics with assistance; early in the rollout, Dr. Crutchfield made almost daily COVID-19 vaccine presentations in the housing unit dayrooms, went cell-to-cell to offer vaccinations in restricted housing units, and recruited a team of Army National Guard medics to assist in vaccinations; and CHS relies on dedicated COVID-19 nurses and site-level staff to administer vaccine clinics, which it continues to hold nearly every week. (DSOF ¶ 198.) The cancellation of some vaccine clinics in January 2022 due to MCSO staffing issues, where MSCO/CHS otherwise regularly provides opportunities for inmates to request and receive vaccinations, and has done so since vaccines became widely available, does not show Defendants made an intentional decision regarding vaccinations that placed Plaintiffs at substantial risk of serious harm.

The instances Plaintiffs cite when class members were not provided vaccinations for two to four months after making a request also fail to make this showing. Johnson was

booked into the Estrella Jail in April 2021, and from April through early May 2021, CHS medical staff canvassed every housing unit in every MCSO jail to offer vaccinations. (DSOCF ¶ 29.) These facts show Defendants took reasonable available measures to offer vaccinations to class members, and there are no facts showing Johnson lacked a reasonable opportunity within the first month of her incarceration to request and receive a vaccination. Later, when she elected to request a vaccination at a medical visit in November 2021, there is a question of fact why her name was not called when vaccination teams came to her housing unit to administer the vaccine. This failure suggests, at most, that CHS scheduling staff were negligent in preparing the list, but there is no evidence anyone made an intentional decision to deny Johnson the vaccine or that her absence from the list was due to CHS's lack of established timeframes for administering vaccinations once requested. Moreover, Plaintiffs do not dispute that, during vaccine clinics, CHS staff offer vaccinations to all inmates in the housing unit, regardless of whether they are on the vaccination list, and they bring enough doses to accommodate additional requests. Plaintiffs present no evidence that Johnson ever requested a vaccination at a vaccine clinic in her housing unit, including the one where she was present and witnessed other inmates being vaccinated, but her name was not on the list. Therefore, even if CHS scheduling staff negligently failed to schedule Johnson for a vaccination, this is not enough to show Defendants failed to take reasonable available measures to ensure that inmates who want vaccinations are vaccinated within a reasonable amount of time of making a request.

Similarly, as to Ms. Wilkeyson, who claims she submitted HNRs from her tablet requesting a vaccination in October and December 2021 but did not receive one until February 1, 2022, there are questions of fact regarding the cause of the delay. But here, too, Plaintiffs fail to create a question of fact that anyone made an intentional decision to deny Wilkeyson a vaccination or that the lack of specified timeframes, not mere negligence on the part of CHS scheduling staff, delayed her eventual vaccination. Once again, Plaintiffs have also not materially controverted that CHS regularly offers vaccinations to all inmates in MCSO jails during vaccine clinics in the housing units and

brings enough doses to accommodate those who have not previously requested a vaccination or who, for whatever reason, are not on the vaccination queue. As with Johnson, Plaintiffs have not provided any evidence Wilkeyson ever requested a vaccination during one of these clinics in her housing unit and was denied. Absent additional facts, Plaintiffs cannot show that CHS fails to take reasonable available measures to ensure that inmates are regularly offered vaccinations within a reasonable amount of time after making a request.

Plaintiffs also argue that MCSO's vaccination rates of 16−17% are low compared to those in Arizona as a whole and within ADCRR, which they claim are over 70% and nearly 80%. (Doc. 330 at 22−23.) They argue that "this alone creates a significant fact dispute whether the Jail's vaccination efforts are reasonable." (*Id.*) Plaintiffs' references to Arizona and ADCRR vaccination rates are inapt comparisons for vaccination rates in MCSO jails where the average length of stay is less than 30 days (DSOF ¶ 132), giving Defendants relatively little time to educate inmates on vaccines, solicit vaccine requests, and carry out requested vaccinations, and Plaintiff do not cite to vaccination rates for any comparable jail facilities. Plaintiffs also base the jails' purportedly low vaccination rates and their arguments about them on insufficiently cited evidence in their Response and on other facts that were not properly set forth or cited in their PSOF or PSOCF.[22] Plaintiffs' imprecise citations and belated attempts to insert new facts in their Response without "reference to the specific paragraphs in the statement of facts that supports the assertion" violates Local Rule of Civil Procedure 56.1(e). In addition, Plaintiffs' argument that MCSO's vaccination rate reflects inadequate vaccination policies is vague and conclusory and fails to create a genuine issue of fact for trial.

_____

[22] The only mention of MCSO's vaccination rates the Court could locate in Plaintiffs' PSOF or their 100-page PSOCF is an out-of-context reference embedded in a two-page purported dispute of Defendants' fact regarding social distancing. (DSOF ¶ 59; PSCOF ¶ 59.) This response does not controvert the facts asserted in that paragraph, consists mostly of arguments that should be reserved for Plaintiffs' memoranda of law, and relies on deposition evidence that Plaintiffs failed to cite with sufficient clarity for the Court to locate. Absent citations to clearly supported statements of fact in their Response, the Court deems these facts unsupported. *See* LRCiv. 56.1(e).

Plaintiffs' arguments regarding Defendants' purported failures to increase vaccine uptake and track inmates for boosters (Doc. 330 at 24) suffer from the same defects. Plaintiffs argue—again based solely on evidence not properly set forth in their facts—that Defendants fail to adequately track inmates for boosters or employ other methods, such as incentive programs used by other institutions, to increase vaccine and booster uptake. (*Id.*)  Plaintiffs also argue that Defendants fail to properly educate inmates regarding COVID-19 vaccines, relying solely on Dr. Crutchfield's deposition statement that he was not aware of the specific content posted in the housing units, which Plaintiffs take out of context to suggest that Defendants do not provide any relevant educational materials to MCSO inmates.  (*Id.*)

Plaintiffs fail to materially controvert Defendants' evidence that MCSO/CHS post educational materials from the CDC and other sources about vaccines and other COVID-19 protections in English and Spanish throughout the jail facilities.  Plaintiffs also fail to acknowledge that this is only one of many ways—including one-on-one discussions with health professionals at intake and during medical/chronic care visits, tablet content, and regular vaccine clinics—that Defendants employ to educate inmates about COVID-19 and offer vaccinations and boosters.  At most, Plaintiffs arguments amount to criticisms that Defendants have not perfectly executed all their COVID-19 protection policies, but this is not enough to create a genuine issue of material fact that anyone made a conscious decision amounting to deliberate indifference to the risk to MCSO inmates of not being vaccinated.  *Fraihat v. U.S. Immigr. & Customs Enf't*, 16 F.4th 613, 647 (9th Cir. 2021) ("There is considerable distance between imperfect implementation of a policy, or even knowledge of the imperfect implementation of a policy, and deliberate indifference in the constitutional sense.")

### ii.	Combined Cohorts and Quarantined Units

Following the CDC's March 2020 Guidance, MCSO/CHS began cohorting new intakes separately from the general population for 14 days (later 10 days in accordance with the CDC's updated February 2022 Guidance) to prevent new intakes from potentially

introducing COVID-19 into the general population.  Per the CDC's May 3, 2022 Guidance, MCSO/CHS now plan to deploy universal testing instead of intake cohorts and to move new intakes who refuse a test into medical observation for 10 days.  (DSOF ¶ 134.)  In addition to its intake measures, MCSO/CHS places housing units on quarantine status for 10 days whenever an inmate in that unit develops COVID-19 symptoms or tests positive for COVID-19, placing those inmates on Movement Restriction, which limits their movements outside the quarantined housing unit to emergencies, court dates and other essential services, and releases from custody.  (PSOF ¶¶ 16, 17.)

Plaintiffs do not dispute these facts or argue that these protections are objectively unreasonable to mitigate the spread of COVID-19 in MCSO jails.  Instead, Plaintiffs take issue with Defendants' practice of combining partially filled cohorts or quarantined housing units with different release dates to make space for new cohorts, which Plaintiffs argue is a "frequent" practice.  (Doc. 287 at 16; Doc. 330 at 16.)  Plaintiffs also take issue with MCSO/CHS' plan to discontinue intake cohorts in favor of universal testing. (Doc. 330 at 19−22.)

Plaintiffs fail to create a triable issue of fact that MCSO/CHS' decisions regarding intake cohorts, quarantine units, or universal testing are objectively unreasonable. Regarding cohorts/quarantines, it is undisputed the average length of stay for MCSO detainees is less than 30 days, meaning it is likely some inmates may be released from custody even before they complete a 10-day intake cohort.  Likewise, those who stay incarcerated through the initial 10 days and are introduced into the general population will be released, on average, within the next 20 days.  Under these facts, it is objectively reasonable for MCSO to combine the resulting partially filled cohort housing units or partially filled quarantined housing units with other partially filled units with the same or similar cohort/quarantine release dates whenever it needs to do so to make room to create new cohorts.  The practice of following the earliest cohort/quarantine release date, which may result in some cohorted/quarantined inmates being released into the general population or taken off Movement Restriction sooner than the 10-day cohort/quarantine periods is also

objectively reasonable where the inmates are still tested two times: once during the cohort/quarantine period, and once at the end, with protocols in place to respond to any positive tests. Early in the pandemic, MCSO also worked with the Maricopa County Attorney's Office to reduce the number of new bookings to lessen the introduction of new detainees into its jails and lessen the density of the overall jail populations. (DSOF ¶¶ 14−15.) Other than to argue that Defendants' cohort/quarantine policies do not strictly adhere to their own SOP or CDC Guidance, Plaintiffs have not offered any reasonably available alternatives of which a reasonable jail administrator would have known that Defendants failed to take, and they have not shown that the above policies and practices are objectively deliberately indifferent to inmate health and safety.

Plaintiffs have also not created a triable issue of fact that MCSO/CHS' plans to begin using universal testing at intake to replace intake cohorts, which the CDC's May 3, 2022 Guidance recognizes as an alternative to "observation periods" (DSOF ¶ 134), is objectively deliberately indifferent, particularly given the space issues already discussed. Plaintiffs' arguments consist of pointing out that the CDC continues to recommend routine observation periods as enhanced protection strategies when certain community and facility factors are met for, which Plaintiffs argue are met in this case.[23]

The CDC's May 3, 2022 Guidance provides "Strategies for Everyday Operations," and "Enhanced COVID-19 Prevention Strategies," and explains that correctional facilities should keep strategies for everyday operations in place at all times and should add enhanced COVID-19 prevention strategies "when the COVID-19 Community Level is medium or high, or when facility-level factors indicate increased risk." (Doc. 292-3 at

---

[23] Even though their PSOF and PSOCF post-date the CDC's May 3, 2022 Guidance (the PSCOF by more than three months), Plaintiffs did not include this evidence in their facts or cite to their factual assertions in their Response, as required under the Federal and Local Rules. *See* Fed. R. Civ. P. 56(c); LRCiv 56.1(e). Plaintiffs cite only to "Ex. 6," which the Court was unable to locate. Because Defendants placed the CDC's May 3, 2022 Guidance in the record, the Court was able to locate this evidence. Counsel for Plaintiffs are reminded, however, of their obligations to comply with the Federal and Local Rules. *See* LRCiv 83.1(f)(1)(A) (after notice and reasonable opportunity to be heard, the Court may impose sanctions upon the party, attorney, or law firm who without just cause fails to conform to the Federal Rules of Civil Procedure or Local Rules of Practice for the District or any order of the Court).

5−6.)  Facility-level factors include (1) vaccination coverage, (2) transmission within the facility, (3) staff/detainee risks of severe health outcomes, and (4) facility structural and operational characteristics.  (*Id.* at 4−5.)  For everyday operations, the Guidance recommends testing all residents at intake or a "routine observation period," and for enhanced prevention strategies, it recommends "routine observation periods during transfer/release protocols." (*Id.* at 6.)  The Guidance does not recommend continuation of intake cohorts where routine testing at intake is implemented, either as an everyday or an enhanced prevention strategy, as Plaintiffs assert.  (*See* Doc. 330 at 20.)  Moreover, the Guidance states that it is "intended to provide guiding principles," that it "describes as a flexible, long-term approach to COVID-19 in correctional and detention facilities," and that it "may need to be adapted based on an individual facility's physical space, staffing population, operations, history of [COVID-19] outbreaks, community factors, and other resources and conditions." (Doc. 292-3 at 3, 4.)  Plaintiffs have failed to create a triable issue of fact that Defendants' plan to implement universal testing at intake in place of intake cohorts is either contrary to CDC guidance, which expressly allows for flexibility, or that it is objectively deliberately indifferent to the health and safety of MCSO inmates.

### iii.    Therapeutic Medications

Plaintiffs lastly argue that Defendants practices regarding prescribing antivirals are objectively unreasonable based on evidence that such medications can significantly decrease the severity of COVID-19 infections.  (Doc. 330 at 25−27.)  Plaintiffs' entire argument boils down to pointing out that, "as of June 2022, CHS has only administered therapeutic treatment to five patients in its custody," and that this is "extremely low relative to the nearly three thousand cases [of COVID-19] in the jail this year." (*Id.* at 27.)  These arguments fail for several reasons.

First, in their PSOCF, Plaintiffs do not materially dispute that CHS applied for allocations of both Paxlovid and Molnupiravir for all MCSO clinics and received initial orders of Molnupiravir in February 2022 and Paxlovid in April 2022, with the ability to replenish its stock at any time.  (DSOF ¶ 226; PSOF ¶ 226.)  They also fail to support their

claim that 3,000 MCSO inmates tested positive for COVID-19 in the first half of 2022, making the number who received antivirals "extremely low" relative to positive cases. (Doc. 330 at 27.)  And they fail to account for the fact that CHS only began receiving its first supply of antivirals in February 2022.  (*Id.*)  The undisputed evidence shows that, from the beginning of 2022 until June of that year, CHS administered 33,817 tests and retests, with 2,121 positive results, and there were no COVID-19 related hospitalizations or deaths. (DSOF ¶ 263.)  Dr. Crutchfield also testified that, as of June 2022, "there have not been many MCSO inmates who were determined by a treating provider to be a suitable candidate for antiviral therapy and who have accepted the offered antiviral therapy."  (*Id.* ¶ 230; Doc. 292-2, Ex. 3, Crutchfield Decl. ¶ 85.)  This fact is consistent with Defendants' materially undisputed facts that most inmates who tested positive since CHS began stocking antivirals were generally young, had no comorbidities, and were either asymptomatic or were only experiencing mild symptoms.  (*Id.* ¶ 229; Crutchfield Decl. ¶¶ 83.)  These facts also track with data that the current Omicron variant "is more transmissible, but is not as virulent, as other variants."  (DSOF ¶ 230; Crutchfield Decl. ¶ 84.)  Considering these facts, the mere fact that CHS only prescribed antivirals to 7 COVID-19 positive patients by June 2022 is not enough to create a genuine issue of material fact that CHS made a conscious choice to withhold antivirals from patients for whom such treatments were clinically indicated or that its policies regarding antiviral treatments are otherwise objectively deliberately indifferent to a substantial risk of serious harm to MCSO inmates.

Because Plaintiffs have not raised genuine issues of material fact that any of MCSO/CHS' COVID-19 protection policies are objectively unreasonable, and they therefore cannot show a Fourteenth Amendment violation, they also cannot show an Eighth Amendment violation.  Absent a constitutional violation, Plaintiffs' *Monell* claims against the County and Sheriff Penzone in his official capacity fail as a matter of law, and the Court will deny Plaintiffs' Motion for Partial Summary Judgment and grant Defendants' Motion for Summary Judgment on these claims.

### F.    ADA/RA Claims

In Counts Six and Seven, Plaintiffs assert claims under Title II of the ADA and Section 504 of the RA on behalf of the Pretrial and Post-Conviction Disability subclasses and Puente.

Plaintiffs allege that Disability Subclass members are protected people with disabilities under the ADA and RA and that Defendants have failed to make the reasonable modifications necessary to provide Disability Subclass members an equal opportunity to benefit from the jail's services, programs, or activities, including medical care, meals, and rehabilitative programming, which puts the subclass members at high risk of severe infection or death from COVID-19.  (Doc. 1 ¶¶ 200, 203.)  Plaintiffs allege that the only reasonable modification in light of the unprecedented risks of COVID-19 is removal from the jail, whether through release or enlargement, but short of that, they seek modifications in the jails, such as separate living spaces instead of dorms/high-capacity shared rooms, universal testing and screening for COVID-19, adequate cleaning supplies and frequent cleaning, personal protective equipment, and staggered access to bathrooms, meals, and other shared resources.  (Id. ¶ 206.)  Plaintiffs allege that the primary purpose of the jails is to provide required safety and health services while ensuring pre-trial detainees' appearances at trial or post-trial proceedings or to detain convicted prisoners serving a criminal sentence for the duration of their sentence.  (Id. ¶ 207.)  And they allege that an inmate who is sickened, unconscious, or killed by COVD-19 will not be able to make court appearances or complete their sentence.  (Id.)  Plaintiffs allege that by "setting up a system where mass infection and resulting harm and death will disproportionately fall on people with disabilities, Defendants have failed to establish methods of administration that do not discriminate against people with disabilities."  (Id. ¶ 207)

Under Title II of the ADA, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.  A "public entity" is "any State or local government; [or]

(B) any department, agency, special purpose district, or other instrumentality of a State or States or local government . . . ."  42 U.S.C. § 12131.  The phrase "services, programs, or activities" applies to the prison setting.  *See Penn. Dep't of Corrs.* v. *Yeskey,* 524 U.S. 206, 210 (1998).

To prevail on a Title II ADA claim, a plaintiff must show that he: "(1) he is a 'qualified individual with a disability'; (2) he was either excluded from participation in or denied the benefits of the public entity's services, programs or activities, or was otherwise discriminated against by the public entity; and (3) such exclusion, denial of benefits, or discrimination was by reason of his disability."  *Updike v. Multnomah Cnty.*, 870 F.3d 939, 949 (9th Cir. 2017).  The term "qualified individual with a disability" includes "an individual with a disability who, with or without . . . the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or participation in programs or activities provided by a public entity."  42 U.S.C. § 12131(2).  The plaintiff in a Title II case bears the initial burden "of producing evidence that a reasonable accommodation was possible."  *Vinson v. Thomas*, 288 F.3d 1145, 1154 (9th Cir. 2002).  The burden then shifts to the public entity to show "that the requested accommodation was not reasonable."  *Id.*  "A public entity may defeat a reasonable accommodation claim by showing that making the modifications would fundamentally alter the nature of the service, program, or activity."  *Sheehan v. City and Cnty. of San Francisco*, 743 F.3d 1211, 1233 (9th Cir. 2014), *rev'd in part on other grounds, cert. dismissed in part sub nom. City & Cnty. of San Francisco, Calif. v. Sheehan*, 575 U.S. 600 (2015).

The RA "is materially identical to and the model for ADA, except that it is limited to programs that receive federal financial assistance."  *Armstrong v. Davis*, 275 F.3d 849, 862 n.17 (9th Cir. 2001) (internal quotation omitted), *abrogated on other grounds by Johnson v. California*, 543 U.S. 499 (2005).  Because the ADA has a broader scope, the Ninth Circuit analyzes claims under both Acts under an ADA standard.  *See Armstrong*, 275 F.3d at 862; *Zuckle v. Regents of the University of California*, 166 F.3d 1041, 1045

1    n.11 (9th Cir. 1999) ("There is no significant difference in analysis of the rights and

2    obligations created by the ADA and the Rehabilitation Act.  Thus, courts have applied the

3    same analysis to claims brought under both statutes.") (internal citations omitted).

4         Defendants argue that Plaintiffs cannot establish they were deprived of any MCSO

5    programs, services, or activities, or discriminated against solely by reason of their alleged

6    disabilities, and Plaintiffs have not identified what barriers they faced because of their

7    disabilities.  (Doc. 294 at 33-34.)  They contend that Plaintiffs have provided no evidence

8    they were denied court appearances or the ability to complete their detention or sentences

9    solely because of their disability; nor have they identified any barriers they faced in MCSO

10   custody because of their disability.  (*Id.*)  Defendants further argue as to Plaintiffs' requests

11   for release that Plaintiffs cannot show discrimination in MCSO's provision of services

12   because removal from jail is not a service MCSO can provide to any inmate.  (*Id.* at 34.)

13        Plaintiffs respond that they have demonstrated they were denied access to court

14   proceedings because of the jail's policies.  (Doc. 329 at 29 n.17, citing "Watson Decl. at

15   ¶6; Virgien Decl., Ex. 12 at MCSO-FENTY017456.)[24]  Inmate Watson testified that he has

16   high blood pressure and fears contracting COVID, which may cause him to miss a court

17   date and result in a longer stay in jail.  (Doc. 320 at 1 ¶ 4.)

18        Plaintiffs further assert, without citing to evidence, that Defendants have entirely

19   stopped quarantining people on intake and have repeatedly failed to follow their own

20   policies of conducting quarantines based on exposure, which disproportionately impacts

21   medically vulnerable people with disabilities in the Disability Subclasses.[25]  Watson, who

22   _____

23        [24] As previously noted, Plaintiffs have filed multiple declarations with exhibits by
     attorney Kyle Virgien, which they cite only as "Virgien Decl.," forcing the Court to scour
24   the docket to locate the possible exhibit Plaintiffs reference.  Here, the Court was unable
     to locate the Watson declaration, as cited, but was able to locate a Watson declaration,
25   which was filed separately at Doc. 302.

26        [25] Plaintiffs claim they have detailed in their Response and in their responses to the
     DSOCF the reasonable modifications Defendants could make to accommodate the risks to
27   subclass members with disabilities, but Plaintiffs do not cite which paragraphs in their
     response to the DSOF include this information.  The DSOF consists of 337 paragraphs,
     and the Court would have to review all paragraphs to try to determine which paragraphs
28   Plaintiffs may mean.  In summary judgment briefing, "[g]eneral references without page
     or line numbers are not sufficiently specific."  *S. Cal. Gas Co. v. City of Santa Ana*, 336

has high blood pressure, claims to fear contracting COVID "because of Defendants' failure to provide basic COVID protections," so he stays in his cell as often as he can and skips recreation, use of the dayroom, and use of the tablets for programming. (*Id.* at 30, citing Watson Decl. ¶ 4.) Plaintiffs argue, again without citing evidence, that there are multiple reasonable modifications Defendants could make to accommodate the risks to Subclass members with disabilities such as "robust offers and access to COVID-19 vaccines; robust and medically accurate patient education materials geared towards persons with disabilities about the benefits of vaccines; more widespread availability of COVID-19 therapeutics (such as Paxlovid); and following CDC guidance for intake and quarantine policies." (*Id.* at 30.)

Plaintiffs' ADA/RA claims fail because Plaintiffs have, as an initial matter, not cited any evidence demonstrating that any member(s) of the Disability Subclasses suffer from a qualifying disability under the ADA or RA. Plaintiffs state in conclusory terms that inmate Watson's high blood pressure "is a relevant disability," but they present no evidence or argument demonstrating that Watson's high blood pressure is a qualifying disability under the ADA or RA. *See, e.g., Murphy v. United Parcel Serv., Inc.*, 517 U.S. 516 (1999) (holding that employee was not disabled under the ADA due to high blood pressure because his high blood pressure did not substantially limit him in any major life activity and was controlled with medication).

But even if Plaintiffs could show that some members of the Disability Subclasses have qualifying disabilities, they have not shown or created a triable issue of fact that any of them were excluded from participation in or denied the benefits of the jails' services, programs, or activities because of their disabilities. The only evidence Plaintiffs cite is Inmate Watson's testimony that he fears that if he contracts COVID-19 he may miss a court date, and he skips certain activities and stays in his cell "because of Defendants' failure to

---

F.3d 885, 889 (9th Cir. 2003). It is Plaintiff's obligation to oppose Defendants' arguments; it is not this Court's obligation to attempt to ascertain what arguments Plaintiff is trying to make or to attempt to locate within multiple pages of evidence what evidence Plaintiff believes supports his arguments. *See Orr v. Bank of America*, 285 F.3d 764, 775 (9th Cir. 2002) (internal quotation omitted) ("Judges need not paw over the files without assistance from the parties.")

provide basic COVID protections." Watson, though, does not say what "basic COVID protections" are not being provided or what accommodations for his claimed disability would lead him to leave his cell more often, and he does not detail any instances when he did not leave his cell due to Defendants' alleged failures to accommodate his disability. This evidence is too vague and conclusory to create a genuine issue of material fact that Watson or any other member of the Disability Subclasses were discriminated against because of their disabilities.

Finally, although Plaintiffs allege that the only reasonable modification in light of the unprecedented risks of COVID-19 is removal from the jail, whether through release or enlargement, Plaintiffs have not shown that Defendants are capable of providing this accommodation, particularly release from jail. *Vinson*, 288 F.3d at 1154. Because the record fails to show a genuine issue of material fact that members of the Disability Subclasses are entitled to this or any other form of injunctive relief under the ADA/RA, the Court will grant summary judgment to Defendants on Plaintiffs' ADA/ RA claims.

**IT IS ORDERED:**

(1)      The reference to the Magistrate Judge is **withdrawn** as to Defendants' *Daubert* Motion to Exclude the Testimony of Homer Venters (Doc. 285); Plaintiffs' Motion for Partial Summary Judgment (Doc. 287), Defendants' Motion for Summary Judgment (Doc. 294), and Plaintiffs' Motion to Exclude the Findings and Opinions of Defendants' Expert Dr. Owen J. Murray (Doc. 296).

(2)      The Motions to Exclude (Docs. 285, 296) and Plaintiffs' Motion for Partial Summary Judgment (Doc. 287) are **denied**.

(3)      Defendants' Motion for Summary Judgment (Doc. 294) is **granted**, and the action is **terminated** with prejudice. The Clerk of Court must enter judgment accordingly.

Dated this 30th day of March, 2023.

Honorable Steven P. Logan
United States District Judge